# Exhibit 4

# BUSINESS LOAN AGREEMENT

| BORROWER: | Vivato Networks, Inc.<br>322 NW Sixth Ave Suite 100<br>Portland OR 97209 | LENDER: | Aequitas Capital Management, Inc.<br>5300 Meadows Road, Suite 400<br>Lake Oswego, OR  97035<br>Telephone: (503) 419-3500 |
|---|---|---|---|

1. THIS BUSINESS LOAN AGREEMENT ("Agreement") dated effective November 30, 2007, is made and executed between Vivato Networks, Inc., a Delaware corporation (Delaware Reg. No. 4413500, formerly an Oregon corporation, Oregon Reg. No. 366329-90) ("Borrower"), and Aequitas Capital Management, Inc., an Oregon corporation (Oregon Reg. No. 369086-89) ("Lender"), on the following terms and conditions. Borrower has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loans" and each a "Loan"), in the maximum principal amount of $1,000,000. Borrower understands and agrees that: (a) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (b) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (c) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

2. TERMS. This Agreement shall be effective as of the date of this Agreement, and shall continue in full force and effect until such time as all Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, reasonable attorneys' fees and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement. Borrower shall execute a Promissory Note in the maximum principal amount of $1,000,000 (the "Note"). The Note shall provide for advances and repayments on the Note pursuant to the terms and conditions of this Agreement. The initial Advance (as provided in Section 3 below) to Borrower shall be for $300,000. Subsequent Advances shall be for at least $150,000 and shall be made within 5 days after written request from Borrower and satisfaction of the conditions provided in Section 4.e) below. Contemporaneously with the execution of this Agreement, Borrower shall execute a Security Agreement in favor of Lender wherein, in order to secure the Note in part, Borrower shall grant to Lender a Security Interest in the collateral described therein which consists, among other things, of (i) a first priority lien in all of its assets, including the patents and patent applications listed on Schedule 1 to the Commercial Security Agreement entered into in connection with this Agreement, and (ii) a pledge of the Common Stock of Borrower held by Allan Rakos and Gary Haycox, pursuant to the terms of a Pledge Agreement provide by Lender, and (iii) a pledge of the promissory note evidencing any loan of the proceeds of the Loan by Borrower to Catcher Holdings, Inc. (the "Parent Loan Document"), if applicable. The principal terms of the Loan to be reflected in the Note are as follows:

   a) **Interest.** Interest shall accrue on the unpaid balance of the Loan at the rate of 20% per annum calculated on the basis of a 365-day or 366-day year, as applicable, and actual days elapsed, payable monthly in arrears to Lender (the "Current Interest").

   b) **Payments.** Borrower will make monthly interest-only payments on the outstanding balance of the Loan commencing one month after the effective date of this Agreement/date of the Note and continuing on the same day of each month thereafter. At Lender's option, such payments shall be made to Lender via an Automated Clearing House ("ACH") transfer from Borrower's checking account.

   c) **Maturity.** The outstanding principal balance and all accrued and unpaid interest shall be due and payable on or before January 30, 2008; provided, however, that after the occurrence of an Event of Default, the outstanding principal and all accrued interest shall be payable on demand. In addition, the outstanding principal balance and all accrued and unpaid interest shall be due and payable in the event of (1) a sale of all or substantially all of the assets of Borrower, or (2) the transfer of ownership or beneficial interest, by merger or otherwise, of 25% or more of the stock or membership interests of Borrower, other than the merger of Borrower into Huckleberry Acquisition Corporation (the "Merger") pursuant to the terms of that certain Agreement and Plan of Merger, dated as of September 24, 2007 (as amended, the "Merger Agreement"), by and among the Catcher Holdings, Inc. ("Parent"), Borrower, and Huckleberry Acquisition Corporation, a wholly-owned subsidiary of Parent.

   d) **Late Charge.** If a payment is 15 days or more late, Borrower will pay to Lender a late charge equal to the lesser of 5.0% of the regularly scheduled payment or the maximum amount permitted under applicable law.

   e) **Interest After Default.** Upon and during the continuation of an Event of Default, including failure to pay all amounts due upon final maturity of the Loan and Note, Lender may, at its option and if permitted by applicable law, increase the interest rate of the Note by 5.00 percentage points (500 basis points). The interest rate will not exceed the maximum rate permitted by law.

