# Exhibit 23



# Transcript of Daniel Burke

**Date:** July 26, 2022
**Case:** XR Communications, LLC -v- D-Link Systems, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052261

**73**

1  statement of unintentional delay was in a
2  position to have firsthand or direct knowledge of
3  the facts and circumstances of the delay at
4  issue, close quote.
5      You did not have firsthand knowledge of
6  all the facts and circumstances of the delay from
7  2008 until the time you filed your petition to
8  revive, correct?
9      A.  Mr. Haslam, I want to get this over
10 probably as much as anybody, but that alarm is
11 distracting. It's very distracting. And I -- if
12 it just stopped, I will just ask you give me a
13 minute and then ask the question over again.
14     But with you asking the question, you
15 know, with a preface and that thing going off, I
16 couldn't -- I couldn't do us justice here.
17     MR. HASLAM:  Why don't we take a
18 10-minute break and I will see if it goes off?
19     THE VIDEOGRAPHER:  Anything before we go
20 off, Mr. Haslam?
21     MR. HASLAM:  No. I'm going to pray that
22 this thing goes away.
23     MR. WANG:  Let us go off the record,
24 please.
25     THE VIDEOGRAPHER:  Certainly. Off the

**74**

1  record 1:31.
2      (Thereupon, there was a recess taken at
3  1:31 p.m.)
4      (Thereupon, the proceedings were resumed
5  at 2:03 p.m.)
6      THE VIDEOGRAPHER:  On record 2:03.
7  BY MR. HASLAM:
8      Q.  I think when we broke, we were looking
9  at I think Burke Exhibit 5, if we can pull that
10 up. This is the notice from the Patent Office
11 accepting your renewed petition to revive.
12     And in the fourth paragraph, it states
13 that, quote: It is not apparent whether the
14 person signing the statement of unintentional
15 delay was in a position to have firsthand or
16 direct knowledge of the facts and circumstances
17 of the delay at issue, period, close quote.
18     Now, you were the person that signed the
19 statement regarding unintentional delay, correct?
20     A.  I was the one who signed that statement
21 in connection with the petition for which this
22 decision was granted, right.
23     Q.  And were you --
24     A.  I think -- I think they are talking
25 about me, if that's what you are getting at.

**75**

1      Q.  Yes. And the delay, the intentional
2  delay that has to be explained as unintentional
3  exists from the time the application went
4  abandoned until the application for revival is
5  made, correct?
6      A.  No. I don't think your statement is
7  correct, sir.
8      Q.  Were you attesting that the delay from
9  June 18th, 2008 until the time you filed your
10 petition, which is Burke Exhibit 4, was
11 unintentional?
12     MR. WANG:  Objection to form.
13     A.  I don't remember the dates, but the
14 entire time period, yes.
15 BY MR. HASLAM:
16     Q.  Okay. And you did not have firsthand or
17 direct knowledge of all the facts and
18 circumstances for that entire period of time,
19 correct?
20     MR. WANG:  Objection to form.
21     A.  I would have been relying on
22 information. You know, I wasn't a witness to it.
23 It wasn't as if I had dropped the ball and let
24 something go abandoned. So if that is what you
25 mean by firsthand knowledge, I was not an

**76**

1  eyewitness where I would be relying on my five
2  senses.
3  BY MR. HASLAM:
4      Q.  Well, it's not what I said. The Patent
5  Office said it did not -- wasn't apparent that
6  you had firsthand knowledge or direct knowledge
7  of the facts and circumstances of the delay at
8  issue. Did you understand that was referring to
9  you?
10     A.  I just said yes.
11     Q.  Okay. And it's true that you didn't
12 have firsthand or direct knowledge of the entire
13 time period from 2008 when the application went
14 abandoned until 2010 when you filed your renewed
15 petition, correct?
16     A.  I don't -- I don't -- I don't accept
17 that statement, sir.
18     Q.  Did you have firsthand knowledge of the
19 events from June 2008 until the time you filed
20 your renewed petition in 2010?
21     A.  What do you mean by firsthand knowledge?
22     Q.  What did you understand the Patent
23 Office meant when it said you -- it was not
24 apparent that you had firsthand knowledge?
25     MR. WANG:  Objection to form.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052280

### 77

1  Argumentative.
2  A.  I don't recall.  You are asking me what
3  I thought back in 2000 -- whenever this was, in
4  2010?
5      MR. HASLAM:  Yes.
6  A.  I don't know that I even -- I don't know
7  that I formed an opinion on it at the time.  I
8  mean, direct knowledge to me is like you witness
9  something or, you know, you could witness
10 something firsthand.
11 Q.  Well, let's focus on that.  Did you have
12 direct knowledge of the circumstances of the
13 delay between -- of this application between June
14 of 2008 and the time that you filed your renewed
15 petition on November 8th, 2010?
16 A.  I would be speculating.  I definitely
17 didn't have it for the entire time period.
18 Q.  For what time period did you have direct
19 knowledge?
20 A.  When I was involved.
21 Q.  And to the best of your recollection,
22 now having gone through several documents, what
23 time period do you think you were involved?
24 A.  I don't recall.  Probably it looks like
25 April of 2010.

