# Exhibit 27



# Transcript of Gary Haycox

**Date:** July 7, 2022
**Case:** XR Communications, LLC -v- D-Link Systems, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052437

**Page 9**

```
 1  marked as Brooks Exhibit 1.
 2          REMOTE TECH:  Stand by.
 3          MR. HASLAM:  Mr. Brooks, can we give
 4  control of the document to Mr. Haycox.
 5          REMOTE TECH:  Mr. Haycox, if you
 6  click your screen, you should have control of
 7  the document.
 8  BY MR. HASLAM:
 9     Q   You will see this is -- the first
10  page of this is a form filed with the Patent
11  Office.  It indicates that Vivato, Inc., as a
12  conveying party, was transferring something to a
13  company called Wayout Wireless.  Do you see
14  that?
15     A   Yes, I do.
16     Q   And is this the document that you
17  filed with the Patent Office indicating -- or
18  having filed on your behalf indicating that
19  Wayout Wireless had acquired the listed patent
20  applications and patents from Vivato, Inc.?
21     A   Yes.
22     Q   If you will scroll down to the bottom
23  of just this first page, you will see it is
24  filed -- it is signed by an Edward J. Brooks,
25  III.  Was Mr. Brooks your patent counsel at the
```

**Page 10**

```
 1  time?
 2     A   Yes.  I retained Mr. Brooks to file
 3  and do the patent filings with the U.S. Patent
 4  Office.
 5     Q   The -- this was filed as of -- on
 6  September 19, 2006.  Was the work with Wayout
 7  Wireless the first work you did with Mr. Brooks
 8  in connection with obtaining patent prosecution
 9  services?
10     A   Yes, it is.
11     Q   And did he come recommended by
12  somebody?
13     A   Yeah.  I think at the time I was
14  working in Minnesota, he was out of Minnesota as
15  well, so I got a referral from -- I believe one
16  of -- there was an investment company.  I don't
17  recall the name right now.  I think it was ATEL
18  or -- in Minnesota, and so I was just looking
19  for someone that was working with IP, and they
20  recommended Mr. Brooks.
21     Q   Okay.  If you scroll down to the
22  attachment, which is the Assignment Agreement.
23     A   How far down is that?
24     Q   Yeah, it should be the next --
25     A   It actually says "Assignment
```

**Page 11**

```
 1  Agreement."  Okay.
 2     Q   Yeah.
 3     A   Under the "Patent Assignment
 4  Agreement"?
 5     Q   Yeah.  If you could, scroll down
 6  further to the Notice Provisions.
 7     A   What page is that on?  Do you know?
 8     Q   I don't have the page.  If you just
 9  keep scrolling down, it will be -- I think it is
10  Section 5.
11     A   Oh, Section 5.  Okay.
12     Q   And if you go up to the beginning of
13  Section 5 --
14     A   Which section are you -- what section
15  are you looking at?  5 at what?
16     Q   The beginning of Section 5.
17     A   Yeah, I overshot it.
18     Q   I apologize.  It's not at the
19  beginning.  In any event, let me ask you this:
20  At the time that this Assignment Agreement was
21  entered into, had you met Mr. Ambrose?
22     A   I believe so.
23     Q   And --
24     A   I believe Wayout Wireless was created
25  under Mr. Ambrose.
```

**Page 12**

```
 1     Q   Had you worked with Mr. Ambrose
 2  before the creation of Wayout Wireless?
 3     A   No.
 4     Q   And, again, did he come recommended
 5  by somebody?
 6     A   Yeah.  He was recommended at the time
 7  by Allan Rakos, who was also working with me on
 8  this.
 9     Q   And what was Mr. Rakos' background?
10     A   His background was with Intel
11  Corporation, as I, and he was working with me to
12  form the Wayout Wireless and the consulting
13  group.  At the time when the patents came in
14  to -- or the -- well, I should say the asset
15  purchase of Vivato became available, he was
16  working with me on forming that business
17  consulting group.
18     Q   And what was your intention when you
19  acquired the assets, other than patent assets,
20  from Vivato, Inc.?  What was your purpose or
21  what was your intent doing something with those
22  assets?
23     A   Yeah, the intent was not only -- it
24  was an asset purchase, so we -- patents came
25  along with inventory of product and two designs
```

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052440

### Page 13

1  of the outdoor wireless array antennas. So our
2  intent was to bring the assets forward, put them
3  under the structure of the company, and then
4  start forming and rebuilding and standing the
5  company back up to deliver wireless products to
6  outdoor customers.
7       Q   Okay.
8           MR. HASLAM: Can we bring up Brooks
9  Exhibit 2.
10      Q   This is another document filed with
11 the Patent Office, and you can see that this one
12 names as the conveying party -- it is Wayout
13 Wireless, LLC, and the name of the receiving
14 party is Vivato Networks, LLC, and the nature of
15 the conveyance or execution indicates that it is
16 simply a change of names. And this -- Box 2
17 indicates that the contact person would be
18 Ambrose Law in Portland, Oregon.
19          What was the purpose of changing the
20 name from Wayout Wireless to Vivato Networks?
21      A   Strictly for branding. Vivato had a
22 brand in the marketplace as a known company
23 delivering a unique outdoor wireless solution,
24 and so we felt that changing the name and using
25 Vivato, we would actually leverage on the brand

