# Exhibit 33



# Transcript of Christopher Ambrose

**Date:** July 7, 2022
**Case:** XR Communications, LLC -v- D-Link Systems, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052028

### Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3            LOS ANGELES DIVISION
 4   --------------------------------X
 5   XR COMMUNICATIONS LLC d/b/a      :
 6   VIVATO TECHNOLOGIES,             :
 7               Plaintiffs,    :
 8        v.               :Civil Action No:
 9                         :8:17-CV-00596
10   D-LINK SYSTEMS, INC.,            :
11               Defendants.    :
12   --------------------------------X
13        DEPOSITION OF CHRISTOPHER AMBROSE
14     APPEARING REMOTELY FROM BEND, OREGON
15            THURSDAY, JULY 7, 2022
16                 12:00 P.M.
17
18
19
20
21
22
23   Job No.: 455085
24   Pages 1 - 84
25   Reported by: Adrienne Mignano, RPR
```

### Page 2

```
 1        Deposition of CHRISTOPHER AMBROSE, held via
 2   Zoom videoconferencing, pursuant to Notice, before
 3   Adrienne M. Mignano, a Notary Public and Registered
 4   Professional Reporter in and for the State of New
 5   York.
```

### Page 3

```
 1              A P P E A R A N C E S
 2
 3
 4   ON BEHALF OF PLAINTIFFS:
 5        PHILIP X. WANG, ESQUIRE
 6        RUSS AUGUST & KABAT
 7        12424 Wilshire Boulevard
 8        12th Floor
 9        Los Angeles, California 90025
10        310.826.7474
11
12
13   ON BEHALF OF DEFENDANT - ARUBA NETWORKS:
14        ROBERT T. HASLAM, ESQUIRE
15        KEE YOUNG LEE, ESQUIRE
16        COVINGTON & BURLING LLP
17        3000 El Camino Real
18        5 Palo Alto Square - 10th Floor
19        Palo Alto, California 94306
20        650.632.4700
```

### Page 4

```
 1
 2       A P P E A R A N C E S (Continued)
 3
 4   ON BEHALF OF DEFENDANT - NETGEAR & FALCON
 5        ALEXANDRA LANE, ESQUIRE
 6        DUANE MORRIS LLP
 7        1540 Broadway
 8        New York, New York 10036
 9        212.471.4772
10
11   ALSO PRESENT:
12        Drew Halton - Videographer
13        Malcolm Cooke - Remote Technician
```

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052029

Page 61

1  that there was a gentleman named Hal Turner, and
2  that -- also another gentleman named Gary
3  Rogers.  And I was not privy to their
4  communications, but my recollection is that
5  there was a dispute among them regarding Catcher
6  Holdings' willingness to proceed with the sale.
7      Q   Do you know if Mr. Turner or
8  Mr. Rogers were installed as officers of Catcher
9  Holdings after Mr. Haycox was terminated by
10 Aequitas?
11     A   I'm sorry, can you rephrase that
12 again?
13     Q   Did Aequitas, after Mr. Haycox was
14 terminated, play any role in installing
15 Mr. Turner or Mr. Rogers as officers of Catcher
16 Holdings?
17     A   I don't recall that.
18     Q   Do you know where Mr. Turner and
19 Mr. Rogers had been employment-wise prior to
20 being installed at Catcher Holdings sometime in
21 March 2008?
22     A   I don't.  My recollection is that
23 they had some former relationship with Gary
24 Haycox, but I may be wrong on that.
25         MR. HASLAM:  Okay.  I have no further

Page 62

1  questions.  Thank you very much for your time.
2          THE WITNESS:  Thank you.
3          MR. WANG:  I have a few questions.
4  Do you need a break, Mr. Ambrose, or are you
5  fine to continue?
6          THE WITNESS:  I'm fine to continue.
7  Thank you.
8          MR. WANG:  Thank you.  I promise to
9  be brief.  Okay, so give me one second to turn
10 my light back on.
11         EXAMINATION BY COUNSEL FOR PLAINTIFF
12 BY MR. WANG:
13     Q   Mr. Ambrose, I believe you testified
14 that you are not a patent lawyer; is that
15 correct?
16     A   That is correct, that I am not a
17 patent lawyer in the sense that I have dealings
18 with the Patent and Trademark Office.  I have
19 worked with the purchase and sale of patents.
20     Q   But you wouldn't characterize
21 yourself as a patent prosecution attorney,
22 correct?
