# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES,<br>*Plaintiff,*<br><br>v.<br><br>AT&T SERVICES INC.; AT&T MOBILITY LLC; and AT&T CORP.,<br>*Defendants,*<br><br>NOKIA OF AMERICA CORPORATION and ERICSSON INC.,<br>*Intervenors.* | Case No. 2:23-cv-00202-JRG-RSP<br>(Lead Case)<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF XR COMMUNICATIONS, LLC DBA VIVATO TECHNOLOGIES'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**

TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF ISSUES ................................................................................... 2

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................... 3

      A.    '329 Application Prosecution and Abandonment ......................................... 3

      B.    Aequitas Foreclosure Proceedings and Revival Petitions ........................... 6

      C.    Purchase by XR Communications, LLC .................................................... 6

IV.   OTHER RELEVANT FACTS ............................................................................... 7

V.    LEGAL STANDARD ........................................................................................... 10

      A.    Summary Judgment ................................................................................... 10

      B.    Inequitable Conduct .................................................................................. 10

VI.   ARGUMENT ......................................................................................................... 11

      A.    There is no genuine evidence that Schwedler or Burke made knowingly false
            statements in the revival petitions. ........................................................... 12

      B.    Defendants/Intervenors' suggestion—that Schwedler and Burke committed
            inequitable conduct by failing to conduct an inquiry "reasonable under the
            circumstances"—fails as a matter of law. ............................................... 14

      C.    Defendants/Intervenors' claim also fails because it cannot prove that Schwedler
            Burke violated the duty to conduct a reasonable inquiry by clear and convincing
            evidence. ................................................................................................... 18

            1.    Undisputed facts demonstrate that Schwedler and Burke conducted an inquiry
                  "reasonable under the circumstances." .......................................... 18

            2.    Defendants/Intervenors' criticisms of Schwedler and Burke are unsupported
                  and speculative—they cannot show intent to deceive by clear and convincing
                  evidence. ...................................................................................... 21

      D.    No persuasive authority supports a finding of inequitable conduct here. ................... 24

VII.  CONCLUSION ...................................................................................................... 26

# TABLE OF AUTHORITIES

Page

**Cases**

*3D Medical Imaging Sys., LLC v. Visage Imaging, Inc.*,
 228 F. Supp. 3d 1331 (N.D. Ga. 2017) ................................................................... 24

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ............................................................................................ 10, 11

*Asghari-Kamrani v. United Services Automobile Association*,
 252 F. Supp. 3d 562 (E.D. Va. 2017) ....................................................................... 26

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ................................................................................................. 10

*Freshub, Inc. v. Amazon.com, Inc.*,
 93 F.4th 1244 (Fed. Cir. 2024) ................................................................................ 17

*Freshub, Inc., et al. v. Amazon.com, Inc., et al*,
 6:21-CV-00511-ADA, Dkt. 274 (W.D. Tex. Aug. 2, 2021) .................................... 16

*In re Rembrandt Technologies LP Patent Litigation*,
 899 F. 3d 1254 (Fed. Cir. 2018) .............................................................................. 24

*Lumenyte Int'l Corp. v. Cable Lite Corp.*,
 92 F. 3d 1206 WL 383927 (Fed. Cir. 1996) ........................................................... 24

*Pavo Solutions LLC v. Kingston Tech. Co., Inc.*,
 Case No. 8:14-cv-01352-JLS-KES, 2019 WL 4390573, (C.D. Cal. June 26, 2019) ............... 23

*Therasense, Inc. v. Becton, Dickinson & Co.*,
 649 F.3d 1276 (Fed. Cir. 2011) ................................................................... 10, 11, 15

**Rules**

37 C.F.R. §1.137(b) ....................................................................................................... 1
37 CFR § 11.18(b)(2) ........................................................................................ 3, 15, 21
37 CFR 3.71 .................................................................................................................. 5
37 CFR 3.73(b) ............................................................................................................. 6
FED. R. CIV. P. 56(a) ................................................................................................... 10
FED. R. CIV. P. 56(c)(1)(A) ........................................................................................ 10

## TABLE OF EXHIBITS & ABBREVIATIONS

| Ex. | Document Description |
|-----|----------------------|
| 1. | 2006 Power of Attorney for Brooks for the '329 Application |
| 2. | Vivato Networks Security Interest Assignment to Aequitas Capital Attaching Commercial Security Agreement (XR-EDTX1-00000052) |
| 3. | Vivato Networks Assignment to Vivato Networks Holdings (XR-EDTX1-00000069) |
| 4. | Vivato Networks Business Loan Agreement with Aequitas Capital Management (XR-EDTX1-00052610) |
| 5. | Aequitas Capital Management Assignment to Aequitas Equipment Finance Attaching Loan Assignment and Acceptance with Vivato Networks (XR-EDTX1-00000074) |
| 6. | Aequitas Equipment Finance Assignment to XR Communications (XR-EDTX1-00000119) |
| 7. | Excerpts from January 2, 2008 Catcher Holdings Prospectus (XR-EDTX1-00052494) |
| 8. | Vivato Networks Assignment to Aequitas Equipment Finance Attaching Judgment of Foreclosure, and Catcher-Vivato Networks Holdings License Agreement and Assignment (XR-EDTX1-00000077) |
| 9. | Catcher 8-K Filing on April 1, 2008 |
| 10. | Request for Withdrawal of Edward Brooks for the '329 Application (XR-EDTX1-00052244) |
| 11. | Notice of Abandonment for '329 Application |
| 12. | Aequitas's Foreclosure Complaint in *Aequitas Equipment Finance v. Vivato Networks, et. al.*, D. OR. Case No. 3:08-cv-00750 |
| 13. | Order Granting Summary Judgment for Aequitas in *Aequitas Equipment Finance v. Vivato Networks, et. al.*, D. OR. Case No. 3:08-cv-00750 |
| 14. | August 28, 2009 Petition to Revive '329 Application by Carl Schwedler (XR-EDTX1-00052763) |

| Ex. | Document Description |
|-----|---------------------|
| 15. | First Decision Denying Revival of '329 Application (XR-EDTX1-00052810) |
| 16. | November 18, 2009 Request for Reconsideration of Denial of Petition to Revive '329 Application by Carl Schwedler (XR-EDTX1-00052322) |
| 17. | Second Decision Denying Revival of '329 Application (XR-EDTX-00090655) |
| 18. | November 8, 2010 Petition for Revival of '329 Application by Daniel Burke (XR-EDTX1-00052371) |
| 19. | Notice of Acceptance of Power of Attorney for Burke and Decision Granting Revival of '329 Application (XR-EDTX1-00052433) |
| 20. | XR-Aequitas Patent Purchase Agreement — ***CONFIDENTIAL, FILED UNDER SEAL*** (XR-EDTX1-00049331) |
| 21. | Excerpts from Carl Schwedler's July 8, 2022 Deposition Transcript (XR-EDTX1-00052637) |
| 22. | Excerpts from Carl Schwedler's December 5, 2022 Deposition Transcript (XR-EDTX-00090427) |
| 23. | Excerpts from Daniel Burke's July 26, 2022 Deposition Transcript (XR-EDTX1-00052261) |
| 24. | Excerpts from Daniel Burke's January 20, 2023 Deposition Transcript (XR-EDTX-00091733) |
| 25. | Excerpts from Edward Brooks's July 6, 2022 Deposition Transcript (XR-EDTX1-00052124) |
| 26. | Excerpts from Edward Brooks's January 5, 2023 Deposition Transcript (XR-EDTX-00091501) |
| 27. | Excerpts from Gary Haycox's July 7, 2022 Deposition Transcript (XR-EDTX1-00052437) |
| 28. | Excerpts from Allan Rakos' December 8, 2022 Deposition Transcript (XR-EDTX-00090691) |
| 29. | Excerpts from Nicholas Godici's April 25, 2025 Expert Report |

