# Exhibit 2

# PATENT ASSIGNMENT

Electronic Version v1.1
Stylesheet Version v1.1

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | SECURITY AGREEMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| Vivato Networks, Inc., formerly Vivato Networks, LLC | 11/30/2007 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | Aequitas Capital Management, Inc. |
| Street Address: | 5300 Meadows Road |
| Internal Address: | Suite 400 |
| City: | Lake Oswego |
| State/Country: | OREGON |
| Postal Code: | 97035 |

**PROPERTY NUMBERS Total: 19**

| Property Type | Number |
|---|---|
| Application Number: | 11526543 |
| Patent Number: | 7177369 |
| Patent Number: | 6967625 |
| Patent Number: | 7256750 |
| Patent Number: | 7099698 |
| Application Number: | 11383167 |
| Application Number: | 10700329 |
| Application Number: | 10680965 |
| Patent Number: | 6995725 |
| Application Number: | 11275950 |
| Application Number: | 10944376 |
| Patent Number: | 7062296 |
| Application Number: | 11420860 |
| Application Number: | 10700342 |

| Application Number: | 11198016 |
|---|---|
| Patent Number: | 6611231 |
| Patent Number: | 6970682 |
| Patent Number: | 6992621 |
| Patent Number: | 6980169 |

### CORRESPONDENCE DATA

Fax Number: (916)930-2501

*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*

Phone: (916) 930-2500
Email: carl.schwedler@bullivant.com
Correspondent Name: Carl J. Schwedler
Address Line 1: 1415 L Street
Address Line 2: Suite 1000
Address Line 4: Sacramento, CALIFORNIA 95814

| ATTORNEY DOCKET NUMBER: | 29988/00005 |
|---|---|
| NAME OF SUBMITTER: | Carl J. Schwedler |

Total Attachments: 15
source=Commercial Security Agreement#page1.tif
source=Commercial Security Agreement#page2.tif
source=Commercial Security Agreement#page3.tif
source=Commercial Security Agreement#page4.tif
source=Commercial Security Agreement#page5.tif
source=Commercial Security Agreement#page6.tif
source=Commercial Security Agreement#page7.tif
source=Commercial Security Agreement#page8.tif
source=Commercial Security Agreement#page9.tif
source=Commercial Security Agreement#page10.tif
source=Commercial Security Agreement#page11.tif
source=Commercial Security Agreement#page12.tif
source=Commercial Security Agreement#page13.tif
source=Commercial Security Agreement#page14.tif
source=Commercial Security Agreement#page15.tif

**PATENT
REEL: 020174 FRAME: 0699**

XR-EDTX1-00000053

# COMMERCIAL SECURITY AGREEMENT

| BORROWER/<br>GRANTOR: | Vivato Networks, Inc.,<br>formerly Vivato Networks, LLC<br>322 NW Sixth Ave Suite 100<br>Portland OR 97209 | LENDER: | Aequitas Capital Management, Inc.<br>5300 Meadows Road, Suite 400<br>Lake Oswego, OR 97035<br>Telephone: (503) 419-3500 |
|---|---|---|---|

**THIS COMMERCIAL SECURITY AGREEMENT** dated November 30, 2007, is made and executed between Vivato Networks, Inc., a Delaware corporation (Delaware Reg. No. 4413500, formerly an Oregon corporation, Oregon Reg. No. 366329-90) ("Borrower"), and Aequitas Capital Management, Inc., an Oregon corporation (Oregon Reg. No. 369086-89) ("Lender").

1. **GRANT OF SECURITY INTEREST.** For valuable consideration, Borrower grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to Collateral, in addition to all other rights which Lender may have by law.

2. **COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Borrower is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note, this Agreement, and the Related Documents.

