# Exhibit 21



# Transcript of Carl Schwedler

**Date:** July 8, 2022
**Case:** XR Communications, LLC -v- D-Link Systems, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**RESTRICTED - ATTORNEYS' EYES ONLY**

XR-EDTX1-00052637

---

**Page 17**

1 having to process them. I don't remember the
2 exact timing.
3    Q   Okay. Prior to the Judgment of
4 Foreclosure, Aequitas Equipment Finance had a
5 security interest but had not yet been granted the
6 right to foreclose on the security.
7       This judgment, which is an April 2009,
8 basically is a judgment which granted them
9 ownership of the patent collateral clear of any
10 prior liens.
11      I refer to that just to sharpen up and
12 ask, do you recall that it was after
13 Aequitas Equipment Finance actually had ownership
14 of the patents that you received the files?
15   A   I don't recall.
16   Q   You do recall at the time you received
17 it, though, that there was some sort of rush
18 related to them?
19   A   There was a sense of urgency, yeah.
20   Q   And do you recall what the sense of
21 urgency related to?
22   A   Just that the files needed work, I
23 think.
24   Q   Other than -- at some point in time, did
25 you actually then begin to prosecute any of the

**Page 18**

1 patents that Aequitas Equipment Finance had
2 obtained ownership of?
3    A   Yes, I do remember that. There were --
4 there were actions that needed to be responded to
5 in some of the files.
6       MR. HASLAM:  Can we have Ambrose 5
7 brought up.
8       (Ambrose Exhibit 5 was previously marked
9 for identification and is attached to the
10 transcript.)
11   Q   This is a document that has been marked
12 at an earlier deposition, and this is a -- an
13 Office Action that was mailed on December 11,
14 2008, and it is a Notice of Abandonment.
15      Do you recall when you received the
16 files and reviewed them, that you noticed that
17 some of the files had been abandoned?
18   A   I seem to remember that.
19   Q   Okay. And now this Notice of
20 Abandonment, as indicated, it was mailed
21 December 11, 2008.
22      Noting that date, does that refresh your
23 recollection at all as to when you received the
24 files from Aequitas?
25   A   No, that doesn't really help.

**Page 19**

1    Q   To the extent that you recall having
2 reviewed the files and found that some
3 applications had been abandoned, doesn't that
4 suggest that you would have received the files
5 sometime after December 11, 2008?
6    A   At least with respect to -- if that was
7 one of the files I noticed as being abandoned,
8 yes.
9       MR. HASLAM:  Can we have marked the next
10 exhibit, Tab 18.1.
11      (Exhibit 4 was marked for identification
12 and is attached to the transcript.)
13      MR. HASLAM:  Can we enlarge that.
14   Q   This is a form that's a Power of
15 Attorney or Revocation of Power of Attorney with a
16 new Power of Attorney.  And if you'll notice, the
17 applicant's signature is Thomas A. Sidley, Senior
18 Managing Director/Aequitas Capital Management.
19      Do you recall talking to Mr. Sidley in
20 connection with the patent portfolio of
21 Vivato Networks Holdings that you were working on?
22   A   I don't have a specific recollection of
23 that.  We certainly -- we got -- somehow we got
24 him to sign the document.
25   Q   You'll notice the date of his signature

**Page 20**

1 here is -- I believe it is May 20, 2009, and it
2 relates to patents with the inventor name
3 James Brennan.
4       And is that your signature on the page?
5    A   Yeah, that was my signature at the time.
6    Q   And that is on the last page of this
7 document.
8       And this was a filing that gave you
9 Power of Attorney to work with the Patent Office
10 in connection with this particular application,
11 correct?
12   A   Yeah, that, yeah -- yes.
13   Q   And prior to the filing of this document
14 with the Patent Office you would not have been
15 authorized to deal with the Patent Office on this
16 file, correct?
17   A   Right.
18   Q   And the date of this is May 22nd, 2009.
19   A   Right.
20   Q   Again, I apologize for continuing to --
21 at times to ask you if documents put things in
22 date sequence, but I'm going to do that again.
23      Given that this is dated May 22nd, 2009,
24 does this help you place when you got the actual
25 boxes with the patent files from Aequitas that you

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052642

**Page 21**

1 reviewed and found there were some abandoned
2 applications on?
3    A   Well, yeah, I might have had the files
4 by then. I don't know how long I'd had them. I
5 don't think I worked on them for very -- for too
6 long.
7    Q   Okay. Now, we saw Ambrose Exhibit 5
8 that the -- there was a Notice of Abandonment in
9 this application that was mailed on December 11,
10 2008, and you were appointed -- or given Power of
11 Attorney to act on behalf of Aequitas with the
12 Patent Office in May.
13        Do you recall what actions, if any, on
14 the Vivato Networks' portfolio you were taking
15 between December 11, 2008, and May 22nd, 2009?
16        MR. WANG: Objection. Privilege.
17    Q   Do you recall?
18    A   My recollection is that there were a
19 number of files, a number of boxes, and just
20 trying to get myself up to speed on the
21 technology, what was being applied for, where the
22 prosecution stood in each file.
23    Q   Okay.
24    A   There was just kind of catch-up on all
25 the files and all the portfolio.

