# Exhibit 40

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES | |
| *Plaintiff,* | Case No. 2:23-CV-00202-JRG-RSP |
| v. | LEAD CASE |
| AT&T SERVICES INC.; AT&T MOBILITY LLC; AND AT&T CORP., | |
| *Defendant.* | |

**REBUTTAL EXPERT REPORT OF NANCY J. LINCK, JD, PhD**

Executed on May 21, 2025

Nancy J. Linck, JD, PhD

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................... 1

       I.A.    My Qualifications to Testify as an Expert Witness ............................ 3

       I.B.    Compensation ............................................................ 10

II.    OVERVIEW OF USPTO PRACTICES AND PROCEDURES ........................... 10

       II.A.   The Patenting Process Relevant to This Case ................................. 11

       II.B.   Abandonment and Petitions to Revive ........................................ 13

       II.C.   The USPTO's "Duty of Candor and Good Faith" ........................... 17

       II.D.   The Inequitable Conduct Standard .............................................. 19

III.   EVENTS SURROUNDING THE ABANDONMENT AND REVIVAL OF THE '329

       APPLICATION .................................................................... 23

       III.A.  Initial Assignment to Vivato, Inc. .................................................. 24

       III.B.  Assignment to Wayout Wireless .................................................. 25

       III.C.  Assignment (by Name Change) to Vivato Networks, LLC and Vivato

               Networks, Inc. ...................................................................... 25

       III.D.  Assignment to Vivato Networks Holdings, LLC and Aequitas

               Equipment Finance, and Aequitas' Security Interest ...................... 27

       III.E.  Edward J. Brooks III Withdrawals .............................................. 29

       III.F.  Aequitas Foreclosure Proceedings and Application Abandonments 31

       III.G.  Petitions for Revival ................................................................ 34

       III.H.  XR Communications, LLC Acquisition ......................................... 35

IV.    ANALYSIS AND OPINIONS ................................................... 40

IV.A.   BACKGROUND ..............................................................................40

IV.B.   MR. GODICI'S UNSUPPORTED OPINIONS ...........................................42

IV.C.   FACTS AND EVIDENCE NOT ADDRESSED BY MR. GODICI.........................43

IV.D.   MR. GODICI'S SUGGESTION THAT ABANDONMENT WAS "DELIBERATE" .......65

IV.E.   THE EVIDENCE DOES NOT SUPPORT MR. GODICI'S OPINION THAT SCHWEDLER

        FILED PETITIONS TO REVIVE WITHOUT CONDUCTING A REASONABLE INQUIRY74

IV.F.   THE EVIDENCE DOES NOT SUPPORT MR. GODICI'S OPINIONS THAT MR. BURKE

        FILED A PETITION TO REVIVE WITHOUT CONDUCTING A REASONABLE INQUIRY

        ...........................................................................................80

IV.G.   THE EVIDENCE DOES NOT SUPPORT MR. GODICI'S OPINIONS THAT REVIVAL OF

        THE '329 APPLICATION WAS IMPROPER ..............................................82

## I.    INTRODUCTION

1.    I, Dr. Nancy J. Linck, have been retained by the law firm of Russ August & Kabat on behalf of Plaintiff XR Communications, LLC dba Vivato Technologies ("XR") as an independent expert witness in the above-captioned matter. I have been asked to provide expert testimony in this case with regard to the rules, practices, and procedures for examination of patent applications by the United States Patent and Trademark Office ("USPTO") and compliance with those rules, practices, and procedures during the examination of the patents asserted in this case, including the rules, practices, and procedures related to petitions to revive abandoned patent applications.

2.    As part of this engagement, I have been asked to provide my review, analysis, and opinions regarding the Expert Report of Nicholas P. Godici dated April 25, 2025 ("Godici Rpt."), submitted on behalf of Defendants AT&T Services, Inc.; AT&T Mobility LLC; AT&T Corp.; Verizon Communications, Inc.; Cellco Partnership d/b/a Verizon Wireless; T-Mobile USA, Inc.; and Intervenors Ericsson Inc. and Nokia of America Corporation (collectively, "Defendants/ Intervenors"). Godici Rpt. ¶1. This rebuttal report is provided in response to the Godici Report.

3.    My understanding of Mr. Godici's opinions is that he contends (1) U.S. Patent No. 10,715,235 ("'235 Patent") is unenforceable on the basis of purported inequitable conduct[1] because U.S. Patent Application 10/700,329 ("'329 application") from which the

---

[1] Although the Godici Report makes two references to "unclean hands" (Godici Rpt. ¶¶ 23 and 66), I understand that unclean hands has not been pled by Defendants/ Intervenors and is not a basis for Mr. Godici's opinions. *See, e.g.*, AT&T Defendants' Answer, 2:23-cv-00202-JRG-RSP (E.D. Tex.), Dkt. 26, at pp. 13-16), and similar statements contained in the

'235 Patent ultimately issued was intentionally abandoned, and (2) Sidley, Schwedler, Burke and Zajac "owed a duty of candor to the USPTO and the filing of petitions to revive "without the required inquiry into the circumstances of abandonment." *See* Godici Rpt. ¶¶ 224-243. And since, according to Mr. Godici, "at least Sidley, Schwedler, Burke, and Zajac owed a duty of candor to the USPTO relative the prosecution of the Asserted Patents," the "filing of knowingly false unintentional delay statements in petitions to revive and/or failure to make a reasonable inquiry as to the truthfulness of such statements would be a violation of the USPTO duty of candor and reasonable inquiry requirements." Godici Rpt. ¶ 243.

4.     With respect to (1), there is no evidence that the abandonment was intentional.  In fact, the evidence supports just the opposite conclusion, *i.e.*, that the value of the '329 application was recognized throughout the time it was being prosecuted and thus abandonment was unintentional and due to the circumstances surrounding the abandonment.  *See infra* §§ III, IV.C.-IV.D. for more detail.  With respect to (2), to my knowledge, there is not a single case – and Mr. Godici cites to none – that have held a patent prosecutor or assignee guilty of inequitable conduct for filing a revival petition without contacting former individuals handling the prosecution of the abandoned application.  His reliance on 37 CFR 11.18 does not support his opinion that the '235 patent should be held unenforceable.  37 CFR Pt 11 is a set of disciplinary rules enacted to permit the Office of Enrollment and Discipline (OED) to discipline those registered to practice before the USPTO and not to be applied as Mr. Godici is attempting to do here.  *See* 37 CFR 11.1: "This part

---

consolidated cases; Godici Rpt. ¶¶ 224-243. To the extent Defendants/ Intervenors are permitted to pursue a new theory based on unclean hands, I reserve the right to address it.

governs solely the practice of patent, trademark, and other law before the United States Patent and Trademark Office."[2] Mr. Godici does not cite a single case supporting his application of Rule 11.18 here.  Of course, if a court determines a patent lawyer has filed "knowingly false unintentional delay statements in petitions to revive" with an intent to deceive the USPTO such that the intent prong of the *Therasense v. Becton Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc) inequitable conduct analysis has been satisfied, USPTO's OED may investigate whether the lawyer has violated the disciplinary rules.  See 11.2(4).

5.      As I discuss in more detail below, while my position is that such a violation, in the absence of clear and convincing evidence of an intent to deceive the USPTO, is not sufficient to hold a patent unenforceable, I further disagree with Mr. Godici that the record evidence supports his position that a "reasonable inquiry under the circumstances was not made in this case and thus that there was a violation of USPTO duty of candor and good faith, as found in USPTO's disciplinary rule 37 CFR §11.18.

6.      If requested, I expect to testify regarding the opinions that I set forth in this report.  I reserve the right to supplement my opinions as a result of further review and analysis, based upon receiving further information from the parties or the Court, and/or in response to any positions hereafter taken on the issues addressed in this report by Defendants or their expert(s).

### I.A.    My Qualifications to Testify as an Expert Witness

---

[2] As the Solicitor for the USPTO, I oversaw OED and thus am very familiar with 37 CFR Part 11 (Part 10 at that time) and its applicability.

7.     My curriculum vitae, which includes a complete list of my background, professional achievements, and qualifications, is attached as **Exhibit A**. I have summarized below those that I believe are particularly relevant to my qualifications to testify as an expert witness in this case and thus to offer the opinions in this report.

8.     The cases in which I have testified at trial and/or by deposition since 2017 are listed in **Exhibit B**.

9.     I have practiced patent law, including patent prosecution, for more than 41 years, beginning shortly after the Court of Appeals for the Federal Circuit was formed. My education includes the following:  I earned my JD from Western New England University School of Law, Springfield, MA, in May 1984 (magna cum laude, Law Review: Research Editor, 1983-84; Staff, 1982-83) and have been registered to practice before the USPTO for almost 40 years.

10.     My work experience includes the following:  From 1999 until May 2006 and again between 2008 and today, I have served and continue to serve as a consultant and expert witness in federal court proceedings and in post-grant proceedings in the U.S. Patent and Trademark Office ("USPTO"), and advise on all patent matters in the USPTO and Federal Courts.  From November 2016 to the present, I have done so as a solo practitioner in the firm of NJ Linck Consulting.  Recently, in mid-2024, I agreed to provide consulting services from time to time to Carmichael IP, PLLC as a contract attorney.  From February 2008 until November 2016, I was a partner at Rothwell, Figg, Ernst & Manbeck, where I was involved in various aspects of patent law, including post-grant proceedings in the USPTO (including AIA reviews), appellate advocacy, consulting and serving as an expert, mediation and

arbitration, litigation, and licensing.

11.     I served as an Administrative Patent Judge ("APJ") at the Board of Patent Appeals & Interferences of the USPTO ("Board") (now called the Patent Trial and Appeal Broad ("PTAB")), from May 2006 until February 2008, where I was responsible for hearing and deciding appeals from examiners' rejections.  The decision of the PTAB constitutes the USPTO's final determination of patentability.  During the period I served, I made the USPTO's final determination of patentability in more than 150 cases, either as the authoring judge or as a member of a 3-judge panel.  In addition, I made rejections in cases in which the examiner had improperly failed to do so, acting in the role of "examiner-in-chief."  My duties required extensive knowledge of USPTO practices and procedures and required me to make patentability determinations from the perspective of one of ordinary skill in the art and thus to determine what information would be material to the examination of a patent application.

12.     In the 2005 to 2006 period, I served as Deputy General Counsel, IP & Trade for the Biotechnology Industry Organization, where I was responsible for all intellectual property and trade issues for member biotechnology companies, including international issues.

13.     From 1998 until 2005, I was a member of the Guilford Pharmaceuticals executive team, first as Vice President, Intellectual Property, responsible for all aspects of intellectual property, including life cycle management, litigation, prosecution and licensing; then later as Sr. Vice President & General Counsel, responsible for all legal matters worldwide, including all aspects of intellectual property, and regulatory affairs (including obtaining FDA approval for Guilford's pharmaceutical products and ensuring compliance

5

with the FDA's requirements for manufacturing one pharmaceutical product); and finally as Sr. Vice President, Intellectual Property, Regulatory Affairs & Chief Compliance Counsel, responsible for all aspects of intellectual property, for legal compliance, regulatory affairs and corporate quality.  In this latter position, I managed a staff of 30 professionals.

14.     From 1994 through 1998, I was the Solicitor for the USPTO in Washington, D.C., where I served as the general counsel for the USPTO Commissioner of Patents and Trademarks (now called the "Director").  At that time, the Solicitor was the highest-ranking lawyer for the USPTO.  As the Solicitor, I was lead counsel in more than fifty appeals in the U.S. Court of Appeals for the Federal Circuit and a number of litigations in the various district courts, primarily involving patentability issues under the patent statutes, 35 U.S.C. §§ 102, 103 and 112.  My Office defended decisions of the USPTO Board of Patent Appeals and Interferences when applicants appealed to the Federal Circuit or to the U.S. District Court for the District of Columbia.  I also had primary responsibility for preparing briefs to be submitted by the Solicitor General to the U.S. Supreme Court in patent and trademark cases.  As Solicitor, I was heavily involved in all legal matters within the USPTO, including evaluation of proposed changes to relevant statutes, rules, and the Manual of Patent Examining Procedure ("MPEP").  I was responsible for review and editing of the MPEP which was conducted under my supervision by Associate Solicitors. In addition, I was responsible for what ultimately became known as the USPTO's "legal guidelines," including those relating to patent eligibility under 35 U.S.C. § 101 and the written description requirements under 35 U.S.C. § 112 ¶ 1.  I personally played a lead role in the drafting and adoption of these guidelines by the USPTO.  Such guidelines are necessary in complex areas of patent

6

law, particularly in areas in which the law has evolved, as examiners typically do not have a law degree.  Also, as the Solicitor, I oversaw the Office of Enrollment and Discipline ("OED"), the USPTO office responsible for investigating USPTO practitioners' actions that possibly violated the USPTO's Code of Professional Responsibility, found at that time in 37 C.F.R. Pt. 10 (now 37 C.F.R. Pt. 11).  As part of that responsibility, certain Associate Solicitors were assigned to prosecute lawyers who OED determined had violated the Code.

15.     From 1998 until the present, I also have served an Adjunct Professor of Law at the following law schools: University of San Diego School of Law (2016-present); Georgetown University Law Center (1998-2013); and George Washington University School of Law, Washington, D.C. (1995-1998).  As an Adjunct Professor, I have taught courses in intellectual property, with an emphasis on patent practice before the USPTO and current legal issues.  At San Diego University School of Law, I have taught an in-depth course on Post-Grant Patent Practice.  I am a co-author of a treatise entitled "Post-Grant Patent Practice," first published in 2012, with a second edition published in 2014 and a supplement published in 2016.  Chapter 14 briefly describes the filing of petitions under 37 CFR 1.137(b) to revive or accept a late paper in a reexamination proceeding.  Chapter 15 is titled "The Duty of Disclosure And The Inequitable Conduct Defense In Post-Grant Practice" and describes the requirements for proving materiality and intent in an inequitable conduct case under the controlling law in *Therasense*.

16.     From 1987 until mid-1994, I was with Cushman, Darby & Cushman, an intellectual property law firm in Washington, D.C., first as associate from 1987 to 1990, and later as a partner from 1990 until mid-1994.  At Cushman, I was involved in patent and

trademark litigation, patent prosecution, and client counseling.

17.     From mid-1986 until mid-1987, I served as a judicial clerk for the Honorable Judge Pauline Newman at the U.S. Court of Appeals for the Federal Circuit in Washington, D.C.  In that role, I reviewed briefs, listened to oral arguments, drafted opinions in Federal Circuit cases when they were assigned to Judge Newman, and advised her on matters relating to cases before her.

18.     From 1984 until mid-1986, I was in-house counsel for Monsanto Company, where I was a lawyer and advisor for several of Monsanto's patent portfolios.  In that role, I prosecuted patent applications and advised a group of scientists on all matters relating to intellectual property, including the obtaining of and preserving of patent protection for their inventions, and the need to disclose all relevant information to the USPTO during prosecution of a patent application.

19.     During my professional career, I have testified during hearings before Congress, the Federal Trade Commission ("FTC"), and the Department of Justice on issues relating to how to improve the U.S. patent system through improving practices and procedures before the USPTO.  I also have testified in U.S. District Courts and before the FTC on behalf of private clients.

20.     I have been admitted to practice law in the following courts and jurisdictions: U.S. Supreme Court, admitted 1988; U.S. Court of Appeals for the Federal Circuit, admitted 1987; District of Columbia, admitted 1986; U.S. Patent and Trademark Office, admitted 1986; and the Commonwealth of Massachusetts, admitted January 1985.

21.     I have been active in various professional organizations throughout my career

and have focused my work on improving the patent system.  As part of those activities, I played an active role in drafting the revision of 35 C.F.R. § 1.56 ("Rule 56"), adopted in 1992. Rule 56 governs the disclosure requirements required of all those associated with a patent application filed with the USPTO (but no longer governs the materiality determination in inequitable conduct cases).  I also served on the Advisory Board of BNA's Patent, Trademark and Copyright Journal.  I am also a Founding Fellow and past Director of the American Intellectual Property Law Association, an intellectual property professional society.  I have served as a member of numerous other intellectual property law societies, including as President of the Giles S. Rich American Inn of Court, an organization dedicated to promoting the ethical practice of intellectual property law.

22.    Based on my forty-one years of experience in all aspects of patent law, including USPTO practice, I am familiar with the rules, practices, and procedures of the USPTO as governed by the United States Code (35 U.S.C.), and the Code of Federal Regulations (37 C.F.R.), and with the guidance given to examiners and others in the MPEP,[3] The MPEP does not have the force of law or the force of the rules in Title 37 of the Code of Federal Regulations, but is adhered to by patent examiners in prosecuting a patent application.  *See* the Foreword of the MPEP, available at https://www.uspto.gov/web/offices/pac/mpep/mpep-0015-foreword.html  ("The Manual

---

[3] In consulting the MPEP, I have primarily used the versions in effect during prosecution of the '329 application that issued as the '106 Patent (the 'great-grandparent patent of the patent-in-suit, i.e., the '235 Patent (e.g., from 2002 through 2013), particularly focusing on the period shortly before the '329 application went abandoned in 2008 until its revival in 2012. The Eighth Edition of the MPEP was enacted in August 2001 and replaced by the Ninth Edition in March 2014.

does not have the force of law or the force of the rules in Title 37 of the Code of Federal Regulations.").

23.    I am knowledgeable and prepared to testify about the preparation, filing, and prosecution of patent applications, the issuance of patents in accordance with those rules, practices, and procedures.  Finally, I have significant expertise, based on my many years of serving as an expert in patent prosecution and procedure and its impact on the inequitable conduct defense to explain the relationship between actions taken in the USPTO and their relevance to the inequitable conduct defense (including that of egregious misconduct) in federal court.

### I.B.    Compensation

24.    I am being compensated at my usual standard consulting rate of $900 per hour for my time spent on this matter.  This compensation is not contingent in any way on the substance of my opinions or testimony in this case, or on the outcome of this case, and has in no way affected my analysis of the issues addressed or the conclusions that I have reached as set forth below.

### I.C.    Materials Considered

25.    Materials that I have considered in connection with forming my opinions expressed in this matter are cited in the report and/or listed in **Exhibit C**. They include the Godici Report and materials cited in the Godici report. I also have reviewed the relevant statutes of Title 35, the federal rules guiding practice before the USPTO,  the MPEP, and the cited case law.

