**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES, <br><br> Plaintiff, <br><br> v. <br><br> AT&T SERVICES INC.; AT&T MOBILITY LLC; and AT&T CORP., <br><br> Defendants. | Case No. 2:23-cv-00202-JRG-RSP <br> (**Lead Case**) <br><br> **JURY TRIAL DEMANDED** |

**DEFENDANTS/INTERVENORS' OPPOSITION TO PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................................1

II.    RESPONSE TO PLAINTIFF'S STATEMENT OF ISSUES TO BE DECIDED .............2

III.    FACTUAL BACKGROUND FOR INEQUITABLE CONDUCT DEFENSE..................3

    A.    Response To Plaintiff's Statement of Undisputed Material Facts ......................... 3

        1.    '329 Application Prosecution and Abandonment ...................................... 3

        2.    Aequitas Foreclosure Proceedings and Revival Petitions........................... 5

    B.    Response to "Other Relevant Facts"....................................................................... 5

IV.    ARGUMENT AND CITATIONS TO LEGAL AUTHORITY ..........................................6

    A.    Catcher and Aequitas Deliberately Abandoned the '329 Application................... 7

    B.    Schwedler and Burke Made Misrepresentations To The Patent Office In the Petitions to Revive ...................................................................................... 12

        1.    There Is a Genuine Issue of Fact As To Whether Schwedler and Burk Represented That the Delay Was Unintentional When In Fact It Was Intentional .................................................................................... 12

        2.    There Is A Genuine Issue of Material Fact As To Whether Schwedler and Burke Misrepresented That They Had Performed An Inquiry Reasonable Under the Circumstances When In Fact They Had Not .......................... 13

            a.    Schwedler Did Not Make a Reasonable Inquiry Into the Facts and Circumstances of Abandonment of the '329 Application..................................................................................14

            b.    Burke Did Not Make a Reasonable Inquiry into the Facts and Circumstances of Abandonment of the '329 Application..................................................................................16

    C.    Schwedler and Burke Each Had Specific Intent to Deceive The Patent Office. ..................................................................................................... 18

        1.    Schwedler Specifically Intended to Deceive the Patent Office ............... 19

        2.    Burke Specifically Intended to Deceive the Patent Office ...................... 22

V.    CONCLUSION......................................................................................................24

i

# TABLE OF AUTHORITIES

## Cases

*3D Medical Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 1331 (N.D. Ga. 2017) ...................................................................................10, 13, 19, 23

*Application of Cheol Kim*, 2009 WL 1212054 (P.T.O. Apr. 1, 2009) .................................. 7-8, 11

*Application of G*, 11 U.S.P.Q.2d 1378.................................................................................11

*Ashgari-Kamrani v. U.S.A.A.,* 252 F.Supp.3d 562 (E.D. Va. 2017)............................................24

*Fed. Trade Commn. v. AbbVie Inc.*, 329 F. Supp. 3d 98 (E.D. Pa. 2018), *reversed in part on other grounds*, 976 F.3d 327 (3d Cir. 2020) ........................................................11

*Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244 (Fed. Cir. 2024)............................................21

*In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1273 (Fed. Cir. 2018) ..........................6

*Lumenyte Int'l Corp. v. Cable Lite Corp.*, 92 F.3d 1206 (Fed. Cir. 1996).......................................................................... 7, 9-11, 18, 23

*Pavo Solutions LLC v. Kingston Technology Company, Inc.,* 2019 WL 4390573 (C.D. Cal. June 26, 2019) ..............................................................................................21

*Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357 (Fed. Cir. 2008)..............................18

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011)..................................................................................10, 13, 18

## Rules

Local Rule CV-5(a)(3)..........................................................................................................25

## Regulations

37 C.F.R. § 1.137(b) ............................................................................................................16

37 C.F.R. § 1.137(b)(4).........................................................................................................10

37 C.F.R. § 11.18(b)(2)....................................................................................................6, 14

## Non-Periodical Publications

MPEP 711.03(c).......................................................................................................................6

MPEP § 711.03(c)...............................................................................................................9, 20

Defendants AT&T Corp., AT&T Mobility LLC, and AT&T Services, Inc. ("AT&T"), Verizon Communications, Inc. and Cellco Partnership d/b/a Verizon Wireless ("Verizon"), T-Mobile USA, Inc. ("T-Mobile"), and Intervenor Ericsson Inc. (collectively, "Defendants/Intervenor") respond to Plaintiff's Motion for Partial Summary Judgment of No Inequitable Conduct (ECF No. 172). Defendants/Intervenor request that the Motion for Partial Summary Judgment be denied and that the issue of inequitable conduct be resolved in a bench trial.

## I.    INTRODUCTION

The crux of Plaintiff's motion for summary judgment is that because the patent prosecutors, Schwedler and Burke, who petitioned to revive the '329 Application (which led ultimately to the '235 Patent) denied in depositions that they intended to deceive the Patent Office, the Court must grant summary judgment in Plaintiff's favor. But of course, if that were the standard, no inequitable conduct defense would ever succeed, and thus that is not the law. To the contrary, the Federal Circuit and district courts have repeatedly held that mere denials of intent to deceive do not prevail over documentary evidence supporting such intent. And that is precisely the record before the Court here. In April 2008, the prosecuting attorney for the '329 Application had not been paid for his services in over a year. So, he meticulously documented his intention to withdraw from prosecuting the portfolio of applications, including the '329 Application, and was unequivocal about what would happen if Plaintiff's predecessor did not hire someone to respond to the pending final rejection: "if no response has been received by the USPTO, this application will become Abandoned." ECF No. 172-35, at 4.

But it is clear from the record that the two parties responsible for maintaining the portfolio—Catcher Holdings and Aequitas Capital—decided not to take the steps necessary to keep the '329 Application alive. Indeed, no one appears to have paid any mind to the pending

application until Aequitas foreclosed on the portfolio (which was collateral for an unpaid loan) in mid-2009. At that point, Aequitas apparently changed its mind and decided that, in order to try to recoup some of its outlay, it needed to revive the applications so they could be sold (ultimately to Plaintiff). Over the course of more than a year, through three petitions to revive the abandoned '329 Application (two of which were denied for technical reasons), prosecuting attorneys Schwedler (for Aequitas) and Burke (for Plaintiff XR Communications) repeatedly—and falsely—represented that, after conducting an "inquiry reasonable under the circumstances," they knew that the "entire period" of delay in responding to the final rejection of the '329 Application was unintentional and thus the application was eligible for revival. It is apparent from the record that Schwedler and Burke made that representation with intent to deceive the PTO into granting relief to which Aequitas and Plaintiff were not legally entitled. Accordingly, Schwedler and Burke committed inequitable conduct and the '235 Patent, which resulted from the '329 Application, should be held unenforceable.

