# EXHIBIT E



# Transcript of Gary Haycox

**Date:** July 7, 2022
**Case:** XR Communications, LLC -v- D-Link Systems, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**RESTRICTED - ATTORNEYS' EYES ONLY**

XR-EDTX1-00052437

XR-EDTX1-00052437

Transcript of Gary Haycox
Conducted on July 7, 2022

1 (1 to 4)

**1**

```
1   IN THE UNITED STATES DISTRICT COURT
2       FOR THE CENTRAL DISTRICT OF CALIFORNIA
3            LOS ANGELES DIVISION
4   -------------------------------X
5   XR COMMUNICATIONS LLC d/b/a      :
6   VIVATO TECHNOLOGIES,             :
7               Plaintiffs,   :
8        v.                   :Civil Action No:
9                             :8:17-CV-00596
10  D-LINK SYSTEMS, INC.,            :
11              Defendants.   :
12  -------------------------------X
13         DEPOSITION OF GARY HAYCOX
14    APPEARING REMOTELY FROM BEAVERTON, OREGON
15            THURSDAY, JULY 7, 2022
16               5:00 P.M.
17
18
19
20
21
22
23  Job No.: 455085
24  Pages 1 - 86
25  Reported by: Adrienne Mignano, RPR
```

**2**

```
1          Deposition of GARY HAYCOX, held via Zoom
2   videoconferencing, pursuant to Notice, before Adrienne
3   M. Mignano, a Notary Public and Registered
4   Professional Reporter in and for the State of New
5   York.
```

**3**

```
1            A P P E A R A N C E S
2
3
4   ON BEHALF OF PLAINTIFFS:
5       PHILIP X. WANG, ESQUIRE
6       RUSS AUGUST & KABAT
7       12424 Wilshire Boulevard
8       12th Floor
9       Los Angeles, California 90025
10      310.826.7474
11
12
13  ON BEHALF OF DEFENDANT - ARUBA NETWORKS:
14      ROBERT T. HASLAM, ESQUIRE
15      KEE YOUNG LEE, ESQUIRE
16      COVINGTON & BURLING LLP
17      3000 El Camino Real
18      5 Palo Alto Square - 10th Floor
19      Palo Alto, California 94306
20      650.632.4700
21
22
23
24
25
```

**4**

```
1
2        A P P E A R A N C E S (Continued)
3
4   ON BEHALF OF DEFENDANT - NETGEAR & FALCON
5       JENNIFER FORTE, ESQUIRE
6       DUANE MORRIS LLP
7       1540 Broadway
8       New York, New York 10036
9       212.471.4772
10
11  ALSO PRESENT:
12      Anna Prusko
13      Drew Halton - Videographer
14      Malcolm Cooke - Remote Technician
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052438
XR-EDTX1-00052437

5

1           C O N T E N T S
2
3  EXAMINATION OF GARY HAYCOX            PAGE
4       By Mr. Haslam                     7
5
6           E X H I B I T S
7       (Attached to the transcript)
8  HAYCOX DEPOSITION EXHIBITS           PAGE
9  Exhibit 1   Catcher Holdings 8-K       18
10 Exhibit 2   Prospectus                 27
11 Exhibit 3   Business Loan Agreement    30
12 Exhibit 4   Commercial Security Agreement  73
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1      Would the reporter please swear in
2  the witness.
3  Whereupon,
4       GARY HAYCOX,
5  being first duly sworn or affirmed to testify to
6  the truth, the whole truth, and nothing but the
7  truth, was examined and testified as follows:
8     EXAMINATION BY COUNSEL FOR DEFENDANT - ARUBA
9            NETWORKS
10 BY MR. HASLAM:
11    Q   Good afternoon, Mr. Haycox.  Can you
12 tell us where you reside?
13      You're muted.
14    A   Good afternoon.
15    Q   Good afternoon.  Can you tell us --
16      (Pause in proceedings.)
17    Q   Mr. Haycox, can you tell us where you
18 currently reside?
19    A   Yeah.  I currently reside in
20 Beaverton, Oregon.
21    Q   Have you ever had your deposition
22 taken before?
23    A   Yes, I have.
24    Q   Okay.  Then you're somewhat familiar.
25 I will ask you questions and you can answer them

6

1      THE VIDEOGRAPHER:  Here begins Disk
2  Number 1 in the video deposition of Gary Haycox
3  in the matter of XR Communications, LLC d/b/a
4  Vivato Technologies versus D-Link Systems, Inc.,
5  in the U.S. District Court, Central District of
6  California; Civil Action Number:
7  8:17-CV-00596-DOC.
8      Today's date is July 7, 2022.  Time
9  on the video monitor is 5:01 p.m. Eastern.  The
10 videographer is Drew Halton for Planet Depos.
11 All participants are attending remotely.
12     Would counsel please voice-identify
13 themselves and state whom they represent.
14     MR. HASLAM:  Bob Haslam, Covington &
15 Burling, representing Aruba Networks.  With me
16 is Kee Young Lee.