Page 1 of 12 - BUSINESS LOAN AGREEMENT

Exhibit 1
Page 1 of 12

ARUBA_0034568


Exhibit # Haycox 3
07/06/22 - MC

XR-EDTX1-00052610

Case 2:23-cv-00202-JRG-RSP    Document 170-5    Filed 06/04/25    Page 3 of 13 PageID
Case 3:08-cv-00750-AC    Document 18    Filed 09/19/08    Page 15 of 89
#: 7919

f) **Prepayment.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the Loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. All or any portion of the Loan may be prepaid at any time following notice to Lender of not less than 5 business days. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule; early payments will reduce the outstanding principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such payment, Lender may accept it without losing any of Lender's rights under the Loan, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of any disputed amount must be mailed or delivered to Lender at the address above.

3. **FUNDING.** Upon the initial satisfaction of conditions provided in Section 4 below, Lender shall make an initial Advance of $70,000 and an additional Advance of $230,000 within three (3) business days thereafter. Further Advances shall be made as provided in Section 4, including the Advance-specific conditions of Section 4.e) below.

4. **CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligations to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents, specifically including:

   a) **Loan Documents.** Borrower shall execute and deliver or otherwise provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) pledge agreements from Allan Rakos and Gary Haycox covering their 60% of the outstanding stock of the Borrower prior to the Merger; (6) a pledge agreement from Parent with regard to 100% of the capital stock of Borrower, effective as of the completion of the Merger; and (7) all such additional Related Documents as Lender may require for the Loan. All such documents shall be in form and substance satisfactory to Lender and Lender's counsel.

   b) **Authorizations.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel may require.

   c) **Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges and other expenses which are incurred by Lender in connection with the Loan, or as specified in this Agreement or any Related Document, including without limitation reasonable attorney fees (including fees of in-house counsel), collateral appraisal costs, travel costs, lien search fees and filing fees, together with a fully-earned, non-refundable loan fee for this credit facility in the sum of $10,000. Lender acknowledges prior receipt of the sum of $10,000 to be applied in payment of these fees and expenses. Lender may elect to withhold such fees and reimbursable expenses from any Advance. If any such fees or expenses have not been finally determined at the time of an Advance, Lender may withhold an estimated amount from the Advance with reconciliation to occur when the actual amounts have been finally determined. If any amount withheld is insufficient to pay such fees or expenses, Borrower shall promptly reimburse Lender upon request or invoice for the same.

   d) **Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

   e) **Specific Conditions.** After the first Advance of $300,000, the following conditions shall apply:

      i. The Merger (as defined in Section 2.c) above) shall have taken place.

      ii. For an additional Advance of $150,000 on or after December 15, 2007, Parent shall have entered into a formal mandate with an investment banking firm, which firm is reasonably acceptable to Lender, for a preferred stock offering of at least $5,000,000 (the "Parent Preferred Offering") and the Parent shall have arranged sufficient financing, to the sole satisfaction of Lender, to repay any notes due under the Parent's Note and Restricted Stock Purchase Agreement that mature on or before January 30, 2008 unless such note holders have delivered irrevocable written notice under the Note and Restricted Stock Purchase to convert such notes to stock of Parent.

      iii. For an additional Advance of $300,000 on or after January 3, 2008, Parent shall have caused the preparation of a formal offering memorandum for the Parent Preferred Offering and have made significant progress, in the sole opinion of Lender, towards completing and funding the Parent Preferred Offering by January 31, 2008.

  iv. For a final Advance of $250,000, Lender shall, at its sole discretion of Lender based on the operating needs and the performance of Parent and Borrower, have determined that such Advance is advisable.