### 78

1  Q.  Okay.  So you had direct knowledge --
2  A.  At least, you know, at least.
3  Q.  So from April 10th, at least, through
4  November 8th, 2010, you had direct knowledge of
5  the facts and circumstances of the delay at
6  issue, correct?
7  A.  I don't remember what I knew back then.
8  Looking at these documents, it looked like the
9  delay was unintentional from the -- you know,
10 from the entire time period.
11 Q.  And on what do you base that?
12     MR. BARHAM:  Objection to the extent it
13 has been asked and answered, but you can respond.
14 A.  On my practice, my -- my statement, the
15 other fellow's statements.
16 Q.  You relied on Mr. Schwedler's
17 statements?
18 A.  I have no idea what I relied on back
19 then.  I just said from looking at these
20 documents, it looks like the entire time period.
21 Q.  What was the reason that Mr. Brooks
22 withdrew from representing the client, his
23 client?
24 A.  I have no idea.
25     MR.WANG:  Objection to form.

### 79

1  A.  I don't remember now.  I don't know if
2  ever knew.  But sitting here today, I have no
3  idea.
4  Q.  Do you have any understanding as to
5  whether a client who does not pay or fails to pay
6  his counsel causing an abandonment is a reason
7  that meets the unintentional delay requirements
8  for reviving a petition?
9      MR. BARHAM:  Objection to form.
10 A.  Are you asking me -- are you asking me
11 sitting here right now regarding my understanding
12 of the law?
13 Q.  I'm really asking you at the time you
14 filed the petition, renewed petition in 2010, did
15 you have an understanding on that subject?
16 A.  I have no recollection of my
17 understandings or what I did or what reasonable
18 inquiry I did at the time.
19 Q.  Did you do any legal research as to what
20 constituted unintentional delay with respect to
21 the reason for the original abandonment?
22 A.  Can you just -- somebody repeat that
23 either have it read back or repeat it.
24 Q.  I can repeat it.  Did you do any legal
25 research at the time you prepared your renewed

### 80

1  petition for revival in November of 2010 as to
2  what constituted the legal bases for an
3  unintentional delay causing abandonment?
4  A.  I don't have a specific recollection but
5  I probably did, because that would be my
6  practice.  This isn't something like we deal
7  with every day.  Right?  So I probably looked
8  into it.
9  Q.  Did you document in any way any inquiry
10 or diligence or investigation that you did about
11 the circumstances surrounding the reason for the
12 original abandonment and any efforts made to
13 revive the patent between June of 2008 and the
14 time that you filed your renewed petition on
15 November 8th, 2010?
16     MR. WANG:  Objection to form.
17 Confusing, compound.
18 A.  I don't remember.
19 Q.  Do you still have any files from the
20 time that you represented XR Communication in
21 connection with this application?
22 A.  I don't know.
23 Q.  What was the reason for the delay
24 between May 6th, 2010 when Mr. Schwedler's second
25 petition for revival was denied and November 8th,

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052281

81

1  2010 when you filed your renewed petition?
2      MR. WANG: Objection to form.
3   A.  You are asking what -- what -- what
4  dates are you talking about?
5      MR. HASLAM: May 6th, 2010 and November
6  2010.
7   A.  I object to the characterization as a
8  delay, and I don't think it was a delay. I think
9  we responded within the time limits provided by
10 the Patent and Trademark Office.
11  Q.  What time limits are provided by the
12 Patent and Trademark Office for reviving an
13 abandoned patent application when a prior attempt
14 to revive it is denied?
15  A.  I believe it said it right on the --
16 right on the -- if you go back and look at one of
17 those earlier petitions where it was denied, I
18 think it said it there, but it might have said it
19 somewhere else.
20      I don't -- I don't recall offhand, but
21 if we go -- if you want to go back to one of
22 those exhibits, I think it said it right on
23 there.
24  Q.  What the time limit -- what the time is?
25  A.  I think it had something to that effect,

82

1  if I recall correctly.
2   Q.  Let's go back to Burke Exhibit 4. If we
3  can go to the first page of this, 32805, the
4  first two pages is the petition for revival that
5  you had filed, that you filed.
6   A.  This is the one I filed?
7   Q.  This is the one you filed. Can you show
8  me what you are referring to that gives you what
9  is an appropriate time for delay?
10  A.  I -- I was referring to the decision.
11 Let's go back to the most recent decision. I
12 think you just said it was in May of 2010.
13  Q.  The denial?
14  A.  The denial, the denial, the denial. I'm
15 sorry. Forgive me if I misspoke. This is the
16 petition. So let's go back to the decision. The
17 most -- so as I understand it, so there was a
18 petition, there was a decision to deny it.
19      There was a second, a renewed petition
20 and a decision denying it. Then there was my
21 petition and a decision granting it.
22      MR. HASLAM: Yes.
23  A.  I want to go to the middle decision. It
24 would be the second decision that denied it. It
25 would almost be easier if you had that thing,