### Page 14

1  that was already in the marketplace.
2       Q   And pursuant to this transfer, all
3  the patents, patent applications and the
4  inventory was transferred from Wayout Wireless
5  to a company named Vivato Networks, LLC; is that
6  correct?
7       A   That is correct.
8       Q   Okay. And this was in 2006,
9  approximately?
10          MR. HASLAM: Can you give control of
11 the document to the witness.
12      A   Yeah, it looks like September 28,
13 2006 is on the document.
14      Q   And from September 2006 until the
15 fall of 2007, what was the business activity of
16 Vivato Networks, LLC?
17      A   Okay. We were, again, looking to
18 bring some people on board. We had a couple
19 projects that we were doing at the time with
20 existing inventory. We started servicing
21 existing customers that Vivato already had in
22 place. And then I'm not -- I don't recall the
23 exact date, but there was a point in 2007 where
24 we were introduced to Catcher, Inc., and we went
25 on a -- undergone a series of discussions, a

### Page 15

1  long series of discussions about merging the two
2  companies to leverage both the client-side and
3  network-side solution set to market.
4           MR. HASLAM: Can we have Brooks 3
5  brought up.
6       Q   Brooks 3 -- and I call it Brooks 3
7  because it was Exhibit 3 to Mr. Brooks'
8  deposition. This is a Patent Assignment from
9  Vivato Networks, LLC to Vivato Networks
10 Holdings, LLC, and it indicates that their
11 execution date was December 7, 2007.
12          Was this transfer of the patent
13 assets from Vivato Networks, LLC to Vivato
14 Networks Holdings, LLC part of the transactions
15 that led to the relationship between your
16 companies and Catcher, Incorporated?
17      A   Yes. During the negotiation process,
18 which covered us quite a few months before this,
19 we were engaged in a discussion for merging the
20 companies. And at the time, I -- Hal Turner was
21 a CEO of Catcher. I told him that the patent
22 portfolio was not to be included in the merger
23 process during those negotiations, that they
24 could actually -- if they wanted to purchase the
25 patents, we would have that as included as

### Page 16

1  another deal within the merger.
2           So we structured to move the patents
3  out of the Vivato Networks entity, into the
4  Holdings company, to separate those assets from
5  the actual product inventory, product designs,
6  product development on -- and the employees that
7  we had moving forward in the team from that
8  entity. And so we were preparing to actually
9  separate those two during that process.
10      Q   And I've got some documents I will
11 show you. As part of the merger, did Vivato
12 Networks, LLC, after transferring the patent
13 assets to Vivato Networks Holdings, LLC, merge
14 into a company called Catcher Holdings?
15      A   Again -- so during the process of the
16 merger, we did this to separate them. But in
17 the process of the merger, everything went
18 forward as one collective-merge process, so all
19 of it came together during the merger. It
20 wasn't my intent at the time to do that, but
21 that's how, through the execution process of all
22 the documents, it actually occurred.
23      Q   You indicated that during 2006 and at
24 least up to the merger activity in the fall of
25 2007 that you were running the company and among

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052441

### 17

1  other activities was -- were you selling
2  inventory that you had acquired from Vivato,
3  Inc.?
4     A  Yes, that's correct, and servicing
5  the existing customer base for maintenance and
6  any additional product that they were requiring.
7     Q  Okay. Do you recall whether the
8  products that you were selling went by the name
9  of Stan --
10    A  I don't recall that name.
11    Q  Did -- do you -- were they sold under
12 a numbering system, the VT2210?
13    A  So it was a VT -- VT2210 seems to
14 ring a bell for me. If you give me both product
15 numbers -- there was two products. One was the
16 initial product, and I don't know if that was
17 the 2210, or if there was a 2200 or 1200. I
18 think there is a V1200 and then a V -- VT2210 if
19 I recall now.
20    Q  Okay. I believe that's correct, but
21 you do recall that you were selling two
22 products, one with a VT1 number and one with a
23 VT2 number?
24    A  That's correct.
25    Q  During 2007 leading up to the

### 18

1  assignment of patents from Vivato Networks, LLC
2  to Vivato Networks Holdings, LLC, had Mr. Brooks
3  continued to provide services in prosecuting and
4  maintaining the patent portfolio?
5     A  Yes. He was involved up through the
6  merger process. You know, these documents -- on
7  the Patent Assignment documents and I think this
8  last one with Vivato Networks to Holdings, I
9  don't recall speaking with him. I think that
10 was done through Ambrose directly just as a form
11 of -- basically, used as, again, an entity
12 change of the ownership of the patents, so I
13 wasn't directly involved in that, but on my end
14 I was.
15    Q  Okay.
16    MR. HASLAM:  Can we have Tab 44
17 pulled up. This is a -- and I'll have this
18 marked as Haycox Exhibit 1.
19    (Haycox Exhibit 1 marked for
20 identification and attached to the transcript.)
21    Q  This is a Securities and Exchange
22 Commission Form 8-K filed by Catcher Holdings,
23 Inc., dated November 30, 2007.
24    MR. HASLAM:  And can you give control
25 of this document to the witness.

### 19

1     Q  I'll ask you to scroll through it
2  just to familiarize yourself with it.
3     A  Okay. Okay. Do you have any
4  specific areas you want me to look at?
5     Q  Yep. This filing describes a variety
6  of transactions that took place at the end of
7  2007. Among other things, did you become the
8  CEO of Catcher Holdings as a result of the
9  transactions listed in Haycox Exhibit 1?
10    A  Yeah, I believe during the merger
11 process, I was brought in as a VP or CTO of the
12 company. And then Hal Turner -- during this
13 merger process, you have to understand this
14 is -- it got into a pretty muddy mess with the
15 financial crisis, so a lot of things were going
16 on and happening in real time, and Hal Turner
17 was the CEO of the company, who put all this
18 together on the Catcher side, he was CEO of
19 Catcher. I then assumed that role as more -- at
20 the time, it was more, I would say, of a
21 figurehead because of what was going on in the
22 financing and, kind of, unwinding of the
23 company.
24    Q  The page we're looking at right now,
25 Item 5.02, indicates that you became the chief