23     A   Correct.
24     Q   You don't have a Patent and Trademark
25 Office registration number, correct?

Page 63

1      A   Correct.
2      Q   And have you ever filed papers as an
3  attorney before the PTO?
4      A   The only papers that may have been
5  filed would have been assignments as part of an
6  overall purchase, but nothing regarding
7  prosecution of a patent.
8      Q   And do you know if you would even
9  have the ability to file, for example, an office
10 action in patent prosecution?
11     A   I don't.
12     Q   You do not have that ability?
13     A   I don't know if I have that ability
14 or not.
15     Q   Do you have any knowledge or
16 expertise about patent prosecution procedure?
17     A   Very little.
18     Q   Earlier, Mr. Haslam asked you about a
19 Notice of Abandonment.  Do you recall that?
20     A   He referenced a few of them.  I do
21 recall that testimony.
22     Q   And was it your testimony that
23 because it was so long ago you don't recall
24 receiving -- that you don't actually recall
25 actually receiving a Notice of Abandonment

Page 64

1  around that time, in 2008, for example?
2      A   I went through my files to see what
3  Notices of Abandonment had been received by my
4  office, and the only Notice of Abandonment I was
5  able to locate was the one that was attached to
6  the letter from Mr. Brooks November 6th of 2008.
7  I don't have a record of receiving the Notice of
8  Abandonment directly from the USPTO, nor do I
9  have any recollection of, nor could I locate any
10 Notices of Abandonment for any other patents.
11     Q   And this process of going through
12 your files, when did that occur?
13     A   Yesterday.
14     Q   And I believe you testified that you
15 had just located that one letter with one Notice
16 of Abandonment included, correct?
17     A   Correct.
18     Q   And when -- earlier, when you were
19 testifying in response to Mr. Haslam's
20 questions, you testified about certain events in
21 connection with this Notice of Abandonment.  Is
22 it fair that they are not based on your
23 recollection, but, rather, based on you finding
24 this correspondence yesterday and what you think
25 likely occurred?

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052044

---

**65**

1  MR. HASLAM: Objection. Ambiguous.
2  Unclear and uncertain as to what testimony
3  you're talking about.
4  Q  Mr. Ambrose, I'm trying to reconcile
5  your testimony about not recalling actually
6  receiving Notice of Abandonments, and given how
7  long ago this was that -- I just want to
8  understand if your testimony is based on
9  recollections or based on finding this letter
10 when going through your files?
11  MR. HASLAM: Same objection.
12  A  I have no independent recollection of
13 seeing any Notices of Abandonment. I do recall,
14 very generally, the concept of abandonment
15 because some of the patents had already been
16 abandoned by, I believe, the time of the loan in
17 December of 2007. And so in an attempt to
18 provide full disclosure to Aequitas at that
19 point in time, there would have been a summary
20 provided to me -- I can't recall if it would
21 have been by Mr. Haycox or Mr. Brooks --
22 directly regarding the status of various
23 patents, so a long-winded way of saying my
24 confusion simply is that I recall, generally,
25 the concept of abandonment, but I don't recall

**66**

1  when it occurred.
2  Q  Okay. You also testified about a
3  notation in your files about a conversation with
4  Mr. Brooks after receiving his letter, or around
5  that time, correct?
6  A  Correct. There was a time entry on
7  November 20th of 2008 of a conversation with
8  Mr. Brooks, but I don't have any notes regarding
9  what was discussed.
10  Q  And is that all the time entry says,
11 "Conversation with Mr. Brooks"?
12  A  In summary, yes. It is one sentence
13 along the lines -- I can't say verbatim what it
14 is, but it was, Conversation with Jay Brooks, or
15 Mr. Brooks about patents. Something like that.
16 If you would like to take a break, I -- again, I
17 would be happy to get the exact verbiage, but it
18 does not go into detail of the conversation.
19  Q  Okay. Does it go into further detail
20 beyond "conversation regarding patents"?
21  A  No.
22  Q  And is it fair to say that you have
23 no recollection, sitting here, about that
24 conversation or what you discussed?
25  A  That's correct.

**67**

1  Q  You also testified about a
2  conversation with Mr. Haycox, possibly, about
3  the abandonment issue, correct?
4  A  Yes. My hesitancy to go much further
5  than that is that I have not received word from
6  Mr. Haycox that the attorney-client privilege
7  has been waived, so I'm not sure I can go in any
8  detail. I'm happy to discuss it, but I don't
9  think I can go much more than that.