| Ex. | Document Description |
|-----|----------------------|
| 30. | Excerpts from Nicholas Godici's August 26, 2022 Deposition Transcript (XR-EDTX1-00054314) |
| 31. | Excerpts from AT&T's Sixth Supplemental Responses and Objections to Plaintiff's First Set of Common Interrogatories (Nos. 1-11(now 15)), served April 4, 2025 |
| 32. | USPTO's Decision Granting Withdrawal of Edward Brooks for the '329 Application (XR-EDTX1-00052246) |
| 33. | Excerpts from Christopher Ambrose's July 7, 2022 Deposition Transcript (XR-EDTX1-00052028) |
| 34. | Excerpts from Christopher Ambrose's December 19, 2022 Deposition Transcript (XR-EDTX-00090920) |
| 35. | April 28, 2008 letter from Brooks to Ambrose (XR-EDTX-00091226-1235) |
| 36. | Excerpts from Adrian Chraplyvy's February 27, 2023 Deposition Transcript (XR-EDTX-00041244) - ***CONFIDENTIAL, FILED UNDER SEAL*** |
| 37. | Excerpts from Kai Hansen's February 13, 2023 Deposition Transcript (XR-EDTX-00040541) - ***CONFIDENTIAL, FILED UNDER SEAL*** |
| 38. | Excerpts from Thomas Sidley's March 10, 2023 Deposition Transcript (XR-EDTX-00094435) |
| 39. | *Freshub, Inc. v. Amazon.com, Inc.*, 6:21-CV-00511-ADA, Dkt. 274 (W.D. Tex. Aug. 2, 2021) |
| 40. | Rebuttal Expert Report of Nancy J. Linck, JD, PhD, executed May 21, 2025 |

## I.    INTRODUCTION

Plaintiff XR Communications, LLC dba Vivato Technologies ("XR") is entitled to partial summary judgment of no inequitable conduct. Defendants AT&T Services, Inc., AT&T Mobility LLC, AT&T Corp., Verizon Communications, Inc., Cellco Partnership d/b/a Verizon Wireless, and T-Mobile USA, Inc.; and Intervenors Ericsson Inc. and Nokia of America Corporation (collectively, "Defendants/Intervenors") inequitable conduct claim with respect to U.S. Patent No. 10,715,235 ("'235 Patent") depends on its allegation that patent prosecutors Carl Schwedler ("Schwedler") and Daniel Burke ("Burke") submitted petitions to revive U.S. Application No. 10/700,329 ("'329 application") without conducting a reasonable inquiry into the circumstances of abandonment.[1]

Such a theory of inequitable conduct fails as a matter of law. Under *Therasense*, the intent prong requires a *knowing* and *deliberate* misrepresentation to the USPTO. And here, there is no evidence—let alone clear and convincing evidence—that Schwedler or Burke made knowing and deliberate misrepresentations to the USPTO with the filing of the revival petitions under 37 C.F.R. §1.137(b). Importantly, any allegation that Schwedler and Burke failed to make a reasonable inquiry fails to establish the requisite intent to deceive. Yet that is the extent of Defendants/Intervenors' allegations here. Indeed, *Therasense* makes clear that negligence—or even gross negligence—is insufficient to satisfy the intent prong.

*Therasense* is fatal to Defendants/Intervenors' theory because any finding that Schwedler or Burke did not conduct a reasonable inquiry (which is contrary to the evidence) would *at most* show that they were negligent in submitting the revival petitions. Defendants/Intervenors' theory

---

[1] For convenience, XR primarily cites to the pleadings and discovery responses of AT&T in the Lead Case unless otherwise indicated. There are no substantive differences with respect to the inequitable conduct defense and allegations for each Defendant/Intervenor.

is that Schwedler and Burke "should have known" that more investigation was required or "should have known" that the applications were intentionally abandoned. But this exactly the sort of reasoning that *Therasense* rejected.

Defendants/Intervenors' inequitable conduct claim also fails because there is insufficient evidence that Schwedler and Burke failed to conduct an inquiry reasonable under the circumstances. Both testified to the reasonable inquiry they would have conducted, even if they could not remember specific details from 14 years ago. Any argument that Schwedler or Burke might have done more is unsupported and cannot show inequitable conduct by clear and convincing evidence.

## II.    STATEMENT OF ISSUES

1.    Whether Defendants/Intervenors can meet their burden to prove, by clear and convincing evidence, that patent prosecutors Schwedler and Burke (or Thomas Sidley and Adrian Zajac)[2] committed inequitable conduct by submitting revival petitions during prosecution of the '329 application.

2.    Whether Defendants/Intervenors can meet their burden to prove, by clear and convincing evidence, that Schwedler and Burke *knew* or *believed* that the '329 application was intentionally abandoned by Catcher or Vivato Holdings and therefore ineligible to be revived.

3.    Whether, as a matter of law, a prosecutor's alleged violation of the duty of an "inquiry reasonable under the circumstances" for statements made in a paper under 37 CFR §

---

[2] Defendants/Intervenors' inequitable conduct expert, Nicolas Godici, also makes reference to Thomas Sidley ("Sidley") and Adrian Zajac ("Zajac") "ow[ing] a duty of candor to the USPTO relative to the prosecution of the Asserted Patents" in relation to the same petitions to revive. Ex. 29 ¶243. But Sidley and Zajac only signed the Powers of Attorney for Aequitas Equipment Finance ("Aequitas") and XR, respectively. Godici does not set forth any allegations of inequitable conduct for Sidley and Zajac distinct from the revival petitions submitted by Schwedler and Burke, and Defendants/Intervenors have not disclosed any. *See* Ex. 31 at pp. 29-43; Dkt. 26 (ATT's Answer).

11.18(b)(2) is sufficient to prove, by clear and convincing evidence, the specific intent to deceive the USPTO under *Therasense*.

4.　　Whether Defendants/Intervenors can meet their burden to prove, by clear and convincing evidence, that (a) Schwedler and Burke failed to conduct an inquiry reasonable under the circumstances, and (b) their inquiry was so deficient or non-existent as to constitute the specific intent to deceive the USPTO under *Therasense*.