> All cash, accounts receivable, notes receivable, contract rights, deposits, securities, investments, chattel paper, documents, instruments (including without limitation the promissory note evidencing the loan of the proceeds of the Loan by Borrower to Catcher Holdings, Inc. (the "Parent Loan Document"), patents, patent applications, trade secrets, trademarks, Tradenames, copyrights, general intangibles, inventory, raw materials, work in progress, finished goods, furnishings, fixtures, trade fixtures, equipment, machinery, motor vehicles and all other personal property, assets or rights of whatever nature now owned or hereafter acquired by Borrower and products and proceeds thereof, including all Goods, all Accounts, all General Intangibles, all Deposit Accounts, all Equipment, all Inventory, all Intellectual Property, all books and records pertaining to the Collateral, Chattel Paper, Instruments, Investment Property, Letter-of-Credit Rights. Documents, and to the extent not otherwise included, all Proceeds, Supporting Obligations and products pertaining to any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing, as such terms are defined in Section 11 below.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located.

    a) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

    b) All products and produce of any of the property described in this Collateral section.

    c) All accounts, general intangibles, instruments, rents, monies, payments and all other rights, arising out of a sale, lease or other disposition of any of the Collateral.

    d) All proceeds (including insurance proceeds) from the sale, destruction, loss or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from the party's insurer, whether due to judgment, settlement or other process.

    e) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche or electronic media, together with all of Borrower's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media.

3. **CROSS-COLLATERALIZATION; FUTURE ADVANCES.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender (or an affiliate of Lender), or any one or

Page 1 of 15 – COMMERCIAL SECURITY AGREEMENT

more of them, as well as all claims by Lender (or an affiliate of Lender) against Borrower or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Borrower may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.  In addition to the Note, this Agreement secures all future advances made by Lender to Borrower regardless of whether the advances are made (i) pursuant to a commitment, or (ii) for the same purposes.

4. **BORROWER'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Borrower represents and promises to Lender that:

   a) **Perfection of Security Interest.** Borrower authorizes Lender to file one or more financing statements and such other documents as Lender may require and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral, including such filings as may be necessary or advisable to be made with the U.S. Patent and Trademark Office with regard to the Patents.  Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper if not delivered to Lender for possession by Lender.  Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement.  Lender may at any time, and without further authorization from Borrower, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement.  Borrower will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.  Borrower promptly will notify Lender of any change in Borrower's name including any change to the assumed business names of Borrower.  This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.

   b) **Notices to Lender.** Borrower will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Borrower's name; (2) change in Borrower's assumed business name(s); (3) change in the management of Borrower or, if Borrower is a limited liability company, in the members or managers of Borrower; (4) change in the authorized signer(s); (5) change in Borrower's principal office address; (6) change in Borrower's state of organization; (7) conversion of Borrower to a new or different type of business entity; or (8) change in any other aspect of Borrower that directly or indirectly relates to any agreements between Borrower and Lender. No change in Borrower's name or state of organization will take effect until after Lender has received notice.  Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of that certain Agreement and Plan of Merger, dated as of September 24, 2007, as amended (the "<u>Merger Agreement</u>"), by and among the Catcher Holdings, Inc., Borrower, and Huckleberry Acquisition Corporation, a wholly-owned subsidiary of Catcher Holdings, Inc. and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

   c) **No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Borrower or to which Borrower is a party, and its articles of incorporation, bylaws, operating agreement or other organizational documents do not prohibit any term or condition of this Agreement.

   d) **Enforceability of Collateral.** To the extent Collateral consists of accounts, chattel paper or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any Account becomes subject to a security interest in favor of Lender, the Account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Borrower with or for the account debtor.  So long as this Agreement remains in effect, Borrower shall not, without Lender's prior written consent, compromise, settle, adjust or extend payment under or with regard to any such Accounts.  There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.  Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

e) **Location of the Collateral.** Except in the ordinary course of Borrower's business, Borrower agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Borrower's address shown above or in the Disclosure Schedule to the Loan Agreement, or at such other locations as are acceptable to Lender. Upon Lender's request, Borrower will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Borrower's operations, including without limitation the following: (1) all real property Borrower owns or is purchasing; (2) all real property Borrower is renting or leasing; (3) all storage facilities Borrower owns, rents, leases or uses; and (4) all other properties where Collateral is or may be located.

f) **Removal of the Collateral.** Except in the ordinary course of Borrower's business, including the sales of inventory, Borrower shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles or other titled property, Borrower shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Oregon or Washington, as applicable, without Lender's prior written consent. Borrower shall, whenever requested, advise Lender of the exact location of the Collateral.