**Page 22**

1        MR. HASLAM: Can we have pulled up Tab
2 19. We'll mark this as Exhibit 5.
3        (Exhibit 5 was marked for identification
4 and is attached to the transcript.)
5    Q   Mr. Schwedler, I will scroll through
6 this document and if at any point there's
7 something you want me to stop on so that you can
8 review it, let me know.
9    A   Okay.
10   Q   This is a Petition for Revival of an
11 Application for Patent Abandoned Unintentionally
12 at 37 CFR .137(b), the application of which was
13 filed May 30th, 2006.
14       It indicates that the application had
15 been abandoned for failure to file a timely and
16 proper reply to a Notice of Action by the Patent
17 Office.
18       Is that your signature --
19   A   Yes.
20   Q   -- that is on page 2 of 2?
21       And the date is November 2nd, 2009.
22       Do you recall filing this request for
23 Revival of an Application?
24   A   Not that specific one, but I do remember
25 we did that kind of work on some of the files,

**Page 23**

1 yes.
2    Q   And one of the requirements for the
3 petition is a statement that the entire delay was
4 unintentional. Do you see that?
5    A   Yes.
6    Q   Okay. How did you determine that the
7 delay resulting in abandonment was unintentional?
8        MR. WANG: Objection to the extent it
9 calls for attorney/client privilege.
10   A   I remember -- I believe we investigated
11 the relationship of the application, the entities,
12 of who owned what when. I don't know, there was a
13 history that evolved -- I thought -- I seem to
14 remember it was bankruptcy, but maybe it wasn't
15 bankruptcy.
16       But yeah, I mean generally speaking,
17 that was the kind of information we would have
18 elicited.
19   Q   And from whom would you have elicited
20 that information?
21   A   The attorney -- I think a lot of our
22 communications went through the attorney at
23 Bullivant, the corporate attorney from the other
24 office, whoever that would have been.
25   Q   Did you do any analysis or research to

**Page 24**

1 see whether abandonment for non-payment qualified
2 as unintentional?
3        MR. WANG: Objection to the extent it
4 calls for attorney/client privilege.
5    A   I don't remember doing that
6 specifically.
7    Q   Had you filed petitions for revival of
8 abandoned patents prior to working on the
9 Vivato Networks' files?
10   A   Yeah, I believe it came up in practice.
11   Q   And in the past -- let me withdraw that.
12       Had any of the applications where you
13 had been the prosecuting attorney ever gone
14 abandoned?
15   A   I believe that may have happened.
16   Q   And in those cases, was it basically the
17 crush of work or a deadline that didn't get --
18   A   Yeah, bad document -- yeah, something
19 like that.
20   Q   Had you ever received files that had
21 been worked on by an attorney at a different firm
22 after which you learned that some of the files
23 that you received had gone abandoned? Had that
24 ever happened before?
25       MR. WANG: Objection. Vague. Calls for

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052643

25

1  speculation.
2  A   I don't recall any specific incidents of
3  that.
4  Q   Was this, to the best of your
5  recollection, the Vivato Networks Holdings'
6  portfolio, the first time you had received files
7  from a client that had been worked on by another
8  attorney and learned that some of the applications
9  had gone abandoned?
10  A   I don't recall that ever being --
11  Q   I missed that.  You don't recall any
12  others?
13  A   I don't recall any others in my
14  recollection.
15  Q   And that your best recollection about
16  what you knew about the circumstances of this
17  particular application that's the subject of
18  Exhibit 5 had to do with either bankruptcy or
19  something like that?
20  A   Financial difficulties.  The files had
21  not been working on -- somebody had stopped
22  working on the files for some reason.
23  Q   I'll represent to you that Mr. Brooks
24  was the attorney who had worked on the files, the
25  Vivato Networks Holdings' files earlier.  He's

26

1  been deposed in this case, and he does not recall
2  ever having any discussions with you.
3      Let me ask you, do you think you had any
4  discussions with Mr. Brooks about any of the
5  Vivato Networks' files?
6  A   I remember a lot of communications were
7  through the attorney at Bullivant.
8  Q   Okay.  This is right now just a yes/no
9  question.
10      Did you also discuss any of the
11  circumstances surrounding abandonment, the
12  abandonment of this particular application with
13  anyone at Aequitas Capital Management or
14  Aequitas Equipment Finance?
15      MR. WANG:  Objection.  Privilege.
16  A   I don't specifically remember that.
17      MR. HASLAM:  Can we have Brooks 2
18  brought up.
19      AV TECHNICIAN:  Brooks 2 should be on
20  screen now.
21      MR. HASLAM:  I apologize.  Can I have
22  Brooks 11?  Apologize.  I called out the wrong
23  exhibit.
24      AV TECHNICIAN:  This one should also be
25  on screen now.