## II.    OVERVIEW OF USPTO PRACTICES AND PROCEDURES

26.     The USPTO is charged with the issuance of U.S. patents and the examination of the applications submitted to obtain their issuance.  Examination of a patent application is to determine whether the application meets the legal requirements for a U.S. patent, i.e., governing statutes (35 USC), regulations or rules (37 CFR), and controlling caselaw (primarily that of the Federal Circuit and the U.S. Supreme Court).  In this case, I have not been asked to testify about whether the '329 application satisfies those legal requirements but rather whether revival of the '329 application – once abandoned -- was obtained through inequitable conduct during examination, more specifically, whether actions were taken during prosecution that justify holding the '235 Patent unenforceable.  For that reason, I focus my discussion on certain actions or inactions during prosecution that are relevant to the issues underlying allegations that those actions or inactions render the '235 Patent unenforceable.

### II.A.    The Patenting Process Relevant to This Case

27.     The process begins with the filing of a patent application and payment of a fee. As previously noted, the '329 application was filed on November 3, 2003. Once assigned to an examiner, the examiner reviews the application to learn what is being claimed and determine whether it meets the statutory requirements for patentability. In particular, the examiner carefully reviews the claims, since the claims determine what exclusive rights would be obtained if a patent were to be issued.

28.     Examination typically involves a back-and-forth exchange between the examiner and the applicant during which time the examiner issues "Office Actions" explaining why the examiner does or does not believe the claims are patentable.  Typically,

the applicant then responds to the Office Actions in which the responses can challenge the examiner's position or amend the claims or both.  The procedure is complicated by a number of procedural requirements and time limits placed on responses and may continue for some period of time.  As seen in this case, the '329 application was filed on November 3, 2003, and the applicant did not receive a first substantive Office Action from the examiner until January 12, 2007 (more than 3 years later).

29.    Office Actions may be characterized as "non-final" or "final."  If final, then the applicant's ability to respond may be limited.  If some or all of the claims are determined to be patentable, the examiner will allow them, and ultimately they will issue in a U.S. patent.  In this case, the '106 Patent issued on April 2, 2013 (almost 10 years after filing).  The '235 Patent (that patent-in-suit) issued on July 4, 2020 and is a result of the filing of three continuation applications.  As a continuation, the '235 Patent is entitled to the filing date of the '329 application.  To help visualize the relationship of the '329 application to the '235 Patent, the family tree set forth below is helpful:



30.     Once a patent issues, it is presumed to be valid, in part, based on the presumption the examiner did his or her job pursuant to the statutes and regulations governing patentability.  The presumption can only be overcome with clear and convincing evidence.  *Sanofi-Aventis U.S., LLC v. Dr. Reddy's Lab'ys, Inc.*, 933 F.3d 1367, 1375 (Fed. Cir. 2019) ("A patent is presumed valid, and overcoming that presumption at the district court requires clear and convincing evidence.").   A patent is enforceable for a limited time, from the date it issues until it expires (normally 20 years from its issue date).

**II.B.     Abandonment and Petitions to Revive**

31.     A patent application becomes abandoned if the applicant fails to reply to an Office Action within the fixed statutory period set forth in the Office Action. 37 CFR §

1.135(a); MPEP 711.02. That happened in the case. *See infra* ¶¶70, 76.  If an application becomes abandoned, it may be revived on the basis that the abandonment was unintentional. 37 CFR § 1.137(b) provides: "If the delay in reply by applicant or patent owner was unintentional, a petition may be filed pursuant to this paragraph to revive an abandoned application[.]" *See also* MPEP 711.03(c). A grantable petition pursuant to this paragraph must be accompanied by:

(1)    The reply required to the outstanding Office action or notice, unless previously filed;

(2)    The petition fee as set forth in § 1.17(m);

(3)    A statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this paragraph was unintentional. The Director may require additional information where there is a question whether the delay was unintentional; and

(4)    Any terminal disclaimer (and fee as set forth in § 1.20(d)) required pursuant to paragraph (d) of this section.

CFR § 1.137(b); MPEP 711.03(c).

32.    An application may be expressly abandoned by filing a written declaration of abandonment identifying the pending application. 37 CFR § 1.138 is entitled "Express Abandonment" and states:

(a)    An application may be expressly abandoned by filing a written declaration of abandonment identifying the application in the United States Patent and Trademark Office. Express abandonment of the application may not be recognized by the Office before the date of issue or publication unless it is actually received by appropriate officials in time to act.

(b)    A written declaration of abandonment must be signed by a party authorized under § 1.33(b)(1), (b)(3), or (b)(4) to sign a paper in the application, except as otherwise provided in this paragraph. A registered attorney or agent, not of record, who acts in a representative capacity under the provisions of § 1.34(a) when filing a continuing application, may expressly abandon the

14

prior application as of the filing date granted to the continuing application.

(c) An applicant seeking to abandon an application to avoid publication of the application (see § 1.211(a)(1)) must submit a declaration of express abandonment by way of a petition under this section including the fee set forth in § 1.17(h) in sufficient time to permit the appropriate officials to recognize the abandonment and remove the application from the publication process. Applicant should expect that the petition will not be granted and the application will be published in regular course unless such declaration of express abandonment and petition are received by the appropriate officials more than four weeks prior to the projected date of publication.

33.    According to MPEP 711.01, "Express or Formal Abandonment":

It is imperative that the attorney or agent of record exercise every precaution in ascertaining that the abandonment of the application is in accordance with the desires and best interests of the applicant prior to signing a letter of express abandonment of a patent application. Moreover, special care should be taken to ensure that the appropriate application is correctly identified in the letter of abandonment.

34.    Express abandonment is one form of intentional abandonment but not the only form. The MPEP explains that abandonment is intentional only if the applicant "deliberately permits" an application to become abandoned, i.e., the abandonment was a "deliberately chosen course of action." MPEP 711.03(c) states:

Where the applicant **deliberately** permits an application to become abandoned (e.g., due to a conclusion that the claims are unpatentable, that a rejection in an Office action cannot be overcome, or that the invention lacks sufficient commercial value to justify continued prosecution), the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as "unintentional" within the meaning of 37 CFR 1.137(b). *See In re Application of G*, 11 USPQ2d 1378, 1380 (Comm'r Pat. 1989). An **intentional** course of action is not rendered unintentional when, upon reconsideration, the applicant changes his or her mind as to the course of action that should have been taken. *See In re Maldague*, 10 USPQ2d 1477, 1478 (Comm'r Pat. 1988).

(emphasis added).

15

35.    The MPEP further explains where a delay results from "a deliberately chosen course of action," such an intentional delay does **not** become "unintentional" delay because the applicant, for example, sought to defer patent fees and patent prosecution expenses. MPEP 711.03(c) states:

> A delay resulting from a deliberately chosen course of action on the part of the applicant does not become an "unintentional" delay within the meaning of 37 CFR 1.137(b) because:
>
> (A)    the applicant does not consider the claims to be patentable over the references relied upon in an outstanding Office action;
>
> (B)    the applicant does not consider the allowed or patentable claims to be of sufficient breadth or scope to justify the financial expense of obtaining a patent;
>
> (C)    the applicant does not consider any patent to be of sufficient value to justify the financial expense of obtaining the patent;
>
> (D)    the applicant does not consider any patent to be of sufficient value to maintain an interest in obtaining the patent; or
>
> (E)    the applicant remains interested in eventually obtaining a patent, but simply seeks to defer patent fees and patent prosecution expenses.

36.    This is because, as the MPEP explains, "a change in circumstances that occurred subsequent to the abandonment of an application does not render 'unintentional' the delay resulting **from a previous deliberate decision** to permit an application to be abandoned." MPEP 711.03(c) (emphasis added). Rather, the critical question for determining whether the delay is intentional is "whether there was a *deliberate decision* not to continue the prosecution of *an application*." *Id.*

37.    In this case, the '329 application was revived under the "unintentional abandonment" provision, 37 CFR § 1.137(b) through the use of a USPTO form containing the statement:

16

> The entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 CFR 1.137(b) was unintentional. [NOTE: The United States Patent and Trademark Office may require additional information if there is a question as to whether either the abandonment or the delay in filing a petition under 37 CFR 1.137(b) was unintentional (MPEP 711.03(c), subsections (III)(C) and (D)).]

*See   infra*   ¶¶   86,   89,   94;   *USPTO*   Form   SB004,   available   at

https://www.uspto.gov/sites/default/files/documents/sb0064.pdf.

**II.C.    The USPTO's "Duty of Candor and Good Faith"**

38.    The USPTO provides a background discussion of its duty of candor and good

faith, including its duty of disclosure as follows:

> A patent by its very nature is affected with a public interest.  The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability.  Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which  includes  a  duty  to disclose to the Office all information known to that individual to be material to patentability as defined in this section.

MPEP § 2001.04.

39.    However, in 2011, the USPTO definition of "material to patentability" found in

Rule 56(b) was rejected by the Federal Circuit in *Therasense,* an en banc case that remains

controlling today and spells out the requirements that must be met to hold a patent

unenforceable – materiality and intent. *Therasense*, 649.F.3d at 1290–92.

40.    Thus, while the USPTO has the power to discipline those who are registered to

practice before it under Part 11 of 37 CFR, that power does not extend further.  Thus, to the

extent Mr. Godici suggests that section of the CFR can provide a basis for determining

17

inequitable conduct or holding a patent unenforceable, I disagree.[4]

41.     Consistent with the above, Part (b)(2) of 37 C.F.R. § 11.18 mandates that allegations and other factual contentions must have evidentiary support; denials of factual contentions must be warranted on the evidence; and both must be formed "after an inquiry reasonable under the circumstances."  Thus, to the extent one of the patent practitioners in this case did not perform such an inquiry, he could be subject to USPTO disciplinary proceedings.  But again, that would not justify holding the '235 patent unenforceable unless his actions are proven to be an intent to deceive the USPTO under the *Therasense* standard. See II.D. below discussing *Therasense.*

42.     Part (c) of 37 C.F.R. § 11.18 further confirms the scope of the rule in that it mandates that *any violations shall be subject to penalties that are within the authority of the Director of the U.S. Patent Office to impose*. Those penalties may include combinations of "striking the offending paper," "precluding a party or practitioner from submitting a paper, or presenting or contesting an issue," "affecting the weight given to the offending paper," and "terminating the proceedings" in the USPTO.

43.     Likewise, pursuant to 37 C.F.R. § 11.18(b)(2)(i), a *registered practitioner* who presents a paper to the Patent Office implicitly certifies to the best of his or her knowledge, information, and belief formed after an inquiry reasonable under the circumstances that, *inter alia*, the paper is not being presented for any improper purpose.  Notably, this admonition is limited to patent practitioners and does not extend to others.

---

[4] In my experience, litigants who know they cannot meet the stringent inequitable conduct standard under *Therasense* frequently fall back on the disciplinary rules to buttress their cases.  In my opinion, that is the situation in this case.

## II.D.    The Inequitable Conduct Standard[5]

44.    The Federal Circuit issued an *en banc* opinion in *Therasense Inc. v. Becton Dickinson and Co.*, 649 F.3d 1276 (Fed. Cir. 2011), in which issues related to inequitable conduct were considered. I have reviewed and am very familiar with the *Therasense* opinion, and, as discussed above, co-authored a treatise entitled "Post-Grant Patent Practice," with an entire chapter regarding "The Duty of Disclosure And The Inequitable Conduct Defense In Post-Grant Practice" describing the requirements for proving materiality and intent under *Therasense*. The same analysis applies in this case.  While I do not attempt to instruct the court on the law of inequitable conduct, my opinions regarding the issues in this case are based on my understanding of the law governing inequitable conduct, including the duty of disclosure.  To the extent Mr. Godici implies a different standard, I disagree.

45.    *Therasense* indicates that to prevail on an inequitable conduct claim, the accused infringer must be able to provide clear and convincing evidence sufficient to meet two prongs: (1) the applicant withheld information material to patentability from the USPTO, or the applicant made a misrepresentation to the USPTO that was material to patentability; and (2) the applicant had the specific intent to deceive or mislead the USPTO into granting the patent. *Id.* at 1290–92. *Therasense* rejected the USPTO's Rule 56(b) standard for materiality and reversed older case law adopting a "sliding scale" approach that balanced materiality with intent. *Id.* at 1290.

46.    I understand that the "clear and convincing evidence" standard means

---

[5] To be clear, I will not attempt to instruct the Court on the law of inequitable conduct. I set forth my understanding of the law because they inform my opinions and analyses.

evidence which produces in the mind of the fact finder an abiding conviction that the truth of a factual contention is highly probable.

47.    I further understand that *Therasense* held that materiality is to be determined using the "but-for" standard, which means the withheld prior art or information is material only if the USPTO would not have allowed a claim if it had been aware of the undisclosed prior art or information. *Therasense* noted that there is an exception to the "but-for" standard of materiality. Where the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an "unmistakably false affidavit," the misconduct is material. *Id.* at 1292–93; *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1345 (Fed. Cir. 2013) ("Where the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, materiality is presumed.") (internal citations and quotations omitted).

48.    Based on *Therasense,* I understand that the specific intent prong requires that "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1290. Thus, it is my further understanding that proving the applicant knew of the withheld information, "should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.* However, I further understand that intent may be inferred from indirect and circumstantial evidence. However, to meet the required clear and convincing evidence standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence," and the evidence "must be sufficient to *require* a finding of deceitful intent in light of all the circumstances."

*Id.* at 1290–91 (emphasis in original) (*quoting Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008), and *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 873 (Fed. Cir.1988)). That is "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.*

### II.E.    Mr. Godici's Cited District Court Decisions are Inapplicable Here

49.    Mr. Godici cites several cases that allegedly support his assertion of intentional abandonment. Godici Rpt. 54-55. As an initial matter, I note that Mr. Godici does not include a single controlling case, and only one case was decided after *Therasense*.  In my opinion, his selection of cases exposes the weakness of his position.  Even if considered, the cases are distinguishable and provide some exemplary reasons for why they do not apply to the facts and circumstances here. For example:

- *In 3D Medical Imaging Sys., LLC v. Visage Imaging, Inc*., 228 F. Supp. 3d 1331 (N.D. Ga. 2017), (1) the application was deliberately abandoned; (2) correspondence between the applicant and its patent attorney showed "a deliberate decision to let the [] patent go"; (3) the attorney was "willfully blind" to circumstances of abandonment; (4) the attorney admitted "he did not know" whether the abandonment was unintentional; and (5) the attorney admitted that he had not investigated and "had no knowledge" of whether the certification he made was true. *Id.* at 1337–39.

- In *Lumenyte Int'l Corp. v. Cable Lite Corp*. 92 F.3d 1206, 1996 WL 383927 (Fed. Cir. 1996) (*unpublished)*, the district court rejected the applicant's testimony that it didn't intend to abandon the application "in light of the contrary, contemporary,

documentary evidence." *Id.* at *2. That documentary evidence was extensive and included five buckets of documents and evidence that directly undermined the applicant's testimony. *Id.* at *2–3. Thus, the Federal Circuit held that the district court's finding of inequitable conduct was not an abuse of discretion. *Id.*

- In *In re Application of Cheol Kim*, Application 09/254,058, 2009 WL 1212054, at *3 (P.T.O. Apr. 1, 2009), there was extensive documentary evidence of a deliberate course of action to permit abandonment of the specific application at issue. For example, the applicant was expressly instructed by the prosecutor that the application would go abandoned and allowed it to do so. The applicant also stated: "I gave up the proceeding of the application," which the USPTO relied on as showing a deliberate course of action which resulted in the abandonment of the application.

- In *In re Application of G*, 11 USPQ2d 1378, 1380 (Comm'r Pat. 1989), the applicant was expressly informed that the Office Action rejection could not be overcome. Thus, the applicant's conclusion that the Office Action could not be overcome was not a reasonable mistake. Further, the applicants deliberately chose not to file a response to the Office Action based on that understanding and thereby deliberately allowed the application to become abandoned. In sum, the USPTO found that a deliberate abandonment that was due to applicant's misjudgment that there was nothing patentable was not unintentional.

- In *In re Maldague,* 10 USPQ2d 1477 (Comm'r Pat. 1988), the applicant could find no flaws in an Office Action rejection and thus concluded that the rejection was reasonable and that "there was no possibility of defending against it." *Id.* at *1. The

applicant thus deliberately chose not to file a response to the Office Action and thereby *deliberately* allowed the application to become abandoned. *Id.* at *1-3. That the applicant *subsequently* determined that the invention could be distinguished from the references in a "subtle" way did not change the deliberate abandonment into an unavoidable or unintentional one.

## III.  EVENTS SURROUNDING THE ABANDONMENT AND REVIVAL OF THE '329 APPLICATION

50.    Mr. Godici has focused on the prosecution of U.S. Patent Application 10/700,329 ("'329 application") (of which the '235 Patent is a continuation) and the alleged intentional abandonment of the '329 application. *See* Godici Rpt. §§ III-VIII. Accordingly, I have focused my opinions on this same application, emphasizing what occurred during the period beginning when Edward J. Brooks III sought to withdraw as the patent practitioner handling the application, *i.e.*, on April 25, 2008, until the USPTO declared the '329 application abandoned on June 18, 2008 for failure to respond to an Office Action dated March 17, 2008.

51.    To understand the circumstances surrounding the abandonment, I describe the ownership/assignment history of the '329 application, summarized in the following flow chart to emphasize the timing of events:



52.    In Appendix 1, I've also included a high-level "glossary" or overview of the relevant entities associated with the prosecution, ownership, and assignment history of the '329 application, which may be helpful given the overlap in variations of the "Vivato" name among various entities involved.

### III.A.    Initial Assignment to Vivato, Inc.

53.    On November 3, 2003, U.S. Patent Application 10/700,329 ("'329 application") was filed with the USPTO. The '329 application was titled "Directed Wireless

24

Communication" and assigned to Vivato, Inc.

54.    On July 7, 2004, the assignment of the '329 application from the inventors to

Vivato, Inc. was recorded.

### III.B.  Assignment to Wayout Wireless

55.    On September 21, 2006, the assignment of the '329 application from Vivato

Inc. to Wayout Wireless, LLC was recorded. On September 22, 2006, in the '329 application

examination, Edward J. Brooks III filed a Power of Attorney and Change of Correspondence

Address. Gary Haycox signed as CEO for the assignee. Mr. Brooks testified he only ever

communicated with Mr. Haycox and did not have contact with anyone else during his work

for the applicant. Brooks Tr.[6] at 11, 13-14.

56.    On October 18, 2006, in the '329 application examination, Edward J. Brooks III

filed a response to the September 28, 2006 Office Action for the applicant and again filed a

Power of Attorney and Change of Correspondence Address, signed by Gary Haycox for the

assignee.

57.    On January 12, 2007, in the '329 application examination, the USPTO mailed

a second Office Action. On April 12, 2007, in the '329 application examination, Edward J.

Brooks III filed a response for the applicant to the January 12, 2007 Office Action. On July 17,

2007, in the '329 application examination, the USPTO mailed a final Office Action.