While Defendants/Intervenors believe that the evidence strongly favors a finding of unenforceability based on inequitable conduct, that ultimate issue is not the question before the Court on this motion. At the very least, the extensive record here, consisting of numerous documents, hundreds of pages of testimony, and dueling expert opinions, presents genuine issues of material fact that require resolution through a full bench trial, not on the abbreviated record of summary judgment. The Court, therefore, should deny Plaintiff's motion for partial summary judgment.

## II.    RESPONSE TO PLAINTIFF'S STATEMENT OF ISSUES TO BE DECIDED

Plaintiff's first, second, and fourth issues reflect the issue before the Court on this Motion, which is whether the evidence would permit a fact-finder to find inequitable conduct, with one exception. Plaintiff repeatedly uses the phrasing "Schwedler **and** Burke" (emphasis added) to

describe the attorney's whose conduct is at issue. In fact, an issue of material fact with respect to *either* Schwedler *or* Burke warrants denial of summary judgment.

Plaintiff's third issue is a mischaracterization to the extent it seeks a ruling "as a matter of law" that violation of the duty to make a reasonable inquiry into the basis for patent office filings can never form the basis of an inequitable conduct claim. The actual issue before the Court is whether Schwedler or Burke knowingly misrepresented to the Patent Office that they *had* conducted a reasonable inquiry when in fact they had not.

## III.    FACTUAL BACKGROUND FOR INEQUITABLE CONDUCT DEFENSE

### A.    Response To Plaintiff's Statement of Undisputed Material Facts

Defendants/Intervenors' responses below track the paragraph numbering in Plaintiff's Statement of Undisputed Material Facts and adopts Plaintiff's headings to make following the disputes simpler for the Court.

1.    Undisputed.

2.    Undisputed.

### 1.    '329 Application Prosecution and Abandonment

3.    Undisputed.

4.    Disputed in part. The cited passage states that while Brooks only interacted directly with Haycox, he "believe[d] [Haycox] gave me instructions from business counsel Ambrose." ECF No. 172-25 (Brooks Dep.), at 14:2-4.

5.    Undisputed.

6.    Undisputed.

7.    Disputed in part. The entity to which Vivato Networks assigned the '329 Application was in Vivato Networks Holdings, *LLC* (not Inc.). *See* ECF No. 172-4, at 1.

8.    Disputed in part. The cited document does not support that "Vivato Networks had

failed to make the required payments and was in default" as of January 30, 2008. Rather, even as of April 2008, Catcher reported that "[t]he note holder has verbally agreed, from time to time, to forgo action it may take; however, there is no assurance that it will continue to do so." ECF No. 172-10, at 2.

      9.      Undisputed.

      10.      Undisputed.

      11.      Disputed in part. Brooks' letter was directed to Gary Haycox, and he was copied, along with Ambrose. ECF No. 172-35, at 1 ("Dear Gary"). The letter was in Ambrose's files. *Id.* Haycox received the letter and its enclosures. *Id.* at 2 ("Cc: Gary Haycox w/enc"). The April 28, 2008, letter informed Haycox and Ambrose that the '329 Application "currently has an outstanding **Final Office Action with initial due date for response of May 17, 2008**." *Id.* at 4. Haycox and Ambrose knew that "[e]xtensions are available until September 17, 2008, at which point, if no response has been received by the USPTO, this application will become abandoned." *Id.* Contrary to the implication in Plaintiff's statement of facts, Haycox knew that Brooks was withdrawing as counsel in front of the Patent Office and that "there would be no counsel" to prosecute the portfolio. ECF No. 172-27, at 54:10-56:10.

      12.      Disputed in part. The USPTO sent a "courtesy copy" of the decision accepting Brooks' withdrawal to Ambrose. ECF No. 172-32, at 3. Ambrose "certainly understood that Mr. Brooks was going to be withdrawing and communications were to be sent to me." Exh. A, Ambrose July 7, 2022 Depo., at 31:9-22. The PTO also sent Ambrose a copy of the decision granting Brooks' withdrawal petition. Exh. B, Ambrose July 7, 2022 Depo., at Ambrose 3. Further, the cited material does not support that the Vivato address to which the USPTO sent correspondence was "defunct" at the time of the decision on the petition to withdraw. Ambrose

and Haycox also received a copy of the Notice of Abandonment for another application in the portfolio, Application Serial No. 10/700,342 from Brooks in November 2008, nine months before Schwedler petitioned to revive the application. Exh. A, Ambrose July 7, 2022 Depo., at 48:14-49:17.

13.     Disputed in part. The Notice of Abandonment was mailed on January 8, 2009. By that time, Ambrose and Haycox had already received a copy of the Notice of Abandonment for another application in the portfolio, Application Serial No. 10/700,342 from Brooks in November 2008. Exh. A, Ambrose July 7, 2022 Depo., at 48:14-49:17. Ambrose also received a phone call from the PTO in connection with Application Serial No. 10/700,342 in September 2008. The PTO employee recorded the call (and a call to Brooks) as follows:

> On 09/26/08, I telephoned Christopher R. Ambrose. Mr. Christopher R. Ambrose said he rehire Mr. Edward J. Brook to work on the application. On 09/30/08, I telephoned Mr. Edward J. Brook. Mr. Edward J. Brook said he is not receive message from Mr. Christopher R. Ambrose to continue to work on the application.

Exh. C, Brooks July 6, 2022 Depo., at Brooks 11.

### 2.     Aequitas Foreclosure Proceedings and Revival Petitions

14.     Undisputed.

15.     Undisputed.

16.     Undisputed.

17.     Undisputed.

18.     Undisputed.

19.     Undisputed.

20.     Undisputed.

### B.     Response to "Other Relevant Facts"

Plaintiff's brief includes a section called "Other Relevant Facts" that presumably includes

5

"facts" that Plaintiff believes are "relevant" but not material to the ultimate decision on this motion. Defendants/Intervenor do not provide a point-by-point response to that recitation here, but incorporate below and above facts that demonstrate that there is a genuine issue of material fact to be decided at a bench trial on inequitable conduct.