17     MS. FORTE:  Jennifer Forte with Duane
18 Morris representing Defendants Netgear and
19 Falcon.
20     MR. WANG:  Phillip Wang of the firm
21 Russ, August & Kabat on behalf of Plaintiff XR.
22 I am joined by my colleague, Anna Prusko, also
23 of Russ, August & Kabat, on behalf of XR.
24     THE VIDEOGRAPHER:  The court reporter
25 is Adrienne Mignano representing Planet Depos.

8

1  to the best of your ability.  If you don't
2  understand a question, let me know and I'll try
3  to rephrase it.  I'm going to be primarily
4  covering events from 2006 to the end of 2008 and
5  into 2009, so I know I'm going back some ways.
6  I do have documents that I think will help us as
7  we go along.
8      Did you form, at one point, a company
9  called Wayout Wireless?
10    A   Wayout Wireless, I believe, was
11 the -- it is a long ways back, but I believe
12 that was the initial company that we created,
13 but then it was formed into Vivato Networks.
14    Q   And what did Wayout Wireless -- what
15 was its business?
16    A   The business was more of a consulting
17 and integration business, so working with
18 wireless customers and doing implementations.
19    Q   At some point, did Wayout Wireless
20 acquire some assets and patent properties,
21 patent applications and patents from a company
22 known as Vivato, Inc.?
23    A   Yes.  We did an asset purchase and --
24 which included the patent portfolio.
25     MR. HASLAM:  Can we pull up what was

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052439
XR-EDTX1-00052437

Transcript of Gary Haycox
Conducted on July 7, 2022

41

1  on. We showed them the projects we were working
2  on. We showed them what the -- what items
3  that it -- expansions were happening. We had
4  rent of a facility up in Spokane. We had an
5  office in Beaverton. And we had employees,
6  payroll that was being paid and other
7  expenditures, so everything was being forwarded
8  into that management process.
9      Q   Did Aequitas have at some point
10 during the term of the loan, or at least between
11 November of 2007 and February 2008, did they
12 have someone on premises to facilitate the
13 approval of the disbursements?
14     A   No. They -- their offices were about
15 five miles from where we were at, so we spent a
16 great deal of time over at their offices, and I
17 never received -- even through the process of a
18 complaint that we filed later in this case. I
19 hadn't received any of the internal document
20 notes of the meetings that they had with regard
21 to our company, so anything that they had
22 discussed at the company that I wasn't there
23 participating in, I don't have any availability
24 to that.
25     Q   Okay. Well, do you know whether

42

1  Mr. McCarthy had regular communications, either
2  meetings or phone calls, with anyone at Aequitas
3  during this -- the period of the loan --
4      MR. WANG: Objection. Calls for
5  speculation.
6      Q   -- that he met with? Let me rephrase
7  the question.
8      Do you know whether Mr. McCarthy had
9  meetings with or telephone calls with Aequitas
10 discussing what disbursements could be paid?
11     MR. WANG: Same objection.
12     Q   You -- there is -- you can answer
13 subject to the objection.
14     A   Dennis McCarthy was the CFO of
15 Catcher, was with that entity for some time up
16 to and through the merger process, and he was
17 the one that facilitated the -- you know, the
18 large part of the deal with the Catcher merger,
19 including the loan. He was aware of the loan as
20 well, the bridge note. And so back to the point
21 of speculation, I would assume that he was
22 constantly contacted with Aequitas.
23     Q   Okay.
24     A   But that is -- you know, you would
25 have to ask Dennis how often he talked to them,

43

1  how much Aequitas took the management on their
2  own.
3      Q   Okay. But just to confirm, then, did
4  you, on occasion, have meetings with Aequitas to
5  discuss the spending of the loan proceeds?
6      A   Yes, I had meetings with them.
7      Q   Do you recall any specific meetings
8  or any specific types of disbursements that you
9  had discussions with Aequitas concerning their
10 funding those particular expenses?
11     A   Again, the first few advances went
12 pretty smoothly because we were getting
13 disbursements for operations of the company.
14 Later on, they took a more, I should say,
15 hands-on or firm approach of not agreeing to
16 everything I was looking for them to do, so --
17 which told me at the time that, you know, they
18 were basically in full control of the
19 disbursements.
20     And then I had to actually kind of
21 walk carefully on some of the things I was
22 working with them on and to get them to agree to
23 do some of the financing specifically in the
24 area of the projects that we had undergoing. So
25 we had some customers that were needing to be

44

1  fulfilled, and we needed money, operational
2  expenses to deal with those.
3      There's also things like the rent for
4  the facilities up in Spokane. We can't let that
5  go stale. We had the patents and the patent
6  portfolio, as discussed to them in -- I think in
7  the agreement, that they needed to make sure
8  that this stayed enforced. And then we also had
9  an office in Portland that we ended up winding
10 down as part of the conversation, which is to
11 reduce spending. And then all of us at the top
12 were -- basically, stopped taking paychecks to
13 fund our employees that were doing the
14 operations on the customers.