f) **No Event of Default.** There shall not exist at the time of any Advance a condition which, with the passage of time or otherwise, would constitute an Event of Default under this Agreement or under any Related Document.

g) **Consents; Intercreditor Agreements.** Borrower shall have obtained any necessary consents and approvals from other lenders or third parties in order to consummate the transactions contemplated by this Agreement or any Related Document. If deemed appropriate by Lender, an intercreditor agreement and lien releases satisfactory to Lender shall have been executed by other lenders to ensure the priority of Lender's Security Interests.

h) **Key Man Life Insurance.** Lender shall have been designated as the assignee/beneficiary (as its interest may appear) of key man life insurance as described in Section 6.g) below.

i) **Pledge of Parent Loan Document.** Borrower shall have delivered the originals of the Parent Loan Document in order to perfect the grant of the security interest of Lender therein.

j) **Employment Agreements.** Borrower shall have entered into employment agreements with key management employees designated by Lender on terms satisfactory to Lender no later than December 15, 2007.

k) **Advisory Services Agreement.** An advisory services agreement shall be in effect between Borrower and Aequitas Capital Management, Inc. (the "Advisory Services Agreement"), and Borrower shall not be in default of its obligations under such agreement.

5. **REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of Loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

a) **Organization.** Borrower is, and at all times shall be, duly organized, validly existing and in good standing under and by virtue of the laws of the state of its incorporation or formation. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and all times shall be, duly qualified to do business in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains its principal office at the address set forth on the first page of this Agreement, and any other office or warehouse locations are listed in the **Disclosure Schedule** attached to this Agreement. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender at least thirty (30) days prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

b) **Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, a complete list of all assumed business names under which Borrower does business is listed in the attached **Disclosure Schedule**.

c) **Authorization.** Borrower's execution, delivery and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of Borrower's articles of organization, operating agreement, articles of incorporation, bylaws, other organizational documents or agreements or instruments binding upon Borrower or (2) any law, governmental regulation, court decree or order applicable to Borrower or to Borrower's properties.

d) **Capitalization.** The authorized capital stock of Borrower consists of 20,000,000 shares of common stock and, as of the date hereof, 3,500,000 shares are issued and outstanding ("Borrower's Stock"). There are no outstanding subscriptions, options, warrants, preemptive or other preferential rights, or other arrangements under which the Borrower is or may be obligated to issue any securities. Allan Rakos owns 20.68 % of Borrower's Stock, consisting of 723,799.79 common shares, Gary Haycox owns 42.43 % of Borrower's Stock, consisting of 1,485,049.60 common shares, and other shareholders own the remaining 36.89 % of Borrower's Stock. No other capital stock of Borrower is authorized or issued and there are no outstanding warrants, options or other rights to acquire stock of Borrower.

e) **Financial Information.** Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in

Page 3 of 12 – BUSINESS LOAN AGREEMENT

Exhibit 1
Page 3 of 12

ARUBA_0034570

XR-EDTX1-00052612

Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

f) **Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable and liens listed in the attached **Disclosure Schedule**, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years, except as disclosed in the attached **Disclosure Schedule**.

g) **Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of Borrower's Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral, except to the extent any such activity is permitted under applicable Environmental Laws and conducted in compliance with all applicable federal, state and local laws, regulations and ordinances including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon any area in which the Collateral is stored in order to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance in, on or related to the Collateral, or as a result of a violation of any Environmental Laws. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

h) **Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or, to the knowledge of Borrower, threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims or other events, if any, that have been disclosed to Lender in the **Disclosure Schedule**.

i) **Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

j) **Lien Priority.** Except as disclosed to Lender in the **Disclosure Schedule**, Borrower has not entered into or granted any security agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

k) **Merger Agreement.** Notwithstanding anything to the contrary herein, Lender acknowledges and approves the merger of Borrower into Huckleberry Acquisition Corporation (the "Merger") pursuant to the terms of that certain Agreement and Plan of Merger, dated as of September 24, 2007, as amended (the "Merger Agreement"), by and among the Catcher Holdings, Inc. ("Parent"), Borrower, and Huckleberry Acquisition Corporation, a wholly-owned subsidiary of Parent, including but not limited to the transfer of the Intellectual Property of Borrower as referenced in the Merger Agreement (terms defined above), subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of the Security Agreement entered into in connection with this Agreement.

l) **Binding Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally.