83

1  that document that Mr. Sharma sent because he had
2  all of them together, I think.
3      MR. HASLAM: Can we go to Burke Exhibit
4  2?
5   A.  Okay. Yeah. This is kind of what I was
6  referring to. So if you look right under where
7  it says dismissed in bold print, it says: Any
8  request for reconsideration of this decision must
9  be submitted within two months from the mailed
10 date of this decision. Extensions of time under
11 CFR 1.136 A are permitted.
12      So if I recall correctly, we had four
13 months. If it's a two-month -- if it's a
14 two-month response time, usually the extensions
15 you get four months. So you get six months from
16 this, I think. If there's weekends and holidays
17 or something like that, you know that factors in.
18      I don't know. You have to go back and
19 see if I was within that six-month time.
20  Q.  You filed it five months and two days
21 later.
22  A.  Okay. I believe, just from
23 recollection, I believe I was within the time.
24  Q.  Assuming it's a four-month extension?
25  A.  Yes. That's the way they usually work.

84

1  If it's a three-month -- they basically give you
2  six months total and you have to pay for any
3  extension times. So if it's a three-month
4  response period, you can get three more months.
5   Q.  If it's two months, you get four months
6  is your understanding?
7   A.  Right. You just have to pay a little
8  more.
9   Q.  And what investigation did you do for
10 the time period between June 2009 and August
11 2009?
12      MR. BARHAM: Objection to form. You can
13 answer.
14  A.  June 2009, I'm sorry, and when?
15 BY MR. HASLAM:
16  Q.  August 2009. What was the reason for
17 any delay in that time period in filing a
18 petition for revival?
19  A.  Could I have that question read back to
20 me, please?
21  Q.  What did you do to determine the reasons
22 for any delay in filing a petition for revival of
23 this application between June of 2009 and August
24 of 2009?
25  A.  I said many times, I really don't

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052282

85

1  recount -- recall what I did, you know, back
2  then.  But you keep using the word delay.  You
3  know, I don't -- I don't know that that was a
4  factor at all.
5       You know, you look at -- you look at how
6  long the Patent Office took to make the
7  decisions.  I think one time it was two months,
8  one time it was six months.  That's just normal.
9  You know, I don't -- I don't even understand --
10 well, go ahead.
11    Q.   So waiting two months when you know that
12 an application has previously been abandoned to
13 file a petition for revival is just common
14 practice in your understanding?
15         MR. WANG:  Objection to form.
16 Mischaracterizes testimony.
17    A.   I -- there was never a -- when you say
18 delay, you make it sound like there was an
19 intentional delay or some type of -- I don't -- I
20 just -- that's why I'm having trouble with these
21 questions.
22         I don't think there was any delay.  I
23 don't think there was any motivation for any
24 delay.  And I think the issue here is whether the
25 abandonment was intentional.  I don't -- I think

86

1  you might be confusing it with there are -- there
2  used to be other grounds for reviving
3  applications where you had to show that everybody
4  involved treated this as like their number one
5  priority and that's like all they worked on.
6         That's not the basis for reviving these
7  applications.  You know, in these petitions, it's
8  just a different basis.  So I'm just -- I'm
9  sorry.  I'm not accepting your preface about
10 there being delay.
11         I think these were timely.  And I think
12 it should be pretty darn clear to anybody looking
13 at this record that, you know, you had at least
14 from the period of all these petitions, that
15 clearly people didn't want them, you know,
16 abandoned.
17         But as far as the focus on the time
18 period before that, I just don't remember what I
19 did.
20    Q.   The statement that you certified in your
21 petition for revival states:  The entire delay in
22 filing the required reply from the due date for
23 the required reply until the filing of a
24 grantable petition under 37 CFR 1 point 137(b)
25 was unintentional, close quote?