### 20

1  technical officer of Catcher, Inc., correct?
2     A  5.02. Yes.
3     Q  The second paragraph begins --
4     A  Yes, that's correct.
5     Q  Yep. And Catcher, Inc. was the
6  operating company that ran Catcher's business,
7  correct?
8     A  That's correct.
9     Q  And Catcher Holdings was a company
10 that was formed separate from Catcher, Inc.,
11 correct?
12    A  I don't remember exactly why Catcher
13 Holdings was created, but if it is during that
14 merger process, that was being done on the
15 Catcher side, which I was not really involved in
16 a whole lot then because they had a whole
17 structure in place for CTO and a CEO, and so I
18 was looking more at the terms of the merger from
19 the Vivato side.
20    MR. WANG:  Mr. Haslam, I'm sorry to
21 interrupt, but could I have a copy of the
22 exhibits. I don't believe that Exhibit 1 was
23 provided in the folder or provided before.
24    MR. HASLAM:  Kee Young, can you send
25 or upload an --

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052442

45

1 IP stays enforced. And so, at that point, I
2 don't know if they actually spoke with Brooks or
3 if they put it under their attorneys to -- you
4 know, to keep the portfolio in place, but they
5 basically had management responsibility under
6 the contract, I believe, to ensure that that
7 portfolio stayed up to date.
8     Q    Do you know whether Aequitas --
9         MR. HASLAM:  Well, strike that.
10    Q    Do you know whether Catcher was ever
11 able to bring Mr. Brooks' payments current in
12 2008?
13    A    In 2008?
14    Q    Yes.
15    A    I don't believe that that happened.
16    Q    Did Mr. Brooks ever have a
17 conversation with you that if he -- if his bills
18 were not brought current, he would have to
19 withdraw from representing Vivato Networks or
20 Catcher, whichever company he was performing
21 services for?
22    A    Yeah, it was --
23        MR. WANG:  I'm sorry.  Sorry.
24 Objection to the extent it calls for
25 attorney-client privilege.  I don't believe any

46

1 privilege has been waived, so I wanted to note
2 that issue that's come up in a couple
3 depositions.
4        MR. HASLAM:  Well, I'll just state
5 for the record that I don't think it has
6 hindered us so far.  I'm not sure that, given
7 the company has gone out of business, a
8 privilege remains, but I understand your
9 objection.  We are not going to resolve now.
10 BY MR. HASLAM:
11    Q    So subject to that objection, you can
12 answer the question.
13    A    Okay.  I believe the -- any
14 correspondence that came from Brooks went into
15 the entity and it was presented, you know, as an
16 expenditure to Catcher at the time because a
17 merger completed, and so that would have been
18 forwarded on to the team that was actually
19 looking at the expenditures that were going out.
20    Q    Do you recall that Aequitas -- do you
21 recall personally that Aequitas refused to agree
22 to bring -- to make payments to bring
23 Mr. Brooks' account current?
24    A    I don't recall them ever saying they
25 were not going to do it.  I recall me on

47

1 multiple times advising them on keeping the
2 patent portfolio up to date and that the Brooks
3 payment was due.  And at that point, I said --
4 went back in to the Aequitas team, and whether
5 or not they were going to work with -- continue
6 to work with Brooks or they are going to have
7 their own attorneys pick up the portfolio was
8 something that -- I assume that they were having
9 those conversations, but I don't have any
10 information that shows what really happened in
11 there.
12    Q    But do you recall at some point
13 becoming aware that Mr. Brooks was going to
14 withdraw from representing Vivato Networks
15 Holdings or Catcher with -- in the Patent Office
16 with respect to the patent prosecution that was
17 ongoing on the applications?
18    A    Yeah, that was -- again, that was
19 part of the correspondence with the payment that
20 was required, so that went into the management
21 team.  They had that information.
22    Q    And do you -- do you know that
23 Mr. Brooks ultimately did withdraw from
24 representing Vivato Networks Holdings, Inc. or
25 Catcher Holdings at the Patent Office?

48

1    A    Yeah, I'm not sure at the time if I
2 was aware, but I was made aware of it in -- just
3 recently, so I know that he was making that
4 request for payment, and that was forwarded on
5 into the Aequitas team.  And, again, I --
6 because a lot of information that wasn't being
7 given to me at the time, I didn't know if they
8 had moved it to an internal -- their internal
9 attorneys to manage that portfolio or if they
10 were -- continued to work with Brooks.
11    Q    Do you recall becoming informed at
12 some point that patent applications went
13 abandoned because there was no attorney
14 registered to act on behalf of Vivato Networks
15 Holdings, Inc. or Catcher at the Patent Office?
16        MR. WANG:  Objection to form.
17    Q    You can answer the question to the
18 extent you can.
19    A    I don't recall.  I don't recall what
20 happened in that transition process.  I know at
21 some point Aequitas went dark with me after
22 they -- you know, after they secured the IP
23 portfolio and they were going to manage selling
24 that portfolio.
25        There was a period of time in the

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052449

**Page 49**

beginning of that process -- I don't recall what month it was, but it was in 2008, at some point, I had a call with Aequitas, and I don't recall the entity or entities. Might have been a consultant that they had on at the time to go out and try and sell the patent portfolio. And I provided them input as far as the knowledge I had about the patents, which I'm not the inventor, nor am I the patent author, so I gave them as much as I could, and then, at that point, they pretty much disappeared.

So I assume at that point when I was talking with them -- I would make the assumption that since they are trying to sell the patents that they had them up in -- up to date.

Q   Did you ever have any reason to believe that Catcher -- that Aequitas -- I apologize.

Did you ever have reason to believe that Aequitas, because they had a lead on the portfolio, was refusing to pay Brooks' billings in order to cause a default so that Aequitas could ultimately take possession of the portfolio?