10  Q  Okay. And I want to understand, do
11 you have recollection of that, of that
12 conversation, or is this something that you
13 think may have happened?
14  A  I do not have a recollection of a
15 specific conversation. My general recollection
16 is that certain, by the exhibits, identifying
17 what patents were being assigned and what was
18 part of the patent portfolio that -- my general
19 recollection is that we wanted to make sure that
20 we recovered and that I was not a patent
21 attorney, I was not prosecuting patents, and
22 that if there was any value to the pending
23 patents or that -- the abandoned patents, that
24 they be taken care of, but I -- that's my
25 general overall recollection, but I can't recall

**68**

1  specific -- a specific conversation.
2  Q  And, Mr. Ambrose, what you just
3  testified to, is it based on your general
4  recollection or any sort of documentary records?
5  A  My general recollection.
6  Q  And you don't know the time frame of
7  the general topics of the conversations that you
8  may be referring to, right?
9  A  It would have been 2007, 2008. I
10 wish I could narrow it down more for you, but I
11 can't.
12  Q  Around that time, Mr. Ambrose, would
13 you say that Mr. Haycox was your client?
14  A  Yes. Mr. Haycox was a shareholder or
15 member or officer of the Vivato entities we have
16 been discussing, so yes.
17  Q  More accurately, would the Vivato
18 entities we have been discussing be your client
19 or who you were --
20  A  Correct, at least until -- at least
21 until the merger, at which point in time Catcher
22 Holdings took over Vivato Networks, Inc., and I
23 did not represent Catcher Holdings, so -- and I
24 do know that at that point in time Mr. Haycox
25 started having a dual role, and I believe at

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052045

**Page 69**

1 that point in time my primary communications
2 with respect to Vivato Networks Holdings was
3 Mr. Rakos.
4      Q   Okay.  As far as you know, have any
5 of the Vivato entities around that time waived
6 any privilege, any attorney-client privilege?
7      A   Not that I'm aware of.
8      Q   Do you think Mr. Haycox himself would
9 have authority to waive that privilege?
10     A   I don't know the answer to that.
11 Vivato Networks Holdings is a dissolved entity.
12 Vivato Networks, Inc. is a dissolved entity, or
13 merged into Catcher Holdings.  So I don't know
14 the answer to that.
15     Q   Mr. Ambrose, do you --
16     A   I guess my preference would be to
17 have both Mr. Haycox and Mr. Rakos -- well, I'm
18 not sure.  I'm not sure, quite frankly, even
19 after all these years how it works with the
20 dissolved entity.
21     Q   But in your testimony today, you
22 tried to respect the attorney-client privilege
23 for things, you know, covered by attorney-client
24 communications, correct?
25     A   Yes.

**Page 70**

1      Q   And you didn't intend to waive that
2 privilege in your answers, correct?
3      A   Correct.
4      Q   Mr. Ambrose, you testified that
5 Mr. Haycox was terminated as CEO of -- in March
6 2008, correct?
7      A   Of -- did you say of Catcher?
8      Q   That was going to be my next
9 question, but was he the CEO of Catcher?
10     A   I believe he became CEO of Catcher
11 after this merger, and I believe that he was CEO
12 until there was a dispute among the Catcher
13 Holdings individuals, and he was terminated as
14 CEO at that point in time.  Again, my primary
15 contact was with Vivato -- well, was with
16 Mr. Rakos.  In any event, that's my
17 recollection, yes.
18     Q   And that termination occurred in
19 March 2008, correct?
20     A   If it's okay with you, I did have a
21 chronology from that point in time that I'm
22 happy to take a look at to give you the precise
23 date, but I don't want to look at it without
24 your okay.
25     Q   Okay.  I am concerned about privilege

**Page 71**

1 issues, Mr. Ambrose, so, like, can I ask, like,
2 what the chronology is?  Is it something from
3 your file as an attorney?  Or what are you
4 referring to?
5          MR. HASLAM:  If it is just dates,
6 it's not privileged.
7      A   I'm not sure that this would be
8 privileged, so I -- again, I don't want to waive
9 anything, but this was, I can tell you, a
10 chronology that I prepared for purposes of a
11 meeting with the investors of Vivato Networks
12 Holdings on May 19th of 2008, and because at
13 that point in time, obviously, things were going
14 sour with Aequitas and the loan and the
15 potential purchase -- or the potential sale of
16 the patent portfolio to Vevi Wireless.