## III.　STATEMENT OF UNDISPUTED MATERIAL FACTS

1.　　Defendants/Intervenors plead a Seventh Affirmative Defense of unenforceability of the '235 Patent due to alleged inequitable conduct. Dkt. 26 at 13-16; Dkt. 57 at 16-19; Dkt. 58 at 16-18; Dkt. 59 at 16-18; Dkt. 100 at 12-14; Dkt. 101 at 19-21; Dkt. 102 at 18-21; Dkt. 103 at 18-21; Dkt. 104 at 13-16; Dkt. 105 at 12-15; Dkt. 106 at 13-15; No. 2:23-CV-204, Dkt. 15 at 12-15.

2.　　The '235 Patent claims priority to a parent application originally filed in 2003 as the '329 application. Dkt. 1-3 ('235 Patent) at 3.

### A.　　'329 Application Prosecution and Abandonment

3.　　By November 7, 2006 Edward J. Brooks III ("Brooks") was the prosecuting attorney on the '329 application. The Power of Attorney for Brooks was signed by Gary Haycox ("Haycox") as CEO for the assignee. Ex. 1.

4.　　Brooks testified that he only ever communicated with Haycox and did not have contact with anyone else during his work for the applicant. Ex. 25 at 11:16-21, 13:8-14:4.

5.　　Haycox was the CEO of Catcher Holdings, Inc., Vivato Networks, Inc., Vivato Networks, LLC, and Vivato Networks Holdings, Inc. in 2007–2008. *See* Exs. 2-3; Ex. 7 at 3; Ex. 9 at 3.

6.      On November 30, 2007, Vivato Networks, Inc. ("Vivato Networks"), then-owner of the '329 application, granted Aequitas Capital Management, Inc. ("Aequitas Capital") a perfected security interest in the '329 patent application as part of a commercial security agreement. Ex. 2. Vivato Networks and Aequitas Capital also entered into a Business Loan Agreement and Promissory Note evidencing the loan. Ex. 4. That same day, Aequitas Capital assigned its security interest in the '329 patent application to Aequitas Equipment Finance, LLC ("Aequitas Equipment"). Ex. 5.

7.      On December 4, 2007, Vivato Networks, Inc. merged with Catcher Holdings, Inc. ("Catcher"). Ex. 7 at 3; Ex. 27 at 15:6-16:22. After this merger, Vivato Networks assigned its patents and applications, including the '329 application, to a newly formed entity of the merger, Vivato Networks Holdings, LLC ("Vivato Networks Holdings"). Ex. 3. That same day, Vivato Networks Holdings granted Catcher "an exclusive license to the Licensed IP Rights" and Catcher had "the exclusive right during the term of this Agreement, to prepare, file, prosecute, maintain and enforce the Licensed IP Right." Ex. 8 at 12.

8.      On January 30, 2008, all principal and accrued interest in the Vivato Networks-Aequitas Promissory Note and Business Loan were due and payable. But Vivato Networks had failed to make the required payments and was in default. Ex. 4 at 1.

9.      Two months later, by or around April 1, 2008, Catcher terminated all its employees and ceased doing business because it had insufficient working capital. Catcher also admitted to defaulting on the $1 million loan from Aequitas. Ex. 9 at 2; Ex. 27 at 77:22-78:7.

10.     Shortly after Catcher collapsed, on April 25, 2008, Brooks filed a Request for Withdrawal in the '329 application examination. That request designated notices to be sent to

Christopher Ambrose ("Ambrose") in his stead even though Ambrose is not a patent prosecutor. Ex. 10; Ex. 33 at 62:20-63:17.

11.     On April 28, 2008, Brooks sent a letter directed to "Vivato Networks Holdings c/o Christopher R. Ambrose" to Ambrose's office, indicating Brooks was withdrawing and providing notice of a pending final office action due by June 17, 2008. Ex. 35. But while Mr. Ambrose testified he was aware of this letter, he could not say what, if any, specific information was relayed to Vivato Networks Holdings or Haycox. Ex. 34 at 84:23-87:3. Haycox, on the other hand, affirmatively testified that it never came to his attention that the '329 application Brooks had been prosecuting went abandoned. Ex. 27 at 64:6-12.

12.     On June 9, 2008, in the '329 application examination, the USPTO mailed notice to Brooks, "Vivato, Inc." (at "139 Townsend Street, Suite 200, San Francisco, CA 94107"), and Ambrose that it approved Brooks's Request to Withdraw, but *rejected the change of correspondence of record* because "the requested correspondence address is not that of (1) the first named signing inventor; or (2) an intervening assignee of the entire interest under 37 CFR 3.71. *Accordingly, all correspondence will be mailed to the assignee*." (emphasis added). Ex. 32. But the USPTO failed to mail correspondence to the address of the correct assignee (Vivato Networks Holdings), and instead mailed correspondence to the original 2004 assignee (Vivato, Inc.) at a defunct address. *See* Ex. 11 at 3.

13.     On June 18, 2008 and just before Aequitas Equipment initiated foreclosure proceedings, the '329 application went abandoned per USPTO rules and procedures because no response to a March 17, 2008 final Office Action had been filed. Ex. 11. The notice of abandonment mailed by the USPTO was sent to Vivato, Inc. at the San Francisco address and was returned undelivered. Ex. 11 at 3.

**B.    Aequitas Foreclosure Proceedings and Revival Petitions**

14.    On June 20, 2008, Aequitas Equipment initiated foreclosure proceedings against Vivato Networks, Inc. and Vivato Networks Holdings, Inc. for defaulting on the loan. Ex. 12. Bullivant Houser Bailey ("Bullivant") represented Aequitas Equipment in these proceedings. *Id.* Vivato Networks Holdings filed counter-claims against Vivato Networks and Catcher. On November 19, 2008, Aequitas Equipment won summary judgment. Ex. 13.

15.    On April 23, 2009, Aequitas Equipment Finance received a foreclosure judgment against Vivato Networks Holdings including for the '329 patent application. *See* Ex. 20 at -7324-329. On June 2, 2009, Aequitas Equipment Finance purchased the rights to the '329 patent application, among other IP, at a sheriff's sale. *See* Ex. 20 at -49355-358.

16.    Shortly thereafter, on August 28, 2009, Schwedler, who also worked at Bullivant, filed a Petition for Revival of an Application for Patent Abandoned Unintentionally Under 37 CFR 1.137(b) in the '329 application, and also filed a Request for Continued Examination (RCE) and response to the March 17, 2008 Office Action. Ex. 14. On November 3, 2009, the USPTO dismissed Schwedler's petition to revive the '329 application because Aequitas Equipment Finance was not yet the assignee of record. Ex. 15. Schwedler corrected these issues on November 18, 2009, and filed: (1) a Statement under 37 CFR 3.73(b) for Aequitas Equipment Finance, LLC as the assignee of an undivided interest in the entirety of the application; (2) a Power of Attorney for Schwedler signed by Thomas A. Sidley ("Sidley"), Member of Aequitas Equipment Finance, LLC, for assignee; (3) a renewed Petition for Revival of an Application for Patent Abandoned Unintentionally; and (4) a response to the March 17, 2008 Office Action. Ex. 16.