g) **Transactions involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Borrower's business, or as otherwise provided for in this Agreement or in connection with the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While and Event of Default is continuing under this Agreement, Borrower may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale of inventory in the ordinary course of Borrower's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than Permitted Liens (as defined in the Loan Agreement), the lien of this Agreement and security interests disclosed to Lender in the Loan Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Borrower shall immediately deliver any such proceeds to Lender. Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

h) **Title.** Borrower represents and warrants to Lender that Borrower holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for Permitted Liens (as defined in the Loan Agreement), the lien of this Agreement and security interests disclosed to Lender in the Business Loan Agreement between the parties dated of as the date hereof. (the "Loan Agreement")  No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

i) **Repairs and Maintenance.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

j) **Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

k) **Taxes, Assessments and Liens.** Borrower will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any other of the Related Documents. Borrower may withhold any such payment or may elect to contest any lien if Borrower is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral in not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Borrower shall deposit with Lender cash, or a sufficient corporate surety bond or other security satisfactory to Lender, in an amount adequate to provide for the discharge of any lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Borrower shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Borrower shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Borrower further agrees to furnish Lender with evidence that such taxes, assessments, and

PATENT
REEL: 020174 FRAME: 0702
XR-EDTX1-00000056

governmental and other charges have been paid in full and in a timely manner. Borrower may withhold any such payment or may elect to contest any lien if Borrower is in good faith conducting any appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

l) **Compliance with Governmental Regulations.** Borrower shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's sole opinion, is not jeopardized.

m) **Hazardous Substances.** Borrower represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of a Hazardous Substance. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

n) **Maintenance of Casualty Insurance.** Borrower shall procure and maintain all risk insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender, no later than December 7, 2007. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Borrower will provide Lender with such loss payable or other endorsements as Lender may require. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

o) **Application of Insurance Proceeds.** Borrower shall promptly notify Lender of any loss or damage to the Collateral. Lender may make proof of loss if Borrower fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Borrower from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Borrower. Any proceeds which have not been disbursed within six (6) months after their receipt and which Borrower has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

p) **Insurance Reserves.** Lender may require Borrower to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Borrower of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Borrower shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Borrower as they become due. Lender does not hold the reserves funds in trust for Borrower, and Lender is not the agent of Borrower for payment of the insurance premiums required to be paid by Borrower. The responsibility for the payment of premiums shall remain Borrower's sole responsibility.

q) **Insurance Reports.** Borrower, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risk insured; (3) the amount of the policy; (4) the property insured; (5) the then current value of the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Borrower shall upon request by Lender (however not more often than

annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

### WARNING

Unless Borrower provides Lender with evidence of the insurance coverage as required herein, Lender may purchase insurance at Borrower's expense to protect Lender's interest. This insurance may, but need not, also protect Borrower's interest. If the Collateral becomes damaged, the coverage Lender purchases may not pay any claim Borrower makes or any claim made against Borrower. Borrower may later cancel this coverage by providing evidence that Borrower has obtained property coverage elsewhere.

Borrower is responsible for the cost of any insurance purchased by Lender. The cost of this insurance may be added to the Note balances. If the cost is added to the Note balances, the interest rate on the Notes will apply to this added amount. The effective date of coverage may be the date Borrower's prior coverage lapsed or the date Borrower failed to provide proof of coverage.

The coverage Lender purchases may be considerably more expensive than insurance Borrower can obtain on Borrower's own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.

5. **BORROWER'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until the occurrence of an Event of Default and except as otherwise provided below with respect to accounts and above in the paragraph titled "Transactions Involving Collateral", Borrower may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Borrower's right to possession and beneficial use shall not apply to any collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Unless otherwise notified by Lender, Borrower may collect any of the Collateral consisting of accounts. Upon the occurrence and during the continuation of any Event of Default, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for the application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Borrower shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Borrower shall not itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

6. **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging and paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (3) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence and during the continuation of any Event of Default.

7. **PREFERENCE PAYMENTS.** Any monies Lender pays because of an asserted preference in Borrower's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Borrower as provided in this Agreement.