27

1      (Brooks Exhibit 11 was previously marked
2  for identification and is attached to the
3  transcript.)
4  Q   I'll scroll through this document for
5  you.  This is a communication from the
6  United States Patent and Trademark Office dated
7  October 31, 2008.  It is an Interview Summary in
8  connection with this application.
9      It indicates that on September 26, 2008,
10  the Examiner telephoned Christopher R. Ambrose.
11  Mr. Christopher R. Ambrose said he would rehire
12  Edward Brooks to work on the application.  And on
13  9/30/2008 he telephoned Mr. Edward J. Brooks.
14  Mr. Edward J. Brooks said he has not received a
15  message from Christopher R. Ambrose to continue
16  work on the application.
17      Do you recall having reviewed this when
18  you reviewed the files?
19  A   Well, if it was in the file, I assume I
20  would have looked at it, if it was in the file.
21  Q   And attached to that was a Notice of
22  Abandonment of this file, and I take it that in
23  reviewing the box of files after you got it, you
24  would have noticed that this particular file had
25  also gone abandoned?

28

1  A   Yeah, I assume I would have sorted that
2  out.
3  Q   And when you received the box of files
4  relating to the Vivato Networks' patent portfolio,
5  did you receive those files all at once?
6  A   I think I did.  It seems to me we were
7  waiting for them, waiting for them, and they all
8  came in at once.  That's my recollection.
9  Q   Do you recall who said there was a
10  rush -- something rush about the files, doing
11  something with the files, where that came from?
12  A   I assume the -- I don't remember the
13  name, but the corporate attorney at Bullivant out
14  of one of the other offices.
15      MR. HASLAM:  Can we have Tab 21.  I'll
16  mark this as Schwedler Exhibit 6.
17      (Exhibit 6 was marked for identification
18  and is attached to the transcript.)
19  Q   This is another Petition for Revival of
20  an Application for Patent Abandoned
21  Unintentionally Under 37 CFR (b) -- 1.137(b).
22  It's for application for Patent 10/700,342, and it
23  was filed November 3rd, 2003.
24      I'm going to scroll down in this.
25      Again, this petition required a

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052644

### 29

1  statement that the entire delay was unintentional.
2      Was it your -- did you come to an
3  understanding that the abandonment of this
4  particular application was for the similar reasons
5  as what we saw in Exhibit 5, the request for
6  revival in a different file?
7      A   Yeah, I don't remember thinking there
8  was something different about it.
9      Q   So your action on -- of taking steps to
10 determine whether it had been unintentional or not
11 was the same as what you testified to earlier?
12     A   Right.  Yeah, conversations with at
13 least the corporate attorney in Bullivant.
14     Q   And I'll ask you again.  You don't
15 recall having talked with anyone at the client,
16 Aequitas Capital or Aequitas Equipment Finance, in
17 connection with the attempts to revive the
18 abandoned applications; is that correct?
19     A   That is correct.
20     Q   And it's your best recollection that you
21 did not talk to Mr. Brooks about the circumstances
22 surrounding his withdrawal from prosecuting the
23 files; is that correct?
24     A   That's correct.
25     Q   That's your signature on page 2 of 25 on

### 30

1  this particular request for revival?
2      A   Yes, I believe that's so.
3      Q   And is that your handwriting on the
4  October 30, 2009, date that's next to your
5  signature?
6      A   Yes.  It was starting to go downhill
7  then, but that looks about right.
8      Q   It still looks pretty good to me.
9          In connection with the filing of this,
10 you also filed an amendment in response to an
11 Office Action of April 3rd, 2008; is that correct?
12     A   I believe I had to.
13     Q   Right.  And that was something -- that's
14 because that Office Action had been pending at the
15 time of abandonment?
16     A   Right.
17         MR. HASLAM:  We can take that exhibit
18 down.
19     Q   Do you recall at some point in time that
20 the files relating to Vivato Networks' portfolio,
21 responsibility for that, was passed on to another
22 attorney?
23     A   I do believe so, yes.  I don't -- I
24 don't recall who that was or ...
25     Q   Does the name Daniel Brooks sound