### III.C.  Assignment (by Name Change) to Vivato Networks, LLC and Vivato

---

[6] As Mr. Godici did in his report, references to depositions herein are to the following
depositions unless otherwise noted: May 13 and 17, 2022 Deposition of Adrian Chraplyvy;
May 19, 2022 Deposition of Kai Hansen; July 6, 2022 Deposition of Edward Brooks; July 7,
2022 Deposition of Gary Haycox; July 7, 2022 Deposition of Christopher Ambrose; July 8,
2022 Deposition of Carl Schwedler; July 26, 2022 Deposition of Daniel Burke.

Networks, Inc.

58.     On August 6, 2007, the assignment of the '329 application from Wayout Wireless, LLC to Vivato Networks, LLC by change of name was recorded. On September 19, 2007, Vivato Networks, LLC changed its name to Vivato Networks, Inc. ("Vivato Networks").

59.     On October 17, 2007, in the '329 application examination, Edward J. Brooks III filed a Request for Continued Examination ("RCE") and a response to the July 17, 2007 Office Action for the applicant.

60.     Starting in or around the last quarter of 2007, Mr. Brooks began to not be paid regularly for his prosecution work for the applicant, even though payment was a topic that Mr. Brooks discussed regularly with Mr. Haycox. Brooks Tr. at 25-26. Mr. Brooks was told that his owed amounts would be brought current, even though that did not happen. *Id.* Mr. Haycox testified that he did not recall specific discussions or notice regarding Mr. Brooks withdrawing as counsel, but believes he informed Aequitas "that they needed to ensure that this patent portfolio stays enforced" and that he "told them the importance of keeping this patent portfolio." Brooks Tr. at 54-58; *see also id.* at 44-45. However, Mr. Haycox does not recall Aequitas refusing to bring Mr. Brooks' account current, and does not know what, if anything, Aequitas did with Mr. Brooks. Haycox Tr. at 46-48, 57.[7]

---

[7] Interestingly, nowhere does Mr. Godici cite to anything from the deposition of Thomas Sidley, the only individual from Aequitas that was deposed, to support his inequitable conduct opinions. It does not even appear from Mr. Godici's Materials Considered that Mr. Godici reviewed Mr. Sidley's deposition transcript (XR-EDTX-00094435). Mr. Sidley testified that he did not recall anything about the Vivato transaction(s), Aequitas loans, the prosecution history, or the revivals. *See generally* Sidley Tr. However, Bullivant's billing records indicated Mr. Sidley did have some discussions with attorneys at the Bullivant firm regarding the revival of the '329 application around 2009 when Schwedler was working on

### III.D.  Assignment to Vivato Networks Holdings, LLC and Aequitas Equipment Finance, and Aequitas' Security Interest

61.     On November 30, 2007, Vivato Networks, Inc. granted Aequitas Capital Management, Inc. ("Aequitas Capital") a perfected security interest in the '329 application as part of a commercial security agreement. *See* Vivato Networks-Aequitas Capital Assignment, Commercial Security Agreement, Promissory Note, and Business Loan Agreement. That same day, Vivato Networks, Inc. and Aequitas Capital also entered into a Business Loan Agreement and Promissory Note evidencing the loan. Section 4 of the Commercial Security Agreement set forth the Borrower's (Vivato Networks, Inc.) representations and warranties with respect to the collateral (which included the security interest in the '329 application), including:

   a)  Perfection of Security Interest. Borrower authorizes Lender to file one or more financing statements and such other documents as Lender may require and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral, including such filings as may be necessary or advisable to be made with the U.S. Patent and Trademark Office with regard to the Patents....

   ...

   8)  Repairs and Maintenance. Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

---

revival documents. *See* Sidley Tr. 97:3-100:16. The billing records also indicate that multiple attorneys at the Bullivant firm reviewed records and had discussions in connection with their work on the revival petition. *Id.* There is further indication that the investigation regarding the circumstances of the abandonment and revival were "report[ed] to potential buyer." *See* Sidley Tr. 100:12-101:19.

...

Section 8 of the Commercial Security Agreement and Section 10 of the Business Loan
Agreement provides the default provisions. Section 9 of the Commercial Security Agreement
sets forth the "Rights and Remedies on Default" and Section 11 of the Business Loan
Agreement provides a similar "Effect of an Event of Default."

62.    Mr. Ambrose and Mr. Haycox testified that Aequitas Capital provided a loan of
$1 million to Vivato Networks, Inc. Haycox Tr. at 31-37; Ambrose Tr. at 22-27. But Mr.
Ambrose clarified that most of the money from the loan ended up with Catcher Holdings.
Ambrose Tr. at 23-25, 28-30. Mr. Haycox also testified that 30% of the loan was funded by
Western Holdings, an entity to which Haycox and his family members contributed. Haycox
Tr. at 36-37.

63.    On November 30, 2007, Aequitas Capital Management Inc. assigned its
security interest in the '329 patent application to Aequitas Equipment Finance, LLC
("Aequitas Equipment"). *See* Aequitas Capital-Aequitas Equipment Assignment and Loan
Assignment and Acceptance.

64.    On December 4, 2007, Vivato Networks, Inc. merged with Catcher Holdings,
Inc. ("Catcher"). *See* Catcher-Vivato Networks License Agreement, Amended and Restated
Agreement and Plan of Merger, and January 2, 2008 Catcher Holdings Prospectus. Mr.
Haycox and Mr. Ambrose testified that after this merger, Vivato Networks, LLC assigned its
patents and applications to a newly formed entity of the merger, Vivato Networks Holdings,
LLC ("Vivato Networks Holdings"). Haycox Tr. at 15-17; Ambrose Tr. at 21.

65.    On December 4, 2007, Vivato Networks Holdings, Inc. granted Catcher

28

Holdings, Inc. "an exclusive license to the Licensed IP Rights" and Catcher had "the exclusive right during the term of this Agreement, to prepare, file, prosecute, maintain and enforce the Licensed IP Rights..." Catcher-Vivato Networks License Agreement.

66.    On December 7, 2007, Vivato Networks, LLC assigned its interest in the '329 patent application to Vivato Networks Holdings, Inc. *See* Vivato Networks, LLC-Vivato Networks Holdings, Inc. Assignment.

67.    On December 21, 2007, in the '329 application examination, the USPTO mailed another Office Action.

68.    On January 30, 2008, all principal and accrued interest in the Vivato Networks-Aequitas Promissory Note and Business Loan were due and payable, but Vivato Networks had not made the required payments at least by January 30, 2008, if not earlier, and was in default. *See* Complaint, *Aequitas Equipment Finance, LLC v. Vivato Networks, Inc.*, USDC District of Oregon Case No. 3:08-cv-00750 (June 20, 2008).

69.    On February 14, 2008, in the '329 application examination, Edward J. Brooks III filed a response to the December 21, 2007 Office Action for the applicant. On March 17, 2008, in the '329 application examination, the USPTO mailed a second final Office Action. The USPTO set a three-month period for the response, and no later than six months.

70.    By or around April 1, 2008, Catcher terminated all of its employees and ceased doing business because it had insufficient working capital. Catcher also admitted to defaulting on the $1,000,000 loan from Aequitas. *See* Catcher April 2008 8-K; Haycox Tr. at 77-79.

### III.E.    Edward J. Brooks III Withdrawals

71.     On April 25, 2008, in both the '329 application examination, Edward J. Brooks III filed a Request for Withdrawal as Attorney or Agent and Change of Correspondence Address. Mr. Brooks stated the reason for the request as "Under 37 CFR 10.40(c)(1)(iv) Applicant (Marcus da Silva, et al., and Assignee Vivato Networks Holdings, LLC) have been unable to reach a mutually agreeable understanding of payment of services with attorneys of record." As is appropriate to avoid unintentional abandonment, Mr. Brooks directed the USPTO to send all future correspondence to Christopher R. Ambrose, Ambrose Law Group, LLC, Bend Office, 805 SW Industrial Way, Ste 201, Bend, OR 97702.

72.     On April 28, 2008, Mr. Brooks sent a letter directed to Gary Haycox of Vivato Networks Holdings, LLC, but in the care of Mr. Ambrose and mailed to Mr. Ambrose's office address, stating that Brooks's law firm was "discontinuing legal representation" on the '329 patent application, and also stating that with respect to the '329 patent application, there was "an outstanding **Final Office Action with initial due date for response of May 17, 2008 (two months) with a three month no- fee response date of June 17, 2008. Extensions are available until September 17, 2008**, at which point, if no responses has been received by the USPTO, this application will become Abandoned." Exh. 15 to 12/19/22 Ambrose Tr. at XR-EDTX-00091207 (emphasis in original); *see also* 12/19/22 Ambrose Tr. at 84:23-87:3. However, although Mr. Ambrose confirmed he was aware of this letter, he gave no indication of what information was relayed to Vivato Networks Holdings or Mr. Haycox. 12/19/22 Ambrose Tr. at 89:23-92:10. Mr. Haycox, for his part, affirmatively testified that it never came to his attention that the '329 application that Mr. Brooks had been prosecuting went abandoned after Mr. Brooks withdrew:

> Q Did it ever come to your attention that any of the patents applications – patent applications that Mr. Brooks had been prosecuting went abandoned after Mr. Brooks withdrew and the Patent Office approved his withdrawal?
>
> A No.

Haycox Tr. 64:6-12.

73.     On June 9, 2008, in the '329 application examination, the USPTO mailed notice to Edward J. Brooks III, Vivato, Inc. (at 139 Townsend Street, Suite 200, San Francisco, CA 94107), and Christopher Ambrose (at "Christopher R. Ambrose" / "Bend Office", "805 SW Industrial Way, Ste 201" / "Bend, OR 97702") that it approved Mr. Brooks's Request to Withdraw, **but rejected the change of correspondence of record** because "the requested correspondence address is not that of (1) the first named signing inventor; or (2) an intervening assignee of the entire interest under 37 CFR 3.71. **Accordingly, all correspondence will be mailed to the assignee**." (emphasis added). I note that thereafter, as discussed below, the USPTO failed to mail correspondence to the address of the correct assignee (Vivato Networks Holdings), and instead mailed correspondence to the original 2004 assignee (Vivato, Inc.) at a defunct address.

### III.F.    Aequitas Foreclosure Proceedings and Application Abandonments

74.     On June 20, 2008, Aequitas Equipment Finance—represented by Bullivant Houser Bailey ("Bullivant firm")—initiated foreclosure proceedings against Vivato Networks, Inc. and Vivato Networks Holdings, Inc. for defaulting on the loan. *See* Complaint, *Aequitas Equipment Finance, LLC v. Vivato Networks, Inc.*, USDC District of Oregon Case No. 3:08-cv-00750 (June 20, 2008) (XR-EDTX1-00052105).

75.     As of June 18, 2008, the '329 application went abandoned per USPTO rules

and procedures since the response was due on June 17, 2008.

76.    Mr. Brooks and Mr. Haycox both testified that they did not recall the '329 application going abandoned. Brooks Tr. at 46-47; Haycox Tr. at 64-68. Mr. Brooks also testified he did not recall any instruction to abandon any application. Brooks Tr. at 48-49. Mr. Brooks also testified that none of the documents he reviewed from the prosecution histories or revival petitions reflected an intent to deceive the USPTO. Brooks Tr. at 49-50. Mr. Haycox also testified that Catcher never intended to abandon any patents or patent applications. Haycox Tr. at 81-82 ("there was a significant amount of money at stake [to] bring it forward and keep it rolling and have the moving sale of the patent portfolio").

77.    On September 19, 2008, Vivato Networks Holdings, Inc. filed its Answer to Aequitas Equipment Finance's Complaint in the foreclosure proceedings and filed cross-claims and third party claims against Vivato Networks, Inc. and Catcher Holdings, Inc.

78.    On November 19, 2008, the United States District Court of the District of Oregon granted summary judgment against Vivato Networks Holdings, Inc. and a default judgment against Vivato Networks, Inc. and Catcher. See District Court Judgment. *See* Order of Judgment, *Aequitas Equipment Finance, LLC v. Vivato Networks, Inc., et. al.*, No. 3:08-CV-00750-AC, Dkt. 52 (D. Or. Nov. 19, 2008) (XR-EDTX-00091201).

79.    On January 8, 2009, in the '329 application examination, the USPTO mailed a Notice of Abandonment to Vivato, Inc. for the '329 application for failure to timely reply to the USPTO's March 17, 2008 Office Action. There is no indication in the file history that this Notice of Abandonment was attempted to be sent (or sent) to anyone other than the then-defunct Vivato, Inc. at the Townsend Street, San Francisco address.

80.     On January 21, 2009, in the '329 application examination, the Notice of Abandonment that the USPTO had attempted to send to Vivato, Inc. was returned to the USPTO as undeliverable, stamped "Return to Sender" / "Attempted – Not Known" / "Unable to Forward."  I am not aware of any evidence in the file history of the '329 application indicating that the USPTO took any further action to ensure that the *correct* assignee (Vivato Networks Holdings, **not** the unrelated original 2004 assignee Vivato, Inc. which no longer existed), which had been designated by the USPTO to receive correspondence according to the USPTO's June 9, 2008 notice, discussed above, actually received USPTO correspondence after Mr. Brooks' withdrawal. I am also not aware of any evidence in the file history of the '329 application indicating that Mr. Ambrose (the person named by Mr. Brooks to receive USPTO correspondence in the case after his withdrawal) actually received such correspondence.

81.     On April 23, 2009, Aequitas Equipment Finance, LLC received a foreclosure judgment against Vivato Networks Holdings and foreclosed on the '329 application from an Oregon state court. See Aequitas Foreclosure Judgment.

82.     On May 6, 2009, the assignment of the '329 application from Vivato Networks, Inc. to Aequitas Equipment Finance, LLC by a limited judgment of foreclosure was recorded. See Vivato Networks–Aequitas Equipment Assignment.

83.     On June 2, 2009, Aequitas Equipment Finance, LLC purchased the rights to the '329 application, among other Vivato property, at a sheriff's sale for $1,000,000. *See* Sheriff's Sale.

84.     On June 5, 2009, the assignment of the '329 application from Vivato Networks

33

Inc., formerly Vivato Networks Holdings, LLC to Aequitas Equipment Finance, LLC by Sheriff's Certificate of Judicial Sale was recorded. *See* Vivato Networks–Aequitas Equipment Sheriff's Sale Assignment.

### III.G.   Petitions for Revival

85.    On August 28, 2009, in the '329 application examination, Carl J. Schwedler, who worked at Bullivant Houser Bailey ("Bullivant firm"), filed a Petition for Revival of an Application for Patent Abandoned Unintentionally Under 37 CFR 1.137(b). In the petition, Mr. Schwedler signed the USPTO form which stated; "The entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 CFR 1.137(b) was unintentional." He also filed a Request for Continued Examination (RCE) and response to the March 17, 2008 Office Action.

86.    Mr. Schwedler testified that when he submitted the Petitions for Revival for the application, they were based on his best information at the time, and "certainly" based on a reasonable investigation into what he needed to know to make those representations. Schwedler Tr. at 44-46. He further testified that he never intended to deceive the USPTO, and never received any indication that the '329 application was ever deliberately abandoned. *Id.* Rather, his understanding was that the abandonment was unintentional throughout all the relevant periods that were the subject of the certifications that he made. *Id.* Mr. Schwedler did not recall whether he talked to the prior prosecuting counsel on the '329 application at the time it went abandoned, or specifically what research he did. However, Mr. Schwedler recalled investigating the relationship of the application, the entities, and ownership history, and recalls there being financial difficulties or a bankruptcy

34

with the prior assignees. Schwedler Tr. at 23, 25. Mr. Schwedler believes that much of his

firm's communications with Aequitas or with Mr. Brooks would have gone through one of his

firm's corporate attorneys. Schwedler Tr. at 23, 26, 46-47.

87.    On November 3, 2009, in the '329 application examination, the USPTO

dismissed Mr. Schwedler's petition to revive the '329 application because he was attorney

of record for Aequitas Equipment Finance, LLC (which was not yet the assignee of record)

and Mr. Schwedler had not been given power of attorney on behalf of the assignee of record.

The USPTO stated, "In sum, petitioner must submit a petition containing a statement of

unintentional delay and reply (amendment) signed by all the inventors, unless petitioner

herein is the assignee of the entire right, title and interest in the instant application, then

compliance with 37 CFR 3.73(b) must be satisfied, which can be accomplished by

completion of the enclosed certificate under 37 CFR 3.73(b)." A copy was also sent to

Vivato, Inc., which was returned to the USPTO on November 17, 2009 as undeliverable.

88.    On November 18, 2009, in the '329 application examination, Mr. Schwedler

filed: (1) a Statement under 37 CFR 3.73(b) for Aequitas Equipment Finance, LLC as the

assignee of an undivided interest in the entirety of the application; (2) a Power of Attorney

for Schwedler signed by Thomas A. Sidley, Member of Aequitas Equipment Finance, LLC, for

assignee; (3) a renewed Petition for Revival of an Application for Patent Abandoned

Unintentionally; and (4) a response to the March 17, 2008 Office Action. In the renewed

petition, Schwedler again signed the USPTO form which stated: "the entire delay in filing the

required reply from the due date for the reply was unintentional."

**III.H.   XR Communications, LLC Acquisition**

89.    On December 23, 2009, XR Communications, LLC ("XR") purchased the rights to the '329 patent application, among other property, from Aequitas Equipment Finance, LLC for $1,000,000. *See* Patent Purchase Agreement and Aequitas Equipment-XR Assignment. In Section 5 of the purchase agreement, Aequitas Equipment represented and warranted that it had:

> [F]iled, in accordance with the applicable rules and procedures of the USPTO, appropriate petitions for revival for the patent applications indicated and had pursued, and through the Closing Dates will pursue, such revival with best commercially reasonable good faith efforts.

Aequitas Equipment also agreed to provide XR with all documents and files "necessary to establish that [Aequitas's] representations and warranties of Section are true and correct[] relating to the Patents and the Abandoned Assets." *See* Aequitas-XR Patent Purchase Agreement, XR-EDTX-00004152 at §5.9.[8]

90.    On April 29, 2010, in the '329 application examination, Daniel P. Burke filed a Power of Attorney. Adrian Zajac, President of XR Communications LLC at the time, signed for assignee, with a Statement under 37 CFR 3.73(b) for XR Communications LLC as the assignee of the entire right, title, and interest in the application.