## IV.    ARGUMENT AND CITATIONS TO LEGAL AUTHORITY

The Court should deny Plaintiff's motion for summary judgment because there are genuine disputes of material fact about whether Schwedler's and/or Burke's certifications to the Patent Office in connection with their petitions to revive the '329 Application were materially false and made with intent to deceive. Both Schwedler and Burke represented that the '329 Application was eligible for revival because the "entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition . . . was unintentional." MPEP 711.03(c). But the evidence strongly demonstrates—and certainly permits the inference—that Schwedler and/or Burke knew that representation was false when they made it. As explained below, the law is clear that abandoning an application because of a failure to pay for continued prosecution is an *intentional* abandonment, and that such a misrepresentation can ground an inequitable conduct claim. *See, e.g.*, *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1273 (Fed. Cir. 2018) ("[T]he PTO would not have revived the patents if it had known that Paradyne consciously allowed them to expire. In other words, the statement was material to patentability—or at least continued enforceability. . . . Paradyne's alleged mistake of fact is no defense."). Schwedler's and Burke's representations to the contrary were thus false and material as a matter of law.

Were that not enough, Schwedler and Burke both represented that they had knowledge of facts—the unintentional abandonment of the application—that they did not have. The Patent Office routinely warns prosecutors, and did so in this case, that an attorney who lacks personal knowledge of the circumstances of abandonment must make an "inquiry reasonable under the

circumstances" to ensure that the factual positions have evidentiary support. 37 C.F.R. § 11.18(b)(2). But Schwedler and Burke both represented that the delay in filing the required office action response for the '329 Application was unintentional without having conducted any verifiable investigation into the basis for that statement. To the contrary, the record reflects that Schwedler and Burke failed to take the most obvious investigative steps, such as calling Brooks to learn more about the circumstances of abandonment.

On top of these material misrepresentations, there is ample evidence permitting an inference of intent to deceive on the part of both Schwedler and Burke. Schwedler and Burke both received explicit notices from the Patent Office about their obligation to do a reasonable inquiry and yet neither documented *any* inquiry that they did. Even putting aside the letters from Brooks to Haycox and Ambrose, the file histories before Schwedler and Burke provided ample reasons for inquiry, and yet neither followed up on any of them. Plaintiff, who was represented by Burke both during the purchase of the '329 Application and the petition to revive, has not offered a reasonable explanation for the failure to uncover the circumstances of the abandonment.

Defendants/Intervenor respectfully requests that the Court deny Plaintiff's motion for partial summary judgment and hold a bench trial on the issue of whether inequitable conduct renders the '235 Patent unenforceable.

## A.    Catcher and Aequitas Deliberately Abandoned the '329 Application

It has long been the law that abandoning a patent application because the applicant does not want, or cannot afford, to pay an attorney to prosecute it is an ***intentional*** course of conduct and not an unintentional one. *Lumenyte Int'l Corp. v. Cable Lite Corp.*, 92 F.3d 1206, at *3-4 (Fed. Cir. 1996). Thus, when the decision not to pay for prosecution or for responding to an office action results in abandonment, revival under the "unintentional delay" standard is not available. *Application of Cheol Kim*, 2009 WL 1212054, at *3 (P.T.O. Apr. 1, 2009). In *Cheol Kim*, much

7

like Plaintiff claims occurred here, the applicant sought to revive an abandoned application after his attorney failed to file a response because the applicant had not paid the attorney's fees. *Id.* at *1. The applicant stated, in support of the unintentional delay petition, that he "could not afford" the attorney's fees and so "gave up the proceedings of the application but the give-up of the application was not my intention." *Id.* The Patent Office concluded that, regardless of the applicant's statement that he could not afford the fee (rather than that he simply chose not to pay it), the failure to pay the attorney to respond was a "deliberate course of action which resulted in the abandonment." *Id.* at *3. In other words, even if the applicant only sought to delay until he could afford the fee, that delay could not be "unintentional" for the purpose of a revival petition. *See id.* ("A change in circumstances that occurred subsequent to the abandonment of an application does not render "unintentional" the delay resulting from a previous deliberate decision to permit an application to be abandoned.").

The facts here mirror *Cheol Kim*. Brooks, the attorney responsible for prosecuting the '329 Application immediately before abandonment, testified that he had not been paid for his services in a year leading up to his withdrawal. Exh. D, Brooks July 6, 2022 Depo., at 28:24-29:7. Haycox, Catcher's CEO and the entity with the "exclusive right . . . to prepare, file, prosecute, maintain and enforce" the '329 Application, Pl's SOF ¶¶ 5, 7, was aware that Brooks had not been paid and was requesting payment to continue prosecuting the applications, Exh. E, Haycox July 7, 2022 Depo., at 44:15-45:7, 47:12-21, 50:3-10; 51:5-52:15, 54:1-20. Haycox also repeatedly notified Thomas Sidley, the primary manager at Aequitas Capital, that the patent portfolio required attention and that Brooks would withdraw if he was not paid. Exh. E, Haycox July 7, 2022 Depo., at 43:6-45:7, 51:2-4, 68:14-70:22. Thus, all the interested parties knew the state of play, and knew what was required—payment—if Brooks was going to continue to prosecute the portfolio.

Although Catcher was the one with the right to prosecute the applications, Aequitas Capital was entitled to expend funds to protect the collateral, i.e., the portfolio of patents and applications. ECF No. 172-3, at 8 ("Lender on Borrower's behalf may . . . taken any action that Lender deems appropriate, including but not limited to . . . paying all costs for insuring, maintaining and preserving the Collateral."). Thus, Aequitas Capital could have acted at any time to protect its rights and ensure that it hired an attorney to prosecute the applications, and did not need to wait until it received legal title to the portfolio. Indeed, although Plaintiff glosses over the fact, Aequitas (through Aequitas Equipment Finance) did not actually purchase the rights to the portfolio until the June 2009 sheriff's sale. Pl's SOF ¶ 15. But it hired Schwedler *before* obtaining legal title to the portfolio, and Schwedler filed a power of attorney (signed by Sidley at Aequitas) in May 2009 in connection with a related application. Exh. F, Schwedler July 8, 2022 Depo., at 19:13-20:17; Exh. G, Schwedler July 8, 2022 Depo., at Schwedler 4. Aequitas knew, then, that there was a need to protect the collateral by hiring an attorney to continue prosecution, but between April 2008 and August 2009, it did *nothing* to ensure continued prosecution of the '329 Application.