15     Q   At some point in either late 2007 or
16 early 2008, did you become aware that Mr. Brooks
17 began to raise the issue of the payment of his
18 bills for performing services and maintaining
19 the patent portfolio and prosecuting the patents
20 that Vivato Networks Holdings owned?
21     A   Yes, and that was one of the meetings
22 I had, or maybe multiple meetings I had with
23 Aequitas. I told them, you know, that this --
24 they perfected the note against the IP, and I
25 said that this -- they need to ensure that that

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052448

XR-EDTX1-00052437

Transcript of Gary Haycox

Conducted on July 7, 2022

45

1  IP stays enforced.  And so, at that point, I
2  don't know if they actually spoke with Brooks or
3  if they put it under their attorneys to -- you
4  know, to keep the portfolio in place, but they
5  basically had management responsibility under
6  the contract, I believe, to ensure that that
7  portfolio stayed up to date.
8      Q   Do you know whether Aequitas --
9          MR. HASLAM:  Well, strike that.
10     Q   Do you know whether Catcher was ever
11 able to bring Mr. Brooks' payments current in
12 2008?
13     A   In 2008?
14     Q   Yes.
15     A   I don't believe that that happened.
16     Q   Did Mr. Brooks ever have a
17 conversation with you that if he -- if his bills
18 were not brought current, he would have to
19 withdraw from representing Vivato Networks or
20 Catcher, whichever company he was performing
21 services for?
22     A   Yeah, it was --
23         MR. WANG:  I'm sorry.  Sorry.
24 Objection to the extent it calls for
25 attorney-client privilege.  I don't believe any

46

1  privilege has been waived, so I wanted to note
2  that issue that's come up in a couple
3  depositions.
4          MR. HASLAM:  Well, I'll just state
5  for the record that I don't think it has
6  hindered us so far.  I'm not sure that, given
7  the company has gone out of business, a
8  privilege remains, but I understand your
9  objection.  We are not going to resolve now.
10 BY MR. HASLAM:
11     Q   So subject to that objection, you can
12 answer the question.
13     A   Okay.  I believe the -- any
14 correspondence that came from Brooks went into
15 the entity and it was presented, you know, as an
16 expenditure to Catcher at the time because a
17 merger completed, and so that would have been
18 forwarded on to the team that was actually
19 looking at the expenditures that were going out.
20     Q   Do you recall that Aequitas -- do you
21 recall personally that Aequitas refused to agree
22 to bring -- to make payments to bring
23 Mr. Brooks' account current?
24     A   I don't recall them ever saying they
25 were not going to do it.  I recall me on

47

1  multiple times advising them on keeping the
2  patent portfolio up to date and that the Brooks
3  payment was due.  And at that point, I said --
4  went back in to the Aequitas team, and whether
5  or not they were going to work with -- continue
6  to work with Brooks or they are going to have
7  their own attorneys pick up the portfolio was
8  something that -- I assume that they were having
9  those conversations, but I don't have any
10 information that shows what really happened in
11 there.
12     Q   But do you recall at some point
13 becoming aware that Mr. Brooks was going to
14 withdraw from representing Vivato Networks
15 Holdings or Catcher with -- in the Patent Office
16 with respect to the patent prosecution that was
17 ongoing on the applications?
18     A   Yeah, that was -- again, that was
19 part of the correspondence with the payment that
20 was required, so that went into the management
21 team.  They had that information.
22     Q   And do you -- do you know that
23 Mr. Brooks ultimately did withdraw from
24 representing Vivato Networks Holdings, Inc. or
25 Catcher Holdings at the Patent Office?

48

1      A   Yeah, I'm not sure at the time if I
2  was aware, but I was made aware of it in -- just
3  recently, so I know that he was making that
4  request for payment, and that was forwarded on
5  into the Aequitas team.  And, again, I --
6  because a lot of information that wasn't being
7  given to me at the time, I didn't know if they
8  had moved it to an internal -- their internal
9  attorneys to manage that portfolio or if they
10 were -- continued to work with Brooks.
11     Q   Do you recall becoming informed at
12 some point that patent applications went
13 abandoned because there was no attorney
14 registered to act on behalf of Vivato Networks
15 Holdings, Inc. or Catcher at the Patent Office?
16         MR. WANG:  Objection to form.
17     Q   You can answer the question to the
18 extent you can.
19     A   I don't recall.  I don't recall what
20 happened in that transition process.  I know at
21 some point Aequitas went dark with me after
22 they -- you know, after they secured the IP
23 portfolio and they were going to manage selling
24 that portfolio.
25         There was a period of time in the

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052449

XR-EDTX1-00052437

Transcript of Gary Haycox
Conducted on July 7, 2022

49

1  beginning of that process -- I don't recall what
2  month it was, but it was in 2008, at some point,
3  I had a call with Aequitas, and I don't recall
4  the entity or entities.  Might have been a
5  consultant that they had on at the time to go
6  out and try and sell the patent portfolio.  And
7  I provided them input as far as the knowledge I
8  had about the patents, which I'm not the
9  inventor, nor am I the patent author, so I gave
10  them as much as I could, and then, at that
11  point, they pretty much disappeared.