ARUBA_0034571

XR-EDTX1-00052613

6.  **AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

   a) **Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower which could materially affect the financial condition of Borrower.

   b) **Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

   c) **Financial Statements.** Furnish Lender with the following:

   i. **Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each fiscal year, Borrower's balance sheet and income statements for the year ended, audited/reviewed/compiled by a certified public accountant satisfactory to Lender provided, however, that following the Merger, the Borrower shall instead deliver the Annual Report on Form 10-KSB of Catcher Holdings, Inc. as filed with the Securities and Exchange Commission, within two (2) days of such filing.

   ii. **Interim Statements.** As soon as available, but in no event later than forty-five (45) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender; provided, however, that following the Merger, the Borrower shall instead deliver the Quarterly Report on Form 10-QSB of Catcher Holdings, Inc. as filed with the Securities and Exchange Commission, within two (2) days of such filing.

   iii. **Additional Requirements.** Copies of tax returns within fifteen (15) days of filing.

   d) **GAAP.** Prepare all financial reports required to be provided under this Agreement according to GAAP and certify the same as being true and correct.

   e) **Additional Information.** Furnish such additional information and statements, including confirmation of paid obligations (e.g., tax obligations), as Lender may request from time to time.

   f) **Insurance.** Maintain fire and other risk insurance, public liability insurance and such other insurance as Lender may require with respect to Borrower's properties and operations, including insurance covering all inventory and Collateral covered by any Security Agreement from Borrower in favor of Lender, in such form, amounts, coverages and with insurance companies acceptable to Lender, no later than December 7, 2007. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a Security Interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

   g) **Key Man Life Insurance.** Obtain, by December 30, 2007, and maintain at all times while the Loan is outstanding a life insurance policy or policies on the lives of Allan Rakos and Gary Haycox, or other key management employees designated by Lender, each with a death benefit sufficient to satisfy the Loan obligations in full.

   h) **Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

   i) **Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations or such purpose(s) as may be specifically set forth in this Agreement, unless specifically consented to the contrary by Lender in writing.

   j) **Employment Agreements.** Enter into employment agreements with employees of Borrower designated by Lender on terms satisfactory to Lender by December 15, 2007.

   k) **Corporate Governance.** (1) Convene meetings of Borrower's Board of Directors not less than once each calendar quarter, (2) allow Lender's designated representative(s) to have observation rights with respect to meetings of the Board of Directors (in person or by telephone), (3) send notice to Lender of the time and place of any meetings of the Board of Directors in the same manner and at the same time as notice is sent to members of the Board of Directors, (4) upon request of Lender, cause Borrower's shareholders to promptly elect to the Board of Directors up to 2 persons designated by Lender, and (5) pay the reasonable out-of-pocket costs and expenses incurred by Lender's designated observers or directors (not exceeding 2 persons) in connection with attending regular and

special meetings of the Board of Directors or any committee thereof, together with (in the case of directors only) any additional compensation payable to directors pursuant to policies adopted by Borrower or its Board of Directors.

l) **Advisory Engagement.** Continue to utilize the advisory services of Aequitas Capital Management, Inc. pursuant to the terms of the Advisory Service Agreement, as the same may be modified by mutual agreement of the parties thereto.

m) **Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income or profits.

n) **Performance.** Perform and comply in a timely manner with all terms, conditions and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

o) **Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; and conduct its business affairs in a reasonable and prudent manner.

p) **Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance, defined as toxic or a hazardous substance under applicable federal, state or local law, rule, regulations, order or directive, on or affecting any property or any facility owned, leased or used by Borrower.