87

1       Aren't they using delay just to refer to
2  that time period between the time that the
3  required reply was due and when you file a
4  petition?
5     A.   No.  They are talking about the whole
6  time period.  They are talking about the entire
7  time period.  But in your questions, in your
8  questions, it seems like you are suggesting that
9  somehow maybe that the attorney has like delayed
10 this or somebody delayed this intentionally.
11         I think they are just using it to refer
12 to, you know, the span of time between the
13 original due date for the response and the
14 grantable petition, the filing date of the
15 grantable petition, which I filed on I think,
16 what did you say, November something.
17    Q.   Yes.  Well, the statement simply says
18 you have to account for that period of time,
19 correct, what was going on?
20    A.   No.  No.  It does not say that.  It
21 doesn't say you have to account.  I think before
22 you used the word you have to explain, and that's
23 what I'm trying to point out.  I'm sorry.  I
24 don't want to be argumentative.
25         But what it's asking you is during that

88

1  time period, the entire time period, was it
2  unintentional or did somebody intend to, you
3  know, did somebody intend to allow the
4  application to go abandoned.
5     Q.   Can we pull up Burke Exhibit 5?  In
6  paragraph 4, I asked you about the first sentence
7  and we have gone over that.  In the -- after the
8  second sentence, which states, quote:
9  Nevertheless, such statement is being treated as
10 having been made as a result of a reasonable
11 inquiry into the facts and circumstances of such
12 delay, close quote.
13        And then it cites a CFR cite and a final
14 rule notice in the Federal Register.  Do you see
15 that?
16    A.   I see that.
17    Q.   Did you review that?
18         MR. WANG:  Objection to form.
19    A.   Sitting here now, I don't recall if I
20 reviewed either one of them.  I don't know.  I
21 just don't remember.
22    Q.   The sentence after that citation to the
23 Federal Register says, quote:  In the event that
24 such an inquiry has not been made, Petitioner
25 must make such an inquiry, close quote.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052283

**89**

1  And I have asked you before, but having
2  looked at that, did you make an inquiry as to the
3  entire period of time from March 17 -- from
4  March -- from the day after the due date of the
5  March 17th office action 2008 until the time you
6  filed your petition for revival?
7      A.   According to my practice and the way
8  I've always practiced, I did, but I just don't
9  remember what I did.  I don't -- wouldn't file
10 something like this willy-nilly.  I would do what
11 I was supposed to do.
12         It's -- you know, I have been involved
13 in disputes, you know, since before I got out of
14 law school.  And it's obvious that when patents
15 are in litigation, that things like this are
16 combed over with a fine tooth comb.
17         It's no surprise that you got to do
18 things right up front, correctly up front so that
19 when somebody goes over it with a fine tooth
20 comb, there are no issues.
21     Q.   And given that people go over it with a
22 fine tooth comb, you would have documented the
23 analysis you did to support the statement that
24 you made that entire time of delay was
25 unintentional, correct?

**90**

1      A.   No.
2          MR. WANG:  Objection to form.
3      A.   I don't know what I did.  And not
4  necessarily, no.
5      Q.   You did not talk to anybody about the
6  reason why the application went abandoned in the
7  first place, correct?
8          MR. WANG:  Objection to form.
9  Mischaracterizes testimony.  Asked and answered.
10     A.   That's not correct, Mr. Haslam.
11     Q.   Who did you talk to?
12     A.   I told you I don't remember, but you
13 can't say -- you can't -- I don't remember who I
14 spoke to or what I did, but I can't sit here and
15 testify that I didn't speak to anybody.
16         I mean, it didn't go abandoned on my
17 watch so to speak.
18     Q.   But your statement covers that time
19 period when it wasn't on your watch, correct?
20     A.   Yes, sir.
21         MR. HASLAM:  I have no further
22 questions.
23         MR. WANG:  I have some questions.  But
24 before I continue, Mr. Burke do you need a break
25 or would you like a short break?

**91**

1          THE WITNESS:  No.
2          EXAMINATION BY COUNSEL FOR THE PLAINTIFF
3  BY MR. WANG:
4      Q.   Mr. Burke, now is 2022, correct?
5      A.   2022.
6      Q.   And the events that Mr. Haslam asked
7  about today occurred in 2000 --
8          THE WITNESS:  Time out.  Can somebody
9  mute?  Somebody is moving papers around.  It's
10 just making it difficult to hear.  Can you start
11 that question again?
12         MR. WANG:  Sure.  Sure.
13 BY MR. WANG:
14     Q.   The events that we have been talking
15 about in this deposition occurred roughly in the
16 2009/2010 time frame?
17     A.   Roughly and earlier, yes.
18     Q.   So that's at least 13 years ago,
19 correct?
20     A.   Ballpark, yes.
21     Q.   And you did not have a specific --
22 specific recollections of particular
23 conversations or actions from that time period 13
24 years ago, correct?
25     A.   That's correct.