A   I wish I knew I had that information.

**Page 50**

That would have been part of my complaint. No, sir.

Q   Okay. But what you do clearly recall is, is that you -- that the bills from Mr. Brooks were forwarded to Aequitas, correct?

A   I believe all the expenditures were being forwarded in to them. They were managing the control of funds for all the expenditures. And I do recall informing them directly in meetings.

Q   Okay. And you -- do you recall informing Aequitas that if Mr. Brooks withdrew as counsel that they would need to appoint somebody to continue handling the IP portfolio at Vivato Networks Holdings, Inc., correct?

A   I informed them I was informing them to keep the patent portfolio enforced. The method to which they were going to do that, I don't have any insight to that.

Q   Did they assure you that they would do so, or did -- was your statement that they needed to keep the portfolio in shape met with silence?

MR. HASLAM: Let me withdraw it.
Q   That is a bad question.

**Page 51**

A   Yeah.
Q   You told Aequitas that they needed to keep the IP portfolio current, correct?
A   That's correct.
Q   Did they ever tell you that they would do so? Did they ever affirmatively state that they would do so?
A   I think they -- it was just part of the process that we -- you know, we will get the funds allocated. I don't recall, in person, them ever telling me that they were -- they did it, they were going to do it. But if I recall -- if I recall that they had that responsibility in the contract of perfecting and acquiring the patents.
Q   Under the merger -- I will just represent we can look at it. Under the merger in the documentation, Catcher Holdings had the responsibility for maintaining and prosecuting patents.

And with that -- with that representation, is it your recollection that part of the reason that you were talking to Aequitas about Mr. Brooks and his bills and maintaining the portfolio because Catcher

**Page 52**

Holdings had the responsibility for prosecuting the patents?
A   My -- the -- I am not sure where -- if Catcher Holdings has that, but my -- what was in my mind at the time was they actually perfected control over the IP as collateral, and once they, basically, foreclosed and pulled up that collateral, that would be their responsibility. But, in the end, I was thinking, since that is a piece of collateral that they see as value for the loan, that they would keep that patent portfolio in place. I reminded them on a couple occasions that they needed to do that. Any specific yes, noes to me, I don't recall those conversations.
Q   And it is your recollection that the payment of expenses by Vivato Networks Holdings or Catcher Holdings, Inc. in 2008, including any payments to Mr. Brooks for his services prosecuting the patents or patent applications, had to be approved by Aequitas; is that correct?
A   At the time, pretty much everything, especially later advances into the 2 -- you said "2008," so those are later advances. As we transitioned into 2008, it became very heavy

**Page 53**

1  management on the funds.
2      Q   Okay.
3          MR. HASLAM:  Can we have Brooks -- I
4  think it is Brooks 7 brought up.
5      Q   This is an April 28, 2008 filing with
6  the United States Patent and Trademark Office,
7  and it is a request by Mr. Brooks to withdraw as
8  counsel in connection with this particular
9  application.  And I will --
10         MR. HASLAM:  Can you give control to
11 the witness.
12     Q   It is a reasonably short document.  I
13 would like you to look at it.  I am going to ask
14 you if you recall seeing it.
15         (Witness reviewing document.)
16     A   So repeat -- I was just reading the
17 document.  Can you repeat the question, please.
18     Q   I think it is a little more further
19 down.
20     A   Yep.
21     Q   And on the page you're on, you see
22 that Mr. Brooks -- this is dated April 25,
23 2008 -- indicates that the firm or individual
24 for future correspondence is Christopher R.
25 Ambrose.

**Page 54**

1          Do you recall becoming aware in April
2  of 2008 that Mr. Brooks was actually taking
3  steps to withdraw as prosecution counsel for the
4  patent portfolio owned by Vivato Networks
5  Holdings, Inc.?
6      A   Yeah, I'm sure this is -- I am sure
7  this is a document I received and then -- or
8  seen.  I don't know if I received it.  It would
9  have went over to Aequitas.
10     Q   So you recall -- whether you saw this
11 document or not, do you recall becoming aware in
12 the spring of 2008 that Mr. Brooks was actually
13 withdrawing as counsel for Vivato Networks
14 Holdings, Inc. at the Patent Office for
15 maintaining the portfolio?
16     A   According to this document, yes.
17     Q   And you passed that on to -- you
18 passed that information on to Aequitas?
19     A   Yes.  Aequitas was getting all the
20 correspondence, I believe.
21     Q   Well, this particular communication
22 filed with the Patent Office -- put it this way:
23 I don't know one way or the other whether this
24 document ever found its way to Aequitas.  What
25 I'm asking you is:  Once you became aware that

**Page 55**

1  Mr. Brooks was actually withdrawing as counsel,
2  in any of the meetings that you had with
3  Aequitas, did you inform them orally that they
4  needed to do something because Mr. Brooks was
5  withdrawing and there would be no counsel in
6  front of the patent to represent those -- that
7  portfolio in the Patent Office?
8          MR. WANG:  Objection to form.
9      Q   You can answer the question.
10     A   I believe -- timing is going to be
11 hard for me here.  Before this occurred, when
12 bills were coming in, they were presented to
13 Aequitas with the -- and with my recommendation
14 to them, that they need to keep this patent
15 portfolio in place, that they are basically
16 controlling the funds, they are controlling the
17 collateral, they are the collateral agent, that
18 they need to keep this patent portfolio in place
19 and as part of the -- part of the management
20 services they were providing.  They were the
21 collateral agent, they were holding the
22 collateral.
23     Q   My question is:  Once you became
24 aware that Mr. Brooks was actually taking steps
25 to withdraw from representation, did you at