17     Q   Okay.  Thank you, Mr. Ambrose.
18         I just wanted to reorient myself and
19 refer back to Mr. Haycox's termination around
20 March of 2008.  And my question is:  Do you have
21 any more information about why he was terminated
22 or how that arose?
23     A   So in March, possibly early April of
24 2008, I know that there was an internal dispute
25 among the primary officers of Catcher Holdings

**Page 72**

1 regarding the operations of Catcher, and
2 particularly with respect to this potential sale
3 of the patent portfolio to the third party in
4 order to pay off -- at least, in part, to pay
5 off the Aequitas loan.
6         And at that point in time, then,
7 Mr. Haycox, I believe, was terminated as CEO.
8 And at approximately that time, I guess, in
9 general, or soon thereafter, Catcher Holdings
10 wrapped up its operations.  So I don't know
11 exactly the date of dissolution, but I'm pretty
12 sure April, perhaps end of May of 2008, Catcher
13 Holdings was terminating everybody, wrapping up
14 its operations essentially, ceasing to do
15 business.
16     Q   What is your personal relationship
17 with Mr. Haycox?  Are you on friendly terms?
18     A   I'd say we're on no terms.  Not
19 unfriendly.  I just -- since 2010, I think I've
20 communicated with him maybe once or twice, and I
21 can't even recall what that pertained to.  We're
22 LinkedIn acquaintances, but beyond that, I am
23 not -- I would say we don't have any
24 relationship.
25     Q   Okay.  When were you first contacted

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052046

**81**

1 to step aside, that they needed somebody to
2 receive the communications, again, as a
3 placeholder pending for somebody else stepping
4 in.
5       And at that point in time, there
6 were -- they were in the midst of the potential
7 sale of the patent portfolio. There was the
8 merger. And at some point in time, my
9 expectation certainly was that be it Catcher or
10 whoever they sold the company to would hire
11 their own counsel, their own prosecuting patent
12 attorney, and there would be a transition that
13 way.
14   Q   When you did receive the letter from
15 Mr. Brooks with the Notice of Abandonment and
16 the notice that he had withdrawn, did you pass
17 that on to Mr. Rakos?
18   A   I don't recall whether there was a
19 discussion with Mr. Rakos or Mr. Haycox. The
20 letter was cc'd to Mr. Haycox as well.
21 Mr. Haycox and Mr. Rakos, I believe -- well, I
22 don't believe -- I know were in communications
23 at that point in time. I don't have a specific
24 recollection of where it went from -- where it
25 went from there.

**82**

1       MR. HASLAM: Okay. I have no further
2 questions. Thank you very much for your time.
3       THE WITNESS: Thank you.
4       MR. HASLAM: Is that it?
5       MR. WANG: Nothing further from me.
6 Thank you, Mr. Ambrose.
7       THE WITNESS: You're welcome. Thank
8 you, all.
9       THE VIDEOGRAPHER: Anything else
10 before we close, Attorney Haslam?
11       MR. HASLAM: Not from me.
12       THE VIDEOGRAPHER: The time is 2:30,
13 and this concludes today's deposition of
14 Christopher Ambrose. We're off the record.

**83**

3       ACKNOWLEDGMENT OF DEPONENT

5       I, CHRISTOPHER AMBROSE, do hereby
6 acknowledge that I have read and examined the
7 foregoing testimony, and the same is a true,
8 correct and complete transcription of the
9 testimony given by me and any corrections appear
10 on the attached Errata sheet signed by me.

12 _____   _____
13   (Date)                 (Signature)

**84**

3       CERTIFICATE OF REPORTER - NOTARY PUBLIC
4       I, ADRIENNE MIGNANO, the officer before
5 whom the foregoing deposition was taken, do hereby
6 certify that the foregoing transcript is a true
7 and correct record of the testimony given; that
8 said testimony was taken by me and thereafter
9 reduced to typewriting under my direction; that
10 reading and signing was requested; and that I am
11 neither counsel for, related to, nor employed by
12 any of the parties to this case and have no
13 interest, financial or otherwise, in its outcome.
14       IN WITNESS WHEREOF, I have hereunto set
15 my hand and affixed my notarial seal this 17th day
16 of July, 2022.
17 My Commission Expires: June 2026.

23 *Adrienne M. Mignano* (signature)

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052049