**C.    Purchase by XR Communications, LLC**

17.    On December 23, 2009, before the USPTO decided whether to grant Schwedler's renewed petition to revive the '329 application, XR Communications, LLC ("XR") purchased the

rights to the '329 patent application, among other IP, from Aequitas Equipment Finance for $1,000,000. Ex. 20. In Section 5.9 of the purchase agreement, Aequitas Equipment represented and warranted that it had "filed in accordance with the applicable rules and procedures of the USPTO, appropriate petitions for revival for the patent applications indicated and had pursued, and through the Closing Dates will pursue, such revival with best commercially reasonable good faith efforts." *Id.* Daniel P. Burke ("Burke") represented XR throughout this transaction with Aequitas Equipment and worked on the purchase agreement. Ex. 24 at 56:13-58:4, 97:7-98:8. Around this time, Burke also recorded the assignment from Aequitas to XR. Ex. 6.

18.    Because of the change in ownership of the '329 application, on May 6, 2010, the USPTO dismissed Schwedler's renewed petition to revive the '329 application stating his power of attorney was now improper because it did not "contain a complete chain of title from the original owner to the current assignee of record." Ex. 17 at -90655.

19.    On November 8, 2010, Burke filed a Petition for Revival of an Application for Patent Abandoned Unintentionally in the '329 application examination, an RCE and response to the March 17, 2008 Office Action, and a "Renewed Petition Under 37 CFR 1.137(b)." Ex. 18. Adrian Zajac signed the power of attorney on behalf of XR. *Id.* In the Petition for Revival, Burke stated that "the entire delay in filing the required reply from the due date for the reply was unintentional" and summarized the background and history of the petitions to revive filed by Mr. Schwedler and subsequent assignment of the '329 application to XR Communications LLC while the decision on Mr. Schwedler's November 28, 2009 Petition for Revival was still pending. *Id.*

20.    Burke's revival petition was granted on November 18, 2010. Ex. 19.

## IV.    OTHER RELEVANT FACTS

In addition to the undisputed material facts in the preceding section, there are additional relevant testimony in the record. First, Mr. Schwedler testified that he never intended to

deceive the PTO in submitting the petitions for revival. Ex. 21 at 44:13-16. He also testified that the representations he made to the PTO in those petitions about the abandonments being unintentional were based on his best information at the time and were based on a reasonable investigation into what he needed to know to make those representations. Ex. 21 at 43:16-44:12. Schwedler testified that he never received any information that the applications were intentionally or deliberately abandoned, and that his understanding was the applications were unintentionally abandoned "through all relevant periods that were subject to the certifications [he] made". Ex. 21 at 44:17-46:5. Schwedler testified that he recalled "catch[ing] up on all the files and all the portfolio" after being retained. Ex. 21 at 21:13–25. Schwedler testified that he likely would have made a determination that the delays were unintentional based on "investgat[ing] the relationship of the application, the entities, of who owned what when." Ex. 21 at 23:6-24. He testified that he recalled there were financial difficulties or a bankruptcy with the prior assignees and identified that as "the kind of information we would have elicited." *Id.*; Ex. 21 at 25:15-22. He also testified that he reviewed the prosecution histories and "would have done some outside research at least." Ex. 21 at 25:15-22, 40:6–18. He also testified that a lot of the communications with the client went through a corporate attorney at his firm, Bullivant, who as the client contact and managing partner of the case. He also testified that if he needed more information about the applications or revival petitions, "anything relevant would have communicated through the managing partner of the case." He also testified that he would have received

factual information from his colleague, and then made his own conclusions about prosecution practice. Ex. 21 at 25:15-22, 40:6–18., at 46:17–22, 46:25–47:3, 46:25-47:20.

Similarly, Burke testified to his belief that he performed a reasonable inquiry in connection with the revival petition he submitted in the '329 patent application examination because it was his practice to do so. Ex. 23 at 85:22-86:16, 102:5-8. Burke testified that he "probably did" legal research "because that would be [his] practice. This isn't something like we deal with every day . . . . So [he] probably looked into it." Ex. 23 at 79:24-80:8; *see also* Ex. 24 at 128:18-130:3 (testifying he had a general practice to follow USPTO rules and procedures, and that his research could extend beyond the MPEP and into court decisions). Burke testified that it was his usual practice to carefully follow and adhere to the duty of candor owed to the PTO, and that if instructed to conduct an investigation by the USPTO, his general practice is to follow that instruction. Ex. 23 at 97:11-14; Ex. 24 at 129:23-130:3. Burke testified that his practice was to make an inquiry for the entire time period relevant to the petition for revival petition because he "wouldn't file something like this willy-nilly. [He] would do what [he] was supposed to do." Ex. 23 at 89:1-20. Burke testified that he has never seen any evidence that the patent applications were intentionally or deliberately abandoned. Ex. 23 at 101:10-17. Burke testified that he did not see any evidence of knowingly false statements made, any evidence of a specific intent to deceive the PTO, any evidence of inequitable conduct in the prosecution history documents he reviewed during his deposition. Ex. 23 at 99:5-100:12. Burke testified that he did not think there was any delay or motivation for any delay and that the petitions for revival were timely. Burke also testified that he believed it should be clear to anyone

looking at this record that at least from the period of all the petitions that clearly people did not want them abandoned. Ex. 23 at 85:22-86:16.

## V.    LEGAL STANDARD

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."). A fact is "material" only if it affects the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Likewise, a dispute as to a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* The question is "whether a jury could reasonably find *either* that the [moving party] proved his case by the quality and quantity of evidence required by the governing law *or* that he did not." *Id.* at 254. Accordingly, once the moving party establishes a *prima facie* case, the burden shifts to the nonmoving party to set forth specific facts by "citing to particular parts of materials in the record" showing that there is a genuine issue for trial. FED. R. CIV. P. 56(c)(1)(A); *see also Anderson*, 477 U.S. at 250.

### B.    Inequitable Conduct

Inequitable conduct requires a showing that both (1) information material to patentability was withheld from the USPTO or material misinformation was provided to the USPTO; and (2) the action was taken with the specific intent to deceive the USPTO into granting the patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290–92 (Fed. Cir. 2011) (*en banc*).

To satisfy the specific intent prong, the asserting party must establish by clear and convincing evidence that the action in the materiality prong was both knowing and deliberate. *Id.* at 1290 ("the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it."). Negligence—or even gross negligence—is not sufficient to satisfy the intent prong. *Id.* ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement.").

To meet the clear and convincing evidence standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Id.* at 1290. Indeed, the evidence "must be sufficient to *require* a finding of deceitful intent in light of all the circumstances." *Id.* (emphasis in original). Hence, "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290–91.