8. **DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement.

    a) **Payment Default.** Borrower fails to make any payment within five (5) calendar days when due under the Indebtedness.

    b) **Other Defaults.** Borrower fails to comply with or to perform any other term, obligations, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term,

Page 5 of 15 – COMMERCIAL SECURITY AGREEMENT

obligation, covenant or condition contained in any other agreement between Lender and Borrower. If any failure, other than a failure to pay money, is curable and if Borrower has not been given a notice of a similar breach within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower, after delivery of written notice from Lender demanding cure of such failure: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance within sixty (60) days after notice is sent.

c) **Default in Favor of Third Parties.** Failure of Borrower to comply with or to perform any other term, obligation, covenant, or condition contained in any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Indebtedness or perform their respective obligations under this Agreement or any of the Related Documents.

d) **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading in any material respect at any time thereafter.

e) **Bankruptcy.** The dissolution of Borrower (regardless of whether election to continue is made), or any other termination of Borrower's existence as a going business, or the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower. Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

f) **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any Collateral securing the Indebtedness.

g) **Adverse Change.** A material adverse change occurs in Borrower's financial condition.

9. **RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs and is continuing under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Oregon Uniform Commercial Code. In addition, and without limitation, Lender may exercise any one or more of the following rights and remedies:

a) **Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment charge which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower. In the case of an Event of Default of the type described in the "Bankruptcy" subsection above, such acceleration shall be automatic and not optional

b) **Assemble Collateral.** Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

c) **Sell the Collateral.** Lender shall have full power to sell, lease, transfer or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral are to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least thirty (30) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing, for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from the date of expenditure until repaid.

PATENT
REEL: 020174 FRAME: 0705
XR-EDTX1-00000059

d) **Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

e) **Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

f) **Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

g) **Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

h) **Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under this Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare an Event of Default and exercise its remedies.

10. **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

   a) **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

   b) **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help collect this Agreement, and Borrower shall pay the costs and expenses of such enforcement. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for arbitration or bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

   c) **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

   d) **Assignments.** Borrower acknowledges that Lender may sell and assign its interest in the Indebtedness, the payments due thereunder and the Collateral, in whole or in part, or sell participations therein, to an assignee (the "Assignee") which may be represented by a bank or trust company acting as a trustee of such Assignee. BORROWER ACKNOWLEDGES THAT ANY ASSIGNMENT OR TRANSFER BY LENDER OR ANY ASSIGNEE SHALL NOT MATERIALLY CHANGE BORROWER'S OBLIGATIONS UNDER THIS AGREEMENT. Any Assignee shall be entitled to enforce all the rights so assigned but be under no obligation to Borrower to

perform any of Lender's obligations under this Agreement, the sole remedy of Borrower being against Lender with Borrower's right against Lender being unaffected except as provided herein. Borrower agrees that upon notice of assignment of the Indebtedness, it shall pay directly to the Assignee, unconditionally, all amounts which become due hereunder. Borrower specifically covenants and agrees that it will not assert against any Assignee any claims by way of abatement, defense, set-off, counterclaim, recoupment or otherwise which Borrower may have against Lender or any third party, and BORROWER SHALL NOT ASSERT AGAINST SUCH ASSIGNEE IN ANY ACTION FOR PAYMENTS OR OTHER MONEYS PAYABLE HEREUNDER ANY DEFENSE EXCEPT THE DEFENSE OF PAYMENT TO SUCH ASSIGNEE. Upon Lender's request, Borrower will acknowledge to any assignee receipt of Lender's notice of assignment.

e) **GOVERNING LAW.** This Agreement will be governed by, construed and enforced in accordance with the laws of the State of Oregon. This Agreement has been accepted by Lender in the State of Oregon. If there is a lawsuit, Borrower agrees to submit to the jurisdiction of the courts of Multnomah County, Oregon, or the U.S. District Court of the District of Oregon, as applicable.

f) **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower shall constitute a waiver of any of Lender's rights or of any of Borrower's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

g) **Notices.** Any notice required to be given under the Agreement shall be given in writing, and shall be effective when actually delivered, when deposited with a reputable overnight courier for next business day delivery, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail with postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

h) **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid, and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

i) **Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Borrower irrevocably waives, disclaims and relinquished all claims against such other person which Borrower has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

j) **Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness. Lender concurrently herewith acknowledges and authorizes the merger of Borrower into Huckleberry Acquisition Corporation pursuant to the terms of the Merger Agreement and any and all changes to Borrower associated therewith, subject, however, to the first priority lien of Lender in the Collateral pursuant to the terms of this Agreement.

k) **Survival of Representations and Warranties.** All representations, warranties and agreements made by Borrower in this Agreement and the Related Documents shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

l) **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

m) **Jury Waiver.** ALL PARTIES TO THIS AGREEMENT HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY.