### 31

1  familiar?
2      A   Maybe.  It's been a while.
3      Q   When the files were -- when the files
4  were transferred, do you recall what it was -- why
5  it was that the files were transferred from
6  Bullivant and your responsibility to another firm?
7      A   No, I don't remember why.  I do remember
8  at all times when I was working on the
9  prosecution, though, it was -- I was considering
10 it a stopgap until they could find other
11 representation.
12     Q   Why did you consider it stopgap?
13     A   I was the only attorney with a patent --
14 registered patent -- I was the only registered
15 patent attorney at Bullivant.  I think there -- I
16 think there may have been one other junior woman,
17 but that was not really my area of technology.
18     Q   What was your area of technology?
19     A   I was trained as a biologist.
20     Q   Do you have -- recall ever having any
21 conversations with a Mr. Haycox?
22     A   Not offhand, no.
23     Q   Do you recall having any conversations
24 with anyone who had previously been associated
25 with the Vivato Networks Holdings' portfolio in

### 32

1  connection with attempts to sell the portfolio?
2      A   No, I don't believe -- I don't believe I
3  was involved with that.
4      Q   But your -- the limit of what you were
5  doing relating to the Vivato Networks Holdings'
6  patent portfolio was, as you say, stopgap
7  prosecution and the filings to revive abandoned
8  applications, correct?
9      A   Yeah, to keep the balls in the air until
10 something could be decided.
11     Q   Okay.
12         MR. HASLAM:  Can we have Bullivant 12,
13 and we'll mark this as 7.
14         (Exhibit 7 was marked for identification
15 and is attached to the transcript.)
16     Q   This is another Office Action from the
17 United States Patent and Trademark Office in
18 connection with application 10/700,329, and the
19 mailing date of this is January 8, 2009.
20         And I'll scroll down.
21         This is another file in which there was
22 a Notice of Abandonment issued on that date -- or
23 mailed on that date, January 8, 2009.
24         Am I correct that this would have been
25 another Notice of Abandonment you would have

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052645

---

**33**

1  located when you went through the files after you
2  received them?
3     A   Yes.
4     Q   And am I --
5     A   More of the same.
6     Q   And am I correct that given that this
7  particular Notice of Abandonment was mailed on
8  January 8, 2009, that you would have received the
9  files at some date after that in order for you to
10 have noticed that this had been abandoned?
11    A   Yeah, I think it must be, yeah.
12        MR. HASLAM:  Can we have Tab 23.  We'll
13 mark this as Exhibit 8.
14        (Exhibit 8 was marked for identification
15 and is attached to the transcript.)
16    Q   This is a Petition for Revival of an
17 Application for Patent Abandoned Unintentionally
18 Under 37 CFR1-1.37(b).  And this was filed on
19 November 3rd, 2003.
20        And again, the petition, as noted on
21 this form, required a statement that the entire
22 delay was unintentional.
23        And I'll just ask you, was the basis on
24 which you made the statement that the entire delay
25 was unintentional was related to the bankruptcy or

**34**

1  bankruptcy-type issues?
2     A   The information I received from -- yeah,
3  I seem to remember all -- I'm starting to remember
4  now that a lot -- it was a frustration of this
5  prosecution of these patents that all the
6  communications were conveyed through the attorney
7  at Bullivant.
8     Q   And why was that a source of
9  frustration?
10    A   I -- I seem to remember I wanted -- I
11 would have liked access to the inventors for a
12 number of reasons.
13    Q   Why would you have wanted access to the
14 inventors?
15        MR. WANG:  Objection.  Calls for
16 attorney/client privilege.
17        MR. HASLAM:  I'm asking why, not for any
18 communications.
19    Q   Why -- I'm asking right now for what you
20 would have asked them.  I'm asking why you would
21 have wanted access to the inventors.
22    A   Well, to understand the technology
23 better, understand the course of the prosecution,
24 all those -- all of the reasons you would want
25 that prosecution.

**35**

1     Q   So would one of those things you also
2  would have wanted to ask the inventors what they
3  knew about the circumstances as to why the
4  applications had gone abandoned?
5     A   Of course.
6        MR. WANG:  Objection.
7     Q   Was there a reason that you were not
8  able to talk to the inventors?
9     A   I cannot think of any good reason.  I
10 think at the time I was frustrated that it might
11 have been resource driven.
12    Q   And "resource driven" meaning the client
13 didn't want to spend the money?
14    A   Yeah.
15    Q   And I think I've asked you this, and I
16 apologize if I have, you've told me that the
17 information you had, which you based the statement
18 that the entire delay was unintentional, may have
19 come from one of your colleagues at the Bullivant
20 law firm.
21        Do you recall on any of the -- with
22 respect to any of the applications that went
23 abandoned, that you talked to anyone at the
24 client, Aequitas Capital Management or
25 Aequitas Equipment Finance?