---

[8] Mr. Chraplyvy testified that XR asked for the §5.9 representation in the Aequitas-XR Purchase Agreement that applications would be revived "in accordance with the applicable rules and procedures of the USPTO" with the intent "to make sure that [Aequitas] would properly revive some of the abandoned assets that they could." 2/27/23 Chraplyvy Tr. at 196:20-198:4. He also testified that while he didn't recall specific steps XR took, XR conducted significant diligence (including hiring lawyers to do so) prior to entering into the transaction, which likely would have included reviewing publicly available documents that would have shown the bankruptcy proceedings and Catcher Holdings ceasing operations. 2/27/23 Chraplyvy Tr. at 188:21-189:4, 218:19-219:8. Mr. Hansen testified to these same points as Mr. Chraplyvy. 02/13/23 Hansen Tr. at 139:23-144:15, 145:18-148:24, 149:18-151:25, 153:21-155:7.

91.    On April 29, 2010, the assignment of the '329 application to XR Communications, LLC was recorded with the USPTO.

92.    On May 6, 2010, in the '329 application examination, the USPTO dismissed Mr. Schwedler's renewed petition to revive the '329 application because the power of attorney was improper because it did not "contain a complete chain of title from the original owner to the current assignee of record." At this time, XR Communications, LLC was the current assignee of record, but Mr. Schwedler had filed the revival petition in November 2009 on behalf of Aequitas Equipment Finance, LLC who was then the assignee of record. A copy was also sent to Vivato, Inc., which was again returned as undeliverable on May 11, 2010. Again, there is no evidence that the USPTO further attempted to ensure a responsible party able to act on behalf of the assignee received the notice.

93.    On November 8, 2010, in the '329 application examination, Mr. Burke filed a Petition for Revival of an Application for Patent Abandoned Unintentionally, an RCE and response to the March 17, 2008 Office Action.  He also filed  a "Renewed Petition Under 37 CFR 1.137(b)," using the appropriate USPTO form that includes the statement that "the entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition ...was unintentional."[9] As part of the submission, Mr. Burke

---

[9] In the *Network Signatures decision* dated 2013, the Federal Circuit remarked that "An examination of recently approved petitions [to revive] confirms that such petitions are routinely filed and granted without explanation for the 'unintentional' delay. *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1243–44 n. 2 (Fed. Cir. 2013); *cf. id.* at 1242-1243 (finding that the "compliance with the standard PTO procedure for delayed payment, using the PTO form for delayed payment [of maintenance fees], does not provide clear and convincing evidence of withholding of material information with the intent to deceive the Director.").

summarized the background and history of the petitions to revive filed by Mr. Schwedler and subsequent assignment of the '329 application to XR Communications LLC while the decision on Mr. Schwedler's November 28, 2009 Petition for Revival was still pending. Mr. Burke also stated:

> In support of this renewed petition, Applicants respectfully submit that they have now corrected the defects to the originally filed Petition filed on August 28, 2009 and the defects to the Renewed Petition filed on November 18, 2009. Specifically, Applicants submit herewith a Power of Attorney signed by the current assignee of record, namely XR Communications LLC, appointing the undersigned as the attorney of record to prosecute this application. Also submitted herewith is a Statement Under 37 CFR 3.73(b) setting forth a complete chain of title from the inventors of this application to the current assignee of record, namely XR Communications LLC. Applicants respectfully submit that the documentary evidence of the chain of title set forth in the 3.73(b) statement and the attached supplemental sheet were previously submitted to the PTO for recordation. Accordingly, the statement of unintentional delay in the Renewed Petition is proper in that it is now signed by the attorney of record for the current assignee of record.

The Power of Attorney was signed by Adrian Zajac for the assignee.

94.    Mr. Burke testified that, while he did not have a specific recollection of what investigation he conducted when he prepared the Petition for Revival, he had general policies and practices that he followed during his nearly 40 years of practice. Burke Tr. at 96-97. For example, it was his usual practice to adhere to the duty of candor owed to the USPTO and make a reasonable investigation into the facts if called for by a certification or a submission. *Id.* As another example, he testified he "probably did" legal research "because that would be my practice. This isn't something like we deal with every day . . . . So I probably looked into it." Burke Tr. at 79-80. Mr. Burke further testified that his practice was always to make an inquiry for the entire time period because he "wouldn't file something like this willy-nilly. [He] would do what [he] was supposed to do." Burke Tr. at 88-89. Mr. Burke also

clarified that it is not correct that he didn't speak to anyone as part of his investigation into the abandonments – rather, he just could not recall who he spoke to or what he did 13 years ago. Burke Tr. at 90-91. Mr. Burke also testified he had never seen any evidence that the '329 application was ever "deliberately abandoned on purpose," nor "affirmatively intentionally abandoned." Burke Tr. at 101-102. Mr. Burke also testified that he did not see any evidence of knowingly false statements made, any evidence of a specific intent to deceive the USPTO, or any evidence of inequitable conduct in the documents he reviewed during his deposition. Burke Tr. at 99-100.

95.     To the contrary, Mr. Burke testified that his review of the record shows the abandonment was unintentional. Burke Tr. at 80-81 ("I think these were timely. And I think it should be pretty darn clear to anybody looking at this record that, you know, you had at least from the period of all these petitions, that clearly people didn't want them, you know, abandoned.").  In my opinion, Mr. Burke properly assessed the record:  It is very clear that those responsible for the '329 application did not want it abandoned, as the pending patent applications was a valuable company asset.  There is no evidence to the contrary, other than the failure to pay Mr. Brooks for his services (for whatever reason).  That unexplained failure is not sufficient to conclude that the '329 application was intentionally abandoned.

96.     On January 3, 2011, the USPTO granted Mr. Burke's renewed petition to revive the '329 application for unintentional delay. Thereafter, prosecution continued in the '329 application until December 6, 2012, when the USPTO mailed a Notice of Allowance.

97.     On April 2, 2013, the '329 application issued as Patent No. 8,412,106, the "great-grandparent" to the '235 Patent

## IV.    ANALYSIS AND OPINIONS

### IV.A.    Background

98.    In analyzing the facts of the case and in rendering my opinions (including the opinions expressed above), I have attempted to focus on the relevant issues in this litigation on which I've been asked to testify.  As I understand those issues, they are as follows:

1)  Is there clear and convincing evidence to establish that the abandonment of the '329 application was intentional?

2)  Is there clear and convincing evidence to establish that the statements made by those prosecuting the '329 application in order to revive it made with an intent to deceive the USPTO?

3)  To the extent intent can be inferred, is it the most reasonable inference that can be drawn from the evidence?

In my opinion, if the answer to the first question is "no", then the statements made to the USPTO that the delay was unintentional were true and thus would dictate that the second question be answered "no."

99.    Mr. Godici describes his view of the relevant facts, including portions of the prosecution history and the ownership and assignment history.   *See* Godici Rpt. §§ III–VII (¶¶ 70–223). Where necessary for an understanding of the issues in the case, I have included a less extensive description of those facts, supplementing them when needed.[10]

100.    Mr. Godici's opinions are included at the end of his report in a section titled

---

[10] My decision not to directly respond paragraph by paragraph to the Godici Report is not, and should not be interpreted, as my agreement with Mr. Godici's interpretation or characterization of the evidence.

"Conclusions." *See* Godici Rpt. § VIII (¶¶ 224-243). In general, his opinions are conclusory and based on insufficient facts and evidence and/or unsupported characterizations or inferences from the facts and evidence.

101.    While Mr. Godici cites USPTO procedures and rules, Mr. Godici provides no indication whether he is providing an opinion relating to inequitable conduct (the only defense asserted by Defendants/Intervenors in their Answers), or some other claim or defense. But given that inequitable conduct is the only unenforceability defense raised in Defendants/Intervenors Answers, that is the issue on which I focused in my analysis. *See, e.g.*, AT&T Defendants' Answer, 2:23-cv-00202-JRG-RSP (E.D. Tex.), Dkt. 26, at pp. 13-16), and similar statements contained in the consolidated cases; Godici Rpt. ¶¶ 224-243.

102.    An understanding of the applicable legal principles governing patent practice before the USPTO is necessary in this case to determine, for example, whether there is clear and convincing evidence of a specific intent to deceive the USPTO under *Therasense*. For example, Mr. Godici repeatedly opines that an action did not constitute a "reasonable inquiry" and may have been "a violation of the duty of candor." But because Mr. Godici does not describe the legal framework under which he is providing his opinion, it is difficult to understand whether Mr. Godici is providing the opinion that there is clear and convincing evidence supporting a finding of a specific intent to deceive, as required under *Therasense*, or some other unspecified and unpled framework.

103.    Further, although inequitable conduct requires the identification of the party allegedly committing misconduct, Mr. Godici is intentionally vague about such identification in his opinions. For example, Mr. Godici asserts that "at least Sidley,

41

Schwedler, Burke, and Zajac owed a duty of candor to the PTO relative [to] the prosecution of the Asserted Patents." Godici Rpt. ¶ 243. But Mr. Zajac was not deposed in this action, and Mr. Sidley did not recall anything about the Vivato patent applications, the Vivato transactions, or anything about the abandonment or revival of the '329 application. *See generally* Sidley Tr. However, Mr. Sidley confirmed that Bullivant's billing records indicated Mr. Sidley did have some discussions with attorneys at the Bullivant firm regarding the revival of the '329 application around 2009 when Mr. Schwedler was working on revival documents. *See* Sidley Tr. 97:3-100:16. The billing records also indicate that multiple attorneys at the Bullivant firm reviewed records and had discussions in connection with their work on the revival petition. *Id.* There is further indication that the investigation regarding the circumstances of the abandonment and revival were "report[ed] to potential buyer." *See* Sidley Tr. 100:12-101:19. In sum, Mr. Godici has little or no evidence regarding Mr. Zajac's or Mr. Sidley's actions during the relevant time periods or their intent. Therefore, Mr. Godici's assertion that Mr. Sidley or Mr. Zajac may have committed misconduct is unsupported and speculative.  O n the other hand, Mr. Schwedler and Mr. Burke were deposed in this action. And their testimony undermines Mr. Godici's assertion that they may have committed misconduct (Godici Rpt. §§ VIII.C.-VIII.E.), as shown above in the Facts section (*see supra* at §§ III), and discussed in more detail below.  *See infra* §§ IV.C., IV.E.-IV.F.

### IV.B.  Mr. Godici's Unsupported Opinions

104.    Mr. Godici indicates that he was asked to provide an opinion regarding "rules, practices, and procedures" for the USPTO. Godici Rpt. ¶ 1. Mr. Godici then describes his experience working for the USPTO, and his eight years as an Executive Advisor at a law firm.

42

Godici Rpt. ¶¶ 3–12. I also note that Mr. Godici does not have a law degree and is not a member of any state bar. Godici Rpt. ¶ 12.

105.    Mr. Godici's opinions, however, extend beyond the "rules, practices, and procedures" of the USPTO. For example, Mr. Godici expresses opinions regarding the "reasonableness," "good faith," or supposed misconduct of various entities and prosecutors with respect to the abandonment and revival of the '329 application. Aside from various factual and legal inaccuracies in Mr. Godici's opinions, which I discuss below, Mr. Godici is not qualified to provide opinions as to the alleged state of mind of the various entities and prosecutors.

106.    To be clear, I am not providing opinions as to conclusions of law. However, to the extent Mr. Godici is permitted to express his opinions regarding the law, I am qualified to respond to such opinions, based on my education and experience both at the USPTO and as a practicing prosecutor, and therefore offer my responses to Mr. Godici's opinions.

### IV.C.  Facts and Evidence Not Addressed by Mr. Godici

107.    There are facts and evidence that Mr. Godici has not addressed or has presented in a way that does not clearly indicate their relationship.   Some non-limiting examples are noted below.

108.    *First*, Mr. Godici fails to present all relevant events or actions in a single chronology, which presents an incomplete and potentially misleading view. For example, Mr. Godici provides separate sections concerning the prosecution history of the '329 Patent (Godici Rpt. § III), its ownership and assignment history (*id*. § IV), and characterizations of the deposition testimony of Brooks, Schwedler, and Burke (*id*. §§ V–VII). As a result, a

number of the facts Mr. Godici presents lack the appropriate context. For that reason, I have presented the facts in a single chronology, showing, for example, the Catcher bankruptcy and Aequitas foreclosure proceedings coinciding with the relevant periods of abandonment (*see supra* §§ III.D.-III.F. for further details):

- As of January 2008, Vivato Networks (the assignee of the '329 application) was in default of a promissory note.

- In March 2008, the USPTO mailed Office Actions for the '329 application, setting a 3-month period for the responses, and no later than six months.

- Meanwhile, by April 1, 2008, Catcher (Vivato Networks's licensee with the exclusive right to prosecute the applications) collapsed and ceased doing business because of insufficient working capital.

- Meanwhile, on April 25, 2008, Mr. Brooks filed a notice of withdrawal for the '329 application. Mr. Brooks's letter regarding his withdrawal was sent to and received by Mr. Ambrose, but there's no evidence his withdrawal was relayed to Mr. Haycox.

- On June 9, 2008, the USPTO approved Mr. Brooks's request to withdraw, but rejected changing the correspondence address to Mr. Ambrose's office as Mr. Brooks had requested, instead stating it would direct all correspondence to the assignee. But the USPTO sent correspondence to the *wrong* Vivato entity, and notice of abandonment was returned as undeliverable.

- Soon thereafter, on June 18, 2008, the '329 application went abandoned for failure to respond to the Office Actions issued three months earlier.

- At nearly the same time, on June 20, 2008, Aequitas Equipment Finance initiated foreclosure proceedings against Vivato Networks, Inc. and Vivato Networks Holdings, Inc. for defaulting on the loan.

Under such circumstances, it is highly unlikely those involved would have intentionally abandoned the '329 application.[11] Thus, considering these facts together weighs against

---

[11] Given the events surrounding abandonment, there may have been some confusion regarding which entity was responsible for prosecuting the '329 application at that time. See the testimony of Haycox, *infra* at ¶¶ 119-120, and the Aequitas loan and Catcher-Vivato Networks License Agreement, *supra* at ¶¶ 61-65.

Mr. Godici's opinions regarding intentional abandonment.

109.    *Second*, Mr. Godici does not address relevant facts from the prosecution

history of the '329 application, such as:

- On January 21, 2009, in the '329 application examination, the Notice of Abandonment that the USPTO had attempted to send to Vivato, Inc. was returned to the USPTO as undeliverable, stamped "Return to Sender" / "Attempted – Not Known" / "Unable to Forward." The USPTO made no further effort to ensure the Notice was received by the correct party – one in a position to act in response.

- On November 3, 2009, in the '329 application examination, the USPTO dismissed Mr. Schwedler's petition to revive the '329 application because Mr. Schwedler not been given power of attorney on behalf of the assignee of record. A copy was sent to Vivato, Inc. (who had not been the assignee since September 21, 2006), which was returned to the USPTO on November 17, 2009 as undeliverable. The USPTO made no further effort to ensure the Notice was received by the correct party – one in a position to act in response.

-

- On May 6, 2010, in the '329 application examination, the USPTO dismissed Mr. Schwedler's renewed petition to revive the '329 application because the power of attorney was improper because it did not "contain a complete chain of title from the original owner to the current assignee of record." A copy was sent to Vivato, Inc. yet again, which was again returned as undeliverable on May 11, 2010. Again, The USPTO made no further effort to ensure the Notice was received by the correct party – one in a position to act in response.

*See supra* §§ III.D.-III.F. for further details.

110.    Thus, a reasonable inference is that those who should have and could have

prevented abandonment were not apprised of the abandonment and/or were not aware they

were required to act. It seems most likely, when considered in conjunction with the changes

in ownership and/or names of the entities involved that there was substantial confusion

among them around the time Mr. Brooks withdrew his representation. In my opinion, based

on the record evidence and my experience working with small companies such as those

involved in this case, the most reasonable inference is not that the '329 application was

45

intentionally abandoned but rather that abandonment was unintentional.[12]

111.    Further, the contemporaneous record supports the conclusion that abandonment was never intentional, i.e., deliberate (even setting aside well after-the-fact deposition testimony which also supports my opinions, as discussed below), Thus, review of that record would be considered a reasonable inquiry under the circumstances.  Again, my experience working with small businesses and the challenges they face inform my opinion.   Larger entities have entire departments to stay on top of patent prosecution and the need to meet the many technicalities the USPTO imposes on those attempting to get patent protection.  In this case, such challenges are reflected in the prosecution history of the '329 application, e.g., the deadlines to respond to Office Actions and the demands of the USPTO made during the many attempts to revive the '329 application before one was successful.   Again, these facts support the inference that abandonment of the application was not intentional, contrary to Mr. Godici's position.

112.    *Third*, Mr. Godici relies on the testimony of Mr. Brooks, Mr. Ambrose, Mr. Haycox, Mr. Schwedler, and Mr. Burke but has failed to address certain testimony given by these same witnesses.

113.    For example, Mr. Brooks testified he never received any instruction to abandon the '329 application and was not aware of any intentional abandonment:

> Q Thanks. And the applications identified on the documents that you were shown today, I believe you testified that you weren't aware that any of those went abandoned after you

---

[12] Also, in my experience, small businesses are much more dependent on patent protection for their inventions.  Such protection is necessary to compete with larger companies to weigh against the power larger companies have because of their size and amount of capital. For that reason alone, applications are not abandoned, if abandonment can be avoided.

withdrew. Correct?

A I do not recall.

Brooks Tr. at 46:20–25.

Q And you were never instructed to – to abandon any
application. Fair?

A I do not recall an instruction to abandon an application.

Brooks Tr. at 49:1–4.

114.    Mr. Books also testified that none of the documents he reviewed from the

prosecution histories, including the revival petitions, reflected an intent to deceive the

USPTO:

Q I'll ask a different question. You were shown, I counted about
a dozen documents this morning. Fair?

A Yes, it appears that we looked at about a dozen documents.

Q Did any of those documents indicate any intent to deceive the
patent office from you?

...

A The documents we looked at were form documents from the
patent office. Why would they reflect an intent to deceive?

Q I don't think they would, but I'm asking -- I'm just asking you if
you think that they would.

A I do not.

...

Q Yes. The bills document that we reviewed which counsel
called Tab 45, do you recall that document?

A Yes.

> Q That, also, does not reflect or suggest any intent to deceive
> the USPTO. Fair?
>
> ...
>
> A It does not appear to be.

Brooks Tr. at 49:11–17, 49:23–50:4, 50:14–21 (objections omitted).

115.    As to Mr. Ambrose, for example, he originally testified that he did not have any

independent recollection of receiving any notices of abandonment and was only able to

locate one notice of abandonment from his files shortly before his first deposition:

> Q And was it your testimony that because it was so long ago you
> don't recall receiving -- that you don't actually recall actually
> receiving a Notice of Abandonment around that time, in 2008,
> for example?
>
> A I went through my files to see what Notices of Abandonment
> had been received by my office, and the only Notice of
> Abandonment I was able to locate was the one that was
> attached to the letter from Mr. Brooks November 6th of 2008. I
> don't have a record of receiving the Notice of Abandonment
> directly from the USPTO, nor do I have any recollection of, nor
> could I locate any Notices of Abandonment for any other
> patents.
>
> Q And this process of going through your files, when did that
> occur?
>
> A Yesterday.
>
> Q And I believe you testified that you had just located that one
> letter with one Notice of Abandonment included, correct?
>
> A Correct.