Under *Lumenyte* and *Cheol Kim*, it does not matter whether the failure to pay was because of a lack of funds or simply a desire to defer spending on the portfolio until such time as Aequitas decided it might be worth something. In either scenario, the law is clear that abandonment is an intentional course of conduct. The Manual of Patent Examining Procedure provides as one example of circumstances that will not satisfy the unintentional standard that the "applicant remains interested in eventually obtaining a patent, but simply seeks to defer patent fees and patent prosecution expenses." MPEP § 711.03(c). The only reasonable inference here is that the abandonment of the '329 Application was a deliberate course of conduct by Catcher and Aequitas. Aequitas, after all, had just loaned Catcher a substantial sum of money that had not been paid back,

9

and would have spend more money (both to bring Brooks' current and for future work) to continue to prosecute the pending applications. In this regard, it is notable that the '329 Application was not in condition for allowance, or even particularly close to it. Rather, the '329 Application had received a final rejection finding all of the pending claims obvious.[1] ECF No. 172-4. So, it is not surprising that Aequitas would not want to throw good money after bad by spending money to prosecute an application of questionable value that had already been finally rejected. But again, it matters not whether Aequitas was cash strapped or just wanted to hold off on payment; either results in intentional abandonment under the case law cited above. Accordingly, the statements of Schwedler and Burke that the entire period of delay was unintentional are materially false statement of fact.[2]

Plaintiff does not seriously dispute this analysis, instead claiming that Schwedler and Burke did not make "knowingly false statements with intent to deceive" the PTO. ECF No. 172, at 12. But that is an issue of intent to deceive, and not a rebuttal to the material falsehood element. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) ("To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO."); *3D*

---

[1] Even after the '329 Application was revived in January 2011, it took almost two years of further prosecution to get to the Notice of Allowance stage.

[2] There is no serious dispute that misrepresenting that the delay was unintentional when it in fact was not is material. Had the petition to revive not made that representation, it would have been denied. *See* 37 C.F.R. § 1.137(b)(4) (petition for revival must contain a "statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this section was unintentional"). Has the petition been denied, the '329 Application could not have given birth (through continuations) to the '235 Patent. *See Lumenyte*, 92 F.3d at *1 ("[B]ecause the application would never have matured to issuance without the allegedly false petition, the court found that the petition to revive was highly material."); *3D Medical Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 1331, 1339 (N.D. Ga. 2017) ("Had [counsel] not certified that he knew the delay was unintentional, he would not have met the petition's requirements and the PTO would not have reinstated the [patent].").

*Medical*, 228 F. Supp. at 1336 ("Materiality and intent must be separately established."). To the extent Plaintiff does dispute the intentionality of the abandonment of the '329 Application, it does so based on testimony that does not bear on the actual issue. For example, Plaintiff cites Brooks' testimony that he never received any instruction to abandon the applications. ECF No. 172, at 12. But that is beside the point; a party need not explicitly instruct an attorney to abandon an application for that abandonment to be intentional. *See Lumenyte*, 92 F.3d 1206, at *2; *Choel Kim*, 2009 WL 1212054, at *3; *Application of G*, 11 U.S.P.Q.2d 1378, at *4 (deliberate decision not to respond to office action, but no explicit instruction to abandon). Moreover, the law generally presumes that people intend the natural consequences of their actions—here not hiring counsel to respond to the pending final rejection for the '329 Application. *See Fed. Trade Commn. v. AbbVie Inc.*, 329 F. Supp. 3d 98, 124, 126 (E.D. Pa. 2018), *reversed in part on other grounds*, 976 F.3d 327 (3d Cir. 2020). And the relevant parties, Haycox at Catcher and Sidley/Ambrose at Aequitas, knew that the result of their inaction would be abandonment because Brooks' letters were unequivocal: "[e]xtensions are available under September 17, 2008, at which point, if no response has been received by the USPTO, this application will become abandoned." ECF No. 172-35, at 4. Allowing that to happen was thus a deliberate course of conduct and not unintentional.

The remaining statements that Plaintiff relies on are all self-serving statements from the principals of the companies involved or from the prosecution counsel themselves that testified that there was no intent to abandon the applications. Plaintiff's theory seems to be that because those folks denied intentionally abandoning the application, and there is not testimony from someone explicitly admitting to such intention, Defendants/Intervenors cannot show otherwise. But those statements are flatly contradicted by the documentary record and by the case law—which Plaintiff ignores—holding that failing to pay counsel to prosecute a portfolio is a deliberate course of

11

conduct. The Federal Circuit has rejected Plaintiff's line of argument where, as here, the documents contradict the self-serving testimony. *Lumenyte*, 92 F.3d at *2 (rejecting argument that "because no witness contradicted their testimony, the testimony must be accepted"). At the very least, the conflict between the deposition testimony that Plaintiff cites and the documentary record creates a genuine issue of material fact for trial.

Accordingly, the Court should conclude that the '329 Application was intentionally abandoned as a matter of law or, at the very least, that there is a genuine issue of fact for trial on this issue.

### B.    Schwedler and Burke Made Misrepresentations To The Patent Office In the Petitions to Revive

The parties do not dispute the basic history of the petitions to revive the '329 Application. Schwedler filed revival petitions on August 28, 2009, and November 18, 2009, both of which were denied for technical reasons relating to an incorrect chain of title. Pl's SOF ¶¶ 16-17. In each petition, Schwedler represented that "the entire delay in filing the required reply from the due date for the reply was unintentional." Burke, after taking over for Schwedler as prosecuting attorney on the '329 Application, filed a renewed petition to revive on November 8, 2010, relying explicitly on the background and history of the petitions filed by Schwedler. Pl's SOF ¶ 19. Burke represented to the PTO that "the entire delay in filing the required reply from the due date for the reply was unintentional." Pl's SOF ¶ 19. Burke's revival petition was granted.