12       So I assume at that point when I was
13  talking with them -- I would make the assumption
14  that since they are trying to sell the patents
15  that they had them up in -- up to date.
16     Q   Did you ever have any reason to
17  believe that Catcher -- that Aequitas -- I
18  apologize.
19       Did you ever have reason to believe
20  that Aequitas, because they had a lead on the
21  portfolio, was refusing to pay Brooks' billings
22  in order to cause a default so that Aequitas
23  could ultimately take possession of the
24  portfolio?
25     A   I wish I knew I had that information.

50

1  That would have been part of my complaint.  No,
2  sir.
3     Q   Okay.  But what you do clearly recall
4  is, is that you -- that the bills from
5  Mr. Brooks were forwarded to Aequitas, correct?
6     A   I believe all the expenditures were
7  being forwarded in to them.  They were managing
8  the control of funds for all the expenditures.
9  And I do recall informing them directly in
10  meetings.
11     Q   Okay.  And you -- do you recall
12  informing Aequitas that if Mr. Brooks withdrew
13  as counsel that they would need to appoint
14  somebody to continue handling the IP portfolio
15  at Vivato Networks Holdings, Inc., correct?
16     A   I informed them I was informing them
17  to keep the patent portfolio enforced.  The
18  method to which they were going to do that, I
19  don't have any insight to that.
20     Q   Did they assure you that they would
21  do so, or did -- was your statement that they
22  needed to keep the portfolio in shape met with
23  silence?
24       MR. HASLAM:  Let me withdraw it.
25     Q   That is a bad question.

51

1     A   Yeah.
2     Q   You told Aequitas that they needed to
3  keep the IP portfolio current, correct?
4     A   That's correct.
5     Q   Did they ever tell you that they
6  would do so?  Did they ever affirmatively state
7  that they would do so?
8     A   I think they -- it was just part of
9  the process that we -- you know, we will get the
10  funds allocated.  I don't recall, in person,
11  them ever telling me that they were -- they did
12  it, they were going to do it.  But if I
13  recall -- if I recall that they had that
14  responsibility in the contract of perfecting and
15  acquiring the patents.
16     Q   Under the merger -- I will just
17  represent we can look at it.  Under the merger
18  in the documentation, Catcher Holdings had the
19  responsibility for maintaining and prosecuting
20  patents.
21       And with that -- with that
22  representation, is it your recollection that
23  part of the reason that you were talking to
24  Aequitas about Mr. Brooks and his bills and
25  maintaining the portfolio because Catcher

52

1  Holdings had the responsibility for prosecuting
2  the patents?
3     A   My -- the -- I am not sure where --
4  if Catcher Holdings has that, but my -- what was
5  in my mind at the time was they actually
6  perfected control over the IP as collateral, and
7  once they, basically, foreclosed and pulled up
8  that collateral, that would be their
9  responsibility.  But, in the end, I was
10  thinking, since that is a piece of collateral
11  that they see as value for the loan, that they
12  would keep that patent portfolio in place.  I
13  reminded them on a couple occasions that they
14  needed to do that.  Any specific yes, noes to
15  me, I don't recall those conversations.
16     Q   And it is your recollection that the
17  payment of expenses by Vivato Networks Holdings
18  or Catcher Holdings, Inc. in 2008, including any
19  payments to Mr. Brooks for his services
20  prosecuting the patents or patent applications,
21  had to be approved by Aequitas; is that correct?
22     A   At the time, pretty much everything,
23  especially later advances into the 2 -- you said
24  "2008," so those are later advances.  As we
25  transitioned into 2008, it became very heavy

RESTRICTED - ATTORNEYS' EYES
ONLY

XR-EDTX1-00052450

XR-EDTX1-00052437

Transcript of Gary Haycox
Conducted on July 7, 2022

53

1 management on the funds.
2    Q   Okay.
3       MR. HASLAM:  Can we have Brooks -- I
4 think it is Brooks 7 brought up.
5    Q   This is an April 28, 2008 filing with
6 the United States Patent and Trademark Office,
7 and it is a request by Mr. Brooks to withdraw as
8 counsel in connection with this particular
9 application.  And I will --
10      MR. HASLAM:  Can you give control to
11 the witness.
12   Q   It is a reasonably short document.  I
13 would like you to look at it.  I am going to ask
14 you if you recall seeing it.
15      (Witness reviewing document.)
16   A   So repeat -- I was just reading the
17 document.  Can you repeat the question, please.
18   Q   I think it is a little more further
19 down.
20   A   Yep.
21   Q   And on the page you're on, you see
22 that Mr. Brooks -- this is dated April 25,
23 2008 -- indicates that the firm or individual
24 for future correspondence is Christopher R.