q) **Compliance with Governmental Requirements.** Comply with all laws, ordinances and regulations, now or hereafter in effect, of all governmental authorities, applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

r) **Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts and records and to make copies and memoranda of Borrower's books, accounts and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense. Any expense incident to the exercise by Lender of any right under this section for one annual inspection or audit and any inspections or audits following the occurrence of an uncured Event of Default shall be borne by Borrower, otherwise such expense shall be borne by Lender.

s) **Environmental Compliance and Reports.** Comply in all respects with any and all Environmental Laws and furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

t) **Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, landlord waivers, instruments, documents and other agreements as Lender or its counsel may reasonably request to evidence and secure the Loans and to perfect all Security Interests. Borrower shall promptly reimburse Lender upon request or invoice for all fees, charges and other expenses which are subsequently incurred by Lender in connection with the Loan, including without limitation reasonable attorney fees (including fees of in-house counsel), collateral appraisal and inspection costs, travel costs, lien search fees and filing fees.

7. **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring,

Page 6 of 12 - BUSINESS LOAN AGREEMENT

Exhibit 1
Page 6 of 12

ARUBA_0034573

XR-EDTX1-00052615

maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the day of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (a) be payable on demand; or (b) be treated as a balloon payment which will be due and payable at the Note's maturity.

8.  **NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

    a)  **Liens.** (1) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (2) sell any of Borrower's accounts, except to Lender and except as contemplated by the Merger.

    b)  **Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, amend its organizational documents (including a change of its name) or dissolve, except as contemplated by the Merger, (3) transfer or sell Collateral, except for sales of inventory in the ordinary course of business, and except as contemplated by the Merger, including but not limited to the transfer of the Intellectual Property to Vivato Networks Holdings, Inc., subject, however, to the first priority lien of Lender in such Intellectual Property pursuant to the terms of the Security Agreement entered into in connection with this Agreement, (4) make any distribution to shareholders or members or with respect to any capital account, whether by reduction of capital or otherwise, except a distribution to pay taxes attributable to pass-through taxable income from Borrower, (5) redeem or repurchase any of Borrower's outstanding capital stock or membership interests or any option to acquire Borrower's capital stock or membership interests, or (6) issue any additional capital stock or membership interest or any option to acquire capital stock or membership interests, except as contemplated by the Merger.

    c)  **Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligations as surety or guarantor other than in the ordinary course of business.

9.  **CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (a) an Event of Default occurs and is continuing under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower has with Lender; (b) Borrower files a petition in bankruptcy or similar proceedings, or is adjudged as bankrupt; (c) there occurs a material adverse change in Borrower's financial condition or in the value of any Collateral securing any Loan; or (d) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

10. **DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement.

    a)  **Payment Default.** Borrower fails to make any payment within five (5) calendar days when due under the Note.

    b)  **Other Defaults.** Borrower or any Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in the Note or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender (or an affiliate of Lender) and Borrower. If any failure, other than a failure to pay money, is curable and if Borrower or a Grantor, as the case may be, has not been given a notice of a similar breach within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or a Grantor, as the case may be, after delivery of written notice from Lender demanding cure of such failure: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than 15 days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance within sixty (60) days after notice is sent.

    c)  **Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit or security agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Note or perform Borrower's obligations under the Note or any of the Related Documents.

    d)  **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement, the Note or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading in any material respect at any time thereafter.

    e)  **Bankruptcy.** The dissolution of Borrower (regardless of whether election to continue is made), or any other termination of Borrower's existence as a going business, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

ARUBA_0034574

XR-EDTX1-00052616

f) **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.

g) **Adverse Change.** A material adverse change occurs in Borrower's financial condition.

11. **EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur and be continuing, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Bankruptcy" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform any obligation of Borrower or of any Grantor shall not affect Lender's right to declare an Event of Default and to exercise its rights and remedies.