**92**

1      Q.   And -- and you wouldn't want to
2  speculate to testify about any specific actions
3  or communications if you didn't have a
4  recollection about them, correct?
5      A.   I think I told Mr. Haslam everything I
6  remember.
7      Q.   Okay.  I want to clarify something.  And
8  I apologize if you already stated this.  But many
9  times in today's deposition, you would respond to
10 Mr. Haslam's questions with I don't recall or I
11 don't remember.
12         Do you recall that?
13     A.   Yeah.  That was my response to a lot of
14 Mr. Haslam's questions.
15     Q.   Right.  Just to be absolutely clear,
16 when you gave that response, you were not
17 testifying that something did or did not occur,
18 correct?
19     A.   That's correct.
20     Q.   It was just that you didn't have a
21 specific recollection of that event or whether or
22 not it occurred sitting here today?
23     A.   I think a lot of it, I didn't have any
24 general recollection.  So yeah, I didn't have a
25 specific recollection or even a general

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052284

**93**

1 recollection.
2   Q.   Okay.  Mr. Burke, I want to ask about
3 your background, because you -- you touched upon
4 that.  And so when did you receive your law
5 degree?
6   A.   1985.
7   Q.   And you mentioned that you had done some
8 work at the PTO.  Can you describe that or the
9 time, the time frames for that?
10  A.   Just to sum it up, after college, after
11 I was done my engineering degree, I got an
12 engineering degree at Cooper Union, I went to
13 work at the Patent Office.
14       I worked as a patent examiner.  I was
15 trained at the Patent Office.  I left the Patent
16 Office after about 13 months.  I went to the
17 University of Virginia full time.  During the
18 summers, I worked at patent firms.
19       I think I referred to something I was
20 working on in '84 while I was a summer associate
21 at Kenyon & Kenyon.  I would have kept working on
22 it but my wife went in to labor with our first
23 kid.  School had started, but I was into it and
24 kept working on it.
25       But from '85 -- from now, I mean,

**94**

1 initially, I worked at firms.  Then there came a
2 time when I started my own firm.  My own firm and
3 had a partner for a while.  We went our separate
4 ways a while back.
5       And so I have worked with patents,
6 trademarks and copyrights my entire career.
7   Q.   Okay.  So you have nearly 40 years of
8 experience at patents, trademarks and copy
9 rights?
10  A.   Getting close to that, yeah.
11  Q.   And all of those things relate to the
12 Patent and Trademark office, right, the PTO?
13  A.   No.  Actually, my -- one of my biggest
14 litigations was copyright, copyright infringement
15 action.  So I do all fair amount of copyright
16 licensing now.
17  Q.   I just wanted to clarify.  So you worked
18 as an examiner and as a patent agent at the PTO.
19 Is that correct?
20  A.   No.  No.  So the way it worked at the
21 Patent Office, if you -- I believe if you worked
22 at the Patent Office -- well, at the Patent
23 Office, I was a patent examiner.
24       After I left, I had to take the agent's
25 exam.  I hadn't worked at the Patent Office long

**95**

1 enough to get a waiver.  So I became a patent
2 agent, and I took that exam while I was in law
3 school.  So there was a period of time where I
4 was a patent agent and not yet a patent attorney.
5   Q.   Okay.  So how -- how many years have you
6 worked at the PTO or inside the PTO?
7   A.   I worked there a little over a year.
8 Basically, a summer to a summer.
9   Q.   Okay.  What -- sorry.  Go ahead.
10  A.   I think it was 13 months if I recall it.
11  Q.   When did you become a patent attorney
12 registered to practice before the PTO?
13  A.   As soon as I -- well, I don't -- I don't
14 recall when I got the paperwork in.  But
15 basically as soon as I became an attorney and I
16 was sworn in in, I believe, the spring of '86,
17 then it was just a matter of form to be
18 recognized as a patent attorney instead of a
19 patent agent.  I might have had to file a paper
20 with the Patent Office to show them I was an
21 attorney now.
22  Q.   I see.  And after you became an
23 attorney, you got a PTO registration number,
24 correct?
25  A.   No.  No.  I think I had the registration

**96**

1 number as a patent agent.
2   Q.   Okay.  And have you continued to
3 practice as an attorney before the PTO up until
4 today?
5   A.   Yes.
6   Q.   So -- so you practiced before the PTO
7 for 30-plus years?
8   A.   It's getting close to 40.
9   Q.   Getting close to 40.  Okay.  Have you
10 ever been subject to discipline by the Patent and
11 Trademark Office?
12  A.   No.
13  Q.   Have you ever been found to have
14 committed inequitable conduct before the Patent
15 Office?
16  A.   No.
17  Q.   So I know that you may not have a
18 specific recollection about some of the specific
19 documents that Mr. Haslam showed you from 13-plus
20 years ago, but I want to talk about your general
21 policies or practices.
22       Is that okay?
23  A.   You don't need my permission to ask
24 questions.  Go ahead.
25  Q.   I want to talk about you are well aware