**Page 56**

1  least inform Aequitas of that fact?
2      A   Specifically, I don't recall.  I
3  think it is just part of the process of the
4  discussions I had with them on the portfolio.
5  So since the -- I assume if they got this
6  document, it was directed over -- all the
7  documents were being directed to their offices,
8  the Vivato information that, under the merger,
9  was directed to the Aequitas offices, that they
10 would have seen this.
11     Q   Okay.  And I understand your
12 testimony about that they would have seen this,
13 but I'm asking, independent of that, do you
14 recall having any discussions with them about
15 the fact that Mr. Brooks was no longer
16 complaining about bringing his bills current,
17 but he was actually taking steps to withdraw
18 from representing Vivato Networks Holdings, Inc.
19 at the Patent Office?
20         MR. WANG:  Objection.  Form.
21     Q   You may answer.
22     A   Yeah, I don't -- I don't recall a
23 specific discussion pertaining to this item.  I
24 discussed -- I recall the collection of what
25 needed to be done to keep this patent portfolio

**RESTRICTED - ATTORNEYS' EYES ONLY**

XR-EDTX1-00052451

**Page 61**

1 that ring a bell with you.
2   A   And can you spell that.
3   Q   I think he said it was perhaps
4 V-E-V-E-Y. Does --
5   A   Yeah, I don't recall the name of the
6 company.
7   Q   Okay. You mentioned earlier in some
8 of your testimony about a lawsuit or some
9 litigation. What were you referring to?
10   A   So when they went dark on selling the
11 patent portfolio in 2008 or '9, I guess it
12 was -- I can't recall the last conversation I
13 had with Aequitas. I know we had a meeting
14 subsequent to one of the calls we had with
15 the -- I believe it was a consultant that was
16 helping them move the portfolio.
17        I had a meeting with the Aequitas
18 folks. They basically told me that they were
19 going to prioritize any payments in the patents
20 sale to them over Western. And I said that's
21 not how the agreement is in place. We have a
22 proportional allocation of the funds, and any
23 payments that come back in on a sale of proceeds
24 you can't prioritize yourself. And then I
25 didn't hear from them. So it is kind of --

**Page 62**

1 things went downhill fast in the early part of
2 the year, and it obviously got pretty sour there
3 on the last conversation with them.
4        So then my brother -- so you asked
5 who was participating -- he wanted to have a
6 statement of zero value for his investment so he
7 can do a tax-loss write-off. I contacted
8 Aequitas and said hey, are -- what is the deal
9 with the patent portfolio? Where is it at?
10 What is -- and this is late. I mean, this is
11 now in -- I don't even remember what year this
12 was. 2010 or '11? I don't really recall, it's
13 just been so long.
14        I contacted them and asked them what
15 the status of the portfolio was, where the --
16 where they were at with it. And they go, Well,
17 we sold that portfolio. I said, what? I said,
18 how come I wasn't notified? How come I didn't
19 see any proceeds from that? And then obviously
20 it was, like, you know, come in and talk. And I
21 started with the conversation. They weren't
22 going to pay me, so then I had to retain an
23 attorney to go after them on that.
24        So it wasn't a smooth relationship
25 with Aequitas. And as you can see where

**Page 63**

1 Aequitas went, like, now, I understand why. I
2 wish I had a crystal ball.
3   Q   Were you aware that in 2008, 2009,
4 there was litigation over Aequitas' attempts to
5 foreclose on the collateral securing the loan?
6   A   No, I was never -- I was never
7 informed of that, nor was I brought into it. It
8 is -- well, I guess it's trivial. I guess it is
9 who they were having problems with.
10   Q   Well, Mr. Ambrose testified that he,
11 at least for a portion of time, represented the
12 Vivato entities and one of the Catcher entities
13 in some of that litigation, but you were never
14 aware that there was a foreclosure action that
15 ultimately led to Aequitas gaining ownership of
16 the patent portfolio?
17   A   Oh, I -- oh, no, I'm aware of them
18 closing and foreclosing on the collateral. I
19 don't recall at the time and right now if there
20 was a complaint against it. I may be -- a lot
21 of things in my mind is kind of gone because it
22 is -- of the loss of everything, but I thought
23 it was just a legal process to foreclose on the
24 collateral. I'm sure I wasn't happy about it,
25 but, you know, it is --

**Page 64**

1   Q   There was some litigation about it,
2 but ultimately Aequitas, to your recollection,
3 was able to foreclose on the collateral and
4 obtain ownership of the patent portfolio?
5   A   Yes.
6   Q   Did it ever come to your attention
7 that any of the patents applications -- patent
8 applications that Mr. Brooks had been
9 prosecuting went abandoned after Mr. Brooks
10 withdrew and the Patent Office approved his
11 withdrawal?
12   A   No.
13   Q   Do you know a -- or have any contact
14 with a Mr. Carl Schwedler, a patent attorney
15 with Bullivant, Houser, Bailey, P.C. in the
16 2009-2010 time frame?
17   A   Is that a firm that was representing
18 Aequitas?
19   Q   It is a firm -- it is an attorney who
20 was a patent attorney in the 2009-2010 time
21 frame.
22   A   In that 2009-2010 time frame, again,
23 things got real quiet. So the end of 2008, we
24 had the conversations to move the portfolio.
25 That -- it may have been in 2009 and not 2008.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052453