## VI.    ARGUMENT

XR is entitled to partial summary judgment of no inequitable conduct. There is no evidence that prosecutors Schwedler and Burke made knowingly false statements in submitting revival petitions for the '329 application. Thus, Defendants/Intervenors' theory depends on their allegation that Schwedler and Burke submitted the petitions without conducting an inquiry "reasonable under the circumstances" for statements made in papers before the USPTO. This fails as a matter of law. The intent prong of *Therasense* requires a *knowing* and *deliberate* misrepresentation to the USPTO. Negligence—or even gross negligence—is insufficient. Defendants/Intervenors' theory also fails because there is insufficient evidence that Schwedler and Burke failed to conduct an inquiry reasonable under the circumstances. Both testified to the investigations they would have performed and their understanding that the '329 application was unintentionally abandoned. Defendants/Intervenors' criticisms about Schwedler and Burke's work from 14 years ago rest

11

primarily on faded memories. And to the extent Defendants/Intervenors cannot show, by clear and convincing evidence, that their inquiry was so deficient or non-existent as to constitute the specific intent to deceive the USPTO under *Therasense*.

### A. There is no genuine evidence that Schwedler or Burke made knowingly false statements in the revival petitions.

Defendants/Intervenors' operative answers assert that Schwedler and Burke's revival petitions "contained *knowingly false statements* made with intent to deceive" the USPTO. Dkt. 26 at 15.[3] But beyond pleading that allegation, Defendants/Intervenors failed to adduce any documents or testimony showing that Schwedler and Burke's statements were knowingly false. Indeed, there is no evidence in the record that Schwedler or Burke *knew* or *believed* that the '329 application was intentionally abandoned and thus ineligible to be revived. None of the relevant witnesses testified to such an understanding. Defendants/Intervenors does not—and cannot—allege that Schwedler or Burke were ever informed that the abandonment of the '329 application was intentional.

To the contrary, the relevant witnesses supported Schwedler's and Burke's understandings that the '329 patent was unintentionally abandoned. This includes representatives from Catcher, the entity responsible for prosecuting the applications, and Vivato Holdings, a subsidiary of Catcher and then-assignee of the '329 application. For example:

- Brooks (prosecutor for Catcher) testified he never received any instruction to abandon the applications. Ex. 25 at 49:1–4; Ex. 26 at 62:20–22 ("Q: You do not recall any instruction to abandon an application, correct? A: Correct."). He also testified that none of the documents he reviewed from the prosecution histories, including the revival petitions, reflected an intent to deceive the USPTO. Ex. 25 at 49:16–50:4.

---

[3] All emphasis added unless otherwise noted.

- The Notice of Abandonment of the '329 application was sent to the wrong assignee (Vivato, Inc.) to a defunct address and was returned to the USPTO as undeliverable. Ex. 11.

- Haycox (CEO of Catcher) testified that Catcher never intended to abandon any applications. Ex. 27 at 81:18–82:4. He also testified that he was never aware that the applications went abandoned. *Id.* at 64:6–12.

- Rakos (President and COO of Vivato) testified that he had never heard abandoning the applications or permitting them to be abandoned. Ex. 28 at 56:23–57:24 ("Q: in all of your involvement with Vivato, have you heard anyone talk about an intention or desire or a strategy to abandon the patent applications or allow them to become abandoned?" A: *No, none whatsoever*." He also testified that abandoning applications would have the opposite of his goals. *Id.* ("A: Why would I invest money in something that I would turn around and abandon? That doesn't make sense.").

- Schwedler (prosecutor for Aequitas) testified to his understanding that the applications were unintentionally abandoned through "all relevant periods." Ex. 21 at 45:2–8. He also testified that he never received any information the applications were intentionally or deliberately abandoned. *Id.* at 44:17–45:1. He also testified that the revival petitions were based on the best information he had at the time. *Id.* at 44:6–11.

- Burke (prosecutor for XR) testified to his firm conviction that any abandonment of the applications was unintentional. Ex. 23 at 85:22–86:16 ("I don't think there was any delay. I don't think there was any motivation for any delay. . . . I think these were timely. And I think it should be pretty darn clear to anybody looking at this record that, you know, you had at least from the period of all these petitions, that clearly people didn't want them, you know, abandoned."). Burke also testified that he has never seen any evidence that the applications were deliberately abandoned. *Id.* at 101:10–17.

Moreover, Defendants/Intervenors only basis for alleging that the application was intentionally abandoned is a purported decision not to pay Brooks to continue prosecution. *See* Ex. 31 at 38. But even if there was evidence of such a deliberate decision not to pay Brooks—and there is none[4]—that does not establish clear and convincing evidence of a deliberate decision to let the

---

[4] There is only evidence that Brooks was not paid and he withdrew. There is no evidence as to *why* Brooks was not paid, or even whether there was a deliberate decision by Haycox, Vivato Networks Holdings, or any other entity not to pay Brooks. Rather, testimony evidence is that all relevant entities (Vivato Networks, Catcher, and Aequitas) were motivated to maintain the patent portfolio

application go abandoned. *See* Ex. 40 at ¶¶141-142. And in any event, Defendants/Intervenors have no contrary testimony or documentary evidence that Schwedler or Burke knew that their representations in the revival petitions were false. Tellingly, in prior litigation in the Central District of California (where Brooks, Haycox, Schwedler, and Burke were first deposed) the defendants in that case never asserted that Schwedler and Burke's statements were knowingly false. That is because they did not have a good faith basis for that assertion. Indeed, defendants' expert on inequitable conduct, Mr. Godici, admitted as much in deposition:

> Q:   I want to confirm, you don't assert or offer an opinion that Mr. Schwedler or Mr. Burke made knowingly false statements to the USPTO in the revival petitions, correct?
>
> A:   Well, again, we don't have testimony that they -- that they had some knowledge or document that said it was intentional, and then decided to tell the Patent Office that it was unintentional.

Ex. 30 at 166:2–12; *see also id.* at 163:16–164:8.

The same applies in this case. There is no genuine evidence that Schwedler and Burke knew that Catcher or Vivato Holdings intentionally abandoned the '329 application or that the applicable was ineligible to be revived. Accordingly, there is no evidence that Schwedler or Burke made knowingly false statements in the revival petitions with the intent to deceive the USPTO.

**B.    Defendants/Intervenors' suggestion—that Schwedler and Burke committed inequitable conduct by failing to conduct an inquiry "reasonable under the circumstances"—fails as a matter of law.**

Lacking any evidence of deceptive intent, Defendants/Intervenors' suggests that Schwedler and Burke committed inequitable conduct by failing to conduct reasonable inquiry into the circumstances of abandonment. This is shown by the allegations in Defendants/Intervenors'

---

and not let any application go abandoned as they believed the patent portfolio was valuable. *See* Ex. 27 at 51:16-52:15, 67:19-68:13, 81:9-82:13; Ex. 28 at 56:23-57:24; Ex. 33 at 66:19-68:1.

interrogatory responses that fault Schwedler and Burke for not conducting a sufficiently detailed investigation before submitting the petitions to revive for the '329 application (*see* Ex. 31 at 39):

> Both Mr. Schwedler and Mr. Burke chose to remain willfully ignorant of the circumstances that led to the abandonments and chose to ignore warnings from the Patent Office that further investigation was warranted based on their lack of personal knowledge.