11. **DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

a) **Account.** Accounts shall mean all "accounts," as such term is defined in the Code, now owned or hereafter acquired by Borrower, including: (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments) (including any such obligations that may be characterized as an account or contract right under the Code); (b) all of Borrower's rights in, to, and under, all purchase orders or receipts for goods or services; (c) all of Borrower's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods); (d) all rights to payment due to Borrower for Goods or other property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, or for services rendered or to be rendered by Borrower or in connection with any other transaction (whether or not yet earned by performance on the part of Borrower); (e) all health care insurance receivables; and (f) all collateral security of any kind given by any Account Debtor or any other Person with respect to any of the foregoing.

b) **Account Debtor.** Account Debtor shall mean any Person who is or may become obligated with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a Payment Intangible).

c) **Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to the Commercial Security Agreement from time to time.

d) **Books and Records.** Books and Records shall mean all books, records, board minutes, contracts, licenses, insurance policies, environmental audits, business plans, files, computer files, computer discs and other data and software storage and media devices, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities, and any and all records and instruments relating to the Collateral or Borrower's business.

e) **Borrower.** The word "Borrower" means the person designated as such on the first page of this Agreement and all other persons and entities signing the Note in whatever capacity.

f) **Chattel Paper.** Chattel Paper shall mean all "chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by any Person.

g) **Code.** Code shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Oregon.

h) **Collateral.** The word "Collateral" means all of Borrower's right, title and interest in and to all the Collateral as described in Section 2 of this Agreement.

i) **Contracts.** Contracts shall mean all the contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which the Borrower may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

j) **Copyright License.** Copyright License shall mean rights under any written agreement now owned or hereafter acquired by the Borrower granting the right to use any Copyright or Copyright registration of any Person.

k) **Copyrights.** Copyrights shall mean all of the following now owned or hereafter acquired by any Person: (a) all copyrights in any original work of authorship fixed in any tangible medium of expression, now known or later developed, all registrations and applications for registration of any such copyrights in the U.S. Copyright Office or any other country, including registrations, recordings and applications, and supplemental registrations, recordings, and applications in the U.S. Copyright Office; and (b) all Proceeds of the foregoing, including license

royalties and proceeds of infringement suits, the right to sue for past, present and future infringements, all rights corresponding thereto throughout the world and all renewals and extensions thereof.

l) **Deposit Accounts.** Deposit Accounts shall have the meaning as such term is defined in the Code, now or hereafter held in the name of the Borrower.

m) **Documents.** Documents shall have the meaning as such term is defined in the Code, now owned or hereafter acquired by any Person, wherever located, including all bills of lading, dock warrants, dock receipts, warehouse receipts, and other documents of title, whether negotiable or non-negotiable.

n) **Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1808, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto or intended to protect human health or the environment.

o) **Event of Default.** The words "Event of Default" mean any of the events of default set forth in Section 8 of this Agreement.

p) **General Intangibles.** General Intangible shall have the meaning as such term is defined in the Code, now owned or hereafter owned by the Borrower, including all right, title and interest that the Borrower may now or hereafter have in or under any Contract, all Payment Intangibles, customer lists, Licenses, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials, Books and Records, Goodwill (including the Goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key-person, and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit accounts, rights to receive tax refunds and other payments, rights to received dividends, distributions, cash, Instruments and other property, and rights of indemnification.

q) **Goods.** Goods shall have the meaning as such term is defined in the Code, now owned or hereafter owned by the Borrower, wherever located, including equipment and embedded software to the extent included in "goods" as defined in the Code.