**36**

1        MR. WANG:  Objection to the extent it
2  calls for privilege.
3        MR. HASLAM:  At this point I'm just
4  asking whether he did have such conversations.
5     A   I don't think -- I don't think I had
6  those conversations.
7     Q   Was that resource constraint, too?
8        THE WITNESS:  That was my dog.
9     Q   Was the reason you didn't have
10 conversations with the client a matter of
11 resources?
12    A   Well, I think that there was a breakdown
13 in communication.  My understanding, there was
14 also some breakdown in communication.
15    Q   When you say "breakdown in
16 communication," what do you mean?
17    A   The relationships were maybe not good.
18    Q   And do you mean between the law firm and
19 the Aequitas entities?
20    A   Whoever -- whoever acquired the patents
21 and the original -- originators of the patents.
22    Q   And how would that have impacted your
23 ability to talk to somebody at Aequitas?
24        MR. WANG:  Objection.  Calls for
25 speculation.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052646

**37**

1  A   I just remember being told to do -- to
2  run the communications through the attorney at
3  Bullivant.
4  Q   And that either came from the client or
5  from your colleague at Bullivant?
6  A   Sorry, could you repeat that?
7  Q   Yeah.  I was just asking you that the --
8  sort of the instruction to run things through your
9  colleague at Bullivant for information flow, was
10 that something that your colleague requested, or
11 was that something you understood the client
12 wanted?
13 A   All I know is what the colleague
14 requested.
15 Q   Okay.  Thank you.
16     MR. HASLAM:  Can we have Tab 23.
17     AV TECHNICIAN:  I think this is Tab 23.
18 Do you mean 23.1?
19     MR. HASLAM:  Oh, it is 23.  23.1,
20 please, thank you.
21     (Exhibit 9 was marked for identification
22 and is attached to the transcript.)
23 Q   This is a message from the Patent Office
24 mailed November 3rd, 2009, in connection with that
25 same application we just looked at.  And this

**38**

1  decision noted here indicates that the request to
2  revive was dismissed.
3     Do you recall that there was one
4  instance which, because you had not attached an --
5  a Power of Attorney, that the application to
6  revive was denied, or dismissed?
7  A   I don't recall that.
8     MR. HASLAM:  Can we have Tab 25.  We'll
9  want this as Exhibit 10.
10     (Exhibit 10 was marked for
11 identification and is attached to the transcript.)
12 Q   This is a filing with the Patent Office
13 that is time stamped as having been received by
14 the Patent Office on April 29, 2010.  It's a Power
15 of Attorney and this gives Power of Attorney to
16 Daniel Burke.
17     I know I asked you about Mr. Burke
18 before, but does this refresh your recollection
19 that sometime in 2010 the files relating to
20 Vivato Networks were transferred for handling to a
21 Mr. Burke?
22 A   Yeah, I -- I'm not sure when I left
23 Bullivant, so I'm not sure whether that would have
24 been before or after I was out the door.
25 Q   Okay.  There was a time at which you

**39**

1  left Bullivant, you're just not sure when?
2  A   Yeah.
3  Q   Am I -- and do you recall having any
4  conversations with Mr. Burke after the files were
5  transferred to Mr. Burke concerning the
6  circumstances surrounding why any of the
7  applications that had been abandoned in the
8  Vivato Networks' portfolio had been abandoned?
9  A   I don't recall.
10     MR. WANG:  Objection.  Privilege.
11 Q   You don't recall doing that?
12 A   I don't recall talking to Dr. --
13 Mr. Burke, no.
14 Q   Do you recall having had any
15 conversations with a Mr. Ambrose concerning the
16 Vivato Networks' portfolio?
17 A   I don't recall that.
18 Q   I'll ask you this one final time.
19     Between the time you received the files
20 relating to the Vivato Networks' patent
21 applications and patents and the time that the
22 files were transferred for handling to Mr. Burke,
23 did you ever have any discussions with
24 Thomas Sidley at Aequitas Capital or
25 Aequitas Equipment Finance concerning the

**40**

1  circumstances surrounding why patent applications
2  in the Vivato Networks Holdings' portfolio had
3  gone abandoned?
4  A   I don't recall ever directly talking to
5  him.
6  Q   Given that -- I think you testified that
7  the attempts to revive the abandoned applications
8  in the Vivato Networks' portfolio that you were
9  handling was the first time you recall dealing
10 with revival of abandoned applications, other than
11 discussions with your colleague at Bullivant, did
12 you do any research or talk to anybody else about
13 reviving abandoned applications?
14     MR. WANG:  Objection.  Calls for
15 privilege.
16 Q   You can answer.
17 A   Yeah, I assume I would have done some
18 outside research at least.
19 Q   Do you recall -- apologies if I asked
20 this.
21     Was the colleague that you were
22 discussing the issues related to the
23 Vivato Networks Holdings' portfolio, was he a
24 corporate attorney?
25 A   Yes, I believe so.