Ambrose Tr. at 63:22–64:17.

116.    Mr. Ambrose also testified that he has "no independent recollection of seeing

any notices of abandonment," nor does he recall any specific discussion regarding

48

abandonment with either Mr. Brooks or Mr. Haycox, or when any such discussion occurred:

> A I have no independent recollection of seeing any Notices of Abandonment. I do recall, very generally, the concept of abandonment because some of the patents had already been abandoned by, I believe, the time of the loan in December of 2007. And so in an attempt to provide full disclosure to Aequitas at that point in time, there would have been a summary provided to me -- I can't recall if it would have been by Mr. Haycox or Mr. Brooks -- directly regarding the status of various patents, so a long-winded way of saying my confusion simply is that I recall, generally, the concept of abandonment, but I don't recall when it occurred.

Ambrose Tr. at 65:12–66:1.

> Q ... You also testified about a notation in your files about a conversation with Mr. Brooks after receiving his letter, or around that time, correct?
>
> A .... There was a time entry on November 20th of 2008 of a conversation with Mr. Brooks, but I don't have any notes regarding what was discussed.
>
> ...
>
> Q Okay. Does [notation] go into further detail beyond "conversation regarding patents"?
>
> A No.
>
> Q And is it fair to say that you have no recollection, sitting here, about that conversation or what you discussed?
>
> A That's correct.
>
> Q You also testified about a conversation with Mr. Haycox, possibly, about the abandonment issue, correct?
>
> A Yes. My hesitancy to go much further than that is that I have not received word from Mr. Haycox that the attorney-client privilege has been waived, so I'm not sure I can go in any detail. I'm happy to discuss it, but I don't think I can go much more than that.

49

> Q Okay. And I want to understand, do you have recollection of that, of that conversation, or is this something that you think may have happened?
>
> A I do not have a recollection of a specific conversation. My general recollection is that certain, by the exhibits, identifying what patents were being assigned and what was part of the patent portfolio that -- my general recollection is that we wanted to make sure that we recovered and that I was not a patent attorney, I was not prosecuting patents, and that if there was any value to the pending patents or that -- the abandoned patents, that they be taken care of, but I -- that's my general overall recollection, but I can't recall specific -- a specific conversation.

Ambrose Tr. at 66:6–9, 66:19–68:1.

117.    And while Mr. Ambrose located an additional letter from Brooks dated April 28, 2008 regarding with respect to the '329 application regarding a response to the Final Office Action being due soon with extension available until September 17, 2008, Mr. Ambrose provided no indication as to what information, if any, was relayed to Vivato Networks Holdings or its principal, Mr. Haycox. 12/19/22 Ambrose Tr. at 84:23-87:3. But Mr. Haycox expressly testified that he was never aware that the '329 application went abandoned:

> Q Did it ever come to your attention that any of the patent applications – patent applications that Mr. Brooks had been prosecuting went abandoned after Mr. Brooks withdrew and the Patent Office approved his withdrawal?
>
> A No.

Haycox Tr. at 64:6–12.

118.    Mr. Haycox also testified that Catcher went bankrupt and that operations ceased as of April 1, 2008, and that "the collapse was pretty significant and fast and it was

pretty much a hard stop":

> Q Okay. Mr. Haycox, I want to be more clear on some of the dates that we talked about. So in April 2008, Catcher pretty much went out of business, right?
>
> A Yeah, April 1st of 2008, we pretty much -- everybody -- we disbanded it at that point. And as far as winding down the company and all that, I am not -- I am really not sure the mechanism to how they did that. But April -- pretty much, April 1st was when the operations ceased.
>
> ...
>
> Q And so was that kind of like a hard stop, just everything ended on that date?
>
> A It was -- the collapse was pretty significant and fast and it was pretty much a hard stop. We had -- like I said, we had the primary job that was being done with the customer that we had to actually notify them and tell them that we couldn't fulfill the project, that they would have to look for an alternative vendor to work on what they were looking to accomplish. But as far as the company itself, it was pretty much a hard stop. It was – like hit the wall.

Haycox Tr. at 77:22–78:7, 78:25–79:12.

    119.   Mr. Haycox also testified that Catcher never intended to abandon any patents

or patent applications:

> Q Okay. I think during your deposition you testified no fewer than six or seven times about enforcing or maintaining the patent portfolio; is that correct?
>
> A Yeah, it is correct. I understand that, you know, if there is -- someone sends me a notice and says that they need to have something filed and keep a portfolio enforced that's kind of what I was repeating, right.
>
> Q Right. And you never had any intention to give up any patents or patent applications, correct?

51

A No. I mean, we had -- as far as through the Western Process, we had 30 percent stake in the collateral. So, you know, I was subject to Aequitas's managing, but we also said there was no reason for me to want to see the thing go away. I mean, there was a significant amount of money at stake to -- you know, to bring it forward and keep it rolling and have the moving sale of the patent portfolio. And, again, that is why -- you know, they called me a couple times after that with meetings with consultants, and there could have been an attorney on the phone, I don't really recall. But to provide information for them, and that was all done like this, I am not – I wasn't being paid. I was not a consultant. I was just providing information to help move that portfolio through the market.

Haycox Tr. at 81:9–82:13.

120.    Mr. Haycox also testified that he believed Aequitas would maintain the patent portfolio because the patent portfolio was collateral for their loan and would be of value to them. *See* Haycox Tr. 51:16-52:15. So he had assumed the patent portfolio was "in place" and application was not abandoned because the patent portfolio had value and "we wouldn't be marketing something that was – has no value":

Q Did he ever call you in the 2009-2010 time frame to ask you about the circumstances surrounding why Mr. Brooks withdrew and why the patents went abandoned?

A In the -- he was managing the portfolio, so the discussions I recall in -- subsequent to the shutting down of the company -- so whether it was 2008, 2009, I don't really recall -- conversations I had with Mr. Sidley was around selling the portfolio. I don't recall any specific conversation as to the state of the patents because at the time, again, I -- they are contacting me to get technical information, more specifics about the technology and how it was used in the product itself, Vivato product, and that they were actually moving to sell the portfolio. So I had – at that point, my assumption is the portfolio is still in place. We wouldn't be marketing something that was -- has no value.

Haycox Tr. 67:19-68:13.

121.    Mr. Schwedler, for example, testified that the revival petitions were based on the best information he had at the time and a reasonable investigation. He also testified that he has never received any information contrary to the representations he made. He also testified that he believed and still believes the '329 application was unintentionally abandoned:

> Q...When you submitted those documents, were they based on your best information at the time?
>
> A Yes, certainly.
>
> Q And were they based on a reasonable investigation into what you needed to know to make those representations?
>
> A Yes, certainly.
>
> Q Did you ever intend to deceive the Patent and Trademark Office in making those submissions?
>
> A No, never.
>
> Q Did you ever have -- did you ever have or receive any information contrary to the representations that you made?
>
> A No.
>
> Q Did you ever receive any information that the patent applications that we've been talking about were deliberately abandoned? In other words, that they were abandoned on purpose?
>
> A No, no, that was contrary to my understanding.
>
> Q Your understanding was that the patents were -- if certain ones were abandoned, it was unintentional?
>
> A Absolutely, yes.
>
> Q Through all relevant periods that were subject to the certifications that you made?

A Yes, yes, certainly.

...

Q For example, Mr. Schwedler, you never received any information that applications were intentionally abandoned because the Office Actions could not be overcome?

A No, no.

Q And you never received any information that certain applications were abandoned because it was decided they were not patentable, ever?

A No, never received that information.

Q You never received any information that certain applications were abandoned because they were -- they lacked sufficient commercial value to justify continued prosecution?

A No.

Q Never?

A Never.

...

Q Do you recall earlier testimony about possibly speaking to the inventors of the applications at issue?

A I remember talking about that, yes.

Q Is it fair to say that if you needed information, direct information from the inventors in order to make your certifications, you would have gotten that information before making the certifications?

A Yes.

Q So whatever additional information that might have been -- that might have come from the inventors were not necessary for you to make those submissions to the Patent Office?

A  I  believe  that  anything  relevant  would  have  been
communicated through the managing partner of the case -- of
the files. In Portland.

Q You had mentioned that your internal contact within your firm
was a corporate attorney. Do you remember that?

A Yes.

Q And you would not be relying on that attorney to make any
legal  conclusions  about  your  obligations  as  a  patent
prosecuting attorney, correct?

A No, I would have looked for him -- no.

Q You would have gotten factual information from that attorney
and then made your own conclusions, correct?

A Yes. Yes.

Q Have you ever been found to have committed inequitable
conduct  throughout  your  20-year  career  as  a  patent
prosecutor?

A No.

Schwedler Tr. at 44:6–45:9, 45:15–46:5, 46:13–22, 46:25–47:3, 47:5–47:24 (objections

omitted).

122.    Mr. Schwedler further testified about the investigation he performed,

including obtaining and reviewing the prosecution histories, noting the status of '329

application, and at least speaking to his colleague who brought in the client, and possibly

Mr. Brooks as well:

Q When you filed the Security Agreement with the Patent Office,
do  you  recall  obtaining  or  reviewing  the  file  history  for  the
particular
patents that you were filing the Security Agreement?

55

A I think we had paper files delivered in boxes at the time. And the paper files, I would have at least (indiscernible) them to make sure they were all what they purported to be, I presume.

...

Q Do you recall, in reviewing them, whether or not you noticed what the current status of any of the patent applications was?

A They're at various statuses. There seemed to be some -- some patents were issued, I think, a number of them were in prosecution, I believe some of them may have been abandoned.

...

Q Do you recall ever having any conversations with Mr. Brooks?

A No, I don't recall. I may have reached out to him; I don't recall.

...

Q...Did you -- yes or no, did you talk to the client about the fact that some of the files indicated that the applications had been abandoned?

A Yes, I would have. I would have either talked to the client or I would have talked to the attorney representing the client in the office. I think may be more properly the Portland office.

Q When you say "the attorney representing," that would have been the attorney at Bullivant?

A Yes.

Q Do you recall if you had a conversation with either or both of those people, the client or one of your colleagues?

A I assume so -- well, I do remember having a conversation with my colleague at least.

Schwedler Tr. at 9:6–15, 12:10–16, 14:6–9, 15:4–20 (objections omitted).

123.   Mr. Schwedler further testified about his work in catching up on the applications and how he determined that the delay resulting in abandonment was unintentional:

> Q...Do you recall what actions, if any, on the Vivato Networks' portfolio you were taking between December 11, 2008, and May 22nd, 2009?
>
> Q Do you recall?
>
> A My recollection is that there were a number of files, a number of boxes, and just trying to get myself up to speed on the technology, what was being applied for, where the prosecution stood in each file. ... There was just kind of catch-up on all the files and all the portfolio.
>
> ...
>
> Q Okay. How did you determine that the delay resulting in abandonment was unintentional?
>
> A I remember -- I believe we investigated the relationship of the application, the entities, of who owned what when. I don't know, there was a history that evolved -- I thought -- I seem to remember it was bankruptcy, but maybe it wasn't bankruptcy. But yeah, I mean generally speaking, that was the kind of information we would have elicited.
>
> Q And from whom would you have elicited that information?
>
> A The attorney -- I think a lot of our communications went through the attorney at Bullivant, the corporate attorney from the other office, whoever that would have been.

Schwedler Tr. at 21:13–25, 23:6–24 (objections omitted).

124.   Mr. Schwedler further testified that he likely did outside research on reviving abandoned applications:

> Q Given that -- I think you testified that the attempts to revive the abandoned applications in the Vivato Networks' portfolio

that you were handling was the first time you recall dealing with
revival of abandoned applications, other than discussions with
your colleague at Bullivant, did you do any research or talk to
anybody else about reviving abandoned applications?

A Yeah, I assume I would have done some outside research at
least.

Schwedler Tr. at 40:6–18 (objections omitted).

125.    As to Mr. Burke, for example, he testified that he had not any seen any

evidence that the '329 application was deliberately abandoned. He also testified to his belief

that any abandonment of the application was unintentional:

Q. So waiting two months when you know that
an application has previously been abandoned to
file a petition for revival is just common
practice in your understanding?

A. I -- there was never a -- when you say delay, you make it sound
like there was an intentional delay or some type of -- I don't -- I
just -- that's why I'm having trouble with these questions. I don't
think there was any delay. I don't think there was any motivation
for any delay. And I think the issue here is whether the
abandonment was intentional. I don't -- I think you might be
confusing it with there are – there used to be other grounds for
reviving applications where you had to show that everybody
involved treated this as like their number one priority and that's
like all they worked on. That's not the basis for reviving these
applications. You know, in these petitions, it's just a different
basis. So I'm just -- I'm sorry. I'm not accepting your preface
about there being delay. I think these were timely. And I think it
should be pretty darn clear to anybody looking at this record
that, you know, you had at least from the period of all these
petitions, that clearly people didn't want them, you know,
abandoned. But as far as the focus on the time period before
that, I just don't remember what I did.

...

Q. So have you seen any evidence today or ever that that
application was ever affirmatively intentionally abandoned?

58

A. No.

Q. Have you seen any evidence today or before that that application was deliberately abandoned on purpose?

A. No.

Burke Tr. at 85:11–86:19, 101:10–17 (objections omitted).

126.    Mr. Burke also testified that he would have done a reasonable investigation as

to any certifications in the revival petition:

Q...And I have asked you before, but having looked at that, did you make an inquiry as to the entire period of time from March 17 – from March -- from the day after the due date of the March 17th office action 2008 until the time you filed your petition for revival?

A. According to my practice and the way I've always practiced, I did, but I just don't remember what I did. I don't -- wouldn't file something like this willy-nilly. I would do what I was supposed to do. It's -- you know, I have been involved in disputes, you know, since before I got out of law school. And it's obvious that when patents are in litigation, that things like this are combed over with a fine tooth comb. It's no surprise that you got to do things right up front, correctly up front so that when somebody goes over it with a fine tooth comb, there are no issues.

...

Q. I want to talk about you are well aware of a patent attorney's obligations in submitting or signing documents submitted to the PTO, correct?

A. I believe so.

Q. And you are familiar with the duty of candor owed to the Patent Office?

A. Yes. Yes.

Q. And is it your usual practice to follow that duty of candor and -- and adhere to it?

A. Yes, carefully.

Q. And is it also your practice to make a reasonable investigation into the facts if called for by a certification or a submission?

A. Yes.
...
Q. ... Do you recall looking at various documents today that were introduced as exhibits, including your -- the revival petition that you submitted and then the Patent Office's decision granting it?

A. Yes.

Q. Okay. In the documents you've seen today, have you seen any false statements in the different exhibits that we've looked at?

A. Not that I recall in anything I've seen today, no.

Q. Do you recall seeing any knowingly false statements made?

A. No.

Q. Have you seen any evidence of inequitable conduct?

A. No.

Q. Have you seen any evidence of a specific intent to deceive the Patent and Trademark Office?

A. No.

...

Q. Did you perform a reasonable inquiry as set forth in that paragraph?

A. I believe I did, because that was my practice, but I don't remember what I did.

Burke Tr. at 89:1–20, 96:25–97:14, 99:5–100:12, 102:5–8 (objections omitted). Mr. Burke

also testified that his general practice is to follow the PTO rules and procedures and that

his research could extend beyond the MPEP into court decisions:

> Q And earlier today in response to some questions about your investigation into the abandonment of the '329 patent application, you mentioned that you had a general practice. Do you recall talking about that?
>
> THE WITNESS: I had a general practice about dealing with all issues, all legal issues.
>
> Q Would you agree that your general practice is to follow the PTAB rules and procedures?
>
> A No, I wouldn't say -- I wouldn't say the PTAB. I would say the PTO.
>
> Q I apologize. Thank you for that correction.
>
> A You know, as well as any -- as well as, you know, the research could extend beyond the MPEP and into decisions. ... Well, if we did research on an issue, it could extend beyond the, you know, the patent -- well, we're just talking about the patent side of the PTO, so beyond the MPEP into court decisions. If we research an issue, we research an issue. It was our practise to research, see what we had to do and to do it.
>
> Q You would agree that if the PTO required you to conduct an investigation or instructed you to conduct an investigation, your general practice is to follow what the PTO required or instructed you to do?
>
> A Yes.

01/20/23 Burke Tr. at 128:18-130:3 (objections omitted).

127.    *Fourth*, Mr. Godici had insufficient facts and information to make various

assertions because that information is not available in this case or never sought in

discovery. For example, Mr. Godici makes assertions regarding Mr. Thomas Sidley (at

Aequitas) and Mr. Adrian Zajac (at XR), including assertions that they may have violated a

duty of candor to the USPTO. But Mr. Zajac was not deposed in this case. And based on Mr.

Godici's list of "Materials Considered" (Exhibit C to Godici Report), it does not appear he

even reviewed Mr. Sidley's transcript (XR-EDTX-00094435). If he had, he would see that Mr.

Sidley generally did not recall anything from the relevant time periods associated with the

Vivato patents or applications, Aequitas loans, patent prosecution, or revivals. *See generally*

Sidley Tr. But Mr. Sidley confirmed that Bullivant's billing records indicated Mr. Sidley did

have some discussions with attorneys at the Bullivant firm regarding the revival of the '329

application around 2009 when Schwedler was working on revival documents:

> Q And Mr. Sidley I would point your attention to the first entry on
> August 13, 2009. ... Just to place this in time, this is about two
> weeks before the first petition for revival that we saw earlier
> dated August 28, 2009. Do you see this time entry from Ann
> Pahk on August 13, 2009. Her name is at the bottom of the block
> of test.
>
> A I see Ann Pahk's name at the bottom of that text.
>
> Q Okay. And then the latter half of this block of this text says:
> "For directed wireless communication, US Patent Application
> Number 10/700,329 in anticipation of filing petition for revival of
> unintentionally abandoned patent application with the [USPTO]
> ..." [As read.] Do you see that?
>
> A I read that, yes.
>
> Q Sorry, right before that it says, "Prepare draft response to
> office action." Do you see that?
>
> A I see that text as well.
>
> Q So Ann Pahk was working on a response to the office action in
> anticipation of filing a petition to revival; that's what this says?
>
> THE WITNESS: I mean, I see what is written on the billing
> statement there.

Q Okay. And then do you see the second entry for August 19, 2009 is for Carl Schwedler?

...

A (Reading): "Search of prior art and begin drafting amendment and revival documents." I read that, yes.