### 1.    There Is a Genuine Issue of Fact As To Whether Schwedler and Burk Represented That the Delay Was Unintentional When In Fact It Was Intentional

Schwedler and Burke made material misrepresentations to the Patent Office in one of two ways, either of which requires denial of Plaintiff's motion for summary judgment. First, as explained above, if Schwedler or Burke did in fact investigate the circumstances of the

abandonment, including simply by looking at the file history containing Brooks' petition to withdraw as counsel based on having been "unable to reach a mutually agreeable understanding of payment of services with attorneys of record," ECF No. 172-11, at 3, they possessed facts directly contradicting their representation that the delay in filing the response was unintentional. Accordingly, there is a genuine issue as to whether Schwedler and Burke misrepresented that they knew the delay to be unintentional when in fact they knew that it was not or were willfully blind to that fact.

### 2. There Is A Genuine Issue of Material Fact As To Whether Schwedler and Burke Misrepresented That They Had Performed An Inquiry Reasonable Under the Circumstances When In Fact They Had Not

Even if Schwedler and Burke avoided learning of the circumstances of the abandonment, they each still made a material misrepresentation to the PTO by representing that they had made an "inquiry reasonable under the circumstances" when they had not in fact done so. When an attorney does not perform the required investigation, but represents that he or she has, that is a misrepresentation and a ground for an inequitable conduct claim. *3D Medical*, 228 F. Supp. at 1338 (attorney's "certification was a misrepresentation because it represented that he knew something he did not"). And, of course, if Schwedler and/or Burke **had** performed the required inquiry, they could not have truthfully represented that the entire period of delay was unintentional. *Id.* There is a material dispute of fact as to whether Schwedler and Burke misrepresented the nature of their investigation.[3]

---

[3] Plaintiff first makes a purely legal argument; it fears that allowing inequitable conduct claims based on a false certification that the prosecutor conducted a reasonable inquiry would effectively allow inequitable conduct defenses based on negligence, because any factual error during prosecution could be recast as a materially false certification that a reasonable inquiry had been performed. ECF No. 172, at 15. But Plaintiff's argument confuses material misrepresentations with the specific intent requirement. It is the latter requirement that ensures that "gross negligence or negligence" does not amount to inequitable conduct. *Therasense*, 649 F.3d at 1290. Accordingly, a false representation that a prosecuting attorney performed a reasonable investigation, even when

a.    **Schwedler Did Not Make a Reasonable Inquiry Into the Facts and Circumstances of Abandonment of the '329 Application**

Schwedler was not directly involved with the prosecution of the portfolio until he was appointed the attorney of record in May of 2009 (in another application in the portfolio). Exh. F Schwedler July 8, 2022 Depo., at 19:14-20:6. Thus, Schwedler was not involved in, and did not have personal knowledge of, the circumstances of the abandonment of the applications explained in detail above. Because Mr. Schwedler did not have personal knowledge, the Patent Office rules obligated him to investigate the facts that underpin his certification. 37 C.F.R. § 11.18(b)(2). Yet, Mr. Schwedler chose to not contact anyone who had "firsthand or direct knowledge" of the events that led to the abandonment of the application. At his deposition, Mr. Schwedler admitted that:

- he did not recall speaking with anyone at his clients Aequitas Equipment and Aequitas Capital, including Sidley, about the circumstances under which the applications had become abandoned, *see, e.g.*, Exh. F Schwedler July 8, 2022 Depo., at 19:14-24, 26:10-16, 29:14-19 ("Q. You don't recall having talked with anyone at the client, Aequitas Capital or Aequitas Equipment Finance, in connection with the attempts to revive the abandoned applications; is that correct? A. That is correct.");

- he did not recall speaking to Brooks himself about why Brooks had withdrawn or failed to file responses to the pending office actions, despite the file history showing that the client

---

material, will not result in inequitable conduct unless the party asserting the defense also shows that the misrepresentation was made with specific intent. Moreover, oftentimes a prosecuting attorney's representation as to having conducted a reasonable inquiry will not be material. For example, a factual error about the contents of a piece of prior art that is before the examining attorney is not likely to be material because the examining attorney will have the opportunity to review the reference for him or herself. But with respect to petitions for revival, the PTO often— and did in this case—expressly relies upon the prosecuting attorney's duty of reasonable inquiry. *See* ECF No. 172-20, at 4 (the statement of unintentional delay "is being treated as having been made as the result of a reasonable inquiry into the facts and circumstances of such delay").

failed to pay, which is a legally insufficient basis for finding delay unintentional, *see* Exh. F Schwedler July 8, 2022 Depo., at 29:20-24 ("Q. And it's your best recollection that you did not talk to Mr. Brooks about the circumstances surrounding his withdrawal from prosecuting the files; is that correct? A. That's correct."); Exh. F Schwedler July 8, 2022 Depo., at 48:23-49:1 ("Q. You did not talk to the prior counsel who had been prosecuting the patents at the time they went abandoned, correct? A. I do not remember doing that, no.");

- he did not recall having any conversation with Mr. Ambrose, the attorney who was identified by Mr. Brooks as the point of contact for the Patent Office with respect to the pending applications, *see* Exh. F Schwedler July 8, 2022 Depo., at 39:14-17 ("Q. Do you recall having had any conversations with a Mr. Ambrose concerning the Vivato Networks' portfolio? A. I don't recall that."); and

- he did not recall having any conversations with Mr. Haycox or anyone previously associated with the oversight of the portfolio of Vivato Networks Holdings, *see* Exh. F Schwedler July 8, 2022 Depo., at 31:20-32:3 ("Q. Do you have -- recall ever having any conversations with a Mr. Haycox? A. Not offhand, no. Q. Do you recall having any conversations with anyone who had previously been associated with the Vivato Networks Holdings' portfolio in connection with attempts to sell the portfolio? A. No, I don't believe -- I don't believe I was involved with that.").

In short, it is clear (or at the very least, there is a genuine factual issue) that Schwedler made his certification without speaking to **any** of the individuals with first-hand knowledge of the abandonment of the '329 Application. When questioned about his investigation regarding abandonment, Schwedler claimed to have spoken with a corporate attorney at his law firm. But he

15

could not provide any details of the alleged conversation with the corporate attorney that pertained to the circumstances surrounding the abandonment or even the identity of the alleged corporate attorney. Exh. F Schwedler July 8, 2022 Depo., at 10:24-11:7, 28:9-14. Mr. Schwedler recalled that in his conversation with the corporate attorney, he may have discussed the ownership of the entities and that there had been a bankruptcy. Exh. F Schwedler July 8, 2022 Depo., at 23:6-24:6, 33:16-34:7.