25 Ambrose.

54

1       Do you recall becoming aware in April
2 of 2008 that Mr. Brooks was actually taking
3 steps to withdraw as prosecution counsel for the
4 patent portfolio owned by Vivato Networks
5 Holdings, Inc.?
6    A   Yeah, I'm sure this is -- I am sure
7 this is a document I received and then -- or
8 seen.  I don't know if I received it.  It would
9 have went over to Aequitas.
10   Q   So you recall -- whether you saw this
11 document or not, do you recall becoming aware in
12 the spring of 2008 that Mr. Brooks was actually
13 withdrawing as counsel for Vivato Networks
14 Holdings, Inc. at the Patent Office for
15 maintaining the portfolio?
16   A   According to this document, yes.
17   Q   And you passed that on to -- you
18 passed that information on to Aequitas?
19   A   Yes.  Aequitas was getting all the
20 correspondence, I believe.
21   Q   Well, this particular communication
22 filed with the Patent Office -- put it this way:
23 I don't know one way or the other whether this
24 document ever found its way to Aequitas.  What
25 I'm asking you is:  Once you became aware that

55

1 Mr. Brooks was actually withdrawing as counsel,
2 in any of the meetings that you had with
3 Aequitas, did you inform them orally that they
4 needed to do something because Mr. Brooks was
5 withdrawing and there would be no counsel in
6 front of the patent to represent those -- that
7 portfolio in the Patent Office?
8       MR. WANG:  Objection to form.
9    Q   You can answer the question.
10   A   I believe -- timing is going to be
11 hard for me here.  Before this occurred, when
12 bills were coming in, they were presented to
13 Aequitas with the -- and with my recommendation
14 to them, that they need to keep this patent
15 portfolio in place, that they are basically
16 controlling the funds, they are controlling the
17 collateral, they are the collateral agent, that
18 they need to keep this patent portfolio in place
19 and as part of the -- part of the management
20 services they were providing.  They were the
21 collateral agent, they were holding the
22 collateral.
23   Q   My question is:  Once you became
24 aware that Mr. Brooks was actually taking steps
25 to withdraw from representation, did you at

56

1 least inform Aequitas of that fact?
2    A   Specifically, I don't recall.  I
3 think it is just part of the process of the
4 discussions I had with them on the portfolio.
5 So since the -- I assume if they got this
6 document, it was directed over -- all the
7 documents were being directed to their offices,
8 the Vivato information that, under the merger,
9 was directed to the Aequitas offices, that they
10 would have seen this.
11   Q   Okay.  And I understand your
12 testimony about that they would have seen this,
13 but I'm asking, independent of that, do you
14 recall having any discussions with them about
15 the fact that Mr. Brooks was no longer
16 complaining about bringing his bills current,
17 but he was actually taking steps to withdraw
18 from representing Vivato Networks Holdings, Inc.
19 at the Patent Office?
20      MR. WANG:  Objection.  Form.
21   Q   You may answer.
22   A   Yeah, I don't -- I don't recall a
23 specific discussion pertaining to this item.  I
24 discussed -- I recall the collection of what
25 needed to be done to keep this patent portfolio

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052451

XR-EDTX1-00052437

Transcript of Gary Haycox
Conducted on July 7, 2022

15 (57 to 60)

57

1  in place. Again, they got -- the communications
2  went pretty bad, stale, with them, and so where
3  their attorneys were picking this up for -- they
4  didn't tell me. They were not informing me as
5  to how they were managing the patent portfolio.
6      Q    In the Request to Withdraw,
7  Mr. Brooks indicates as the reason for
8  withdrawing that Mr. Brooks and Vivato Networks
9  Holdings, LLC have been unable to reach a
10 mutually agreeable understanding of payment of
11 service.
12       Do you recall, at some point,
13 Mr. Brooks informing you that he was going to
14 have to take the step of withdrawing as counsel
15 because he wasn't being paid?
16     A    I don't recall a phone call, but I
17 believe in the invoices that were coming in,
18 that was a bottom-line next step. And, again,
19 that's why as I -- when I informed Aequitas that
20 they needed to ensure that this patent portfolio
21 stays enforced, how they were going to
22 accomplish that, I did not -- I was not privy to
23 that from Aequitas.
24     Q    And we -- with Mr. Brooks' bills
25 coming in, were you aware that while he was

58

1  get -- perhaps receiving some payments, he was
2  not being paid in full on his invoices, or was
3  that something that Mr. McCarthy or someone else
4  at the company would have been more directly
5  responsible for?
6      A    Yeah, it is either Dennis or somebody
7  at Aequitas who was managing payments that were
8  going out. I wasn't aware. I am not aware if
9  they made a payment to it or not, other than,
10 you know, you said the correspondence saying it
11 wasn't being paid.
12       So, again, I went back to Aequitas
13 and told them the importance of keeping this
14 patent portfolio. They either -- again, I don't
15 know what they were doing at the time to keep
16 this portfolio enforced other than they were
17 marketing it, so my assumption was that they
18 were keeping it enforced.