12. **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

a) **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

b) **Loan Expenses.** From time to time following the initial Advance, Borrower will pay all reasonable expenses of Lender on demand (including, without limitation, search costs, audit fees, appraisal fees and the fees and expenses of outside and in-house legal counsel for Lender) relating to this Agreement, and all Related Documents, including, without limitation, expenses incurred in the analysis, negotiation, preparation, closing, administration and enforcement of this Agreement and the Related Documents, the enforcement, protection and defense of the rights of Lender in and to the Loans and Collateral or otherwise hereunder, and any reasonable expenses relating to extensions, amendments, waivers or consents pursuant to the provisions hereof, or any Related Documents or relating to agreements with other creditors, or termination of this Agreement (collectively, the "Expenses").

c) **Legal and Collection Expenses.** Lender may hire or pay someone else to help collect the Indebtedness if Borrower does not pay. Borrower will pay Lender that amount in addition to the Expenses. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and legal expenses, whether or not there is a lawsuit, including without limitation attorneys' fees and expenses incurred by Lender at trial, on appeal, and in any arbitration or bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction). If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

d) **Marketing Authorization.** Borrower agrees that Lender or its affiliates may use Borrower's name and logo, and general information concerning Borrower's relationship with Lender and its affiliates, on the website and in firm brochures maintained and created by Lender or its affiliates (typically in a form commonly known as "tombstones"), in press releases, advertisements, and in other related marketing materials. This authorization will extend to reissues of the advertisements and other marketing tools which Lender or its affiliates may utilize in marketing activities. Borrower may notify Lender in writing at any time to stop further use of references to Borrower in marketing materials.

e) **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

f) **Assignments.** Borrower acknowledges that Lender may (i) sell and assign its interest in this Agreement, the Note, the payments due thereunder and the Related Documents, in whole or in part, or sell participations therein, to an assignee (the "Assignee") which may be represented by a bank or trust company acting as a trustee of such Assignee. BORROWER ACKNOWLEDGES THAT ANY ASSIGNMENT OR TRANSFER BY LENDER OR ANY ASSIGNEE SHALL NOT MATERIALLY CHANGE BORROWER'S OBLIGATIONS UNDER THE ASSIGNED NOTE AND RELATED DOCUMENTS. Any Assignee shall be entitled to enforce all the rights so assigned but be under no obligation to Borrower to perform any of Lender's obligations under the assigned Note and any Related Documents, the sole remedy of Borrower being against Lender with Borrower's right against Lender being unaffected except as provided herein. Borrower agrees that upon notice of assignment of the Note and any Related Documents, it shall pay directly to the Assignee, unconditionally, all amounts which become due thereunder. Borrower specifically covenants and agrees that it will not assert against any Assignee any claims by way of abatement, defense, set-off, counterclaim, recoupment or otherwise which Borrower may have against Lender or any third party, and BORROWER SHALL NOT ASSERT AGAINST SUCH ASSIGNEE IN ANY ACTION FOR NOTE PAYMENTS OR OTHER MONEYS PAYABLE THEREUNDER ANY DEFENSE EXCEPT THE DEFENSE OF PAYMENT TO SUCH

ASSIGNEE. Upon Lender's request, Borrower will acknowledge to any assignee receipt of Lender's notice of assignment.

g) **Governing Law; Choice of Venue.** This Agreement will be governed by, construed and enforced in accordance with the laws of the State of Oregon. This Agreement has been accepted by Lender in the State of Oregon. If there is a lawsuit, Borrower agrees to submit to the jurisdiction of the courts of Multnomah County, Oregon, or the U.S. District Court for the District of Oregon, as applicable.

h) **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

i) **Notices.** Any notice required to be given under the Agreement shall be given in writing, and shall be effective when actually delivered, when deposited with a reputable overnight courier for next business day delivery, or if mailed, when deposited in the United States mail as first class, certified or registered mail with postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving written notice to the other parties, specifying that the purpose of the notice is to change the party's address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

j) **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

k) **Subsidiaries and Affiliates of Borrower.** To the extent the context of any provision of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

l) **Successors and Assigns.** All covenants and agreements contained herein by or on behalf of Borrower shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein without the prior written consent of Lender.

m) **Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

n) **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

o) **Jury Waiver.** ALL PARTIES TO THIS AGREEMENT HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY.