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052285

**97**

1  of a patent attorney's obligations in submitting
2  or signing documents submitted to the PTO,
3  correct?
4  A.  I believe so.
5  Q.  And you are familiar with the duty of
6  candor owed to the Patent Office?
7  A.  Yes.  Yes.
8  Q.  And is it your usual practice to follow
9  that duty of candor and -- and adhere to it?
10  A.  Yes, carefully.
11  Q.  And is it also your practice to make a
12  reasonable investigation into the facts if called
13  for by a certification or a submission?
14  A.  Yes.
15  Q.  Okay.  One of the things that came up
16  today is you referred to a couple of decisions by
17  the PTO denying a petition for revival submitted
18  by Mr. Schwedler.
19       Do you recall that?
20  A.  I remember talking about that.
21  Q.  And you were talking about a first
22  decision and a middle decision.  Do you recall
23  that?
24  A.  Yes.
25  Q.  Are you aware of or do you now know the

**98**

1  reasons why the PTO denied those decisions?
2  A.  Well, it said it right in the decisions.
3  Q.  And it had to do with the ownership or
4  assignee status of the applications, correct?
5  A.  It's best to look at the documents.
6  They really laid out exactly what it is.  It
7  seemed to me it's probably over -- if you want to
8  generalize it, it was a question about
9  documenting.
10  Q.  Documenting.  Okay.  But there was never
11  a finding by the PTO in those decisions that the
12  applications had been intentionally abandoned,
13  correct?
14  A.  I believe -- yes.  I believe that's
15  correct.  In fact, I think -- I think there was
16  something in there that said if they had any
17  doubts about it, they would inquire further.
18  Q.  Right.  And so it wasn't like a
19  substantive rejection on the merits, if you will,
20  but more of a procedural type of thing, correct?
21  A.  You could characterize it that way, I
22  guess.  You could characterize it.
23  Q.  Okay.  We've seen -- we've looked at
24  different documents today in the deposition,
25  including your submission of petition for revival

**99**

1  and then the Patent Office's grant of that.
2       Do you recall that?
3  A.  You were breaking up a little bit.  Can
4  you repeat that?
5  Q.  So yeah, I will repeat the question.  Do
6  you recall looking at various documents today
7  that were introduced as exhibits, including
8  your -- the revival petition that you submitted
9  and then the Patent Office's decision granting
10  it?
11  A.  Yes.
12  Q.  Okay.  In the documents you've seen
13  today, have you seen any false statements in the
14  different exhibits that we've looked at?
15       MR. HASLAM:  Objection.  Calls for
16  speculation.  Lacks foundation.
17  A.  Not that I recall in anything I've seen
18  today, no.
19  BY MR. WANG:
20  Q.  Do you recall seeing any knowingly false
21  statements made?
22       MR. HASLAM:  Objection.  Lacks
23  foundation.  Calls for speculation.
24  A.  No.
25  BY MR. WANG:

**100**

1  Q.  Have you seen any evidence of
2  inequitable conduct?
3       MR. HASLAM:  Objection.  Lacks
4  foundation.  Calls for speculation.
5  A.  No.
6  BY MR. WANG:
7  Q.  Have you seen any evidence of a specific
8  intent to deceive the Patent and Trademark
9  Office?
10       MR. HASLAM:  Objection.  Lacks
11  foundation.  Calls for speculation.
12  A.  No.
13  Q.  Turning to another topic, you got into a
14  discussion with Mr. Haslam about like the word
15  delay and the word intentional, and I want to
16  explore that a little bit.
17       Have you seen any evidence that the
18  applications that you revived or were revived
19  were intentionally abandoned or, in other words,
20  abandoned deliberately and on purpose?
21  A.  Today we really -- I know there was --
22  there was some document relating to some other
23  application.  But basically we are dealing with
24  one application today, right?
25       MR. WANG:  Correct.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052286

101

1  A.  So you were asking -- I think your
2  question, you might have misspoke, but I think
3  you said applications.  So that kind of threw me.
4  Can you give me the question again?
5  Q.  Sure.  Let -- let me ask that.  So we
6  will focus on the application for which you
7  submitted a petition for revival that was granted
8  by the PTO.
9  A.  Okay.
10  Q.  So have you seen any evidence today or
11  ever that that application was ever affirmatively
12  intentionally abandoned?
13  A.  No.
14  Q.  Have you seen any evidence today or
15  before that that application was deliberately
16  abandoned on purpose?
17  A.  No.
18  Q.  In the Patent Office's granting of
19  revival for petition, you don't interpret that as
20  requiring that that the patent prosecutor or you
21  needed to have firsthand knowledge of the entire
22  period of delay, correct?
23       MR. HASLAM:  Objection.  Lacks
24  foundation.  Calls for speculation.
25  A.  It seems to say that right on its face,

102

1  that if you didn't -- if you weren't -- I guess I
2  will interpret it, if you weren't a witness to
3  it, then you did sufficient inquiry or reasonable
4  inquiry.
5  Q.  Did you perform a reasonable inquiry as
6  set forth in that paragraph?
7  A.  I believe I did, because that was my
8  practice, but I don't remember what I did.
9  Q.  Okay.  Mr. Burke, I want to -- you've
10  testified today about communications with
11  Mr. Sharma, who's a colleague of Mr. Haslam, and
12  phone conversations with him, correct?
13  A.  Yeah.  I referred to them, yes.
14  Q.  And Mr. Sharma was an attorney for Aruba
15  who first reached out to you in this case,
16  correct?
17  A.  That's correct.
18  Q.  And I believe you testified you've had
19  about five phone conversations with him?
20  A.  I don't think -- I don't think -- I
21  don't think it was that many.  I think it was
22  more on the order of probably three, two or
23  three, probably two or three.
24  Q.  When roughly were those phone
25  conversations?  Do you recall?