**65**

 1   You know, I -- I am kind of not sure on that.
 2   But he may have been on the phone call when I
 3   was relaying technical information about the
 4   patents and how it was being applied to Vivato
 5   and how -- and just in asking any technical
 6   questions, knowing that I am -- I was not --
 7   like I told them, I am not the inventor, nor
 8   do -- am I the patent author.  I can just give
 9   you the information I have based on my
10   understanding of how Vivato applied them.  He
11   may have been on the call.  I don't recall.
12       Q    Do you recall any attorney who
13   informed you that he represented Aequitas in any
14   capacity calling you in the 2009-2010 time frame
15   and asking you what you knew about Mr. Brooks
16   withdrawing from representing Vivato Networks
17   Holdings at the Patent Office and what you knew
18   about why the patents that he had been
19   prosecuting went abandoned?
20       A    No, I don't recall that.
21       Q    Do you ever -- did you ever receive a
22   call from a Daniel P. Burke, a patent attorney
23   from Oyster Bay, New York representing
24   XR Communications, ever calling you and asking
25   you what information you had about Mr. Brooks'

**66**

 1   withdrawal from representing Vivato Networks
 2   Holdings, Inc. at the Patent Office and the
 3   abandonment of the patents that he had been
 4   prosecuting after he withdrew?
 5       A    What time frame would that be?
 6       Q    2009-2010.
 7       A    I really don't recall.
 8       Q    Did you ever have any conversations
 9   with a Mr. Kai Hansen about the circumstances
10   surrounding why the patent portfolio that Vivato
11   Networks, Inc. possessed before the foreclosure,
12   why those patents had gone abandoned?
13       A    What was the name again?
14       Q    Kai Hansen, H-A-N-S-E-N.
15       A    Where was he from?
16       Q    Well, he is now affiliated with
17   XR Communications.
18       A    I don't recall any conversations
19   about the patents going abandoned.  And, again,
20   if there were, it would have been the same kind
21   of discussion I am having here, was that
22   Aequitas was a manager, the collateral manager,
23   and then became the ultimate owner of the
24   patents, and their responsibility for keeping
25   the patent portfolio enforced was on them.  So

**67**

 1   it would have been the same discussion.  I don't
 2   know where else it would have went.  I don't
 3   know.
 4       Q    I am just going to ask you about some
 5   other names in the same question:  Did any of
 6   these people ever call you and ask you about the
 7   circumstances surrounding why Mr. Brooks
 8   withdrew or why the patents went abandoned?
 9            Any conversations with an Adrian
10   Zajac, Z-A-J-A-C?
11       A    Don't recall that name.
12       Q    Any conversations with Adrian
13   Straplevi?
14       A    Don't recall.
15       Q    Any conversations with a Ron Chaffee?
16       A    Don't recall.
17       Q    Any conversations with Thomas Sidley?
18       A    Tom Sidley was with Aequitas.
19       Q    Did he ever call you in the 2009-2010
20   time frame to ask you about the circumstances
21   surrounding why Mr. Brooks withdrew and why the
22   patents went abandoned?
23       A    In the -- he was managing the
24   portfolio, so the discussions I recall in --
25   subsequent to the shutting down of the

**68**

 1   company -- so whether it was 2008, 2009, I don't
 2   really recall -- conversations I had with
 3   Mr. Sidley was around selling the portfolio.  I
 4   don't recall any specific conversation as to the
 5   state of the patents because at the time, again,
 6   I -- they are contacting me to get technical
 7   information, more specifics about the technology
 8   and how it was used in the product itself,
 9   Vivato product, and that they were actually
10   moving to sell the portfolio.  So I had -- at
11   that point, my assumption is the portfolio is
12   still in place.  We wouldn't be marketing
13   something that was -- has no value.
14       Q    Was Mr. Sidley involved with Aequitas
15   and Catcher and Vivato in 2008 before the
16   company went down?
17       A    Yeah.  He was one of the primary
18   managers, like a program manager or lead in
19   Aequitas that managed through the whole process.
20   I don't have any information as to how much
21   Mr. Sidley was involved with Catcher in the
22   years before the process of bringing the
23   companies together, but he certainly was the key
24   person for managing through the merger process
25   up to operations of the company subsequent to

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052454

**Page 69**

1  the merger process, and then also through the
2  bridge-loan note and payments that were being
3  drawn down off of that note.
4     Q   Was Mr. Sidley involved, to your
5  knowledge, in any way with Aequitas relating to
6  which expenses were getting paid and which ones
7  were not?
8     A   I don't have specific information,
9  but he is the one I would meet with when we were
10 talking about the different dispersions.
11 There's also other people within the company
12 that would do some of the day-to-day management,
13 so I assume that he had someone on staff that
14 was taking care of it, but he was the one I
15 would have conversations with about, you know,
16 we need to keep this thing up and running, we've
17 got to keep these patent portfolios enforced,
18 how is the loan going?  You know, that was
19 probably the biggest conversation we had most of
20 the time, was how are we doing on the financing?
21     I would give him updates on what we
22 were doing with the customers.  We had a -- we
23 had a big project that was underway that we
24 ultimately had to let go because the company was
25 winding down, which was unfortunate.  So a lot

**Page 70**

1  of what I was doing was on the operational side
2  in that, and then, you know, present to them
3  what needed to be paid out, and mainly it was
4  done through -- the primary expenditures were
5  with the payroll, but then we were also having
6  discussions about, you know, cutting the payroll
7  for the execs, us, our team first, I think, in
8  half, and then we went to no paycheck.  So
9  there's a lot of conversations in place about
10 operational stuff, including all the
11 expenditures.
12    Q   Just a few more questions.
13        So Mr. Sidley -- you had
14 conversations with Mr. Sidley about the
15 non-payment of Mr. Brooks and the need to keep
16 the portfolio going; is that correct?
17    A   Yes.  I -- Tom, Mr. Sidley, would be
18 aware of the fact that the portfolio needed to
19 be enforced and that the -- Brooks was the ones
20 that were in place for when we did the original
21 patents.  And where they took it from there, I
22 don't know.
23    Q   Okay.
24    A   Again, I made the assumption that
25 they are marketing the portfolio, they are