Although not sufficiently explained, Defendants/Intervenors appear to argue that Schwedler and Burke violated the USPTO's analog to Rule 11 concerning statements in papers. *See* 37 CFR § 11.18(b)(2) (a patent prosecutor certifies that "all statements made in that paper are true and *formed after an inquiry reasonable under the circumstances*"). Defendants/Intervenors imply that Schwedler and Burke committed inequitable conduct because (1) they had a duty to make an inquiry "reasonable under the circumstances" before submitting the revival petitions, and (2) they failed to make that inquiry. Defendants/Intervenors allege that Schwedler and Burke violated the duty of reasonable inquiry.

But such a theory of inequitable conduct fails as a matter of law. Under *Therasense*, the intent prong requires a *knowing* and *deliberate* misrepresentation to the USPTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (*en banc*) ("the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it."). And here, there is no evidence— let alone clear and convincing evidence—that Schwedler or Burke made knowing and deliberate misrepresentations to the USPTO. Thus, Defendants/Intervenors cannot show that Schwedler and Burke acted with deceitful intent and inequitable conduct cannot be found. *See id.* at 1290. ("Indeed, the evidence must be sufficient to *require* a finding of deceitful intent in light of all the circumstances.") (emphasis in original).

Importantly, any allegation that Schwedler and Burke failed to make a reasonable inquiry into the circumstances of abandonment fails to establish the requisite intent to deceive. Yet that is the extent of Defendants/Intervenors' intent allegations here. Indeed, *Therasense* makes clear that negligence—or even gross negligence—is insufficient to satisfy the intent prong. *Id.* ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement.").

*Therasense* is fatal to Defendants/Intervenors' claim because any finding that Schwedler or Burke violated the duty of reasonable inquiry would at most show that they were negligent in submitting the revival petitions. Defendants/Intervenors' theory is that Schwedler and Burke "should have known" that more investigation was required or "should have known" that the applications were intentionally abandoned. But this exactly the sort of reasoning that *Therasense* rejected. Here, even assuming Schwedler and Burke fell short of a reasonable inquiry, that would only show they failed to meet practice standards of due care and diligence as prosecuting attorneys. Such a finding might amount to professional negligence but does *not* indicate deceitful intent. At a most, negligence could be a reasonable inference, but not the *only* reasonable inference. And under *Therasense*, "when there are multiple reasonable inferences that may be drawn, intent to deceive **cannot** be found." *Id.* at 1290–91.

In *Freshub, Inc. v. Amazon.com, Inc.*, the district court granted the plaintiff's motion for judgment of no inequitable conduct after determining that Amazon could not prove the intent prong because "at the most, Amazon has shown that [the prosecutor] was negligent in his failure to conduct a thorough investigation to determine whether [the applicant's] abandonment of the '291 patent was unintentional." Ex. 39, 6:21-CV-00511-ADA, Dkt. 272 at 10–12 (W.D. Tex. Aug. 2, 2021). The *Freshub* district court decision was recently affirmed by the Federal Circuit, who

held that the district court did not err in finding that on the evidence of record, intent to deceive the USPTO was not proven. *Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244, 1252 (Fed. Cir. 2024) The Federal Circuit ruled that the prosecuting patent attorney's representation to the USPTO that the entire period of delay was unintentional was a representation about the patentee's intent. *Id.* at 1253 ("We consider the record for the . . . question of what Ikan's counsel believed in 2017 about whether Ikan intentionally abandoned the '291 application"). And it was reasonable for the district court to find the prosecutor believed the patentee did not intend to abandon the application, even though the application was abandoned for more than five years. *Id.* at 1254 ("The district court could find that counsel genuinely so believed, whether or not the belief was legally correct, and that counsel did not think that *Ikan* had the intent to abandon during the 2012–17 non-response period."). Likewise here, at *most*, Defendants/Intervenors can show that Schwedler and Burke were negligent in conducting a thorough investigation, but not that their representations in their revival petitions to the USPTO rise to the level of intent to deceive. *Id.*

Indeed, if Defendants/Intervenors' inequitable conduct claim were accepted, it would essentially remove the requirement to prove intent to deceive by clear and convincing evidence. An accused infringer could point to any allegedly incorrect statement in the prosecution history and allege that the prosecutor violated the duty of reasonable inquiry in making the statement. And with the benefit of hindsight, the accused infringer could make various litigation-driven arguments about what further investigation the prosecutor could or should have done. And the accused infringer could try to use the prosecutor's alleged lack of reasonable inquiry to satisfy the requisite intent to allege the inequitable conduct.

That is not the law and would invite negative consequences. Defendants/Intervenors' claim is unsupported and contravenes *Therasense*'s express mandate to "tighten[] the standards for

17

finding the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Id.* at 1290.

### C. Defendants/Intervenors' claim also fails because it cannot prove that Schwedler Burke violated the duty to conduct a reasonable inquiry by clear and convincing evidence.

Because there is no evidence of deceptive intent, Defendants/Intervenors' inequitable conduct claim should be rejected for this reason alone. The Court can simply find (as it should) that Defendants/Intervenors' allegations at most show that Schwedler and Burke acted negligently—but that negligence, or even gross negligence, is insufficient under *Therasense*. Thus, Defendants/Intervenors' inequitable conduct defense fails as a matter of law and partial summary judgment should be entered.

Even assuming that an alleged violation of the duty of reasonable inquiry is sufficient to show inequitable conduct (and it is *not*), Defendants/Intervenors' theory would still fail. This is because Defendants/Intervenors cannot prove that Schwedler and Burke failed to conduct an inquiry reasonable under the circumstances by clear and convincing evidence. Nor can Defendants/Intervenors prove that the inquiry they conducted was so deficient or non-existent as to constitute inequitable conduct.

### 1. Undisputed facts demonstrate that Schwedler and Burke conducted an inquiry "reasonable under the circumstances."

Schwedler and Burke each testified that they conducted a reasonable inquiry in certifying that the '329 application was unintentionally abandoned and therefore eligible to be revived. For example, at least the following relevant facts are undisputed.

Schwedler was a patent prosecutor at Bullivant, a law firm with institutional knowledge about the applications, including their ownership history. Bullivant represented Aequitas in the

foreclosure proceedings against Vivato Holdings in 2008–2009 that resulted in obtaining the patents and applications through a sheriff's sale.

Schwedler testified that when he submitted petitions for revival, they were based on his best information at the time, and "certainly" based on a reasonable investigation into what he needed to know to make those representations. Ex. 21 at 44:17-46:5; *see also* Ex. 22 at 65:20–69:20. He recalled making a determination that the delays were unintentional based on "investgat[ing] the relationship of the application, the entities, of who owned what when." Ex. 21 at 21:13–25, 25:15-22. He also recalled there being financial difficulties or a bankruptcy with the prior assignees and identified that as "the kind of information we would have elicited." *Id.*

Schwedler also testified that he reviewed the prosecution histories and "would have done some outside research at least." *Id.* at 40:6–18. He also testified that a lot of the communications with the client went through a corporate attorney at his firm, Bullivant, who as the client contact and managing partner of the case. *Id.* at 46:17–22, 46:25–47:3, 47:5–24. Schwedler testified that if he needed more information about the applications or revival petitions, "anything relevant would have communicated through the managing partner of the case." *Id.* at 47:5–24. He further testified that he would have received factual information from his colleague, and then made his own conclusions about prosecution practice. *Id.* at 46:25-47:20.