r) **Goodwill.** Goodwill shall mean all goodwill, trade secrets, proprietary or confidential information, technical information, procedures, formulae, quality control standards, designs, operating and training manuals, customer lists, and distribution agreements now owned or hereafter owned by the Borrower

s) **Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quality, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

t) **Indebtedness.** Indebtedness shall mean the indebtedness evidenced by the Note, including all principal and interest, together with all other indebtedness and costs, expenses or trade obligations for which Borrower is responsible under this Agreement or under any of the Related Documents. In addition, the term "Indebtedness" includes all other obligations, debts and liabilities, plus interest thereon, of Borrower, or any one or more of them, to the Lenders, as well as all claims by the Lenders against Borrower, or any one or more of them, whether existing now or later; whether they are voluntary or involuntary, due or not due, direct or indirect, absolute or contingent, liquidated or unliquidated, whether Borrower may be liable individually or jointly with others; whether Borrower may be obligated as guarantor, surety, accommodation party or otherwise, whether recovery upon such indebtedness may be or hereafter may become barred by any statute of limitations, and whether such indebtedness may be or hereafter may become otherwise unenforceable.

u) **Instruments.** Instruments shall have the meaning as such term is defined in the Code, now owned or hereafter owned by any Person, wherever located, including all certificated securities and all notes and other evidences of

PATENT
REEL: 020174 FRAME: 0709

XR-EDTX1-00000063

indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper, including without limited the Parent Loan Document referred to in Section 2 of the Loan Agreement.

v) **Intellectual Property.** Intellectual Property shall mean any and all Licenses, Copyrights, Patents, Trademarks, Trade Secrets and customer lists.

w) **Inventory.** Inventory shall have the meaning as such term is defined in the Code, now owned or hereafter owned by the Borrower, wherever located, including all inventory, merchandise, goods and other personal property that are held by or on behalf of the Borrower for sale or lease or are furnished or are to be furnished under a contract of service or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in the Borrower's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

x) **Investment Property.** Investment Property shall have the meaning as such term is defined in the Code, now or hereafter acquired by any Person, wherever located.

y) **License.** License shall mean any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter held by any Person.

z) **Note.** The word "Note" means the Note executed by Borrower in the maximum principal amount of $1,000,000 of even date herewith, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

aa) **Patents.** Patents shall mean all of the following in which any Person now holds or hereafter holds any interest: (a) all Patent Applications; (b) all letters patent of any country and all registrations and recordings thereof; (c) all reissues, continuations, continuations-in-part or extensions thereof, including without limitation the patents and patent applications listed on **Schedule 1 – Current Patent and Patent Applications**; (d) any patent claiming an invention disclosed by any of the foregoing; and (e) any right or chose in action relating to the foregoing, whether arising before or after the date hereof.

bb) **Payment Intangibles.** Payment Intangibles shall mean as such term is defined in the Code, now owned or hereafter owned by any Person.

cc) **Person.** Person shall mean an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or governmental authority.

dd) **Proceeds.** Proceeds shall have the meaning as such term is defined in the Code and, in any event, shall include: (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any Collateral; (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority); (c) any recoveries by the Borrower against third parties with respect to any litigation or dispute concerning any Collateral, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral; (d) all amounts collected on, or distributed on account of, other Collateral; and (e) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

ee) **Property.** The word "Property" means all of Borrower's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

ff) **Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements and loan agreements (including without limitation the Credit Agreement), environmental agreements, guaranties, security agreements, stock pledge agreements, mortgages, deeds of trust, security deeds, collateral mortgages and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Note.

gg) **Supporting Obligations.** Supporting Obligations shall have the meaning as such term is defined in the Code, including letters of credit and guaranties issued in support of Accounts, Chattel Paper, Documents, General Intangibles, Instruments, or Investment Property.

hh) **Trademark License.** Trademark License shall mean the rights under any written agreement now held or hereafter held by any Person granting any right to use any Trademark or Trademark registration.

ii) **Trademarks.** Trademarks shall mean all of the following now owned or hereafter owned by any Person: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or Territory hereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

jj) **Trade Secrets.** Trade Secrets shall mean all proprietary information, including formulas, patterns, compilations, programs, devices, methods, techniques or processes that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use, all whether now owned or hereafter owned by any Person.

UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY LENDER AFTER OCTOBER 3, 1989 CONCERNING LOANS AND OTHER CREDIT EXTENSIONS MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY LENDER TO BE ENFORCEABLE.

BORROWER ACKNOWLEDGES HAVING READ ALL OF THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND BORROWER AGREES TO ITS TERMS.

BORROWER:

VIVATO NETWORKS, INC.