**41**

1    MR. HASLAM: That's all I have. Thank
2 you very much for your time. I think other
3 counsel may have some questions.
4    MR. WANG: Thank you, Mr. Schwedler.
5 We've been going for more than an hour. If it's
6 okay with you, could we take a five- or 10-minute
7 break and then continue?
8    THE WITNESS: Yeah, sure.
9    MR. WANG: Okay. If it's fine with
10 everyone, I think five minutes or whatever you
11 prefer, Mr. Schwedler.
12    THE WITNESS: Five minutes would be
13 fine.
14    MR. WANG: Let's go off the record.
15    THE VIDEOGRAPHER: Off record, 5:12.
16    (A recess was taken.)
17    THE VIDEOGRAPHER: On record, 5:19.
18    EXAMINATION BY COUNSEL FOR PLAINTIFF
19 BY MR. WANG:
20    Q   Welcome back, Mr. Schwedler.
21        How many years have you been a patent
22 prosecutor?
23    A   Have I been a patent prosecutor?
24    Q   Yes.
25    A   I think I registered in 1995.

**42**

1    Q   And for how many years did you practice
2 as a patent prosecutor?
3    A   Until about 2015.
4    Q   So for about 20 years, correct?
5    A   20 years, sure.
6    Q   Right.
7        And in 1995 was when you were -- you
8 were admitted to the Patent Bar and you got a PTO
9 registration number?
10    A   Yeah, got to register.
11    Q   And in those 20 years, have you ever
12 been subject to any disciplinary proceedings
13 before the PTO?
14    A   I don't think so. There is -- I stopped
15 practicing, and there was a client who had filed a
16 complaint, but I don't think there was
17 proceedings.
18    Q   Okay. So you're aware that patent
19 attorneys have a duty of candor with the Patent
20 and Trademark Office, correct?
21    A   Yes.
22    Q   And at all times in your career did you
23 take those obligations seriously in your
24 communications with the Patent and Trademark
25 Office?

**43**

1    A   Certainly.
2    Q   You're aware that I represent the
3 current Patent Owner, XR, of the patents that
4 arose from some of the applications that we've
5 talked about?
6    A   Yes, I know that.
7    Q   And you're aware that Mr. Haslam
8 represents Aruba, who is an accused infringer of
9 some of these patents, correct?
10    A   Yes.
11    Q   And are you aware that Aruba in this
12 litigation has made the allegation that you,
13 Mr. Schwedler, committed inequitable conduct
14 before the Patent and Trademark Office?
15    A   No.
16    Q   In your -- today we looked at several
17 Petitions for Revival that were submitted to the
18 Patent and Trademark Office. Do you recall that?
19    A   Yes.
20    Q   And in those documents you signed your
21 name, you included your Patent and Trademark
22 number, and you made certain representations to
23 the Patent and Trademark Office. Do you recall
24 that?
25    A   Yes.

**44**

1    Q   Including about the prior abandonment of
2 certain applications being unintentional, correct?
3    A   Yes.
4    Q   When you submitted those documents, did
5 you have -- strike that.
6        When you submitted those documents, were
7 they based on your best information at the time?
8    A   Yes, certainly.
9    Q   And were they based on a reasonable
10 investigation into what you needed to know to make
11 those representations?
12    A   Yes, certainly.
13    Q   Did you ever intend to deceive the
14 Patent and Trademark Office in making those
15 submissions?
16    A   No, never.
17    Q   Did you ever have -- did you ever have
18 or receive any information contrary to the
19 representations that you made?
20    A   No.
21    Q   Did you ever receive any information
22 that the patent applications that we've been
23 talking about were deliberately abandoned? In
24 other words, that they were abandoned on purpose?
25    A   No, no, that was contrary to my