Q Correct. So on August 19, 2009, Carl Schwedler was also working on revival documents, right?

THE WITNESS: Well, there was a billing amount for that service.

Q Okay. And then on the next page, the last -- sorry -- if we can go back up a page, the last entry is from Robert Moore on August 21st,
2009; do you see that?

A Yes: "Conference with Ms. Pahk with regard to patent application revival matters; Robert Moore". And a billing for $138?

Q Correct. And that .4, that means .4 hours, correct?

A That's correct, yes.

Q So .4, that's around 20 minutes?

A Yes, I accept that, yes. I've never billed --

Sidley Tr. 96:22-98:8, 98:14-99:13 (objections omitted). The billing records also indicate that

multiple attorneys at the Bullivant firm reviewed records and had discussions in connection

with their work on the revival petition. *Id*. There is further indication that the investigation

regarding the circumstances of the abandonment and revival were "report[ed] to potential

buyer":

Q Okay. Let's go to page BHB84. And the first entry dated November 30 is also for Robert Moore. The first part of this time entry says: "Receive, review, and respond to emails from Mr. Sidley and conferences with patent counsel with regard to

63

report to potential buyer." Do you see that?

A Yes, I read that.

…

Q Okay. So the second part of this time entry says: "Receive and review response and report of patent counsel and email to Mr. Sidley with regard to communications to purchaser as to patent revival status." Do you see that?

A Yes, I read that.

*See* Sidley Tr. 100:17-25, 101:14-21. Given this testimony, Mr. Godici has little or no direct evidence regarding Mr. Zajac or Mr. Sidley's actions or mindset. Thus, Mr. Godici's opinions are speculative and the result of insufficient investigation. As another example, Mr. Schwedler testified that he obtained information on the circumstances of abandonment in discussions from another colleague at his firm who was the managing partner of the case. *Supra* ¶121. But Defendants never inquired about the name of that individual, nor sought to take his deposition. Without obtaining any information from that individual, Mr. Godici lacks sufficient basis to criticize Mr. Schwedler and assert that Mr. Schwedler conducted an insufficient investigation.

128.    *Fifth*, Mr. Godici improperly interprets a lack of evidence as affirmative evidence of misconduct. As I discuss above, Mr. Godici does not identify any legal test under which he is providing his opinions. If Mr. Godici is providing his opinions in support of an inequitable conduct defense, his opinions do not satisfy the required legal test. Notably, Mr. Godici fails to identify **clear and convincing evidence** of intentional abandonment or intent to deceive the USPTO.  And, while in my opinion he also fails to establish any violation of the USPTO's duty of candor an good faith, even if he were able to establish such a violation, that

64

alone would not be sufficient to establish inequitable conduct under *Therasense*.

129.    Mr. Godici appears to rely on an alleged lack of evidence that the abandonment was unintentional to infer that the abandonment was intentional. Likewise, Mr. Godici relies on the prosecutors' failure to recollect specific details of their reasonable investigation to infer that a reasonable investigation was not conducted. This is unfounded because in my experience a patent prosecutor (or attorney) is unlikely to recall specifics of an investigation they performed in their regular practice almost 15 years ago. As an attorney and former practicing prosecutor myself, I am unlikely to recall specifics of just one particular application or revival petition I worked on many years ago.

130.    It is my understanding that identifying the lack of evidence does not meet the clear and convincing evidence or even preponderance of the evidence standard. Further, despite the lack of evidence of misconduct, in every instance I have identified alternative, more likely inferences to be drawn than those expressed by Mr. Godici.  Thus, Mr. Godici's opinions certainly do not meet the "single most reasonable inference" of intent standard set by the Federal Circuit in *Therasense*.

### IV.D.    Mr. Godici's Suggestion that Abandonment was "Deliberate"

131.    In §§ VIII.A and VIII.B,  paragraph 229, Mr. Godici asserts that "the decision not to pay Brooks to continue prosecution was a deliberate course of action by Catcher Holdings and/or Aequitas." Godici Rpt. ¶ 229. And in paragraph 230, he continues:

> Based on my review of the evidence, it appears to me that Sidley and the Aequitas entities followed a deliberate course of conduct, specifically the decision not to pay Brooks and not to hire another attorney to replace Brooks after he withdrew, even though they were repeatedly made aware that Brooks was not getting reimbursed for his services and that Brooks did eventually withdraw as counsel and that there would be adverse consequences (i.e.,

65

abandonment of applications) if Brooks withdrew and a substitute counsel
was not retained.

*Id.* at ¶ 230.

132.    Although not stated explicitly, Mr. Godici appears to be opining that the

abandonment of the '329 application was a deliberately chosen course of action and

therefore intentionally abandoned and thus could not be revived. In fact, there is little or no

evidence in the record to support such a conclusion, other than the failure to pay Mr. Brooks.

Based on my experience, the relevant USPTO rules and regulations, and my review of the

facts and circumstances here, the most likely inference that can be drawn is that the '329

application was never intentionally abandoned within the meaning of 37 CFR § 1.137.

133.    I understand that inequitable conduct must be proven by clear and convincing

evidence. I further understand that the threshold levels of materiality and intent to deceive

necessary to establish inequitable conduct are questions of fact, which, again, the

challenger must prove by clear and convincing evidence.[13] Defendants contend that the

application was intentionally abandoned in an attempt to show that Mr. Schwedler's and Mr.

Burke's representations to the contrary were (1) material and (2) made with the specific

intent to deceive the USPTO. Therefore, Defendants must prove that the '329 application

was in fact intentionally abandoned by clear and convincing evidence. In my opinion, based

---

[13] *See, e.g., Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1365, (Fed. Cir.
2008) ("The burden of proving inequitable conduct lies with the accused infringer. To
successfully prove inequitable conduct, the accused infringer must present 'evidence that
the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose
material information, or submitted false material information, and (2) intended to deceive
the [PTO].' Further, at least a threshold level of each element—*i.e.*, both materiality and
intent to deceive—must be proven by clear and convincing evidence.").

on the evidence of which I am aware, Mr. Godici's opinions are not supported by the record and thus do not support Defendants' inequitable conduct case.

134.    Based on my experience, the relevant USPTO rules and regulations, and my review of the facts and circumstances here, Defendants and Mr. Godici do not appear to have meet their burden to demonstrate that the '329 application was intentionally abandoned. This is based at least on the following reasons.

135.    *First*, there was no express abandonment through the filing of any written declaration of abandonment (*see supra* at II.B) (discussing express abandonment under 37 CFR § 1.138), and there is no evidence the Brooks or anyone else gave or received any instruction for the '329 application to be abandoned. *See supra* at §§ III and IV.C.

136.    Like express abandonment, intentional abandonment results in the loss of patent protection/rights and, thus, is serious and should be unambiguous.   In my experience, to find intentional abandonment, the USPTO looks for conduct "akin" to express abandonment, *i.e.*, affirmative conduct or objective evidence that clearly reflects an intent to abandon a particular application at issue.   Here, there is no such evidence.   The non-payment of a patent practitioner's invoices (for whatever reason) – without more – is not sufficient.   Thus, given the facts and circumstances in this case, had the USPTO made the determination, it is highly unlikely that it would have determined that the '329 was intentionally abandoned.

137.    *Second*, the record of which I am aware does not provide sufficient evidence of a "deliberately chosen course of action" whereby the applicant deliberately permitted the '329 application to become abandoned. As discussed earlier in Section II.B., according to

MPEP 711.03(c): "Where the applicant deliberately permits an application to become abandoned (e.g., due to a conclusion that the claims are unpatentable, that a rejection in an Office Action cannot be overcome, or that the invention lacks sufficient commercial value to justify continued prosecution), the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as 'unintentional' within the meaning of 37 CFR 1.137(b)."

138.    As discussed earlier in Sections III and IV.C., here, there is not sufficient objective evidence of a deliberately chosen course of action to abandon the '329 application in the prosecution histories, depositions, or other documents and communications. For example, there is no evidence that the applicant deliberately permitted the application to become abandoned due to a conclusion that the claims are unpatentable. Likewise, there is no evidence that the applicant deliberately permitted the application to become abandoned due to a conclusion that the invention lacks sufficient commercial value to justify continued prosecution. As shown and discussed in Sections III and IV.C., the objective evidence in the record, including witness testimony, does not appear to support such a conclusion that under the facts and circumstances here, the USPTO would consider the abandonment of the '329 application to be a deliberately chosen course of action; rather, the record supports the contrary. S*ee, e.g., supra* ¶¶ 55-76, 108-127. For example, as discussed above, Mr. Brooks testified that he was never instructed to abandon any application. *See, supra* ¶ 76, 113. Likewise, as discussed above, Mr. Haycox testified that Catcher did not intend to abandon any application and that it never came to his attention that certain applications went abandoned. *See supra* ¶¶ 113, 117-119, Likewise, as

68

discussed above, Mr. Schwedler and Mr. Burke were never informed that the application was intentionally abandoned and maintained their belief that any abandonment was unintentional. *See supra* ¶¶121-126. This evidence supports a conclusion that under the facts and circumstances here, the USPTO would likely not consider the abandonment of the '329 application to be a deliberately chosen course of action.

139.    Mr. Godici asserts that "Under USPTO procedures, where the applicant or assignee controlling prosecution permits an application to become abandoned due to lack of sufficient commercial value to justify funding prosecution or because the applicant remains interested in eventually obtaining a patent but simply seeks to defer patent fees or prosecution expenses, the abandonment is considered a deliberately chosen course of action, and the resulting delay is not unintentional within the meaning of 37 CFR § 1.137." Godici Rpt. ¶ 228. As support for this assertion, Mr. Godici cites MPEP 711.03 (c) II C. *Id*. n. 16.

140.    I disagree with Mr. Godici's characterization of USPTO procedures to the extent he implies that intentional abandonment can be met without a "deliberately chosen course of action" to abandon or permit abandonment of the application at issue. Based on my experience with USPTO rules and procedures, a deliberately chosen course of action is required. MPEP § 711.03(c)(3)(II)(C) does not say otherwise. *See supra* at II.B. (discussing the applicability of MPEP 711.03(c) and note it refers to intentional abandonment as "a deliberately chosen course of action" or "a previous deliberate decision").

141.    In his analysis, Mr. Godici does not focus on the requirements to establish that an abandonment was intentional but rather, had it been intentionally abandoned, would

69

revival be possible.  That is not the situation in this case.  Again, based on my experience, a finding of intentional abandonment requires affirmative evidence of a deliberate decision to abandon. Typically, such a determination requires direct evidence, such as evidence that the applicant was aware a particular application would become abandoned, and, with that awareness, deliberately permitted the application to go abandoned. In this case, I have not seen any affirmative or direct evidence of a deliberate decision to abandon the '329 application, and Mr. Godici has pointed to none. Clearly, the mere circumstantial evidence that Mr. Brooks was not paid is not sufficient to support a determination that abandonment was intentional.  In fact, the entirety of circumstantial evidence points just the opposite direction.  *See supra* at §§ III and IV.C., *e.g.* ¶¶ 55-76, 108-127.

142.    *Third*, Mr. Godici contends that "the decision not to pay Brooks to continue prosecution was a deliberate course of action by Catcher Holdings and/or Aequitas" (Godici Rpt. ¶ 229) that established intentional abandonment within the meaning of 37 CFR § 1.137. I disagree.  Even if there had been  a deliberate decision not to pay Mr. Brooks (which I do not see evidence of), that does not establish that there was a deliberate decision to let the application go abandoned.  Mr. Godici does not appear to appreciate this difference. In my experience, it is not uncommon for prosecutors to withdraw because of payment issues, and perhaps for such withdrawals to lead to applications being abandoned. But those circumstances do not constitute a deliberate decision by the applicant to abandon all applications the prosecutor was working on. There must be a direct awareness and decision by the applicant to abandon the specific applications at issue. Based on my experience, an allegedly deliberate decision to not pay a prosecutor is not the type of "deliberate course of

70

action" that constitutes intentional abandonment of a particular patent application under 37 CFR § 1.137. Whether there was some allegedly deliberate action in the chain of events that results in an application being abandoned is not the test for intentional abandonment. If it were, then any abandonment would be intentional because a challenger could always point to some event and allege it was a deliberate act that resulted in the abandonment of an application. That is inconsistent with USPTO practice and procedure in which applications are frequently abandoned and revived on the basis of unintentional delay.[14]

143.    Moreover, as discussed earlier, the facts and circumstances here further undermine Mr. Godici's contention that "the decision not to pay Brooks to continue prosecution" (Godici Rpt. ¶ 229) shows intentional abandonment of the '329 application. *See, e.g.,* ¶¶55-76, 108-120. I note that the USPTO issued a Final Office Action in the '329 application on March 17, 2008, almost simultaneously with Mr. Brooks's notice of withdrawal filed on April 25, 2008. This Office Action set a three-month period for a response until June 2008. Since Mr. Brooks was in the process of withdrawing, there is no evidence that he discussed the '329 application with Catcher or Aequitas. Nor is there any evidence that Catcher or Aequitas were aware that responses to new Office Actions would be due in June 2008 or else the '329 application would become abandoned. The only evidence is that Mr. Brooks sent a letter to Mr. Ambrose's office directed to Vivato Networks Holdings, LLC (**not** Catcher or Aequitas), care of Mr. Ambrose on April 28, 2008 after Mr. Brooks already

---

[14] I note that in the *Network Signatures decision* dated 2013, the Federal Circuit remarked that "An examination of recently approved petitions [to revive] confirms that such petitions are routinely filed and granted without explanation for the 'unintentional' delay. *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1243–44 n. 2 (Fed. Cir. 2013).

filed a withdrawal. But as discussed above, there is no evidence that any contents of Brooks's letter was conveyed to Catcher or Aequitas, or even Vivato Networks Holdings. And as discussed above, Mr. Haycox, the principal of Vivato Networks Holdings and Catcher, testified he was never informed that the application would be abandoned after Brooks' withdrawal. Further, Mr. Brooks's notice to withdraw identified replacement counsel. This shows that the applicant intended to continue prosecution of the '329 application. These facts and circumstances support a conclusion that it is inappropriate to characterize an alleged decision to not pay Mr. Brooks as a deliberate decision to abandon or permit abandonment of the '329 application.

144.    *Fourth*, as shown and discussed above in Sections III and IV.C., there is insufficient evidence from Catcher or Aequitas that those entities intended to abandon the '329 application. *See, e.g., supra* ¶¶ 55-89, 103, 108-124, 127.  Moreover, it is unclear whether Aequitas's intent is even relevant to the issue of abandonment since, as the Godici Report acknowledges, Catcher held the "exclusive right" to prosecute the application, and Vivato Networks Holdings was the assignee. Godici Rpt. ¶ 227. Rather, as noted above, there is evidence to the contrary: Testimony shows that both Catcher and Aequitas were motivated to maintain the patent application and not let it go abandoned since they both believed the patent portfolio was valuable to them.  *See, e.g., supra* ¶¶ 116, 120. But in any event, Aequitas represented in the Patent Purchase Agreement that application was revived "in accordance with the applicable rules and procedures of the USPTO." This representation is additional objective evidence that Aequitas had not previously intentionally abandoned the application. For these reasons, Mr. Godici's assertion that Mr. Sidley or Aequitas

intended to abandon the application is not only unsupported but also contrary to the objective evidence in this case.

145.    Further, as noted earlier, the Godici Report is itself unclear about the various entities' roles in funding prosecution and vaguely asserts that "None of Catcher Holdings, Vivato Networks, or Thomas Sidley on behalf of Aequitas Equipment Finance, LLC chose to fund prosecution of the applications by Brooks." Godici Rpt. ¶ 227. Mr. Godici's statement supports the suggestion that, at a minimum, there was (and still is) substantial uncertainty about the various entities' roles in managing prosecution in the 2008 timeframe, i.e., the timeframe surrounding the abandonment. For example, there is no evidence that Mr. Haycox informed Aequitas that Mr. Brooks needed to be paid or else the '329 application would go abandoned (particularly since Mr. Haycox testified he was not even notified that the '329 applications would go abandoned if Mr. Brooks withdrew). Nor is it clear that Aequitas, as opposed to Catcher, was responsible for paying Mr. Brooks. Mr. Brooks's letter regarding his withdrawal with respect to the '329 application was only sent to Mr. Ambrose, and there is no indication what, if any, substance from Mr. Brooks' letter was ever communicated to Mr. Haycox. In fact, Mr. Haycox testified that he was never notified of potential abandonment of the patent application. Further, there is no evidence that Mr. Sidley or Aequitas was informed about the abandonment issue and deliberately permitted the '329 application to go abandoned. Indeed, Mr. Haycox testified he was not aware of the abandonment, so he could not have conveyed that issue to Mr. Sidley or Aequitas. These complicated circumstances, as well as the lack of evidence from Mr. Sidley and Aequitas, demonstrate that Mr. Godici has not provided a sufficient basis to show that the application

was intentionally abandoned.

146.    *Fifth*, as shown and discussed in Sections III and IV.C., Mr. Godici does not consider the circumstances of the abandonments in full context (e.g., in a single chronology), and that context supports the fact that any abandonment was very likely unintentional. *See supra* §§ III, IV.C., e.g., ¶¶ 55-76, 108-127. From my perspective, based on the objective evidence, both the number and type of significant events that occurred from 2008 to 2010 support the conclusion that the entire period of delay in responding to the Office Actions was unintentional under the circumstances within the meaning of 37 CFR 1.137, and eligible to be revived. *See supra,* §§ III and IV.C.

**IV.E.   The Evidence Does Not Support Mr. Godici's Opinion that Schwedler Filed Petitions to Revive Without Conducting a Reasonable Inquiry**

147.    In § VIII.C of his report, Mr. Godici asserts that "Schwedler Filed Petitions to Revive Without the Required Inquiry into the Circumstances of Abandonment." First and foremost, the relevant standard is whether Mr. Schwedler had a specific intent to deceive the USPTO with the filing of the revival petition, and not whether such a "reasonable inquiry" was made.    Second, even if one were to accept Mr. Godici's suggestion that failure to conduct a reasonable inquiry when the USPTO's revival decision specifically asked Mr. Schwedler to do so is evidence of intent to deceive, Mr. Godici still fails to show that a reasonable inquiry was not conducted. In other words, Defendants and Mr. Godici have not shown that Mr. Schwedler had a clear intent to deceive the USPTO or violated any duty of reasonable investigation when he submitted the revival petitions at least for the following reasons:

74

148.    *First*, I am not aware of any strict definition for what constitutes a "an inquiry reasonable under the circumstances".  37 CFR § 11.18(b)(2) (cited in Godici Rpt. § 62). As the phrase suggests, what constitutes a reasonable inquiry depends on the circumstances of the case. Mr. Godici does not further define or explain that term and does not apply it at all in his "Conclusions" section. Based on my experience with USPTO rules and procedure, and by its very language an "inquiry reasonable *under the circumstances*" is a flexible standard that must be determined on a case-by-case basis.