Funneling communications entirely through a non-patent attorney is hardly a reasonable inquiry, but in any event, there is no evidence that the corporate attorney conducted any factual investigation or had firsthand or direct knowledge regarding the abandonment. Further, each of the fact witnesses possessing direct, personal knowledge of the circumstances of the abandonments testified that they do not recall Mr. Schwedler *ever contacting them*. *See, e.g.*, Exh. D, Brooks July 6, 2022 Depo., at 33:10-36:16, 37:1-21; Exh. E, Haycox July 7, 2022 Depo., at 64:13-65:20; Exh. A, Ambrose July 7, 2022 Depo., at 49:19-50:2, 50:8-13.

Accordingly, Schwedler made a material misrepresentation to the PTO when he certified that the "entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 C.F.R. § 1.137(b) was unintentional." ECF No. 172-15.

> **b.    Burke Did Not Make a Reasonable Inquiry into the Facts and Circumstances of Abandonment of the '329 Application**

Burke also made a misrepresentation to the Patent Office when he affirmatively certified that the "entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 C.F.R. § 1.137(b) was unintentional." ECF No. 172-19. Burke did not have personal knowledge of the reason for the delays, and did not do any verifiable investigation to find out whether the statement of unintentional delay had factual support. Exh. H, Burke July 26, 2022 Depo., at 77:11-20 ("Q: Did you have direct knowledge of the circumstances

of the delay between – of this application between June of 2008 and the time you filed your renewed petition on November 8th, 2010? A: I would be speculating. I definitely didn't have it for the entire time period. Q: For what time period did you have direct knowledge? A: When I was involved."). Had any investigation been performed at all, Burke would have uncovered facts directly contrary to his representations. In granting Burke's petition to revive, the Patent Office noted that Mr. Burke did not appear to have "firsthand or direct knowledge of the facts and circumstances of [the] delay" that led to abandonment of the '329 application. ECF No. 172-20, at 4. The PTO told Burke that the statement of unintentional delay "is being treated as having been made as the result of a reasonable inquiry into the facts and circumstances of such delay" and explicitly warned him to make such an inquiry and notify the Office if he found facts contrary to his certification. *Id.* Yet Burke's sworn testimony shows that he never did this follow-up investigation and instead, at best, relied entirely on Schwedler's representations, which he explicitly incorporated into the renewed petition. ECF No. 172-19, at 58-60. Burke's renewed petition simply summarized Schwedler's petition, its denial for a chain of title defect, and stated that the "statement of unintentional delay in the Renewed Petition is proper in that it is now signed by the attorney of record for the current assignee of record." *Id.* at 60.

At his depositions, Burke did not recall what he did to determine that the patent application was unintentionally abandoned due to a failure to timely respond to the pending office action, Exh. H, Burke July 26, 2022 Depo., at 35:2-8, or what diligence he had conducted to confirm that the entire period of delay was unintentional, *id.* at 35:2-8. He did not recall who he spoke to regarding why the applications were abandoned. Exh. H, Burke July 26, 2022 Depo., at 90:5-20. Mr. Burke did not recall talking to either Sidley or anyone else at Aequitas Equipment regarding his work for XR, Exh. H, Burke July 26, 2022 Depo., at 13:17-14:16, 16:8-20, 51:7-20, 53:7-54:9., did not

remember talking to Brooks in connection with his work for XR, *id.* at 21:15-23:18, and did not recall talking to Haycox, Ambrose, anyone associated with Catcher, Vivato Networks Holdings, or the pre-merger Vivato Networks, Inc., *id.* at 23:24-25:5, 25:19-27:12, 39:9-16, 43:17-45:14, 52:20-53:6, 54:10-17. Burke did not even recall speaking to Schwedler, who filed the initial petitions to revive in the same application. Exh. H Burke July 26, 2022 Depo., at 65:10-12. Burke could not have truthfully represented that he made a reasonable inquiry while taking none of those obvious investigative steps. The only reasonable inference is that Mr. Burke cared only about getting the revival accomplished, not about investigating whether revival was legally permissible or factually supported. As he testified somewhat proudly, "I mean, it didn't go abandoned on my watch so to speak." Exh. H Burke July 26, 2022 Depo., at 90:16-17.

Accordingly, Schwedler and Burke both made material misrepresentations to the PTO or, at the very least, there is a genuine dispute of material fact as to whether they did so.

**C.    Schwedler and Burke Each Had Specific Intent to Deceive The Patent Office.**

"[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290 (quoting *Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* Here, the circumstantial evidence indicates only a single most reasonable inference: Schwedler and/or Burke made misrepresentations with specific intent to deceive the Patent Office.

Plaintiff appears to conflate "single most reasonable inference" with "only inference," and thus effectively argues that the naked, uncorroborated testimony of Schwedler and Burke that they lacked intent to deceive requires summary judgment in Plaintiff's favor. But in fact, courts have found sufficient evidence of intent to deceive—and even granted summary judgment of inequitable

conduct—where a prosecuting attorney represented that delay was unintentional while in fact having conducted no reasonable inquiry at all. *Lumenyte*, 92 F.3d at *4 (intent to deceive "properly inferred from the documentary evidence" despite denials of intent by prosecuting attorney and client witnesses); *3D Medical*, 228 F. Supp. 3d at 1339 (granting summary judgment that prosecuting attorney committed inequitable conduct). That is precisely the circumstance at issue here, in that Schwedler and Burke made the unintentional delay certification knowing that such a certification was required to revive the applications, but without conducting an inquiry into the actual circumstances of the abandonment of the '329 Application. Had they done so, they would have discovered that the failure to pay Brooks and the failure to hire replacement counsel to keep the application alive was a deliberate course of conduct that precluded revival. *3D Medical*, 228 F. Supp. 3d at 1339. Those facts support the inference—if not outright prove—specific intent to deceive.