19     Q    When you say "they were marketing
20 it," my understanding is, at one point in 2008,
21 there was an agreement, at least in principle,
22 to sell the portfolio. Do you recall that?
23     A    We had a -- we had an agreement with,
24 you know, that -- Intellectual Ventures during
25 the merger process of negotiating and selling

59

1  the patent portfolio, but because of the things
2  that happened in the merger process, the fact
3  that we had the loan they put in place that
4  collateralized it, that deal lapsed.
5      Q    Do you recall -- sorry.
6      A    And then after -- okay, I was going
7  to say, then after -- subsequent to that,
8  Aequitas then secured the IP. They told -- you
9  know, again, they informed me that they were
10 working to sell the portfolio. There was a lot
11 of contention during the Intellectual Venture
12 process because I told them that this -- here is
13 your -- here is your best and -- best customer
14 you have to date is that one. Western had
15 senior position in the collateralization of
16 that -- of securement of that collateral. And I
17 said that's the deal you should be pursuing.
18 Well, they -- that ended up falling to the
19 wayside, and there is a lot of contention there.
20       They then told me that they were
21 going to move on and move the -- try to sell the
22 patent portfolio again to another -- to a
23 different entity. They didn't have one in place
24 at the time. I had a conversation with them on
25 the phone. Like I said, it was either with a

60

1  consultant or with the people that were looking
2  to buy it just to describe what the patents are,
3  what I felt it was -- what the technical aspects
4  of it were and how they were being used in
5  Vivato products, then everything went dark.
6      Q    And were the conversations on the
7  second -- the second go-round that you just
8  testified to, was that sometime in 2008?
9      A    Yes. That would have been last --
10 either third or fourth quarter 2008.
11     Q    And given what we're looking at here
12 that Mr. Brooks requested to withdraw in April,
13 were those -- was that conversation about in
14 late 2008 after Mr. Brooks had filed his
15 Application to Withdraw?
16     A    Yes, because you -- he -- withdrawal
17 was in April or May.
18     Q    He filed the request in April.
19     A    April, yeah. And so the
20 conversations for -- subsequent conversations
21 for moving the patent portfolio was in Q3 or Q4
22 of '08, so it would have been after that.
23     Q    Mr. Ambrose testified at his
24 deposition that there was, at one time, a
25 discussion with a company called Vevi. Does

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052452

XR-EDTX1-00052437

Transcript of Gary Haycox

Conducted on July 7, 2022

61

1  that ring a bell with you.
2      A   And can you spell that.
3      Q   I think he said it was perhaps
4  V-E-V-E-Y.  Does --
5      A   Yeah, I don't recall the name of the
6  company.
7      Q   Okay.  You mentioned earlier in some
8  of your testimony about a lawsuit or some
9  litigation.  What were you referring to?
10      A   So when they went dark on selling the
11  patent portfolio in 2008 or '9, I guess it
12  was -- I can't recall the last conversation I
13  had with Aequitas.  I know we had a meeting
14  subsequent to one of the calls we had with
15  the -- I believe it was a consultant that was
16  helping them move the portfolio.
17          I had a meeting with the Aequitas
18  folks.  They basically told me that they were
19  going to prioritize any payments in the patents
20  sale to them over Western.  And I said that's
21  not how the agreement is in place.  We have a
22  proportional allocation of the funds, and any
23  payments that come back in on a sale of proceeds
24  you can't prioritize yourself.  And then I
25  didn't hear from them.  So it is kind of --

62

1  things went downhill fast in the early part of
2  the year, and it obviously got pretty sour there
3  on the last conversation with them.
4          So then my brother -- so you asked
5  who was participating -- he wanted to have a
6  statement of zero value for his investment so he
7  can do a tax-loss write-off.  I contacted
8  Aequitas and said hey, are -- what is the deal
9  with the patent portfolio?  Where is it at?
10  What is -- and this is late.  I mean, this is
11  now in -- I don't even remember what year this
12  was.  2010 or '11?  I don't really recall, it's
13  just been so long.
14          I contacted them and asked them what
15  the status of the portfolio was, where the --
16  where they were at with it.  And they go, Well,
17  we sold that portfolio.  I said, what?  I said,
18  how come I wasn't notified?  How come I didn't
19  see any proceeds from that?  And then obviously
20  it was, like, you know, come in and talk.  And I
21  started with the conversation.  They weren't
22  going to pay me, so then I had to retain an
23  attorney to go after them on that.
24          So it wasn't a smooth relationship
25  with Aequitas.  And as you can see where

63

1  Aequitas went, like, now, I understand why.  I
2  wish I had a crystal ball.
3      Q   Were you aware that in 2008, 2009,
4  there was litigation over Aequitas' attempts to
5  foreclose on the collateral securing the loan?
6      A   No, I was never -- I was never
7  informed of that, nor was I brought into it.  It
8  is -- well, I guess it's trivial.  I guess it is
9  who they were having problems with.