13. **DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this

Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

a) **Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a multiple advance basis under the terms of this Agreement.

b) **Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to the Business Loan Agreement from time to time.

c) **Borrower.** The word "Borrower" means the person named as Borrower on the first page of this Agreement and all other persons and entities signing the Note in whatever capacity.

d) **Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien and title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract or otherwise.

e) **Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1808, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules or regulations adopted pursuant thereto or intended to protect human health or the environment.

f) **Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

g) **GAAP.** The word "GAAP" means United States generally accepted accounting principles, consistently applied.

h) **Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

i) **Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quality, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

j) **Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

k) **Loans.** The word "Loans" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

l) **Note.** The word "Note" means each promissory note executed and delivered by Borrower to Lender, including without limitation, the Promissory Note executed by Borrower in the maximum principal amount of $1,000,000 of even date herewith, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for each note or credit agreement.

m) **Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness"; (5) liens and security interests which, as of the date of this Agreement, have

Page 10 of 12 - BUSINESS LOAN AGREEMENT

Exhibit 1
Page 10 of 12

ARUBA_0034577

XR-EDTX1-00052619

been disclosed to and approved by Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the value of Borrower's assets.

n) Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, stock pledge agreements, mortgages, deeds of trust, security deeds, collateral mortgages, landlord waivers and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loans.

o) Security Agreement. The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract or otherwise, evidencing, governing, representing or creating a Security Interest.

p) Security Interest. The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract or otherwise.

UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY LENDER AFTER OCTOBER 3, 1989 CONCERNING LOANS AND OTHER CREDIT EXTENSIONS MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY LENDER TO BE ENFORCEABLE.

BORROWER ACKNOWLEGES HAVING READ ALL OF THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS.

BORROWER:

VIVATO NETWORKS, INC.

By: _____
Name: GARY HAYCOX
Title: CEO

LENDER:

AEQUITAS CAPITAL MANAGEMENT, INC.

By: _____
Authorized Signature

AUTHORIZED AND APPROVED:

CATCHER HOLDINGS, INC.

By: _____
Name: DENIS McCARTHY
Title: CFO

CATCHER, INC.

By: _____
Name: DENIS McCARTHY
Title: CFO

Page 11 of 12 – BUSINESS LOAN AGREEMENT

Exhibit 1
Page 11 of 12

## DISCLOSURE SCHEDULE TO BUSINESS LOAN AGREEMENT

1. The correct corporate (or other entity) name of Borrower is  Vivato Networks, Inc.

2. Borrower is organized and existing under the laws of the following State:  Delaware

3. Borrower has operated under only the following other names and trade names (if none, so state):
VIVATO NETWORKS, INC., VIVATO NETWORKS, LLC, and WAYOUT WIRELESS, LLC

4. All other addresses at which Borrower does business are listed below, including all warehouse addresses:
Devries Storage, 3808 N. Sullivan Road, Blding #22, Spokane Valley, WA 99216

5. Borrower has deposit accounts and/or investment accounts located only at the following institutions:

| Institution Name | Account Number |
|---|---|
| Bank of Oswego | 13001912 |

6. There is no litigation, claim, investigation, administrative proceeding or similar action pending or threatened against Borrower, except the following (attach additional comments, if needed):  None.

7. Federal Tax ID Number:  20-4522882

8. Organizational Number, if any: DE Reg. No. 4413500 (formerly Oregon Reg. No. 366329-90)

9. There are no security agreements or security interests affecting Borrower's properties except the following:
None, except as express or implied pursuant to the Merger Agreement, including but not limited to a transfer of the Intellectual Property to Vivato Networks Holdings, Inc., subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of the Security Agreement entered into in connection with this Agreement