103

1  A.  I think it was before the July 4th
2  weekend.  I believe he sent me an e-mail one day.
3  I didn't respond.  And I think he called me the
4  following day late, it was late our time.  You
5  know, it could have been 5:30, 6 p.m. our time
6  here on the East Coast.
7       That could have been -- it could have
8  been the Thursday before.  My best recollection
9  is around the Thursday before the July 4th
10  weekend.  I didn't really speak to him then and
11  he contacted me the following week.
12       So the following week, I had other
13  communications with him.
14  Q.  And when Mr. Sharma first reached out to
15  you, he did so by e-mail, correct?
16  A.  That's correct.
17  Q.  And I believe you testified that he sent
18  you some documents or a compilation of papers and
19  asked for a call to discuss them, correct?
20  A.  Yeah.  And it wasn't -- it wasn't in his
21  first -- it wasn't in his first e-mail.  So it
22  was in a subsequent e-mail.  It might have
23  been -- I think we agreed to speak after --
24  shortly after the July 4th weekend, so maybe July
25  5th.

104

1       I think before -- it might have been
2  before that conversation that he sent a pdf that,
3  if I recall correctly, had the three petitions
4  and three decisions.  Yeah.  He sent those.
5  Q.  And in those communications with
6  Mr. Sharma by phone and those e-mails, did he
7  ever ask you if you were represented by counsel?
8  A.  No.  I kind of -- I kind of stopped him
9  in his tracks.  You know, I have been involved in
10  these disputes before, and I mean, my primary
11  concern was attorney-client privilege.
12       And I explained to him, I don't know
13  that he didn't know this, but I made clear that
14  the attorney-client privilege belongs to the
15  client.  So I thought it was best practice to do
16  this formally, rather than informally.
17       He wanted to speak -- he wanted to speak
18  to me he said for 20 to 30 minutes, something
19  like that.  I sort of put a stop to it up front
20  and said no, I think we need to do this formally.
21       Attorney-client privilege is one reason.
22  The second reason is that, you know, that there
23  would be a record of what was said and what was
24  not said.
25  Q.  So Mr. Sharma wanted to speak to you,

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052287

---

**Page 105**

1  quote, informally for 20 or 30 minutes. Is that
2  correct?
3  A. Yes.
4  Q. And up to that point, he had never asked
5  you if you were represented by counsel, correct?
6  A. I believe that's correct, yes.
7  Q. And he also did not encourage you to
8  seek counsel, correct?
9  A. That's correct.
10 Q. Mr. Burke, in those early conversations
11 or in conversations with Mr. Sharma, did he ever
12 inform you that his client Aruba was alleging
13 that you, Mr. Burke, committed inequitable
14 conduct before the Patent and Trademark Office?
15 A. No.
16 Q. Apart from saying that he represented
17 Aruba, did he give you any -- any indication of
18 his role or what he was seeking to prove and why
19 he wanted to speak to you?
20 A. I'm sorry. There was just a -- there
21 was a noise in this room. Just give me that one
22 again, please.
23 Q. Sure. In your discussions with
24 Mr. Sharma, apart from indicating that he
25 represented Aruba, did he give you any impression

---

**Page 106**

1  about the claims that they were making or seeking
2  to develop?
3  A. Well, the attachment to his e-mail was a
4  pretty good clue as to what he wanted to talk
5  about. And he might have said early on that his
6  client had been sued by XR Communications.
7     So knowing that he was a defendant and
8  then sending those declarations to revive --
9  excuse me -- knowing that he represented a
10 defendant and then sending those declarations to
11 revive, it's -- it was -- seemed apparent to me
12 what he wanted to, you know, that he was working
13 on a defense.
14    MR. WANG: Okay.
15 A. And those documents, that was the focus,
16 that was the focus of his defense.
17 Q. Sure. He never clarified it in the
18 sense that he -- he was just acting like he was
19 seeking information and wanted to talk about
20 these documents. Is that fair?
21 A. Ask it again.
22 Q. Okay. So let me ask it a different way.
23 You already said that he gave you no indication
24 that his firm and Aruba were seeking to or
25 accusing you of committing inequitable conduct,