**Page 71**

1  taking it forward, having conversations with
2  people that are consulting on moving the product
3  out of the -- going forward, that that was being
4  taken care of.
5     Q   If I can beg your indulgence, I think
6  I am done, but I would like to take five minutes
7  just to review my notes.  Is that okay with you?
8     A   Sure.
9     Q   Okay.
10        MR. HASLAM:  Why don't we go off the
11 record for five minutes.
12        THE VIDEOGRAPHER:  Off record, 6:37.
13        (A recess was taken.)
14        THE VIDEOGRAPHER:  On record, 6:41.
15        MR. HASLAM:  Can we pull up Tab 42.
16        REMOTE TECH:  Stand by.
17        MR. WANG:  Can you provide a copy in
18 the chat, please.
19        REMOTE TECH:  Yes.  It's currently
20 uploading.  It is about halfway there.
21        MR. HASLAM:  Can you give control of
22 this to Mr. Haycox.
23 BY MR. HASLAM:
24    Q   I'll ask you to take a look at this
25 document, and I'm going to ask you, number one,

**Page 72**

1  if that is your signature and, number two, if
2  you can tell me if this is the document that
3  collateralized the patents, the patent
4  portfolio, to secure the bridge loan from
5  Aequitas.
6     A   Yes, that is my signature.  And
7  collateral -- they have a list of collateral.
8  So, yes, this looks like it is the document that
9  provides the list of collateral that secured the
10 loan.
11    Q   Okay.  And is it your understanding
12 that when the loan went into default that
13 Aequitas was able to foreclose on the
14 collateral, which was the subject of this
15 exhibit?
16    A   Yes.
17        MR. HASLAM:  Can I have that marked
18 as the next exhibit in order to Mr. Haycox's
19 deposition.
20        REMOTE TECH:  Sure.  Sorry, does --
21 are you still seeing the exhibit?  It looks
22 like --
23        MR. HASLAM:  Yes.
24        REMOTE TECH:  -- somehow it moved
25 off.  One moment.  Let me just fix that.

---

Page 77

1  invoice. I'm here on my own volition.
2      Q   About how many conversations did you
3  have with Mr. Sharma or attorneys for Covington?
4      A   I would say one conversation that had
5  many questions, and then one with a couple
6  follow-up questions. But other than that, there
7  was just phone mail -- voicemail tag and e-mail
8  back and forth trying to set times.
9      Q   And did you provide any documents to
10 Covington or in response to their subpoena? Did
11 you produce any documents?
12     A   No. I -- the only thing I sent to
13 them was via e-mail. I have no documents.
14     Q   And you also exchanged e-mails with
15 Covington or Mr. Sharma?
16     A   Is that question directed to me?
17     Q   Yes. Yes. You also exchanged
18 e-mails with Mr. Sharma or Covington & Burling?
19     A   Yes. It was just -- and those were
20 pretty much logistics e-mails, just setting up
21 time -- date and times.
22     Q   Okay. Mr. Haycox, I want to be more
23 clear on some of the dates that we talked about.
24 So in April 2008, Catcher pretty much went out
25 of business, right?

Page 78

1      A   Yeah, April 1st of 2008, we pretty
2  much -- everybody -- we disbanded it at that
3  point. And as far as winding down the company
4  and all that, I am not -- I am really not sure
5  the mechanism to how they did that. But
6  April -- pretty much, April 1st was when the
7  operations ceased.
8      Q   So was the winding down leading up to
9  April 1st, or did that occur, like, after
10 April 1st?
11     A   No, we were operating and executing,
12 like I say, working with customers all the way
13 through the first quarter of '08. A lot of time
14 was being spent on servicing customers from our
15 employees' perspective. I had a time where I
16 was working with some of the folks in Austin
17 on -- with -- their product development was
18 occurring, moving forward in the next-generation
19 projects, and then heavy discussion on getting
20 the financing because we wanted to continue
21 operating through the -- through '08. Since the
22 financing didn't come through, the bridge notes
23 were winding out as far as any cash, we had to
24 shut down the operations on April 1st.
25     Q   And so was that kind of like a hard

Page 79

1  stop, just everything ended on that date?
2      A   It was -- the collapse was pretty
3  significant and fast and it was pretty much a
4  hard stop. We had -- like I said, we had the
5  primary job that was being done with the
6  customer that we had to actually notify them and
7  tell them that we couldn't fulfill the project,
8  that they would have to look for an alternative
9  vendor to work on what they were looking to
10 accomplish. But as far as the company itself,
11 it was pretty much a hard stop. It was -- like
12 hit the wall.
13     Q   Okay. So after that date, did you
14 even have any involvement in the operations of
15 Catcher? I mean, was there anything else left
16 to do?
17     A   I'm sure there is a lot of things
18 that had to have been done. I didn't -- Catcher
19 itself was out of Austin, Texas. I made no
20 further trips into Austin after probably the
21 second month in 2008. How that wound down and
22 what are all the operations for shutting
23 everything down was, was really outside of my
24 purview. I was -- I mean, the whole thing was
25 pretty devastating, right, so it, like, hit the

Page 80

1  wall, collapsed. Things just went south really,
2  really, really fast.
3      Q   Is it fair to say that your
4  involvement ended after April 2008?
5      A   I was still involved in discussions
6  and meetings and trying to -- you know, we were
7  still trying to move forward and getting things
8  taken care of. They had the collateralization
9  on the loan. It wasn't just the patent
10 portfolio. There was objects and there was
11 inventory and there was products up in Spokane
12 that needed to be taken care of. And, again, it
13 was a lot of communications on my part of what
14 the collateral agent needed to work on, right?
15         But Aequitas -- and back to those
16 management fees, they managed through that
17 process, you know. I wasn't really heavily
18 involved. I mean, I was obviously looking at
19 what we could do to try and continue the --
20 which was -- it was -- you know, it was just
21 a -- not going to happen. So the company
22 itself, like I said, it just pretty much shut
23 off pretty quickly.
24     Q   Okay. You're not an attorney, are
25 you, Mr. Haycox?