Sidley testified that while he did not generally recall anything specific about the Vivato patent applications or transactions, he confirmed that Bullivant's billing records indicated Sidley *did* have some discussions with attorneys at the Bullivant firm regarding the revival of the '329 application around 2009 when Schwedler was working on revival documents. *See* Ex. 38 at 97:3-100:16. The billing records also indicate that multiple attorneys (not just Schwedler) at the Bullivant firm reviewed records and had discussions in connection with their work on the revival

petition. *Id.* There is further indication that the investigation regarding the circumstances of the abandonment and revival were "report[ed] to potential buyer" (i.e., XR). *See* Ex. 38 at 100:12-101:19.

Burke was a patent prosecutor that XR hired in connection with the patent purchase agreement, and prosecution work for the applications flowed thereafter. Ex. 24 at 26:14-27:25. He was involved in drafting and negotiating the purchase agreement with Aequitas and may have been the primary person working on the agreement for XR. Ex. 24. at 56:19–58:3. In Section 5.9 of the purchase agreement, Aequitas represented and warranted that it had "filed *in accordance with the applicable rules and procedures* of the USPTO, *appropriate petitions for revival* for the patent applications." Ex. 20 at §5.9. Burke may have proposed this as a condition of XR's purchase of the patent assets, including the '329 application. Ex. 24 at 56:19–58:3.

Adrian Chraplyvy ("Chraplyvy") (XR's Rule 30(b)(6) witness on topics pertaining to inequitable conduct allegations) testified that XR asked for the §5.9 representation in the Aequitas-XR Purchase Agreement that applications would be revived "in accordance with the applicable rules and procedures of the USPTO" with the intent "to make sure that [Aequitas] would properly revive some of the abandoned assets that they could." Ex. 36 at 196:20-198:4. He also testified that while he didn't recall specific steps XR took, XR conducted significant diligence (including hiring lawyers to do so) prior to entering into the transaction, which likely would have included reviewing publicly available documents that would have shown the bankruptcy proceedings and Catcher Holdings ceasing operations. Ex. 36 at 188:21-189:4, 218:19-219:8. Kai Hansen ("Hansen") (another member of XR) testified to these same points as Mr. Chraplyvy. Ex. 37 at 139:23-144:15, 145:18-148:24, 149:18-151:25, 153:21-155:7.

Burke testified that he did not recall the specifics of the revival petitions and declined to speculate. Ex. 23 at 91:4–93:1. He testified that he believes he performed a reasonable inquiry "because that was my usual practice, but I don't remember what I did." Ex. 23 at 102:5–8. He also testified that it was his usual practice to adhere to the duty of candor "carefully" and make a reasonable investigation into the facts if called for by a certification or submission. Ex. 23 at 97:11-14. He testified that this was "the way I've always practiced" and that he "wouldn't file something like this willy-nilly. [He] would do what [he] was supposed to do." Ex. 23 at 89:1–20. He testified about his awareness of patent litigation and the importance of doing things "correctly up front so that when someone goes over it with a fine tooth comb, there are no issues." Ex. 23 at 98:7–20. Burke testified to an understanding of unintentional versus unavoidable abandonment and maintained his conviction that the applications were unintentionally abandoned. Ex. 23 at 85:22–86:16 ("I don't think there was any delay. I don't think there was any motivation for any delay.").

Burke testified that he "probably did" legal research regarding unintentional abandonment "because that would be my practice. This isn't something like we deal with every day . . . . So I probably looked into it." Ex. 23 at 79:24–80:8. His research would have extended not just to USPTO rules and procedures, but beyond into MPEP and court decisions. Ex. 24 at 129:3–22. He testified about his usual practice in handling abandoned applications. He explained that he would revive applications if he knew the abandonment was unintentional but not if the abandonment was intentional. Ex. 24 at 124:21-125:24.

**2.    Defendants/Intervenors' criticisms of Schwedler and Burke are unsupported and speculative—they cannot show intent to deceive by clear and convincing evidence.**

Given these facts, any assertion that Schwedler and Burke violated the duty of reasonable inquiry is insufficient and fails for several reasons. *First*, there is no strict definition for what constitutes a reasonable inquiry. 37 CFR § 11.18(b)(2) provides that any party signing, filing, or

submitting a paper certifies that all statements made in the paper are believed to be true and formed after "an inquiry reasonable under the circumstances." Here, Schwedler and Burke certainly conducted an inquiry into the facts and circumstances of the delay. There is no objective evidence, such from USPTO guidelines, that require a particular form of inquiry for Schwedler and Burke to take. Defendants/Intervenors have not provided an expert report regarding USPTO practice and procedure. Thus, any assertion that Schwedler and Burke violated the duty of reasonable inquiry is unsupported and subjective. On this record, it cannot be proven by clear and convincing evidence.

*Second*, the facts and circumstances here further demonstrate that Schwedler and Burke acted reasonably here. For example, Schwedler testified that he obtained information on the circumstances of abandonment in discussions with another colleague at his firm (Bullivant) who was the client contact and managing partner of the case. This reliance was reasonable given that the Bullivant law firm had institutional knowledge about the applications and their history. Indeed, Bullivant had represented Aequitas in obtaining the applications through foreclosure proceedings against Vivato Holdings. Sidley confirmed billing records from Bullivant that indicated multiple attorneys reviewed records and had discussions in connection with their work on the revival petitions. As another example, Burke was directly involved in drafting and negotiating the patent purchase agreement, whereby XR acquired the patent assets from Aequitas. In that agreement, Aequitas represented and warranted that the revival petitions were "appropriate" and filed "in accordance with the applicable rules and procedures of the USPTO." This would have further informed Burke's inquiry and shown it was unreasonable under the circumstances.

*Third*, it is inappropriate to characterize the lack of affirmative evidence that certain steps were performed as affirmative evidence that certain steps were *not* performed. Schwedler and

Burke repeatedly testified that they did not recall the specifics of what they did but testified as to what they could remember or their usual practice as prosecutors. This is not surprising since Schwedler and Burke were asked about conversations and events that may have occurred 14 years ago. And it is likewise inappropriate to rely on lack of recollection as evidence that a reasonable inquiry was not performed.