By: _[signature]_
Name: GARY HAYCOX
Title: CEO

AUTHORIZED AND APPROVED:

CATCHER HOLDINGS, INC.

By: _[signature]_
Name: DENIS McCARTHY
Title: CFO

CATCHER, INC.

By: _[signature]_
Name: DENIS McCARTHY
Title: CFO

PATENT
REEL: 020174 FRAME: 0711
XR-EDTX1-00000065

## Schedule 1 – Current Patent and Patent Applications

### Vivato Networks
10 Issued, 9 Pending

| B & C File No. | Lee &Hayes File No. | Title | Status |
|---|---|---|---|
| 760.0000001 | NA | General Matter | *Assignment changing name from Wayout Wireless to Vivato Networks LLC mailed 08/02/07.* |
| 760.0017631 | NA | Go Network Due Diligence | |
| 760.0020001 | MNI-0025US | | Filed 09/25/2006. Serial No. 11/526,543 Replacement Drawings filed 11/08/06. Updated Filing Receipt received 11/29/06. |
| 760.002999P | MNI-0025USP1 | APPLICATION OF MULTIPLE BEAM ANTENNA SYSTEM TO 802.16 BASE STATIONS | Filed 09/23/2005 Serial No. 60/719,856 |
| 760.0030001 | MNI-0001US | IMPROVED MULTIPATH COMMUNTICATION METHODS AND APPARATUSES | Filed 04/25/2002 Serial No. 10/131,864 ISSUED 7,177,369 on 02/13/2007 |
| 760.003999P | MNI-0001USP1 | IMPROVED MULTIPATH COMMUNTICATION METHODS AND ARRANGEMENTS | Filed 04/27/2001 Serial No. 60/287,163 |
| 760.0040001 | MNI-0003US | EPLANE OMNIDIRECTIONAL ANTENNA | Filed 12/31/2002 Serial No. 10/335,382 ISSUED 6,967,625 on 11/22/2005 |
| 760.0040002 | MNI-0003USC1 | EPLANE OMNIDIRECTIONAL ANTENNA | Filed 04/13/2005 Serial No. 11/104,684 DIV of 10/335,382 ISSUED 7,256,750 on 08/14/2007 Issue Fee Paid 7/2/2007 *Issue Notification Received 07/31/2007.* |
| 760.0050001 | MNI-0004US | COMPLEMENTARY BEAMFORMING TECHNIQUES | Filed 11/03/2003 Serial No. 10/700,991 ISSUED 7,099,698 on 08/29/2006 |
| 760.0050002 | MNI-0004USC1 | COMPLEMENTARY BEAMFORMING TECHNIQUES | Filed 05/12/2006 Serial No. 11/383,167 CON of 10/700,991 Pending. No first Office Action |
| 760.005999P | MNI-0004USP1 | COMPLEMENTARY BEAMFORMING TECHNIQUES | Filed 11/03/2002 Serial No. 60/423,703 |
| 760.0060001 | MNI-0010US | DIRECTED WIRELESS COMMUNICATION | Filed 11/03/2003 Serial No. 10/700,329 Office Action received 09/28/2006. Response mailed 10/18/2006. *Final Office Action Received 07/20/2007. Response Due 09/17/2007 (2 months).* |