**RESTRICTED - ATTORNEYS' EYES ONLY**

XR-EDTX1-00052648

---

**Page 45**

1  understanding.
2  Q   Your understanding was that the patents
3  were -- if certain ones were abandoned, it was
4  unintentional?
5  A   Absolutely, yes.
6  Q   Through all relevant periods that were
7  subject to the certifications that you made?
8  A   Yes, yes, certainly.
9      MR. HASLAM: Objection. Leading. Move
10 to strike for the purposes of interposing the
11 objection.
12 Q   And so, for example, Mr. Schwedler,
13 you --
14     MR. WANG: Excuse me, Mr. Haslam.
15 Q   For example, Mr. Schwedler, you never
16 received any information that applications were
17 intentionally abandoned because the Office Actions
18 could not be overcome?
19 A   No, no.
20 Q   And you never received any information
21 that certain applications were abandoned because
22 it was decided they were not patentable, ever?
23 A   No, never received that information.
24 Q   You never received any information that
25 certain applications were abandoned because they

**Page 46**

1  were -- they lacked sufficient commercial value to
2  justify continued prosecution?
3  A   No.
4  Q   Never?
5  A   Never.
6      (Court Reporter clarification.)
7  Q   Mr. Schwedler, earlier today Mr. Haslam
8  or you talked about possibly talking to the
9  inventors of the applications. Do you recall
10 that?
11 A   I didn't understand that question, could
12 you repeat it?
13 Q   Do you recall earlier testimony about
14 possibly speaking to the inventors of the
15 applications at issue?
16 A   I remember talking about that, yes.
17 Q   Is it fair to say that if you needed
18 information, direct information from the inventors
19 in order to make your certifications, you would
20 have gotten that information before making the
21 certifications?
22 A   Yes.
23     MR. HASLAM: Objection. Calls for
24 speculation.
25 Q   So whatever additional information that

**Page 47**

1  might have been -- that might have come from the
2  inventors were not necessary for you to make those
3  submissions to the Patent Office?
4      MR. HASLAM: Objection. Leading.
5  A   I believe that anything relevant would
6  have been communicated through the managing
7  partner of the case -- of the files. In Portland.
8  Q   You had mentioned that your internal
9  contact within your firm was a corporate attorney.
10 Do you remember that?
11 A   Yes.
12 Q   And you would not be relying on that
13 attorney to make any legal conclusions about your
14 obligations as a patent prosecuting attorney,
15 correct?
16 A   No, I would have looked for him -- no.
17 Q   You would have gotten factual
18 information from that attorney and then made your
19 own conclusions, correct?
20 A   Yes. Yes.
21 Q   Have you ever been found to have
22 committed inequitable conduct throughout your
23 20-year career as a patent prosecutor?
24 A   No.
25 Q   Finally, Mr. Schwedler, I wanted to ask,

**Page 48**

1  when did you stop doing this work, or stop
2  prosecuting?
3  A   Around 2015, '16. My Parkinson's became
4  -- my Parkinson's disease progressed that I
5  couldn't practice anymore.
6  Q   Okay. I'm sorry to hear that. And
7  you're still dealing with that disease now?
8  A   Yes.
9      MR. WANG: With that, I have nothing
10 further. Thank you, Mr. Schwedler.
11     MR. HASLAM: I have just a few
12 follow-up.
13     FURTHER EXAMINATION BY COUNSEL FOR ARUBA
14 BY MR. HASLAM:
15 Q   You were asked some questions about your
16 investigation before filing the Petitions to
17 Revive. I just want to go over that.
18     So one of things you did is you talked
19 to the corporate attorney in the Portland office
20 who was the corporate attorney for Aequitas,
21 correct?
22 A   Yes.
23 Q   You did not talk to the prior counsel
24 who had been prosecuting the patents at the time
25 they went abandoned, correct?

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052649

---

**Page 49**

1  A   I do not remember doing that, no.
2  Q   You did not talk to anyone at Aequitas
3  about information they may have known about why
4  the patents went abandoned?
5  A   Only indirectly, through the corporate
6  attorney.
7  Q   Only through the corporate attorney.
8      You said you may have done some
9  research. You did not find a case, did you, that
10 said that non-payment leading to abandonment made
11 the abandonment unintentional; isn't that correct?
12     MR. WANG: Objection.
13 A   I don't recall.
14     MR. WANG: Privilege.
15 Q   I'm sorry, did I hear an answer?
16 A   I don't recall.
17 Q   After the files were turned over to
18 Mr. Burke, do you recall having any conversation
19 with anybody at XR Communications about anything,
20 any information that you may have had as to why
21 the patent applications in the Vivato Networks'
22 portfolio had gone abandoned?
23 A   I don't recall that. And again, I'm not
24 sure about the timing about when I left Bullivant.
25 Q   Why did you stop the practice of law?

**Page 50**

1  A   Parkinson's disease.
2  Q   Were there any other reasons?
3  A   No. That was a good enough one.
4  Q   Okay.
5      MR. HASLAM: I have no further
6  questions.
7      MR. WANG: I just have a couple.
8  FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
9  BY MR. WANG:
10 Q   Mr. Schwedler, are you being compensated
11 for your testimony here today?
12 A   There was -- there was conversation
13 about, but I don't think I signed agreements to
14 it.
15 Q   And did -- did Aruba's counsel at
16 Covington Burling first reach out to you about
17 your testimony today?
18 A   Yeah, they're the ones who first reached
19 out to me.
20 Q   And when was that?
21 A   Oh, gosh, it was a while ago. Maybe a
22 month ago. I've got emails, I could ...
23 Q   Okay. And who did you have
24 conversations with at Covington & Burling?
25 A   Those are only -- I'd have to look at

**Page 51**

1  the email; I don't remember his name.
2  Q   Was it Mr. Sharma?
3  A   Yes, I think that's right.
4  Q   About how many conversations have you
5  had with Mr. Sharma?
6  A   At least a couple.
7  Q   Did Mr. Sharma ever reveal to you that
8  his firm and his client were alleging that you
9  committed inequitable conduct in patent --
10 A   Absolute -- absolutely not. No hint or
11 suggestion.
12 Q   Assuming that they are making
13 allegation, do you find that his communications
14 with you were misleading?
15 A   Yeah, bordering on dishonorable.
16 Q   How many phone calls have you had with
17 Mr. Sharma?
18 A   I think at least two. He left a couple
19 of messages -- I wouldn't consider them
20 conversations -- about this.
21 Q   And about how many email exchanges have
22 you had with him or his firm?
23 A   Several. Several.
24 Q   More than three?
25 A   Yes, yes.

**Page 52**

1  Q   And I assume that during one of the
2  first communications with Mr. Sharma, he or his
3  firm offered to compensate you for your testimony?
4  A   Yes.
5  Q   And that was something that he brought
6  up in the first instance, correct?
7  A   Absolutely.
8      MR. WANG: With that, I have nothing
9  further.
10     MR. HASLAM: Just one or two follow-up.
11 FURTHER EXAMINATION BY COUNSEL FOR ARUBA
12 BY MR. HASLAM:
13 Q   Many of the emails you exchanged with
14 Mr. Sharma were trying to set up or arrange a time
15 you might be able to talk; is that correct?
16 A   That's correct.
17 Q   The emails themselves were not
18 substantive communications, correct?
19 A   Not the emails, no.
20 Q   You had what, one or two conversations
21 with Mr. Sharma?
22 A   Yeah.
23 Q   And he asked you questions similar to
24 the ones I asked you today, correct?
25 A   No.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052650

---

**53**

1  Q  What additional questions did he ask
2  you?
3  A  He didn't ask any additional questions,
4  he was trying to set up a conference -- trying to
5  set up a place -- first of all, initially, set up
6  a conversation, and later to set up a deposition.
7  Q  So it was just really talking to you
8  about the logistics of could he arrange to talk to
9  you and then when he did, it was to then try to
10 set up the deposition?
11 A  Right. And at some point, subject to
12 compensation.
13 Q  Okay.
14    MR. HASLAM:  Thank you. That's all I
15 have.
16    MR. WANG:  That's all I have, too.
17    Thank you, Mr. Schwedler.
18    THE VIDEOGRAPHER:  Anything else before
19 we close, Mr. Haslam?
20    MR. HASLAM:  Not from me.
21    THE VIDEOGRAPHER:  From anyone else?
22    If there's nothing, then the time is
23 5:36, and this concludes today's deposition of
24 Carl Schwedler. We're off the record.
25    (Off the record at 5:36 p.m.)

---

**54**

1     ACKNOWLEDGMENT OF DEPONENT
2  I, Carl Schwedler, do hereby acknowledge that
3  I have read and examined the foregoing testimony,
4  and the same is a true, correct and complete
5  transcription of the testimony given by me, and
6  any corrections appear on the attached Errata
7  sheet signed by me.
8
9
10 _____  _____
11   (DATE)              (SIGNATURE)

---

**55**

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2    I, Dawn M. Hart, the officer before whom the
3  foregoing deposition was taken, do hereby certify
4  that the foregoing transcript is a true and
5  correct record of the testimony given; that said
6  testimony was taken by me stenographically and
7  thereafter reduced to typewriting under my
8  direction; that reading and signing was not
9  discussed; and that I am neither counsel for,
10 related to, nor employed by any of the parties to
11 this case and have no interest, financial or
12 otherwise, in its outcome.
13    IN WITNESS WHEREOF, I have hereunto set my
14 hand and affixed my notarial seal this 18th day
15 of July, 2022.
16 My commission expires:
17 January 2, 2025
18
19 _____
20 NOTARY IN AND FOR THE
21 STATE OF MARYLAND

---

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052651