149.    For example, in the context of petitions to revive due to unintentional abandonment, such an inquiry does not necessarily require directly interviewing the prior applicants and prosecutors. Although such interviews may be helpful in some cases, I am not aware of any USPTO guidance that requires them, and Mr. Godici cites to none. Rather, based on my experience at the USPTO and as a practitioner before the USPTO, a reasonable inquiry can be satisfied if the individual seeking revival has conducted an inquiry and has a good faith belief that the application was unintentionally abandoned based on the evidence of which he or she is aware. In many circumstances (including this case), the inquiry can be satisfied by reviewing the prosecution history. And, as shown and discussed above, reviewing the prosecution history in this case would support a reasonable inference (and in my view the most reasonable inference) that the abandonment was unintentional. *See* §§ III, IV.C.-IV.D., e.g., ¶¶ 131-146. A reasonable inquiry may also be satisfied if a prosecutor obtains relevant facts from another source, such as from another attorney with knowledge of the abandonment. Again, as shown and discussed above, Mr. Schwedler believed he did so, and Bullivant records support his belief. *See* §§ III and IV.C., e.g., ¶¶ 121-124, 127.

150.    Because Mr. Godici never defines or explains what an "inquiry reasonable under the circumstances" requires, his assertion that Mr. Schwedler's investigation was insufficient is unsupported and subjective. Therefore, Mr. Godici's opinions regarding violation of USPTO's duty under 37 CFR § 11.18(b)(2) do not support the conclusion that the duty was violated by clear and convincing evidence or even a preponderance of the evidence.

151.    *Second*, Mr. Godici's assertions regarding Mr. Schwedler's investigation are inaccurate, incomplete, and conclusory. For example, Mr. Godici asserts that "Schwedler testified that he did not contact any of the individuals responsible for the failure to respond to the USPTO Office Actions before filing the petition to revive and making the representation to the USPTO that the delay was unintentional." Godici Rpt. ¶ 234. While I am not aware of any such requirement to do so as noted above, I have reviewed Mr. Schwedler's deposition transcript and disagree with that characterization. Mr. Schwedler testified that he did not **recall** speaking directly to the prior applicants or prosecutors of the '329 application. This is not surprising since Mr. Schwedler was asked about conversations from 15 years earlier. For example, Mr. Schwedler testified that (1) he did not recall having conversations with Mr. Brooks but "***may have reached out to him***," and (2) he would have talked to the client or his colleague and did remember talking with his colleague "at least." *See supra* ¶¶ 121-123.

152.    And, as noted earlier, Defendants have not obtained deposition testimony from Mr. Schwedler's colleagues (Bullivant firm) and/or the client (Aequitas). And, while Mr. Sidley (formerly associated with Aequitas) was deposed, Mr. Godici does not cite to any of Mr. Sidley's testimony. In fact, as discussed above, it does not appear Mr. Godici even

reviewed Mr. Sidley's transcript. Notably, while Mr. Sidley generally does not recall anything from the relevant time periods associated with the Vivato patents or applications (including the '329 application), Aequitas loans, patent prosecution, or revivals, he confirmed that Bullivant's billing records indicated Mr. Sidley did have some discussions with attorneys at the Bullivant firm.[15]  And those billing records suggest that such discussions  related to the revival of the '329 application around 2009 when Mr. Schwedler was working on revival documents.  Further, the firm's billing records show multiple attorneys at the Bullivant firm reviewed records and had discussions in connection with their work on the revival petition. *See supra* ¶103. This  objective evidence – not addressed by Mr. Godici -- is contrary to Mr. Godici's  assertion that Mr. Schwedler "did not contact any of the individuals responsible for the failure to respond to the USPTO Office Actions." Further, if Mr. Schwedler had contacted Mr. Brooks, for example, he likely would have been informed that there was never an instruction to abandon the '329 application, as Mr. Brooks testified. Brooks Tr. at 48-49.

153.    Mr. Godici asserts that Mr. Schwedler "should have known or could have easily consulted USPTO procedures stating that the failure to fund prosecution that results in abandonment is intentional and not unintentional under USPTO policy" (Godici Rpt. ¶ 234) (with no citation to USPTO policy).  Again, to the extent Mr. Schwedler "should have" or "could have" taken a particular action that Mr. Godici implies was required, such an implication is not sufficient to support the alleged "intentional abandonment" or any intent to deceive the USPTO.  Further, Mr. Godici ignores Mr. Schwedler's testimony  that he would

---

[15] The Bullivant firm is the firm that Mr. Schwedler worked for during the relevant time period, represented Aequitas in the foreclosure proceedings, and also handled the prosecution of the '329 application for Aequitas. *See supra* ¶¶74, 85.

have done some outside research at least. Schwedler Tr. at 40:6–18. For the reasons explained above, I disagree that any "USPTO policy" of which I am aware supports a conclusion that the abandonment of the '329 application at issue was intentional. Instead, based on the entire record of which I am aware, the most likely inference is that abandonment was unintentional. Yes, Mr. Brooks was not paid, and, yes, the application went abandoned. But those two facts without more are not sufficient to draw the conclusion that the abandonment was intentional. In fact, all of the "circumstances" surrounding the abandonment of which I am aware lead to the opposite conclusion, i.e., that the most likely inference is the abandonment was unintentional. Thus, even if Mr. Schwedler had done additional research into the circumstances surrounding the abandonment, he likely would have come to the same conclusion. And even more importantly, all the circumstances surrounding the abandonment of which I am aware do not provide clear and convincing evidence that Mr. Schwedler intended to deceive the USPTO.

154.    Further, Mr. Godici fails to mention the investigation that Mr. Schwedler recalls performing (even after a long period of time), which was discussed earlier. *See* §§ III, IV.C., e.g., ¶¶ 85-88, 121-124. And apart from being inaccurate and incomplete, the remainder of paragraph 234 of the Godici Report is conclusory. See the Godici Rpt. ¶ 234 (asserting: "*Instead of making a* reasonable inquiry as to the circumstances that resulted in abandonment, Schwedler testified he filed the petitions based on input from a corporate attorney in his law firm.") (emphasis added). But as discussed above, the record evidence is that multiple attorneys at the Bullivant firm did work relating to the revival petitions and had discussions with Mr. Sidley related to that work. *See supra* ¶103.

155.    *Third*, as discussed above, I have reviewed Mr. Schwedler's testimony and other evidence (including evidence overlooked by Mr. Godici) and have seen no indication that Mr. Schwedler's investigation was not "reasonable under the circumstances". *See* §§ III and IV.C., e.g., ¶¶ 85-88, 121-124, 127.

156.    *Fourth*, even assuming that Mr. Schwedler fell short of performing a reasonable investigation under the circumstances, there are various other inferences that are more plausible. For example, Mr. Schwedler certainly performed some investigation and believed it was sufficient. But falling short of a full investigation in a particular instance – even if it were required in this case -- is more likely the result of inadvertence or mistake and does not reflect a specific intent to deceive the USPTO.

157.    Mr. Godici asserts that: "By failing to conduct a reasonable inquiry, Schwedler misrepresented to the USPTO that he knew the circumstances of the delay and knew it to be unintentional, when in fact he did not." Godici Rpt. ¶ 235.  I disagree. Based on the objective evidence, including the evidence summarized above, Mr. Schwedler conducted a reasonable inquiry, had sufficient knowledge of the circumstances of the delay, and justifiably determined that the delay was unintentional. *See supra* at §§ III and IV.C., *e.g.*, ¶¶ 85-88, 121-124, 127. Therefore, the objective evidence of which I am aware does not support Mr. Godici's assertion.

158.    Mr. Godici asserts that "had Schwedler conducted the reasonable inquiry required by the law, he would have determined that at least a portion of the delay in fact resulted from a deliberate course of conduct, specifically the decision not to pay Brooks and not to hire another attorney to replace Brooks after he withdrew." Godici Rpt. ¶ 236. I

79

disagree because his suggestion that a deliberate decision not to pay Brooks is sufficient to conclude that abandonment was deliberate is just not the case.  *See supra* at §§ III.C.-III.F., IV.C.-IV.D.  Thus, even if Mr. Schwedler was aware of the nonpayment, that fact alone does not support deliberate abandonment of the '329 application.  As to Mr. Godici's assertion that a "deliberate" decision was made not to hire another attorney, I am not aware of sufficient evidence to support his assertion regarding any deliberate decision not hire another attorney.  It is more likely, based on the events surrounding abandonment, that some confusion and lack of information from the USPTO impacted the delay in hiring an attorney to assume the responsibility.  *See supra* at §§ III.C.-III.F., IV.C.-IV.D, e.g., ¶¶60-84, 108-123, 138-146.  In fact, (1) sufficient facts exist to demonstrate that Mr. Schwedler conducted a reasonable inquiry and (2) as discussed in the previous section of my report, the facts and circumstances provide a sufficient basis to support unintentional delay and do not reflect a deliberate decision to abandon the '329 application at issue.

**IV.F.   The Evidence Does Not Support Mr. Godici's Opinions that Mr. Burke Filed a Petition to Revive Without Conducting a Reasonable Inquiry**

159.   According to Mr. Godici, Mr. Schwedler is not the only bad actor in this case, Thus, Mr. Godici further asserts: "Burke Filed a Petition to Revive Without the Required Inquiry into the Circumstances of Abandonment." Godici Rpt. §§ VIII.D. For example, Mr. Godici asserts that: "By failing to conduct a reasonable inquiry, Burke misrepresented to the USPTO that he knew the circumstances of the delay and knew it to be unintentional, when in fact he did not." Godici Rpt. ¶ 238.  Mr. Godici repeats the assertion he made regarding Mr. Schwedler's inquiry:  "had Burke conducted the reasonable inquiry required by the law,

80

he would have determined that at least a portion of the delay in fact resulted from a deliberate course of conduct, specifically the decision not to pay Brooks and not to hire another attorney to replace Brooks after he withdrew." Godici Rpt. ¶ 239.

160.    Again, first and foremost, contrary to Mr. Godici's suggestion, the relevant standard is whether Mr. Burke had a specific intent to deceive the USPTO with the filing of the revival petition.   Second, even if one were to accept Mr. Godici's assertions regarding what Mr. Burke should have done and what he would have learned had he done so, Mr. Godici still fails to show that an "inquiry reasonable under the circumstances" was not conducted.  And, more importantly, even if the alleged failure to do so were proven, without more, that is not sufficient to conclude that Mr. Burke had a clear intent to deceive the USPTO.

161.    I incorporate my opinions above regarding Mr. Schwedler because they apply to Mr. Burke for substantially the same reasons. *See supra* at § IV.E.  Further, the following Burke testimony and other evidence pertaining to Mr. Burke (including evidence overlooked by Mr. Godici) additionally weighs against Mr. Godici's assertions regarding Mr. Burke's actions.  Based on my review, they instead support the inference that Mr. Burke had no intent to deceive the USPTO and that his investigation was reasonable under the circumstances. *See supra* §§ III, IV.C.

162.    For example, Mr. Burke did not recall the specifics of his investigation, which, again, is understandable given the passage of time. However, I note that he testified about his typical practice and that he would have conducted a reasonable investigation in this instance. *See supra* ¶125-126 (quoting Burke testimony). Mr. Burke further testified that he

81

was familiar with the Patent Purchase Agreement whereby XR acquired the '329 application from Aequitas. *See* 01/20/23 Burke Tr. at 56:13-58:4, 97:7-98:8.[16] That agreement represented that that application was revived "in accordance with the applicable rules and procedures of the USPTO." Aequitas-XR Purchase Agreement, XR-EDTX1-00043855 at §5.9. Further, Mr. Burke's testimony supports the conclusion that he had the prosecution histories of the '329 application, and would have reviewed Mr. Schwedler's petitions for revival.  Mr. Burke testified that "it should be pretty darn clear to anybody looking at this record" that the abandonment was unintentional.  Burke Tr. at 80-81; *see supra* §§ III, IV.C.-IV.E., e.g., ¶153. In view of this record, had Mr. Burke performed the additional inquiry that Mr. Godici claims was required, it most likely would have confirmed his determination that the entire period of delay was unintentional. In any event, again, there is no evidence to support an inference that Mr. Burke had a specific intent to deceive the USPTO, let alone clear and convincing evidence of such intent.

### IV.G.   The Evidence Does Not Support Mr. Godici's Opinions that Revival of the '329 Application Was Improper

163.    Mr. Godici asserts that, if a deliberate decision was made not to fund the prosecution of the '329 application, then the revival of the '329 application was improper and would not have been granted if the USPTO was informed of such.  Godici Rpt. ¶ 240. Again, Mr. Godici is making an assumption for which there is no evidence.  The decision not to pay Mr. Brooks – even if deliberate – does not support the suggestion that a deliberate decision was made not to fund *the prosecution* of the '329 application. *See supra* at § IV.C.-

---

[16] *See supra* fn. 8.

IV.D., e.g., ¶¶ 145, 153.  For the same reason, I disagree that it demonstrates revival was improper and that the '329 application would not have been granted.

164.    Mr. Godici asserts that if "Schwedler and/or Burke failed to make the required inquiry and the statement to the USPTO that the delay was unintentional was false, such would be a violation of the duty of candor and the revival of the applications would have been improper." Godici Rpt. ¶ 240.  Mr. Godici continues: "I understand that patents have been held unenforceable in such a circumstance," but does not identify any such patents/cases to support his position.  *See id*.  In any case, assuming the prosecutors did not make the "required inquiry," at most, they might be subjected to USPTO disciplinary proceedings. Without evidence of deceptive intent, that determination would not be sufficient to hold the '235 Patent unenforceable.  In any case, as discussed previously (*see supra* §§ IV.E.-IV.F.), the objective evidence in this case is not sufficient to support Mr. Godici's assertions that (1) Mr. Schwedler and Mr. Burke did not make an "inquiry reasonable under the circumstances" of abandonment or (2) the form statements they signed were "false." Therefore, the objective evidence does not show that revival of the '329 application was improper but rather supports the opposite conclusion. Further, improper revival is not a basis for unenforceability absent clear and convincing evidence of an intent to deceive. Based on my review of the record and my understanding of the law on inequitable conduct (as explained in *Therasense*), no such evidence exists in this case, let alone clear and convincing evidence.

165.    Mr. Godici attempts to extend his analysis to those who are not registered to practice before the USPTO and thus are not subject to disciplinary proceedings in the USPTO

under 37 CFR § 11.18 by asserting that "at least Sidley, Schwedler, Burke, and Zajac owed a duty of candor to the USPTO relative to the prosecution of the asserted patents." Godici Rpt. ¶ 243.  As an initial matter, as noted earlier, Mr. Godici has little or no evidence regarding the actions (or inactions) of Mr. Sidley and Mr. Zajac.  *See supra* at ¶103. Notably, he does not assert that they violated any duty of candor to the USPTO.

166.    Mr. Godici asserts: "The filing of knowingly false unintentional delay statements in petitions to revive and/or failure to make a reasonable inquiry as to the truthfulness of such statements would be a violation of the USPTO duty of candor and reasonable inquiry requirements." Godici Rpt. ¶ 243.  Again, I have not seen sufficient evidence — let alone clear and convincing evidence — that Mr. Schwedler or Mr. Burke filed any knowingly false statements in the revival petitions. To the contrary, the evidence demonstrates that Mr. Schwedler and Mr. Burke believed their statements to be true, both at the time of the revival petitions and today. *See supra* at ¶¶ 121-126.  Further, the evidence indicates that Mr. Schwedler and Mr. Burke made a reasonable and sufficient inquiry under the circumstances to support their USPTO form statements and thus their revival petitions as to truth of the revival petitions. *See supra* at §§ III.G.-III.H., IV.C., IV.E-IV.F. Therefore, the evidence does not indicate a violation of USPTO duty of candor or of reasonable inquiry in this case, or, even more relevant, clear and convincing evidence of an intent to deceive.

**Exhibit A — CV**

**NANCY J. LINCK, Ph.D.**

4375 Trias Street
San Diego CA 92103
(619) 310-6252
(202) 640-0613 (cell)
nancylinck@outlook.com
njlinckconsulting.com

<u>**Education**</u>

<u>J.D.</u>, magna cum laude, Western New England College School of Law, Springfield, MA, May 1984; <u>Law Review</u>:  Research Editor, 1983-84; Staff, 1982-83

<u>Ph.D.</u> and <u>M.S.</u>, Inorganic Chemistry, University of California, San Diego, 1982 and 1980, respectively

<u>B.S.</u>, with honors, Chemistry, University of California, Berkeley, 1973

<u>Certificate in Advanced Public Management</u>, Syracuse University, Maxwell School of Citizenship and Public Affairs, 1998

<u>Certificate in Essential Training Course for New Clinical Statisticians</u>, Pharmaceutical Education & Research Institute, 2004

<u>Certificate in Mediation</u>, Pepperdine University, 2008

<u>M.S., Biotechnology</u>, Johns Hopkins University, 2009

<u>**Legal Work Experience**</u>

<u>Of Counsel</u>, Carmichael IP, PLLC, April 2024-present:   Post-grant practice before the USPTO; consulting and providing expert testimony on all other patent matters in the USPTO and federal courts, including Hatch-Waxman and antitrust litigation, post-grant proceedings, and inequitable conduct.

<u>Consultant</u>, NJ Link Consulting, Dec. 2016-April 2024: consulting and providing expert testimony (focusing on Hatch-Waxman litigation and Antitrust cases), post-grant proceedings in the USPTO, advising on all patent matters in the USPTO and Federal Courts

<u>Partner,</u>  Rothwell, Figg, Ernst & Manbeck, Feb. 2008-Nov. 30, 2016:  Post-grant proceedings in the USPTO (including AIA reviews), appellate advocacy, consulting and

expert witnessing, mediation and arbitration, litigation, advising on all patent matters, licensing

<u>Administrative Patent Judge</u>, Board of Patent Appeals & Interferences, U.S. Patent & Trademark Office (USPTO), May 2006-Feb. 2008:  responsible for hearing and deciding appeals from examiners' rejections in the pharmaceutical and biotechnology areas

<u>Deputy General Counsel, IP & Trade</u>, Biotechnology Industry Organization, 2005-2006: responsible for all intellectual property and trade issues, including international issues

<u>Mediator</u>, Federal Circuit's Pilot Mediation Program, 2005-2006 and 2011-2012

<u>IP Consulting & Litigation Support</u>, 1999-2006:  consultant and expert witness

<u>Sr. Vice President, Intellectual Property, Regulatory Affairs & Chief Compliance Counsel, Guilford Pharmaceuticals Inc.</u>, 2004-2005:  member of executive management team; responsible for all aspects of intellectual property, including life cycle management, litigation, prosecution and licensing; responsible for legal compliance, regulatory affairs and corporate quality; managed a staff of 30 professionals

<u>Sr. Vice President & General Counsel, Guilford Pharmaceuticals Inc.</u>, 2002-2004: member of executive management team; responsible for the company's legal matters and all aspects of intellectual property; also responsible for the company's regulatory affairs; managed a staff of 15 professionals

<u>Vice President, Intellectual Property, Guilford Pharmaceuticals Inc.</u>, 1998-2002: member of executive management team, responsible for all aspects of intellectual property; managed a staff of 5 professionals

<u>Solicitor, U.S. Patent and Trademark Office (USPTO)</u>, Washington, D.C., 1994-1998: general counsel for the Commissioner; responsible for representing the USPTO in patent, trademark, and administrative law litigation and for assisting the Department Of Justice in IP cases before the U.S. Supreme Court; also responsible for legal matters within the USPTO, including proposed changes to relevant statutes, rules and the MPEP, and the preparation of legal guidelines; supervisor of the 24-member Solicitor's Office

<u>Adjunct Professor of Law</u>, University of San Diego School of Law, 2016-present; Georgetown University Law Center, 1998-2013; George Washington University School of Law, Washington, D.C., 1995-1998

<u>Partner</u>, Cushman, Darby & Cushman, Washington, D.C., 1991-1994; <u>Associate</u>, Cushman, Darby & Cushman, Washington, D.C., 1987-1990:  patent and trademark litigation, patent prosecution, and client counseling

<u>Judicial Clerk</u>, Judge Pauline Newman, U.S. Court of Appeals for the Federal Circuit, Washington, D.C., 1986-1987

<u>Patent Attorney</u>, Monsanto Company, 1984-1986:  lawyer and advisor for polymer facility, responsible for obtaining patent protection and for licensing intellectual property

## Scientific Work Experience

<u>Teaching Assistant</u>, Chemistry, University of California, San Diego, 1979-1981; San Diego State University, 1975-1978

<u>Organic Chemist</u>, Dow Chemical Co., Pittsburg, California, 1973-1975

<u>Analytical Lab Technician</u>, Dow Chemical Co., Walnut Creek, California, 1970-1972

## Bar Membership

U.S. Supreme Court, admitted 1988; U.S. Court of Appeals for the Federal Circuit, admitted 1987; District of Columbia, admitted 1986; U.S. Patent and Trademark Office, admitted 1986; Commonwealth of Massachusetts, admitted January 1985

## Select Professional Society Participation

<u>ABA Intellectual Property Law Section Council</u>, 2009-2012:  <u>Chair</u>, Corporate Practice Committee, 2004-2006

<u>AIPLA Founding Fellow</u>, 2000-present; Amicus Committee, 1995-2000;  <u>Editorial Board</u>, AIPLA Quarterly Journal, 1994-1999; <u>Board of Directors</u>, 1992-1994; <u>Chair</u>,  PTO Relations Committee, 1989-1991 (Congress ultimately adopted reexamination legislation drafted by this committee); <u>Representative</u>, WIPO Diplomatic Conference, 1991; WIPO Meeting of Experts, 1990

<u>BNA Advisory Board</u>, 1998-2016

<u>Giles Sutherland Rich American Inn of Court,</u> <u>President,</u> 2003-2004

<u>IPO</u>, Intellectual Property Committee, 1999-2006

<u>BIO</u>, Intellectual Property Committee (Guilford representative), 2000-2005

<u>PhRMA</u>, Intellectual Property Committee (Guilford representative), 2001-2003

3

## Select Legal Publications

*Only Congress Can Stop Courts' Patent-Eligibility Nonsense* (IP 360 October 15, 2018)

Post-Grant Patent Practice Treatise (first and second editions and supplement) (co-author) (BNA 2012, 2014 and 2016)

*PTO Grants Adjudicated Infringers a "Second Bite at the Apple" In Inter Partes Reexamination*, BNA Patent, Trademark & Copyright J. (Oct. 2005)

*Patent Examination in the New Milennium* (co-author with K. Kramer and D. Ball), 35 U. Houston L. Rev. 305 (Spring 1998)

*Patent Prosecution for Computer-Related Inventions:  The Past, The Present, and The Future*, (co-author with K.A. Buchanan), 18 Hastings Communications and Entertainment L.J. 658 (1996)

*Patent Procurement and Enforcement in Japan--A Trade Barrier,* (co-author with J.E. McGarry), 27 Geo. Wash. J. Int'l L. & Econ. 411 (1994)

*Patent Damages:  The Basics* (co-author with B. Golob), 34 IDEA 13 (1993)

*Trial Of Liability Issues, Part II:  Invalidity, Obviousness, Best Mode and Other Statutory Defenses* (co-author with H.E. Wurst), 1 PLI Patent Litigation 441 (1991)

*The Law Of Public Use And On Sale, Past, Present and Future* (co-author with W.K. West, Jr.), 72 J. Pat. & T.M. Off. Soc. 114 (Feb. 1990)

*The Doctrine of Equivalents:  A Two-Tier Analytical Approach,* AIPLA Selected Legal Papers (Spring 1988)

*Patentable Subject Matter Under Section 101--Are Plants Included?,* 67 J. Pat. Off. Soc. 4889 (Sept. 1985)

*The 'Aborted' Evolution of Fetal Rights after <u>Roe v. Wade</u> - <u>Douglas v. Hartford</u>,* 542 F. Supp. 1267 (D. Conn. 1982), 6 Western New Eng. L. Rev. 535 (1983)

4

## Scientific Publications

N.J. Linck*, The Reactive State and the Resultant Stereochemical Pathway in Photolyses of Cr(III)-Amine Complexes*, University of California, San Diego, 1982

N.J. Linck, S.J. Berens, D.Magde, R.G. Linck, *Doublet Excited States in Chromium(III)-Amine Complexes: Does Back Intersystem Crossing Determine Their Lifetimes?* J. Phys. Chem., 1983, 87, 1733

N.J. Shipley (Linck), R. G. Linck, *Pathway of Decay from the Excited Doublet of the Trans-Cr(NH$_3$)$_2$(NCS)$_4^-$ Ion*, J. Phys. Chem., 1980, 84, 2490

M.C. Cimolino, N.J. Shipley (Linck), R. G. Linck, *Photoracemization of Δ- and Λ-Trisethylene-Diaminechromium (III),* Inorg. Chem., 1980, 19, 3291

C.G. Newman, H.E. O'Neal, M.A. Ring, F. Lesko, and N.J. Shipley (Linck), *Kinetics and Mechanism of the Silane Decomposition*, Int. J. Chem, Kinetics, 1979, 11, 1167

## Select Awards

The Gold Medal of Achievement Award, Department of Commerce, 1997 (for contribution to the Computer-Implemented Invention Guidelines)

The Katz-Kiley Fellow Award, University of Houston Law Center, 1997

Full Tuition Merit Scholarship, Western New England College School of Law, 1981-84

Merit Scholarship, Dow Chemical Co., 1972-73 (to complete B.S. studies in Chemistry at UC, Berkeley)

**Exhibit B — List of Cases**

**Expert Testimony (2017-September 2024)**

In re Neo Wireless, LLC Patent Litigation, No. 2:22-md-03034-TGB (E.D. Mich. (deposition) (Neo Wireless)

AliveCor, Inc. v. Apple Inc., No. 4:21-cv-03958-JSW-SK (N.D. Ca.) (deposition) (Apple)

Zydus Worldwide DMCC v. Teva API Inc., No. 2:19-cv-17086-JXN-JRA (D.N.J.) (deposition) (Teva)

Indivior Inc. v. Alvogen Pine Brook LLC, C.A. No. 17-7106 (D.N.J.) (deposition) (Alvogen)

Chiesi USA v. Aurobindo Pharma USA, No. 3:19-CV-18756-FLW-LHG (D.N.J) (deposition & trial testimony) (Aurobindo)

Confidential Arbitration (London Court of Int'l Arbitration) (Oct. 2021) (hearing testimony) (Patent Licensor)

Eolas Techs. Inc. v. Google LLC, No. 4:17-cv-03033-JST (N.D. Ca.) (deposition) (Eolas)

Eolas Techs. v. Amazon.com Inc., No. 4:17-cv-03022-JST (N.D. Ca.) (deposition) (Eolas)

Eolas Techs. v. Walmart Inc., No. 4:17-cv-03022-JST (N.D. Ca.) (deposition) (Eolas)

In re Zetia Antitrust Litigation, MDL, No. 2:18-md-2836 (E.D. Va.) (deposition) (Merck)

In re: Niaspan Antitrust Litigation, No. 13-MD-2460 (E.D. Pa.) (deposition) (Teva)

Oil-Dri Corp. v. Nestle Purina PetCare Co., No.1:15-cv-01067 (E.D. Ill.) (Oil-Dri)

Egenera, Inc. v. Cisco Systems, Inc., No. 1:16-cv-11613-RGS (D. Mass.) (deposition) (Egenra, Inc.)

In Re: Lamictal Direct Purchaser Antitrust Litigation, No. 2:12-cv-995-WHW-CLW (D.N.J.) (deposition) (Teva Pharmaceuticals USA)

Cipla Ltd. v. Sunovion Pharmaceuticals Inc., C.A. No. 1:15-cv-00424-LPS (D. Del.) (deposition) (Cipla Ltd.)

**Exhibit C—Materials Considered**

I have considered at least in part the following materials:

- Documents discussed or cited in this Rebuttal Expert Report of Nancy J. Linck, JD, PhD.

- The Expert Report of Nicholas P. Godici dated April 25, 2025, and materials discussed or cited therein.

- The prosecution history of the '235 patent, including the prosecution history for the '329 application.

- The deposition transcripts and exhibits of:

  - Edward Brooks (07/06/22 and 01/05/23)
  - Christopher Ambrose (07/07/22 and 12/19/22)
  - Daniel Burke (07/26/22 and 01/20/23)
  - Gary Haycox (07/07/22)
  - Carl Schwedler (07/08/22 and 12/05/22)
  - Thomas Sidley (03/10/23)
  - Kai Hansen (XR 30(b)(1) witness) (05/19/22 and 02/13/23)
  - Adrian Chraplyvy (XR 30(b)(6) witness) (05/13/22, 05/17/22, 02/27/23, and 02/28/23)

- The patent assignment records for the '235 patent and '329 application (including XR-EDTX1-00050604-50612, XR-EDTX1-00052158-2206, XR-EDTX1-00052669-52724, XR-EDTX-00004059-4064, XR-EDTX-00004152-4222).

- Defendants' and Intervenors' answers.

- Plaintiff XR's and Defendants/Intervenors' interrogatory responses regarding inequitable conduct.

- The Expert Report of Nicholas P. Godici dated July 29, 2022 (XR-EDTX1-00051833) and the August 26, 2022 Deposition Transcript of Nicholas Godici (XR-EDTX1-00054314.

- The Rebuttal Expert Report of Teresa Rea, dated August 23, 2022 (XR-EDTX1-000051913) and the August 31, 2022 Deposition Transcript of Teresa Rea (XR-EDTX1-00054530).

- Motion for Partial Judgment of No Inequitable Conduct and related filings from *XR*

*Communications, LLV c. D-Link Systems et al.*, No. 8:17-cv-596, including Dkt. No. 414 (XR's Motion for Partial Summary Judgment of No Inequitable Conduct), Dkt. No. 418 (XR's Memorandum of Law in Support of its Motion for Partial Summary Judgment of No Inequitable Conduct (with exhibits)), Dkt. No. 419 (XR's Statement of Uncontroverted Facts In Support of Motion for Partial Summary Judgment of No Inequitable Conduct), Dkt. No. 477 (Defendants' Response in Opposition to Motion for Partial Summary Judgment of No Inequitable Conduct (with exhibits)), and Dkt. No. 522 (XR's Reply In Support of Motion for Partial Summary Judgment of No Inequitable Conduct)

- Other Documents
  - Business Loan Agreement (XR-EDTX1-00052610)
  - Commercial Security Agreement (XR-EDTX1-00052622)
  - Catcher-Vivato Networks License Agreement (XR-EDTX1-00052077)
  - Catcher April 2008 8-K (XR-EDTX-00094634, at XR-EDTX-00094725—XR-EDTX-00094727)
  - Relevant pleadings from *Aequitas Equipment Finance, LLC v. Vivato Networks, Inc.*, USDC District of Oregon Case No. 3:08-cv-00750 (June 20, 2008) including the Second Amended Complaint (XR-EDTX1-00052105), Vivato Networks Holdings Answer (XR-EDTX1-00052111), Order of Judgment (XR-EDTX-00091201), Aequitas Foreclosure Judgment (XR-EDTX1-00052689)
  - Sheriff's Sale (XR-EDTX-00004059)
  - Catcher January 2008 Prospectus (XR-EDTX1-00052494)
  - XR Patent Purchase Agreement (XR-EDTX1-00043855)

**APPENDIX 1**
**Glossary/Overview of the Relevant Entities**

- **Vivato, Inc.** (original assignee) - a venture-backed startup in 2000 in developing advanced wireless communications systems. Received assignment from inventors on 07/07/04.

- **Wayout Wireless** - Acquired the assets of Vivato Inc. received assignment on 09/21/06. **Gary Haycox** signed powers of attorney for the '329 application. Per Gary Haycox, "the business was more of a consulting and integration business, so working with wireless customers and doing implementations." Haycox Tr. at 8:14-18. **Edward Brooks** from the Brooks Cameron firm handled prosecution of the '329 application on behalf of Wayout, Vivato Networks LLC, Vivato Networks, Inc., and Vivato Networks Holdings.

- **Vivato Networks LLC** - Same business as Wayout Wireless, just changed the name. Received assignment by name change on 08/06/07. **Gary Haycox** was the CEO. Per Haycox, the purpose was "strictly for branding. Vivato had a brand in the marketplace as a known company delivering a unique outdoor wireless solution, and so we felt that changing the name and using Vivato, we would actually leverage on the brand that was already in the marketplace." Haycox Tr. at 13:19-14:1.

- **Vivato Networks, Inc.** – same business as Vivato Networks, LLC, just changed the name on 09/19/07. **Gary Haycox** was the CEO.

- **Catcher Inc.** – Also in the business of wireless communications and had a portable computer product with wireless communication capabilities targeting the military as customers. (*See* XR-EDTX1-00052494, 01/02/08 Catcher Holdings Prospectus).
    - Per Haycox, around 2006-2007, Vivato Networks was working on projects with existing inventory and "servicing existing customers that Vivato already had in place...there was a point in 2007 where we were introduced to Catcher, Inc., and we went on a — undergone a series of discussions, a long series of discussions about merging the two companies to leverage both client-side and network-side solution set to market." Haycox Tr. 14:14-15:3.
    - **Gary Haycox** eventually became the VP or CTO of Catcher Inc., Hal Turner remained CEO of Catcher Inc. Haycox Tr. 19:5-20:2.

- **Catcher Holdings Inc.** - originally a holding company of Catcher Inc., but at some point in time, Catcher Holdings acquired Catcher, Inc. and Catcher Holdings became the main "Catcher" entity moving forward. Haycox Tr. 20:9-19, 29:8-16.
    - At some point, Vivato Networks Holdings, LLC and Vivato Networks, Inc. became subsidiaries of Catcher Holdings. Haycox Tr. 33:24-34:12.
    - **Haycox** became CEO at some point in time of Catcher Holdings after it acquired Catcher Inc. Haycox Tr. 19:5-23, 29:8-16.

1

- o Per Haycox "At the time [of the original merger with Vivato Networks], Hal Turner was a CEO of Catcher. I told him that the patent portfolio was not to be included in the merger process during those negotiations, ...if they wanted to purchase the patents, we would have that as included as another deal within the merger. So we structured to move the patents out of the Vivato Networks entity, into the Holdings company, to separate those assets from the actual product inventory, product designs, product development on — and the employees that we had moving forward int eh team from that entity. And so we were preparing to actually separate those two during that process." Haycox Tr. at 15:17-16:9.
  - o Company wound down completely at "a hard stop" on 05/01/08, including ceasing all operations and firing all employees, for insufficient working capital as of 05/01/08. Haycox Tr. at 77:22-79:12; *See* Catcher April 2008 8-K.

- **Vivato Networks Holdings LLC** - came out of an intended "merger" between Vivato Networks and Catcher Holdings in 2007 per Haycox. *See* above re Catcher Holdings, Catcher, and Vivato Networks. **Gary Haycox** signed powers of attorney for the '329 application. Vivato Networks Holdings received the assignment on 12/07/07.

- **Edward Brooks** from Brooks Cameron was the prosecution attorney of the '329 application for Haycox's respective assignee entities up through his withdrawal.

- **Aequitas Capital Management** - an investment firm that provided a loan to Vivato Networks on November 30, 2007, but most of the money actually went to Catcher Holdings. Ambrose Tr. at 23-25, 28-30. In return, Aequitas received a perfected security interest in the Vivato assets, including the '329 application.

- **Aequitas Equipment Finance** - holding company / subsidiary of Aequitas Capital Management. Aequitas Capital assigned its perfected security interest in assets to Aequitas Equipment Finance on the same day it received the interest from Vivato Networks.
  - o Vivato Networks-Aequitas loan became due on 01/30/08.
  - o Aequitas foreclosed on the Vivato assets on 06/20/08, and won on 11/19/08.
  - o Received the assignment from "Vivato Networks, Inc. f/k/a Vivato Networks Holdings, LLC" via Sheriff's Sale on 12/07/09.
  - o **Thomas Sidley** signed powers of attorney for Aequitas in the prosecution of the '329 application.

- **Bullivant Houser Bailey** (the "Bullivant firm") - also represented Aequitas in the foreclosure proceedings. The prosecution of the '329 application was handled by **Carl Schwedler** from the Bullivant firm on behalf of Aequitas.

- **XR Communications d/b/a Vivato Technologies** (current assignee) - formed with the hope to "restart" the Vivato wireless communications sales and manufacturing

2

business. *See* 02/27/23 Chraplyvy (XR 30(b)(6) witness) Tr. 120:5-12, 122:7-22, 189:13-190:3, 202:12-16.

- o Purchased all assets including the '329 application from Aequitas Equipment Finance on 12/23/09.
- o **Adrian Zajac** signed powers of attorney for XR Communications in the prosecution of the '329 application.
- o **Daniel Burke** prosecuted the '329 application on behalf of XR and helped work on the XR-Aequitas patent purchase agreement. *See* 01/20/23 Burke Tr. at 56:13-58:4, 97:7-98:8.