### 1.    Schwedler Specifically Intended to Deceive the Patent Office

First, Mr. Schwedler performed no verifiable investigation to determine whether the facts actually supported his sworn representations he made to the Patent Office despite both his duty to do so and explicit directions from the Office to do so. As discussed above, Schwedler claims that the alleged investigation consisted of reviewing the file wrappers and speaking to a corporate lawyer at his firm. Exh. F Schwedler July 8, 2022 Depo., at 33:23-35:14, 48:18-49:7. He did not remember ever speaking to Mr. Brooks, who the file history indicated withdrew from prosecuting the portfolio due to financial disagreements with the client. Exh. F Schwedler July 8, 2022 Depo., at 29:20-24, 48:23-49:1. He did not remember ever speaking to Mr. Ambrose, whose name appeared in the file history as the contact person. Exh. F Schwedler July 8, 2022 Depo., at 39:14-17. Notably, there is no reason to think that either Ambrose or Brooks would have been difficult to reach. The Examiner interviewed Mr. Brooks and Mr. Ambrose less than a year before

19

Schwedler filed the first petition to revive the '329 Application, when inquiring about the circumstances of the abandonment of an application in the same portfolio. Exh. C, Brooks July 6, 2022 Depo., at Brooks 11. Mr. Schwedler could have followed the clear leads that were in the file history that he says he reviewed, but did not do so. This inaction is even more egregious because Schwedler successfully revived certain other applications in the portfolio and thus, while he was attorney of record, the PTO explicitly notified him that it was relying on the statements in his petitions as having been made "as a result of a reasonable inquiry into the facts and circumstances" of the allegedly unintentional delay. Exh. I, Schwedler Dec. 5, 2022 Depo., at Schwedler 5.

Second, Mr. Schwedler knew that Aequitas Capital was financially involved with the prior assignees at the time the applications were abandoned, but did not investigate this further. Exh. F Schwedler July 8, 2022 Depo., at 29:14-19. Specifically, Schwedler had personal knowledge that Aequitas Capital had loaned money to Vivato Networks as part of its merger with Catcher and had had a lien on the portfolio because he filed the security agreement with the Patent Office in fall of 2007. ECF No. 172-3. Mr. Schwedler also had personal knowledge that Aequitas Equipment foreclosed on the portfolio after the applications were allowed to go abandoned because he filed the foreclosure judgment with the Patent Office in summer of 2009, shortly before filing the petitions to revive in fall of 2009. ECF No. 172-9; *see also* Pl's SOF ¶ 14 (Schwedler's law firm represented Aequitas in foreclosure proceedings). And Schwedler understood that Aequitas's goal was to defer prosecution as much as possible while it sought to monetize the portfolio, which is of course not an "unintentional" abandonment of the applications. As Schwedler explained, this was a "rush job" and the "idea was to keep the balls in the air until they could find out how to dispose of the portfolio." Exh. F, Schwedler July 8, 2022 Depo., at 9:18-10:23. As discussed above, financial and business-based reasons for allowing a patent application to go abandoned are not

unintentional abandonments. MPEP § 711.03(c). Yet Mr. Schwedler again chose not to speak to those with direct knowledge of the prior assignee's financial situation.[4]

Third, Mr. Schwedler had every motivation to submit the petitions to revive without performing an investigation. Mr. Schwedler testified that he considered his work on the portfolio "a stopgap until [Aequitas] could find other representation." D-SUF ¶ 74. He was also pressured to keep as many of the applications alive until they could be disposed of, but did not have adequate resources. Exh. F, Schwedler July 8, 2022 Depo., at 9:6-10:23, 16:20-18:5, 21:13-25, 28:3-14, 31:3-19, 32:4-10. Schwedler explained that he knew that some of the applications had been abandoned after reviewing the files, Exh. F, Schwedler July 8, 2022 Depo., at 12:6-16, 14:10-16, and that he wanted to speak to the inventors to "understand the course of the prosecution" but was unable to do so, Exh. F, Schwedler July 8, 2022 Depo., at 33:23-35:14, 48:18-49:7. He was unable to do so, recalling being frustrated at the time because it may have been because the client did not want to spend the money. *Id*. Despite that frustration, he chose to not conduct any further investigation and to file the petitions anyway. This too is evidence that Schwedler intended to deceive the PTO into relying on his representation that he knew the delay to be unintentional when

---

[4] The detailed record here and the lack of any investigation shows why *Pavo Solutions LLC v. Kingston Technology Company, Inc.*, 2019 WL 4390573 (C.D. Cal. June 26, 2019) is wholly inapposite. There, the inequitable conduct allegation was based upon a patent owner allegedly paying the lower small entity maintenance fee after it had licensed the patent to a company whose employee count would make it ineligible to pay the lower fee. Crucially, the only record evidence was a deposition of an outside attorney who was not even the attorney responsible for paying the maintenance fee. And he testified in "mere hypotheticals." *Id.* at *4. Indeed, the defendants in that case did not even take any discovery of anyone responsible for the maintenance fee (on the client or attorney side). Accordingly, the court found that defendants had not shown a genuine issue of material fact as to intent to deceive. *Id.* at *5. In contrast, Defendants/Intervenors have amassed a substantial record of depositions and documentary evidence showing that the '329 Application was intentionally abandoned and that Schwedler and Burke intended to deceive the PTO about that fact or about their lack of a reasonable inquiry into the abandonment.

in fact he'd performed no investigation that would have supplied a basis for that representation.[5]

## 2. Burke Specifically Intended to Deceive the Patent Office

First, Mr. Burke did not perform a verifiable investigation to determine whether the representation he made was supported by the facts, despite his duty to do so and despite explicit directions from the Office to do so. As discussed above, Mr. Burke could not recall what, if anything, he did to investigate the circumstances of the abandonment. Exh. H Burke July 26, 2022 Depo., at 35:2-8, 69:19-70:15, 90:5-20. Like Schwedler, he did not remember ever speaking to either Mr. Brooks or Mr. Ambrose, two individuals that the Patent Office thought were worth contacting when ascertaining why the application was abandoned. Exh. H Burke July 26, 2022 Depo., at 21:15-23:18, 23:24-25:5, 25:19-27:12, 39:9-16, 43:17-45:14, 52:20-53:6, 54:10-17, 65:10-12. Mr. Burke could have followed the clear leads that were in the file history, but did not do so. This inaction is extremely inexplicable in light of the fact the PTO explicitly warned Mr. Burke that, in granting the '329 Application, it was relying on the statement in his petition as having been made "as a result of a reasonable inquiry into the facts and circumstances" of the allegedly unintentional delay. ECF No. 172-20, at 4.

Second, Mr. Burke was already aware of the abandoned applications based on his work on

---

[5] Plaintiff's reliance on *Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244 (Fed. Cir. 2024) is misplaced. There, there was no "granular and concrete account of how" the failure to respond to the office action that resulted in abandonment occurred. *Id.* at 1253. And thus, while the Court recognized that the absence of such an account might "well lead a factfinder to find false, or even knowingly false, the assertion that the abandonment was unintentional," that absence of record does not "always compel[] such a finding." *Id.* In contrast, here, there is a granular, documentary record of how the application went abandoned, and thus there is a reality against which to test Schwedler and Burke's false representations that the delay was intentional. The fact that the circumstances of the failure to pay Brooks and the subsequent abandonment were documented— and that the parties with knowledge could have been interviewed by Schwedler or Burke— supports the inference here that Schwedler and Burke intended to deceive the PTO. In contrast, faced with a total absence of evidence of deliberate abandonment in *Freshub*, the Federal Circuit simply credited the district court's conclusion that the evidence did not establish an intent to deceive (while recognizing that a different fact-finder "might well" come out a different way. *Id.*

the Patent Purchase Agreement between Aequitas and XR and his review of the file histories. D-Pl's SOF ¶ 17. Mr. Burke testified that when he was hired by XR, he was asked to help acquire patent properties, and was asked to review a draft to affect that transaction, and apparently spent significant time on it because the original draft "had nothing to do with what they wanted to do." Exh. H Burke July 26, 2022 Depo., at 12:4-13:12, 17:12-18:3. Thus, Mr. Burke must have known that certain patent applications had been abandoned and sought to be revived by Aequitas. Yet Mr. Burke did nothing to investigate the circumstances of those abandonments or the adequacy of Aequitas's representations. To the contrary, the agreement ultimately indicated the parties' intentions that the applications be revived. Pl's SOF ¶ 17. So when the task fell to Burke, he knew that the financial value of the transaction to his client depended upon reviving the applications, regardless of the legal propriety of the revival.

Third, Mr. Burke's actions in filing the renewed petition to revive shows that he at most did the bare minimum based on the paper record and did not perform any verifiable investigation into the relevant facts. ECF No. 172-19. For example, he was careful to point out in the renewed petition that it was being submitted simply to rectify procedural errors in Mr. Schwedler's prior petitions to revive. ECF No. 172-19, at 58-61. And Mr. Burke copied the entirety of the prior proposed amendments and arguments previously filed by Mr. Schwedler verbatim, simply replacing the signature block with his and changing the wording of the "Conclusion." *Compare* ECF No. 172-17, at 4-39 *with* ECF No. 172-19, at 7-52[6] These facts support the inference that Mr. Burke relied entirely on Mr. Schwedler's paper filings in lieu of conducting his own investigation.

Against this evidence of Schwedler's and Burke's intent to deceive, Plaintiff relies almost

---

[6] The copying even extended to typos. *Compare* ECF No. 172-17, at 23 ("The Adachi application if [*sic*] further cited . . . ") *with* ECF No. 172-19, at 31 ("The Adachi application if [*sic*] further cited . . .")

entirely on the fact that Schwedler and Burke, not surprisingly, denied intending to deceive the PTO and made self-serving claims that they "would have" done a reasonable investigation before filing the petitions to revive. But that testimony is contradicted by both the documentary record showing intentional abandonment **and** by the testimony of other witnesses (like Brooks, Haycox, and Ambrose) who testified that they could not recall ever speaking to Schwedler and Burke about the circumstances of the abandonment. *See Lumenyte*, 92 F.3d at *2; *3D Medical*, 228 F. Supp. 3d at 1339 (granting summary judgment of inequitable conduct where prosecutor "denies submitting the Petition with the specific intent to deceive the PTO" but the "circumstantial evidence suggests otherwise"). At the very least, this testimony and documentary record raises a genuine dispute of material fact as to whether Schwedler and Burke had the specific intent to deceive the PTO.[7]

## V.    CONCLUSION

The record at this stage reflects that the '329 Application was abandoned through a deliberate course of conduct, and that Schwedler and Burke falsely represented the contrary to the PTO and did so with intent to deceive. Defendants/Intervenors respectfully request that the Court deny Plaintiff's motion for summary judgment.

---

[7] Plaintiff's citation to *Ashgari-Kamrani v. U.S.A.A.*, 252 F.Supp.3d 562 (E.D. Va. 2017) actually supports Defendants/Intervenors more than Plaintiff. There, the Court expressly found that the Plaintiff offered a competing plausible explanation for the misrepresentation (there a false claim of priority) and that their witnesses testified that the **did** conduct the required investigation. *Id.* at 584. Here, in contrast, Plaintiff has tellingly not offered a plausible explanation for how prosecuting attorneys could have done and investigation without discovering that the abandonment of the '329 Application was based on the failure to pay Brooks to prosecute it and was therefore "intentional" as a matter of law. And the prosecuting attorneys here could not testify about **any** investigation they did; rather, the facts show they failed to take even the basic investigative steps of contacting Brooks, Ambrose, or Haycox about the circumstances of abandonment.

Dated: June 18, 2025                    Respectfully submitted,

*/s/  Matthew S. Yungwirth*
Melissa R. Smith (TBN 24001351)
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450

Deron R. Dacus (TBN 00790553)
ddacus@dacusfirm.com
**THE DACUS FIRM, P.C.**
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: 903.705.1117

Matthew S. Yungwirth
msyungwirth@duanemorris.com
Alice E. Snedeker
aesnedeker@duanemorris.com
John R. Gibson
jrgibson@duanemorris.com
**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309
Telephone: 404.253.6900

Tyler Marandola
tmarandola@duanemorris.com
**DUANE MORRIS LLP**
30 S. 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1000

Kevin P. Anderson
kpanderson@duanemorris.com
Elissa Sanford
esanford@duanemorris.com
**DUANE MORRIS LLP**
901 New York Avenue NW, Suite 700 East
Washington, D.C. 20001-4795
Telephone: (202) 776-5231

***Counsel for Defendants / Intervenors***

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on June 18, 2025.

/s/ Matthew S. Yungwirth
Matthew S. Yungwirth