10      Q   Well, Mr. Ambrose testified that he,
11  at least for a portion of time, represented the
12  Vivato entities and one of the Catcher entities
13  in some of that litigation, but you were never
14  aware that there was a foreclosure action that
15  ultimately led to Aequitas gaining ownership of
16  the patent portfolio?
17      A   Oh, I -- oh, no, I'm aware of them
18  closing and foreclosing on the collateral.  I
19  don't recall at the time and right now if there
20  was a complaint against it.  I may be -- a lot
21  of things in my mind is kind of gone because it
22  is -- of the loss of everything, but I thought
23  it was just a legal process to foreclose on the
24  collateral.  I'm sure I wasn't happy about it,
25  but, you know, it is --

64

1      Q   There was some litigation about it,
2  but ultimately Aequitas, to your recollection,
3  was able to foreclose on the collateral and
4  obtain ownership of the patent portfolio?
5      A   Yes.
6      Q   Did it ever come to your attention
7  that any of the patents applications -- patent
8  applications that Mr. Brooks had been
9  prosecuting went abandoned after Mr. Brooks
10  withdrew and the Patent Office approved his
11  withdrawal?
12      A   No.
13      Q   Do you know a -- or have any contact
14  with a Mr. Carl Schwedler, a patent attorney
15  with Bullivant, Houser, Bailey, P.C. in the
16  2009-2010 time frame?
17      A   Is that a firm that was representing
18  Aequitas?
19      Q   It is a firm -- it is an attorney who
20  was a patent attorney in the 2009-2010 time
21  frame.
22      A   In that 2009-2010 time frame, again,
23  things got real quiet.  So the end of 2008, we
24  had the conversations to move the portfolio.
25  That -- it may have been in 2009 and not 2008.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052453

XR-EDTX1-00052437

65

1 You know, I -- I am kind of not sure on that.
2 But he may have been on the phone call when I
3 was relaying technical information about the
4 patents and how it was being applied to Vivato
5 and how -- and just in asking any technical
6 questions, knowing that I am -- I was not --
7 like I told them, I am not the inventor, nor
8 do -- am I the patent author. I can just give
9 you the information I have based on my
10 understanding of how Vivato applied them. He
11 may have been on the call. I don't recall.
12     Q   Do you recall any attorney who
13 informed you that he represented Aequitas in any
14 capacity calling you in the 2009-2010 time frame
15 and asking you what you knew about Mr. Brooks
16 withdrawing from representing Vivato Networks
17 Holdings at the Patent Office and what you knew
18 about why the patents that he had been
19 prosecuting went abandoned?
20     A   No, I don't recall that.
21     Q   Do you ever -- did you ever receive a
22 call from a Daniel P. Burke, a patent attorney
23 from Oyster Bay, New York representing
24 XR Communications, ever calling you and asking
25 you what information you had about Mr. Brooks'

66

1 withdrawal from representing Vivato Networks
2 Holdings, Inc. at the Patent Office and the
3 abandonment of the patents that he had been
4 prosecuting after he withdrew?
5     A   What time frame would that be?
6     Q   2009-2010.
7     A   I really don't recall.
8     Q   Did you ever have any conversations
9 with a Mr. Kai Hansen about the circumstances
10 surrounding why the patent portfolio that Vivato
11 Networks, Inc. possessed before the foreclosure,
12 why those patents had gone abandoned?
13     A   What was the name again?
14     Q   Kai Hansen, H-A-N-S-E-N.
15     A   Where was he from?
16     Q   Well, he is now affiliated with
17 XR Communications.
18     A   I don't recall any conversations
19 about the patents going abandoned. And, again,
20 if there were, it would have been the same kind
21 of discussion I am having here, was that
22 Aequitas was a manager, the collateral manager,
23 and then became the ultimate owner of the
24 patents, and their responsibility for keeping
25 the patent portfolio enforced was on them. So

67

1 it would have been the same discussion. I don't
2 know where else it would have went. I don't
3 know.
4     Q   I am just going to ask you about some
5 other names in the same question: Did any of
6 these people ever call you and ask you about the
7 circumstances surrounding why Mr. Brooks
8 withdrew or why the patents went abandoned?
9         Any conversations with an Adrian
10 Zajac, Z-A-J-A-C?
11     A   Don't recall that name.
12     Q   Any conversations with Adrian
13 Straplevi?
14     A   Don't recall.
15     Q   Any conversations with a Ron Chaffee?
16     A   Don't recall.
17     Q   Any conversations with Thomas Sidley?
18     A   Tom Sidley was with Aequitas.
19     Q   Did he ever call you in the 2009-2010
20 time frame to ask you about the circumstances
21 surrounding why Mr. Brooks withdrew and why the
22 patents went abandoned?
23     A   In the -- he was managing the
24 portfolio, so the discussions I recall in --
25 subsequent to the shutting down of the

68

1 company -- so whether it was 2008, 2009, I don't
2 really recall -- conversations I had with
3 Mr. Sidley was around selling the portfolio. I
4 don't recall any specific conversation as to the
5 state of the patents because at the time, again,
6 I -- they are contacting me to get technical
7 information, more specifics about the technology
8 and how it was used in the product itself,
9 Vivato product, and that they were actually
10 moving to sell the portfolio. So I had -- at
11 that point, my assumption is the portfolio is
12 still in place. We wouldn't be marketing
13 something that was -- has no value.
14     Q   Was Mr. Sidley involved with Aequitas
15 and Catcher and Vivato in 2008 before the
16 company went down?
17     A   Yeah. He was one of the primary
18 managers, like a program manager or lead in
19 Aequitas that managed through the whole process.
20 I don't have any information as to how much
21 Mr. Sidley was involved with Catcher in the
22 years before the process of bringing the
23 companies together, but he certainly was the key
24 person for managing through the merger process
25 up to operations of the company subsequent to

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

RESTRICTED - ATTORNEYS' EYES
ONLY

XR-EDTX1-00052454
XR-EDTX1-00052437

69

1 the merger process, and then also through the
2 bridge-loan note and payments that were being
3 drawn down off of that note.
4    Q    Was Mr. Sidley involved, to your
5 knowledge, in any way with Aequitas relating to
6 which expenses were getting paid and which ones
7 were not?
8    A    I don't have specific information,
9 but he is the one I would meet with when we were
10 talking about the different dispersions.
11 There's also other people within the company
12 that would do some of the day-to-day management,
13 so I assume that he had someone on staff that
14 was taking care of it, but he was the one I
15 would have conversations with about, you know,
16 we need to keep this thing up and running, we've
17 got to keep these patent portfolios enforced,
18 how is the loan going?  You know, that was
19 probably the biggest conversation we had most of
20 the time, was how are we doing on the financing?
21    I would give him updates on what we
22 were doing with the customers.  We had a -- we
23 had a big project that was underway that we
24 ultimately had to let go because the company was
25 winding down, which was unfortunate.  So a lot

70

1 of what I was doing was on the operational side
2 in that, and then, you know, present to them
3 what needed to be paid out, and mainly it was
4 done through -- the primary expenditures were
5 with the payroll, but then we were also having
6 discussions about, you know, cutting the payroll
7 for the execs, us, our team first, I think, in
8 half, and then we went to no paycheck.  So
9 there's a lot of conversations in place about
10 operational stuff, including all the
11 expenditures.
12    Q    Just a few more questions.
13    So Mr. Sidley -- you had
14 conversations with Mr. Sidley about the
15 non-payment of Mr. Brooks and the need to keep
16 the portfolio going; is that correct?
17    A    Yes.  I -- Tom, Mr. Sidley, would be
18 aware of the fact that the portfolio needed to
19 be enforced and that the -- Brooks was the ones
20 that were in place for when we did the original
21 patents.  And where they took it from there, I
22 don't know.
23    Q    Okay.
24    A    Again, I made the assumption that
25 they are marketing the portfolio, they are

71

1 taking it forward, having conversations with
2 people that are consulting on moving the product
3 out of the -- going forward, that that was being
4 taken care of.
5    Q    If I can beg your indulgence, I think
6 I am done, but I would like to take five minutes
7 just to review my notes.  Is that okay with you?
8    A    Sure.
9    Q    Okay.
10    MR. HASLAM:  Why don't we go off the
11 record for five minutes.
12    THE VIDEOGRAPHER:  Off record, 6:37.
13    (A recess was taken.)
14    THE VIDEOGRAPHER:  On record, 6:41.
15    MR. HASLAM:  Can we pull up Tab 42.
16    REMOTE TECH:  Stand by.
17    MR. WANG:  Can you provide a copy in
18 the chat, please.
19    REMOTE TECH:  Yes.  It's currently
20 uploading.  It is about halfway there.
21    MR. HASLAM:  Can you give control of
22 this to Mr. Haycox.
23 BY MR. HASLAM:
24    Q    I'll ask you to take a look at this
25 document, and I'm going to ask you, number one,

72

1 if that is your signature and, number two, if
2 you can tell me if this is the document that
3 collateralized the patents, the patent
4 portfolio, to secure the bridge loan from
5 Aequitas.
6    A    Yes, that is my signature.  And
7 collateral -- they have a list of collateral.
8 So, yes, this looks like it is the document that
9 provides the list of collateral that secured the
10 loan.
11    Q    Okay.  And is it your understanding
12 that when the loan went into default that
13 Aequitas was able to foreclose on the
14 collateral, which was the subject of this
15 exhibit?
16    A    Yes.
17    MR. HASLAM:  Can I have that marked
18 as the next exhibit in order to Mr. Haycox's
19 deposition.
20    REMOTE TECH:  Sure.  Sorry, does --
21 are you still seeing the exhibit?  It looks
22 like --
23    MR. HASLAM:  Yes.
24    REMOTE TECH:  -- somehow it moved
25 off.  One moment.  Let me just fix that.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052455
XR-EDTX1-00052437