---

**Page 107**

1  correct?
2  A. That's correct.
3  Q. Okay. Without --
4  A. Up to a certain point, you know. You
5  know, like I said, I have been doing this for a
6  very long time. Right? And there was a time
7  when it seemed like every defendant raised
8  inequitable conduct. I think the Federal Circuit
9  even said this is getting out of hand.
10 Everybody's raising inequitable conduct.
11    So when he said he represented a
12 defendant and when he sent me those petitions and
13 the decisions, it probably occurred to me that
14 that's what -- that's where he was going.
15    So in your question when you asked if
16 there was an indication, yeah, I would say that
17 was -- it was at least a hint that that's what he
18 was doing. I'm taking -- I'm using my
19 experience.
20 Q. Right. But nothing that he
21 affirmatively said?
22 A. No. He never said -- he never said we
23 are accusing you of this, that or the other
24 thing.
25 Q. All right. Mr. Burke, is it fair that

---

**Page 108**

1  subsequently, before this deposition, you formed
2  a clearer understanding of the accusations
3  that -- that were being made against you and
4  inequitable conduct?
5  A. Yes.
6  Q. And was that when you -- you made -- and
7  the reason why you made the decision to obtain
8  your own counsel?
9  A. Yes. Actually, it was.
10    MR. WANG: Okay. I have no further
11 questions. I pass the witness.
12    MR. HASLAM: Does anyone else have
13 questions? I have a few.
14 FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT
15        ARUBA
16 BY MR. HASLAM:
17 Q. I just want to go over the sequence of
18 your conversations with Mr. Sharma. You got an
19 e-mail from Mr. Sharma which indicated he
20 represented X -- Aruba which was a defendant in
21 litigation brought by XR and he wanted to talk to
22 you about prosecution, correct?
23 A. I recall -- the only part of that that I
24 can't affirm is that he wanted to talk to me
25 about prosecution. So his e-mail definitely

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052288

**113**

1  Q. Okay. Have you ever had to withdraw
2  from representing a client in connection with
3  prosecution for nonpayment of bills?
4      MR. BARHAM: Objection.
5      MR. WANG: Objection to form.
6      MR. BARHAM: Only answer that if you can
7  do so without divulging attorney-client
8  confidences from other cases.
9  **A. I'm thinking. I don't remember any. So**
10 **I don't know. I mean, I might have. I just**
11 **don't remember.**
12     MR. HASLAM: Okay. Thank you for your
13 time. I have no further questions.
14     THE WITNESS: Okay. I wish you all good
15 luck.
16     MR. WANG: Nothing further from me.
17 Thank you, Mr. Burke.
18     MR. HASLAM: Thank you.
19     THE VIDEOGRAPHER: Anything else before
20 we close, Attorney Haslam?
21     MR. HASLAM: No.
22     THE VIDEOGRAPHER: Time is 3:02 and this
23 concludes today's deposition of Daniel Burke. We
24 are off the record.
25     (Thereupon, there was a discussion off

**114**

1  the record.)
2      MR. LEE: We also have a standing but we
3  would also like to order rush on this.
4      THE REPORTER: When would you like the
5  final, Mr. Lee?
6      MR. LEE: What are the options?
7      THE REPORTER: There are many options.
8  You can have daily copy up to five days. There
9  are many options. I can have the office let you
10 know what the cost is. Do you have an idea when
11 you would want it?
12     MR. LEE: I think before the end of the
13 week.
14     THE REPORTER: Okay. By Friday?
15     MR. LEE: And I think the standing order
16 calls for a rough. We will get that today?
17     THE REPORTER: Yes.
18     (Thereupon, there was a discussion off
19 the record.)
20     THE REPORTER: Mr. Saleem, did you want
21 a copy?
22     MR. SALEEM: Yes, regular transcript is
23 fine.
24     MR. WANG: Dianna, if I could get a
25 rough as well. Thank you.

**115**

1  (Off the record at 3:05 p.m.)

**116**

1           CERTIFICATE OF SHORTHAND REPORTER
2                   NOTARY PUBLIC
3
4      I, Dianna C. Kilgalen, the officer
5  before whom the foregoing deposition was
6  taken, do hereby certify that the foregoing
7  transcript is a true and correct record of
8  the testimony given; that said testimony was
9  taken by me stenographically and thereafter
10 reduced to typewriting under my direction;
11 that reading and signing was not requested;
12 and that I am neither counsel for, related
13 to, nor employed by any of the parties to
14 this case and have no interest, financial or
15 otherwise, in its outcome.
16     IN WITNESS WHEREOF, I have hereunto
17 set my hand and affixed my notarial seal this
18 27th day of July, 2022.
19 My commission expires June 28th, 2025.
20
21 _[signature]_
22 _____
23 NOTARY PUBLIC
24 IN AND FOR THE STATE OF MARYLAND
25 COUNTY OF HARFORD

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052290