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052457

81

1   A   No.
2   Q   Do you have any knowledge or
3   experience with patent prosecution?
4   A   No, other than what was provided
5   through the -- through Brooks for me on that.
6   But as far as all the mechanisms for how to file
7   with the Patent Office and all the process and
8   procedures, no, I don't have that expertise.
9   Q   Okay. I think during your deposition
10  you testified no fewer than six or seven times
11  about enforcing or maintaining the patent
12  portfolio; is that correct?
13  A   Yeah, it is correct. I understand
14  that, you know, if there is -- someone sends me
15  a notice and says that they need to have
16  something filed and keep a portfolio enforced
17  that's kind of what I was repeating, right.
18  Q   Right. And you never had any
19  intention to give up any patents or patent
20  applications, correct?
21  A   No. I mean, we had -- as far as
22  through the Western Process, we had 30 percent
23  stake in the collateral. So, you know, I was
24  subject to Aequitas's managing, but we also said
25  there was no reason for me to want to see the

82

1   thing go away. I mean, there was a significant
2   amount of money at stake to -- you know, to
3   bring it forward and keep it rolling and have
4   the moving sale of the patent portfolio.
5          And, again, that is why -- you know,
6   they called me a couple times after that with
7   meetings with consultants, and there could have
8   been an attorney on the phone, I don't really
9   recall. But to provide information for them,
10  and that was all done like this, I am not -- I
11  wasn't being paid. I was not a consultant. I
12  was just providing information to help move that
13  portfolio through the market.
14         MR. WANG: Okay. I am -- I've got
15  nothing further. Thank you, Mr. Haycox.
16         THE WITNESS: Okay.
17         MR. HASLAM: I have just one more.
18         EXAMINATION BY COUNSEL FOR DEFENDANT:
19  BY MR. HASLAM:
20  Q   In the first quarter in the end of
21  April 2008, did you have discussions with
22  Aequitas about extending the loan or putting
23  more money in?
24  A   I think the -- I think the
25  discussions that we had was to get the

83

1   financing -- to get the bridge taken care of and
2   get the -- keep the company alive. I don't know
3   if I'd -- you could call extend with more
4   financing the bridge note. I mean, the -- when
5   we put that in place, it was under the
6   assumption -- I should say under goodwill --
7   faith and goodwill that their -- that they would
8   have financing put together; otherwise, I don't
9   even think we would have done the bridge.
10         And that is why, you know, I had
11  conversations with them before. I said, this is
12  a bridge loan. It wasn't actually intended to
13  be a -- you know, just hand money over and not
14  have an opportunity to actually execute on what
15  they were telling us they could do. And so I
16  think all the conversations would have been
17  around how do we get -- secure the financing.
18  Q   So the conversations with Aequitas
19  around the time of the merger in 2007 were about
20  Aequitas assisting the company in finding
21  long-term financing either -- was it through
22  some sort of stock offering or merger partner or
23  some other mechanism to get long-term financing
24  into the company?
25  A   Yes, they were brought to my -- you

84

1   know, they were actually brought to me through
2   the Catcher process as have -- having done this
3   in the past. And they said this is what they
4   can do to secure financing. So I believe the
5   financing was going to be done through issuance
6   of stock. I'm sure they were looking at
7   multiple things of either doing another --
8   either stock offering, or they could have had
9   another set of -- sell bonds, but I'm not sure
10  exactly what priority they were driving.
11         MR. HASLAM: Okay. Thank you. I
12  have no further questions.
13         THE VIDEOGRAPHER: Any other
14  questions?
15         MR. WANG: Not for me. Thank you,
16  Mr. Haycox.
17         MR. HASLAM: Thank you for your time.
18         THE VIDEOGRAPHER: Anything else
19  before we close, Attorney Haslam?
20         MR. HASLAM: Not from me.
21         MS. FORTE: Nothing for me.
22         THE VIDEOGRAPHER: The time is --
23  anything else? Did I hear --
24         MS. FORTE: I said nothing for me.
25         THE VIDEOGRAPHER: Time is 6:59, and

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052458

85

1  this concludes today's deposition of Gary
2  Haycox.
3         We're off the record.
4
5
6         ACKNOWLEDGMENT OF DEPONENT
7
8         I, GARY HAYCOX, do hereby acknowledge
9  that I have read and examined the foregoing
10 testimony, and the same is a true, correct and
11 complete transcription of the testimony given by
12 me and any corrections appear on the attached
13 Errata sheet signed by me.
14
15 _____  _____
16    (Date)              (Signature)
17
18
19
20
21
22
23
24
25

86

1
2
3     CERTIFICATE OF REPORTER - NOTARY PUBLIC
4       I, ADRIENNE MIGNANO, the officer before
5  whom the foregoing deposition was taken, do hereby
6  certify that the foregoing transcript is a true
7  and correct record of the testimony given; that
8  said testimony was taken by me and thereafter
9  reduced to typewriting under my direction; that
10 reading and signing was requested; and that I am
11 neither counsel for, related to, nor employed by
12 any of the parties to this case and have no
13 interest, financial or otherwise, in its outcome.
14       IN WITNESS WHEREOF, I have hereunto set
15 my hand and affixed my notarial seal this 17th day
16 of July, 2022.
17 My Commission Expires: June 2026.
18
19
20
21
22  *[signature: Adrienne M. Mignano]*
23
24
25

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052459