Last, to the extent Defendants/Intervenors claim some undisclosed intent to deceive by Sidley or Zajac (*see* fn. 2), it fails for the same reasons as discussed above with respect to Schwedler and Burke. Additionally, Zajac was never deposed in this action, and Sidley did not recall anything about the Vivato patent applications, the Vivato transactions, or anything about the abandonment or revival of the '329 application. *See generally* Ex. 38. However, Sidley confirmed that Bullivant's billing records indicated Sidley *did* have some discussions with attorneys at the Bullivant firm regarding the revival of the '329 application around 2009 when Mr. Schwedler was working on revival documents. *See* Ex. 38 at 97:3-100:16. The billing records also indicate that multiple attorneys at the Bullivant firm reviewed records and had discussions in connection with their work on the revival petition. *Id.* There is further indication that the investigation regarding the circumstances of the abandonment and revival were "report[ed] to potential buyer" (i.e., XR). *See* Ex. 38 at 100:12-101:19. Therefore, any allegation that Sidley or Zajac may have committed misconduct is unsupported, speculative, and can not rise to the level of clear and convincing evidence of an intent to deceive.

Defendants/Intervenors cannot meet their burden by clear and convincing evidence to show that an intent to deceive is "the single most reasonable inference able to be drawn from the evidence." *See Pavo Solutions LLC v. Kingston Tech. Co., Inc.*, Case No. 8:14-cv-01352-JLS-KES, 2019 WL 4390573, at *4–5 (C.D. Cal. June 26, 2019) (granting plaintiff's motion of partial

summary judgment of no unenforceability) (finding that defendant adduced insufficient evidence and therefore there were "a multitude of reasonable inferences" to be drawn from the testimony and intent to deceive could not be inferred as a matter of law).

### D. No persuasive authority supports a finding of inequitable conduct here.

No relevant legal authority supports Defendants/Intervenors' claim of inequitable conduct. For example, cases finding inequitable conduct involve situations where there was direct, compelling evidence that the patent prosecutor *knew* that applications were intentionally abandoned but nevertheless said the opposite to the USPTO.[5] They involve substantial evidence that the prosecutor's statements on were *knowingly false* and made with the specific intent to deceive the USPTO. Those cases (and others finding inequitable conduct) are distinguishable for that simple reason. Here, there is no evidence that that Schwedler's and Burke's revival petitions were knowingly false or made with the specific intent to deceive the USPTO.

Further, no case supports the proposition that the lack of a reasonable inquiry can alone show inequitable conduct. Defendants/Intervenors may rely on one Georgia district court case as allegedly supporting its theory: *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331 (N.D. Ga. 2017). But that case is wholly inapposite, at least because: (1) the application was deliberately abandoned; (2) correspondence between the applicant and its patent attorney

---

[5] In *In re Rembrandt Technologies LP Patent Litigation*, there was direct evidence of abandonment, including the applicant's acknowledgment that "failure to pay maintenance fees results in loss of patent rights" and its knowledge of "exactly why" the applicant decided to abandon two specific patents, "namely, because it believed that they that they were not worth the fee." 899 F. 3d 1254, 1274 (Fed. Cir. 2018). There was also direct evidence of "patent review board meetings" where the applicant "decided which patents to abandon." In *Lumenyte Int'l Corp. v. Cable Lite Corp.,* the district court rejected the applicant's testimony that it didn't intend to abandon the application "in light of the contrary, contemporary, documentary evidence." 92 F.3d 1206, 1996 WL 383927, at *2 (Fed. Cir. 1996) (unpublished). That documentary evidence was extensive and included five buckets of documents and evidence that contradicted the applicant's testimony. *Id.* at *2–3.

showed "a deliberate decision to let the [] patent go"; (3) the attorney was "willfully blind" to the circumstances of abandonment; (4) the attorney admitted he had *no idea* whether the abandonment was unintentional; and (5) the attorney admitted that he had not investigated and "had no knowledge" of whether the certification he made was true. *Id.* at 1337–39.

These facts are not present here. In this case, (1) the '329 application was *not* deliberately abandoned; (2) there is no correspondence or documentary evidence that showed "a deliberate decision to let the patents go"; (3) Schwedler or Burke were not "willfully blind" to the circumstances of the abandonment; (4) Schwedler and Burke maintained that they did know the abandonment was *unintentional*; and (5) Schwedler and Burke testified that they had investigated and had knowledge that the certifications they made were true. For at least these reasons, *3D Medical,* is distinguishable and cannot a support a finding of inequitable conduct here.

To the extent that *3D Medical* suggests that an inadequate investigation can alone support inequitable conduct, it is wrongly decided and inconsistent with *Therasense*. For example, the Georgia court found intent to deceive based on its determination that the certification language "*should have* given [the prosecutor] pause" before making the representation. *Id.* at 1339. But *Therasense* held that an omission that "amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." *Therasense, Inc. v. Becton, Dickinson* and Co., 649 F.3d 1276, 1290–91 (Fed. Cir. 2011). The Georgia court appeared to be assessing the prosecutor's conduct under a "should have known" standard and erroneously inferred deceitful intent in where mere negligence was a more reasonable inference.

Indeed, *3D Medical* is an outlier decision and has been distinguished by other courts. In *Asghari-Kamrani v. USAA*, for example, the Eastern District of Virginia distinguished *3D Medical* and rejected an inequitable conduct claim based on allegedly inadequate investigation as a matter

of law. 252 F. Supp. 3d 562, 583–84 (E.D. Va. 2017). As the court explained, "where Plaintiffs' explanation is, on its face, plausible, intent to deceive cannot be found—even if USAA's explanation is also just as, or even more, plausible." *Id.* Accordingly, the court found that that the defendant "cannot meet the heightened specific intent standard under *Therasense* as a matter of law." *Id.* The same holds true of Defendants/Intervenors here.

## VII.    CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment of no inequitable conduct. Dkt. 26 at 13-16; Dkt. 57 at 16-19; Dkt. 58 at 16-18; Dkt. 59 at 16-18; Dkt. 100 at 12-14; Dkt. 101 at 19-21; Dkt. 102 at 18-21; Dkt. 103 at 18-21; Dkt. 104 at 13-16; Dkt. 105 at 12-15; Dkt. 106 at 13-15; No. 2:23-CV-204, Dkt. 15 at 12-15.


Dated: June 4, 2025                                        Respectfully submitted,

                                                           */s/ Reza Mirzaie*
                                                           Marc A. Fenster
                                                           Reza Mirzaie
                                                           Paul A. Kroeger
                                                           Philip X. Wang
                                                           Jacob R. Buczko
                                                           James N. Pickens
                                                           Minna Y. Jay
                                                           Christian W. Conkle
                                                           RUSS AUGUST & KABAT
                                                           12424 Wilshire Blvd., 12th Floor
                                                           Los Angeles, CA 90025
                                                           310-826-07474
                                                           Fax: 310-826-6991
                                                           Email: mafenster@raklaw.com
                                                           Email: rmirzaie@raklaw.com
                                                           Email: pkroeger@raklaw.com
                                                           Email: pwang@raklaw.com
                                                           Email: jbuczko@raklaw.com
                                                           Email: jpickens@raklaw.com
                                                           Email: mjay@raklaw.com
                                                           Email: cconkle@raklaw.com

*Attorneys for Plaintiff XR
Communications, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that counsel of record who are deemed to have consented to electronic service are being served on June 5, 2025, with a copy of this document via the Court's CM/ECF system.

<u>/s/ Reza Mirzaie</u>
*Reza Mirzaie*