Page 13 of 15 – COMMERCIAL SECURITY AGREEMENT

**PATENT
REEL: 020174 FRAME: 0712**

XR-EDTX1-00000066

| | | | |
|---|---|---|---|
| 760.006999 P | MN1-0010USP1 | A WIRELESS DATA PACKET COMMUNICATIONS SYSTEM | Filed 11/04/2002<br>Serial No. 60/423,660 |
| 760.0070001 | MN1-0013US | DETECTING WIRELESS INTERLOPERS | Filed 10/07/2003<br>Serial No. 10/680,965<br>Pending, No first Office Action |
| 760.0080001 | MN1-0006US | ANTENNA ASSEMBLY | Filed 09/09/2003<br>Serial No. 10/658,346<br>ISSUED. 6,995,725 on 02/07/2006 |
| 760.0080002 | MN1-0006USC1 | ANTENNA ASSEMBLY | Filed 02/06/2006<br>Serial No. 11/ 275,950 a con of 10/658,346<br>*Election mailed 07/09/2007. Response submitted 08/03/2007.* |
| 760.008999P | MN1-0006USP1 | ANTENNA ASSEMBLY | Filed 11/04/2002<br>Serial No. 60/423,700 |
| 760.0090001 | MN1-0017US | IMPROVED LAYERED PROCESSING | Filed 09/18/2004<br>Serial No. 10/944,376<br>Pending, No first Office Action |
| 760.009999P | MN1-0017USP1 | OPTIMUM LAYERED PROCESSING | Filed 09/18/2003<br>Serial No. 60/503,852 |
| 760.0100001 | MN1-0014US | FORCED BEAM SWTICHING IN WIRELESS COMMUNICATION | Filed 10/31/2003<br>Serial No. 10/698,848<br>ISSUED 7,062,296 on 06/13/2006 |
| 760.0100002 | MN1-0014USC1 | FORCED BEAM SWTICHING IN WIRELESS COMMUNICATION | Filed 05/30/2006<br>Serial No. 11/420,860 a con of 10/698,848<br>Pending, No first Office Action |
| 760.0110001 | MN1-0011US | | Closed |
| 760.011999P | MN1-0011USP1 | MULTIMAC CONTROL TECHNIQUES | Filed 11/04/2002<br>Serial No. 60/423,696 |
| 760.0120001 | MN1-0008US | SIGNAL COMMUNICATION COORDINATION | Filed 11/03/2003<br>Serial No. 10/700,342<br>Pending, No first Office Action |
| 760.012999P | MN1-0008USP1 | SYNCHRONIZING MEDIA ACCESS CONTROL (MAC) CONTROLLERS | Filed 11/04/2002<br>Serial No. 60/423,702 |
| 760.0130001 | 2502881-991101 | WIRELESS COMMUNICATION SYSTEM WITH DIRECTIONAL ANTENNA | Filed 08/05/2005<br>Serial No. 11/198,016<br>Pending, No first Office Action |
| 760.013999P | 2502881-991100 | WIRELESS COMMUNICATIONS SYSTEM USING DIRECTIONAL ANTENNAS | Filed 08/05/2004<br>Serial No. 60/599,743 |
| 760.0140001 | MN1-0002US | WIRELESS PACKET SWITCHED COMMUNICATION SYSTEMS AND NETWORKS... | Filed 10/12/2001<br>Serial No. 09/976,246<br>ISSUED 6,611,231 on 08/26/2003<br>2/14/2007 Maintenance Fee for year 3.5 paid |

Page 14 of 15 – COMMERCIAL SECURITY AGREEMENT

**PATENT**
**REEL: 020174 FRAME: 0713**

XR-EDTX1-00000067

| | | | |
|---|---|---|---|
| 760.0140002 | MNI-0002USC1 | WIRELESS PACKET SWITCHED COMMUNICATION SYSTEMS AND NETWORKS... | Filed 09/04/2002 Serial No. 10/235,198 Cont. of Pat. No. 6,611,231 ISSUED 6,970,682 on 11/29/2005 |
| 760.0150001 | MNI-0005US | WIRELESS COMMUNICATION AND BEAM FORMING WITH PASSIVE BEAMFORMERS | Filed 03/07/2003 Serial No. 10/384,308 ISSUED. 6,992,621 on 01/31/2006 |
| 760.0160001 | MNI-0019US | ELECTROMAGNETIC LENS | Filed 01/16/2004 Serial No. 10/760,023 ISSUED 6,980,169 on 12/27/2005 |
| 760.0170001 | | | Unfiled Closed |
| 760.0180001 | | | Unfiled Closed |
| 760.019999P | MNI-0009US | COMMUNICATING BROADCAST FRAMES | Filed 11/04/2002 Serial No. 60/423,701 Abandoned |
| 760.0200001 | MNI-0015US | | Unfiled Closed |
| 760.0210001 | MNI-0016US | | Unfiled Closed |
| 760.0220001 | MNI-0018US | | Unfiled Closed |
| 760.0230001 | MNI-0020US | | Unfiled Closed |

| | | | |
|---|---|---|---|
| 760.0240001 | MNI-0021US | | Unfiled Closed |
| 760.0250001 | MNI-0022US | | Unfiled Closed |
| 760.0260001 | MNI-0023US | | Unfiled Closed |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |