# EXHIBIT F



**Planet Depos**
We Make It Happen™

# Transcript of Carl Schwedler

**Date:** July 8, 2022
**Case:** XR Communications, LLC -v- D-Link Systems, Inc., et al.

Planet Depos
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**RESTRICTED - ATTORNEYS' EYES ONLY**

XR-EDTX1-00052637
XR-EDTX1-00052637

## Page 1

```
              UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF CALIFORNIA
             Case No. 8:17-cv-00596-AG(JCGx)
 XR COMMUNICATIONS, LLC, dba     :
 VIVATO TECHNOLOGIES,            :
               Plaintiffs,       :
      vs.                        :
 D-LINK SYSTEMS, INC., et al.,   :
               Defendants.       :
 --------------------------------
         Videotaped Videoconference Deposition of
                    CARL SCHWEDLER
                  Friday, July 8, 2022
                    4:08 p.m. Eastern




 Job No.: 455291
 Pages: 1 - 55
 Reported By:  Dawn M. Hart, RPR/RMR/CRR
```

## Page 2

```
     Pursuant to Notice, before Dawn M. Hart,
 RPR/RMR/CRR and Notary Public.
            APPEARANCES
 ON BEHALF OF THE PLAINTIFFS:
     PHILIP X. WANG, ESQUIRE
     RUSS AUGUST & KABAT
     12424 Wilshire Boulevard
     Suite 1200
     Los Angeles, California 90025
     (310) 826-7474
 ON BEHALF OF ARUBA NETWORKS:
     ROBERT T. HASLAM, ESQUIRE
     COVINGTON & BURLING, LLP
     3000 El Camino Real, 10th Floor
     Palo Alto, California 94306
     (650) 632-4700
 ON BEHALF OF DEFENDANTS BELKIN AND NETGEAR:
     TYLER MARANDOLA, ESQUIRE
     DUANE MORRIS, LLP
     30 South 17th Street
     Philadelphia, Pennsylvania 19103-4196
     (215) 979-1000
 ALSO PRESENT: Kee Young Lee, Covington & Burling
          Anna Prusko, Russ August & Kabat
          Drew Halton, Videographer
```

## Page 3

```
                   CONTENTS
 EXAMINATION OF CARL SCHWEDLER          PAGE
     By Mr. Haslam       5
     By Mr. Wang        41
     By Mr. Haslam      48
     By Mr. Wang        50
     By Mr. Haslam      52
             EXHIBITS
     (Exhibits are attached to the transcript.)
 C. SCHWEDLER DEPOSITION EXHIBITS        PAGE
 Exhibit 1   Bates Nos. XR-00007813 - 7828    7
 Exhibit 2   Bates Nos. XR-00007834 - 7836   11
 Exhibit 3   Bates Nos. XR-00007837 - 7872   15
 Exhibit 4   Bates Nos. ARUBA_0033271 - 276  19
 Exhibit 5   Bates Nos. ARUBA_0033278 - 879  22
 Exhibit 6   Bates Nos. ARUBA_0034878 - 902  28
 Exhibit 7   Bates Nos. ARUBA_0032688 - 692  32
 Exhibit 8   Bates Nos. ARUBA_0032693 - 739  33
 Exhibit 9   Bates Nos. ARUBA_0032740 - 743  37
 Exhibit 10  Bates Nos. ARUBA_0032795 - 798  38
 PREVIOUSLY MARKED EXHIBITS              PAGE
 Exhibit 5   Bates Nos. ARUBA_0033269 - 70   18
       (Ambrose)
 Exhibit 11  Bates Nos. ARUBA_0034875 - 77   27
       (Brooks)
```

## Page 4

```
                  PROCEEDINGS
     THE VIDEOGRAPHER:  Here begins Disk No.
 1 in the video deposition of Carl Schwedler in the
 matter of XR Communications, LLC, dba Vivato
 Technologies, vs. D-Link Systems, Inc., in the
 U.S. District Court, Central District of
 California, Civil Action No. 8:17-cv-00596-DOC.
        Today's date is July 8, 2022.  Time on
 the video monitor is 4:08 p.m. Eastern.  The
 videographer is Drew Halton, for Planet Depos.
 All participants are attending remotely.
        Would counsel please voice identify
 themselves and state whom they represent.
        MR. HASLAM:  Bob Haslam, from
 Covington Burling, representing Aruba Networks.
 With me is Kee Young Lee.
        MR. WANG:  Philip Wang, from the law
 firm of Russ August & Kabat, for Plaintiff,
 XR Communications, dba Vivato Technologies.  I'm
 joined by my colleague Anna Prusko, also of
 Russ August & Kabat, also for Plaintiff XR.
        MR. MARANDOLA:  Tyler Marandola, of the
 law firm of Duane Morris, for the Defendants
 NetGear, Inc., and Belkin International, Inc.
        THE VIDEOGRAPHER:  The Court Reporter is
```

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052638
XR-EDTX1-00052637

### 5

1  Dawn Hart, representing Planet Depos. Would the
2  Reporter please swear in the witness.
3          CARL SCHWEDLER
4       being first duly sworn or affirmed to
5  testify to the truth, the whole truth, and nothing
6  but the truth, was examined and testified as
7  follows:
8  EXAMINATION BY COUNSEL FOR ARUBA NETWORKS
9  BY MR. HASLAM:
10   Q   Mr. Schwedler, have you been deposed
11  before?
12   A   Yeah, once.
13   Q   Okay. Just generally, then, as a
14  refresher, I'll be asking you questions. If you
15  understand the question, I'd appreciate an answer;
16  if you don't understand the question, just let me
17  know and I'll try to rephrase it.
18        After I ask questions, Mr. Wang or other
19  counsel may follow up with questions that they may
20  have.
21        I will show you some documents during
22  the questioning today, they'll be posted on the
23  screen. I will probably ask the videographer to
24  give you control of the documents if it would make
25  it easier for you to scroll through it.

### 6

1  Otherwise, I can scroll through it if I want to
2  ask you questions on -- at various different parts
3  of the document. Just let me know when we get
4  there what's easiest for you.
5        It's my understanding that you do not
6  practice law now, but you have practiced law in
7  the past; is that correct?
8   A   That is correct.
9   Q   Okay. And when you -- you were
10  practicing at one time, you were with the
11  Bullivant, B-U-L-L-I-V-A-N-T, law firm?
12   A   Yes.
13   Q   If you recall, during what time period
14  were you practicing law at that time?
15   A   I don't -- 2012-ish, give or take. I
16  don't know.
17   Q   Okay.
18        MR. HASLAM: Well, let me have marked
19  as -- pulled up as -- I'll mark it as an exhibit,
20  Tab 29.
21        AV TECHNICIAN: You'd like that marked
22  as Exhibit 1?
23        MR. HASLAM: Exhibit 1 to the Schwedler
24  deposition.
25        AV TECHNICIAN: And, Mr. -- sorry to

### 7

1  interrupt (indiscernible). And, counsel, just so
2  you know, because Mr. Schwedler is on an iPhone, I
3  do not think it's possible to remote control.
4        MR. HASLAM: Okay.
5        (Exhibit 1 was marked for identification
6  and is attached to the transcript.)
7  BY MR. HASLAM:
8   Q   Exhibit 1 is a Patent Assignment that
9  was filed by Bullivant -- attorneys at Bullivant,
10  and it is a Security Agreement relating to
11  Vivato Networks, Inc., and it is a Security
12  Agreement with respect to Aequitas Capital
13  Management, Inc.
14   A   I see that.
15   Q   Okay. And if we scroll down -- I don't
16  know if I can do that -- you can see that you were
17  indicated as the filing party, carljschwedler@
18  bullivant.com.
19   A   Yes.
20   Q   Do you recall filing at some point in
21  time a -- the Security Agreement for
22  Aequitas Capital Management in connection with a
23  patent portfolio of Vivato Networks?
24   A   I remember some files came in and --
25  yeah, that must have been -- yeah, vaguely, I

### 8

1  guess that would have been establishing ownership
2  or -- yeah, that looks familiar. I --
3   Q   Let me go down -- and I'm going to show
4  you -- the attachment to Exhibit 1 is the
5  Commercial Security Agreement granting from
6  Vivato, Networks Inc., to Aequitas Capital
7  Management, Inc., security in a variety of
8  collateral, including some patents and patent
9  applications.
10   A   Yeah, that sounds --
11   Q   Do you recall that generally?
12   A   Yeah, generally, that sounds familiar.
13   Q   Okay. Had you done work for
14  Aequitas Capital before filing what is Exhibit 1?
15   A   I doubt it. I don't remember it coming
16  in that way. It was not -- it was not a client I
17  had, it was a client from someone in another
18  office of Bullivant.
19   Q   Okay. Do you recall talking to anyone
20  at Aequitas Capital Management in connection with
21  the filing of this Security Agreement?
22   A   I don't have a specific recollection.
23   Q   Do you recall at any time in connection
24  with your work with Aequitas -- and I'll just say
25  "Aequitas" because there's Aequitas Capital

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052639
XR-EDTX1-00052637

### Page 9

1 Management and Aequitas Equipment -- but do you
2 recall having conversations from time to time with
3 a Tom Sidley?
4   A   That name sounds familiar, but it may
5 be -- maybe it's from the documents, I don't know.
6   Q   When you filed the Security Agreement
7 with the Patent Office, do you recall obtaining or
8 reviewing the file history for the particular
9 patents that you were filing the Security
10 Agreement?
11   A   I think we had paper files delivered in
12 boxes at the time. And the paper files, I would
13 have at least (indiscernible) them to make sure
14 they were all what they purported to be, I
15 presume.
16   Q   At some point in time did you -- well,
17 let me withdraw that.
18       Other than reviewing the paper files
19 that you received in paper boxes at the time you
20 filed the Security Agreement, do you recall doing
21 anything else other than just skimming through the
22 files?
23   A   No, not really. It seems to me it was
24 kind of a rush -- a rush job. A bunch of files
25 were in need of a home, I guess, and I assume that

### Page 10

1 that submission was to allow us to prosecute going
2 forward.
3   Q   Did you -- let me ask you, did any other
4 patent attorneys at the Bullivant firm assist you
5 in any of your activity with respect to the Vivato
6 files?
7   A   There were a couple -- there was one
8 other registered patent attorney -- I don't know
9 if she was there at that time -- but I was -- my
10 recollection is I was the only registered patent
11 attorney working at the firm at that time.
12   Q   And I think you said something about
13 this being a rush job, the files needed a home.
14       What are you referring to?
15   A   I just seem to have a recollection that
16 there was -- the client, I guess that would have
17 been Aequitas, had acquired -- taken over the
18 assets of the company -- I guess that would be
19 Vivato -- and they -- I'm not sure they even knew
20 what they had.
21       It was kind of a -- the idea was to keep
22 the balls in the air until they could find out how
23 to dispose of the portfolio.
24   Q   Okay. And so is it your best
25 recollection that it was another lawyer at the

### Page 11

1 Bullivant firm who asked you if you could --
2   A   Yeah.
3   Q   -- take charge of the files that related
4 to the Vivato patent assets?
5   A   Yes. Yes. I don't -- I don't recollect
6 the name of that attorney; I was only at Bullivant
7 for a few years.
8   Q   Okay.
9       MR. HASLAM: If we can have pulled up as
10 Tab 30, and we'll mark this as Exhibit 2.
11       (Exhibit 2 was marked for identification
12 and is attached to the transcript.)
13   Q   And if you look at the first page of
14 Exhibit 2, this is an assignment of the security
15 interest from Aequitas Capital Management, Inc.,
16 to Aequitas Equipment Finance, LLC.
17       And if we scroll down to the second
18 page, you'll see again that this is a form that
19 was filed by you with the Patent Office?
20   A   Yeah.
21   Q   Do you recall anything about the
22 transfer of the loan agreement and the security
23 interest from Aequitas Capital Management to
24 Aequitas Equipment Finance?
25   A   Not really. That was -- I was told that

### Page 12

1 those were the assignments -- I was shown the
2 paperwork, but I didn't work on the --
3   Q   Okay.
4   A   -- assignments, I didn't work on the
5 asset transfers, per se.
6   Q   Okay. When you got the boxes of
7 files -- and you said you reviewed them at least
8 briefly, correct?
9   A   Yes.
10   Q   Do you recall, in reviewing them,
11 whether or not you noticed what the current status
12 of any of the patent applications was?
13   A   They're at various statuses. There
14 seemed to be some -- some patents were issued, I
15 think, a number of them were in prosecution, I
16 believe some of them may have been abandoned.
17   Q   And do you recall approximately, at
18 least by year, when you received the boxes of
19 files relating to the Vivato patents?
20   A   I would just go -- I would -- I don't
21 recall. I would go off the date, 2007. I guess
22 that's the execution date on these conveyances on
23 these exhibits.
24   Q   Indeed.
25       What date are you going by when you say

**13**

that?
 A  Aequitas Capital Management, Inc., that's not the execution a function date of this document, I guess.
 Q  But the Loan Assignment Agreement on Exhibit 2 and the Commercial Security Agreement on Exhibit 1 were both executed in November 2007 --
 A  Oh, well --
 Q  -- and is it --
   (Simultaneous speaking.)
 Q  Let me finish the question and then I'll -- you can answer and I won't interrupt you.
   Is it your recollection that you may have signed the -- filed these two documents in 2007 to help perfect the security interest?
 A  No, I -- I don't have any firm recollection of a date.  I saw the date 2007 on one of the exhibits.
 Q  Is it your best recollection that you filed Exhibit 1 and Exhibit 2 that we've just looked at when you first got the boxes of files, or is it your recollection that you may have filed the security interests and subsequently received the boxes of files?
 A  I don't have a firm recollection.  I

**14**

would assume I would have seen the boxes of files.
 Q  Do you know -- did you recognize at any time going through the files a patent attorney by the name of Edward Brooks?
 A  That sounds familiar.
 Q  Do you recall ever having any conversations with Mr. Brooks?
 A  No, I don't recall.  I may have reached out to him; I don't recall.
 Q  You indicated in an earlier answer that -- I believe -- that when you got the boxes of documents and went through them, that you saw that some of the files had gone abandoned; is that correct?
 A  Yeah, I believe so.  I think there's a spectrum of the status on the files.
 Q  Okay.  And when you saw that the patents had been abandoned, did you -- what steps did you take, if any, either to discuss that with the client or to take steps to deal with the abandonment?
 A  I believe --
   MR. WANG:  Sorry, excuse me.
   Objection.  Privilege.  And I make a standing objection.  Has come up in recent

**15**

depositions on that, that the witness not reveal any attorney/client privileged information.
 Q  Well, let me ask you this.
   Did you -- yes or no, did you talk to the client about the fact that some of the files indicated that the applications had been abandoned?
 A  Yes, I would have.  I would have either talked to the client or I would have talked to the attorney representing the client in the office.  I think may be more properly the Portland office.
 Q  When you say "the attorney representing," that would have been the attorney at Bullivant?
 A  Yes.
 Q  Do you recall if you had a conversation with either or both of those people, the client or one of your colleagues?
 A  I assume so -- well, I do remember having a conversation with my colleague at least.
   MR. HASLAM:  Can we have marked as the next exhibit in order, Tab 31.  We'll have this marked as Schwedler Exhibit 3.
   (Exhibit 3 was marked for identification and is attached to the transcript.)

**16**

 Q  This is another form filed with the Patent Office, and this one is a filing -- what's referred to as a Limited Judgment of Foreclosure.
   And I'm going to just skim down in the document -- first of all, before I go down, you'll see again that this is a document you filed, and attached to it is a Limited Judgment of Foreclosure in the litigation between Aequitas Equipment Finance, Vivato Networks, Inc., and Vivato Networks Holdings, Inc., and related cross-actions.
   Do you recall being informed at some point in time that there had been a foreclosure action relating to the patent assets of Vivato Networks and Vivato Networks Holdings that related to the security interest that Aequitas Equipment Finance had?
 A  I remember something about that.
 Q  Okay.  And let me ask you this.
   At the time that you became aware of the Judgment of Foreclosure, was that the time that you received the boxes of documents, the files?
 A  I don't really recall.  I have recollection of the boxes of files coming in, being told they were coming, having them come in,

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052641
XR-EDTX1-00052637

17

1 having to process them. I don't remember the
2 exact timing.
3    Q  Okay. Prior to the Judgment of
4 Foreclosure, Aequitas Equipment Finance had a
5 security interest but had not yet been granted the
6 right to foreclose on the security.
7        This judgment, which is an April 2009,
8 basically is a judgment which granted them
9 ownership of the patent collateral clear of any
10 prior liens.
11        I refer to that just to sharpen up and
12 ask, do you recall that it was after
13 Aequitas Equipment Finance actually had ownership
14 of the patents that you received the files?
15    A  I don't recall.
16    Q  You do recall at the time you received
17 it, though, that there was some sort of rush
18 related to them?
19    A  There was a sense of urgency, yeah.
20    Q  And do you recall what the sense of
21 urgency related to?
22    A  Just that the files needed work, I
23 think.
24    Q  Other than -- at some point in time, did
25 you actually then begin to prosecute any of the

18

1 patents that Aequitas Equipment Finance had
2 obtained ownership of?
3    A  Yes, I do remember that. There were --
4 there were actions that needed to be responded to
5 in some of the files.
6        MR. HASLAM: Can we have Ambrose 5
7 brought up.
8        (Ambrose Exhibit 5 was previously marked
9 for identification and is attached to the
10 transcript.)
11    Q  This is a document that has been marked
12 at an earlier deposition, and this is a -- an
13 Office Action that was mailed on December 11,
14 2008, and it is a Notice of Abandonment.
15        Do you recall when you received the
16 files and reviewed them, that you noticed that
17 some of the files had been abandoned?
18    A  I seem to remember that.
19    Q  Okay. And now this Notice of
20 Abandonment, as indicated, it was mailed
21 December 11, 2008.
22        Noting that date, does that refresh your
23 recollection at all as to when you received the
24 files from Aequitas?
25    A  No, that doesn't really help.

19

1    Q  To the extent that you recall having
2 reviewed the files and found that some
3 applications had been abandoned, doesn't that
4 suggest that you would have received the files
5 sometime after December 11, 2008?
6    A  At least with respect to -- if that was
7 one of the files I noticed as being abandoned,
8 yes.
9        MR. HASLAM: Can we have marked the next
10 exhibit, Tab 18.1.
11        (Exhibit 4 was marked for identification
12 and is attached to the transcript.)
13        MR. HASLAM: Can we enlarge that.
14    Q  This is a form that's a Power of
15 Attorney or Revocation of Power of Attorney with a
16 new Power of Attorney. And if you'll notice, the
17 applicant's signature is Thomas A. Sidley, Senior
18 Managing Director/Aequitas Capital Management.
19        Do you recall talking to Mr. Sidley in
20 connection with the patent portfolio of
21 Vivato Networks Holdings that you were working on?
22    A  I don't have a specific recollection of
23 that. We certainly -- we got -- somehow we got
24 him to sign the document.
25    Q  You'll notice the date of his signature

20

1 here is -- I believe it is May 20, 2009, and it
2 relates to patents with the inventor name
3 James Brennan.
4        And is that your signature on the page?
5    A  Yeah, that was my signature at the time.
6    Q  And that is on the last page of this
7 document.
8        And this was a filing that gave you
9 Power of Attorney to work with the Patent Office
10 in connection with this particular application,
11 correct?
12    A  Yeah, that, yeah -- yes.
13    Q  And prior to the filing of this document
14 with the Patent Office you would not have been
15 authorized to deal with the Patent Office on this
16 file, correct?
17    A  Right.
18    Q  And the date of this is May 22nd, 2009.
19    A  Right.
20    Q  Again, I apologize for continuing to --
21 at times to ask you if documents put things in
22 date sequence, but I'm going to do that again.
23        Given that this is dated May 22nd, 2009,
24 does this help you place when you got the actual
25 boxes with the patent files from Aequitas that you

**Page 21**

1  reviewed and found there were some abandoned
2  applications on?
3      A   Well, yeah, I might have had the files
4  by then. I don't know how long I'd had them. I
5  don't think I worked on them for very -- for too
6  long.
7      Q   Okay. Now, we saw Ambrose Exhibit 5
8  that the -- there was a Notice of Abandonment in
9  this application that was mailed on December 11,
10 2008, and you were appointed -- or given Power of
11 Attorney to act on behalf of Aequitas with the
12 Patent Office in May.
13         Do you recall what actions, if any, on
14 the Vivato Networks' portfolio you were taking
15 between December 11, 2008, and May 22nd, 2009?
16         MR. WANG:  Objection.  Privilege.
17     Q   Do you recall?
18     A   My recollection is that there were a
19 number of files, a number of boxes, and just
20 trying to get myself up to speed on the
21 technology, what was being applied for, where the
22 prosecution stood in each file.
23     Q   Okay.
24     A   There was just kind of catch-up on all
25 the files and all the portfolio.

**Page 22**

1         MR. HASLAM:  Can we have pulled up Tab
2  19. We'll mark this as Exhibit 5.
3         (Exhibit 5 was marked for identification
4  and is attached to the transcript.)
5      Q   Mr. Schwedler, I will scroll through
6  this document and if at any point there's
7  something you want me to stop on so that you can
8  review it, let me know.
9      A   Okay.
10     Q   This is a Petition for Revival of an
11 Application for Patent Abandoned Unintentionally
12 at 37 CFR .137(b), the application of which was
13 filed May 30th, 2006.
14        It indicates that the application had
15 been abandoned for failure to file a timely and
16 proper reply to a Notice of Action by the Patent
17 Office.
18        Is that your signature --
19     A   Yes.
20     Q   -- that is on page 2 of 2?
21        And the date is November 2nd, 2009.
22        Do you recall filing this request for
23 Revival of an Application?
24     A   Not that specific one, but I do remember
25 we did that kind of work on some of the files,

**Page 23**

1  yes.
2      Q   And one of the requirements for the
3  petition is a statement that the entire delay was
4  unintentional. Do you see that?
5      A   Yes.
6      Q   Okay. How did you determine that the
7  delay resulting in abandonment was unintentional?
8         MR. WANG:  Objection to the extent it
9  calls for attorney/client privilege.
10     A   I remember -- I believe we investigated
11 the relationship of the application, the entities,
12 of who owned what when. I don't know, there was a
13 history that evolved -- I thought -- I seem to
14 remember it was bankruptcy, but maybe it wasn't
15 bankruptcy.
16        But yeah, I mean generally speaking,
17 that was the kind of information we would have
18 elicited.
19     Q   And from whom would you have elicited
20 that information?
21     A   The attorney -- I think a lot of our
22 communications went through the attorney at
23 Bullivant, the corporate attorney from the other
24 office, whoever that would have been.
25     Q   Did you do any analysis or research to

**Page 24**

1  see whether abandonment for non-payment qualified
2  as unintentional?
3         MR. WANG:  Objection to the extent it
4  calls for attorney/client privilege.
5      A   I don't remember doing that
6  specifically.
7      Q   Had you filed petitions for revival of
8  abandoned patents prior to working on the
9  Vivato Networks' files?
10     A   Yeah, I believe it came up in practice.
11     Q   And in the past -- let me withdraw that.
12        Had any of the applications where you
13 had been the prosecuting attorney ever gone
14 abandoned?
15     A   I believe that may have happened.
16     Q   And in those cases, was it basically the
17 crush of work or a deadline that didn't get --
18     A   Yeah, bad document -- yeah, something
19 like that.
20     Q   Had you ever received files that had
21 been worked on by an attorney at a different firm
22 after which you learned that some of the files
23 that you received had gone abandoned?  Had that
24 ever happened before?
25        MR. WANG:  Objection.  Vague.  Calls for

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052643
XR-EDTX1-00052637

---

**25**

1 speculation.
2   A   I don't recall any specific incidents of
3 that.
4   Q   Was this, to the best of your
5 recollection, the Vivato Networks Holdings'
6 portfolio, the first time you had received files
7 from a client that had been worked on by another
8 attorney and learned that some of the applications
9 had gone abandoned?
10  A   I don't recall that ever being --
11  Q   I missed that.  You don't recall any
12 others?
13  A   I don't recall any others in my
14 recollection.
15  Q   And that your best recollection about
16 what you knew about the circumstances of this
17 particular application that's the subject of
18 Exhibit 5 had to do with either bankruptcy or
19 something like that?
20  A   Financial difficulties.  The files had
21 not been working on -- somebody had stopped
22 working on the files for some reason.
23  Q   I'll represent to you that Mr. Brooks
24 was the attorney who had worked on the files, the
25 Vivato Networks Holdings' files earlier.  He's

**26**

1 been deposed in this case, and he does not recall
2 ever having any discussions with you.
3        Let me ask you, do you think you had any
4 discussions with Mr. Brooks about any of the
5 Vivato Networks' files?
6   A   I remember a lot of communications were
7 through the attorney at Bullivant.
8   Q   Okay.  This is right now just a yes/no
9 question.
10       Did you also discuss any of the
11 circumstances surrounding abandonment, the
12 abandonment of this particular application with
13 anyone at Aequitas Capital Management or
14 Aequitas Equipment Finance?
15       MR. WANG:  Objection.  Privilege.
16  A   I don't specifically remember that.
17       MR. HASLAM:  Can we have Brooks 2
18 brought up.
19       AV TECHNICIAN:  Brooks 2 should be on
20 screen now.
21       MR. HASLAM:  I apologize.  Can I have
22 Brooks 11?  Apologize.  I called out the wrong
23 exhibit.
24       AV TECHNICIAN:  This one should also be
25 on screen now.

**27**

1       (Brooks Exhibit 11 was previously marked
2 for identification and is attached to the
3 transcript.)
4   Q   I'll scroll through this document for
5 you.  This is a communication from the
6 United States Patent and Trademark Office dated
7 October 31, 2008.  It is an Interview Summary in
8 connection with this application.
9       It indicates that on September 26, 2008,
10 the Examiner telephoned Christopher R. Ambrose.
11 Mr. Christopher R. Ambrose said he would rehire
12 Edward Brooks to work on the application.  And on
13 9/30/2008 he telephoned Mr. Edward J. Brooks.
14 Mr. Edward J. Brooks said he has not received a
15 message from Christopher R. Ambrose to continue
16 work on the application.
17       Do you recall having reviewed this when
18 you reviewed the files?
19  A   Well, if it was in the file, I assume I
20 would have looked at it, if it was in the file.
21  Q   And attached to that was a Notice of
22 Abandonment of this file, and I take it that in
23 reviewing the box of files after you got it, you
24 would have noticed that this particular file had
25 also gone abandoned?

**28**

1   A   Yeah, I assume I would have sorted that
2 out.
3   Q   And when you received the box of files
4 relating to the Vivato Networks' patent portfolio,
5 did you receive those files all at once?
6   A   I think I did.  It seems to me we were
7 waiting for them, waiting for them, and they all
8 came in at once.  That's my recollection.
9   Q   Do you recall who said there was a
10 rush -- something rush about the files, doing
11 something with the files, where that came from?
12  A   I assume the -- I don't remember the
13 name, but the corporate attorney at Bullivant out
14 of one of the other offices.
15       MR. HASLAM:  Can we have Tab 21.  I'll
16 mark this as Schwedler Exhibit 6.
17       (Exhibit 6 was marked for identification
18 and is attached to the transcript.)
19  Q   This is another Petition for Revival of
20 an Application for Patent Abandoned
21 Unintentionally Under 37 CFR (b) -- 1.137(b).
22 It's for application for Patent 10/700,342, and it
23 was filed November 3rd, 2003.
24       I'm going to scroll down in this.
25       Again, this petition required a

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052644
XR-EDTX1-00052637

### Page 29

1 statement that the entire delay was unintentional.
2     Was it your -- did you come to an
3 understanding that the abandonment of this
4 particular application was for the similar reasons
5 as what we saw in Exhibit 5, the request for
6 revival in a different file?
7   A   Yeah, I don't remember thinking there
8 was something different about it.
9   Q   So your action on -- of taking steps to
10 determine whether it had been unintentional or not
11 was the same as what you testified to earlier?
12   A   Right. Yeah, conversations with at
13 least the corporate attorney in Bullivant.
14   Q   And I'll ask you again. You don't
15 recall having talked with anyone at the client,
16 Aequitas Capital or Aequitas Equipment Finance, in
17 connection with the attempts to revive the
18 abandoned applications; is that correct?
19   A   That is correct.
20   Q   And it's your best recollection that you
21 did not talk to Mr. Brooks about the circumstances
22 surrounding his withdrawal from prosecuting the
23 files; is that correct?
24   A   That's correct.
25   Q   That's your signature on page 2 of 25 on

### Page 30

1 this particular request for revival?
2   A   Yes, I believe that's so.
3   Q   And is that your handwriting on the
4 October 30, 2009, date that's next to your
5 signature?
6   A   Yes. It was starting to go downhill
7 then, but that looks about right.
8   Q   It still looks pretty good to me.
9     In connection with the filing of this,
10 you also filed an amendment in response to an
11 Office Action of April 3rd, 2008; is that correct?
12   A   I believe I had to.
13   Q   Right. And that was something -- that's
14 because that Office Action had been pending at the
15 time of abandonment?
16   A   Right.
17     MR. HASLAM: We can take that exhibit
18 down.
19   Q   Do you recall at some point in time that
20 the files relating to Vivato Networks' portfolio,
21 responsibility for that, was passed on to another
22 attorney?
23   A   I do believe so, yes. I don't -- I
24 don't recall who that was or ...
25   Q   Does the name Daniel Brooks sound

### Page 31

1 familiar?
2   A   Maybe. It's been a while.
3   Q   When the files were -- when the files
4 were transferred, do you recall what it was -- why
5 it was that the files were transferred from
6 Bullivant and your responsibility to another firm?
7   A   No, I don't remember why. I do remember
8 at all times when I was working on the
9 prosecution, though, it was -- I was considering
10 it a stopgap until they could find other
11 representation.
12   Q   Why did you consider it stopgap?
13   A   I was the only attorney with a patent --
14 registered patent -- I was the only registered
15 patent attorney at Bullivant. I think there -- I
16 think there may have been one other junior woman,
17 but that was not really my area of technology.
18   Q   What was your area of technology?
19   A   I was trained as a biologist.
20   Q   Do you have -- recall ever having any
21 conversations with a Mr. Haycox?
22   A   Not offhand, no.
23   Q   Do you recall having any conversations
24 with anyone who had previously been associated
25 with the Vivato Networks Holdings' portfolio in

### Page 32

1 connection with attempts to sell the portfolio?
2   A   No, I don't believe -- I don't believe I
3 was involved with that.
4   Q   But your -- the limit of what you were
5 doing relating to the Vivato Networks Holdings'
6 patent portfolio was, as you say, stopgap
7 prosecution and the filings to revive abandoned
8 applications, correct?
9   A   Yeah, to keep the balls in the air until
10 something could be decided.
11   Q   Okay.
12     MR. HASLAM: Can we have Bullivant 12,
13 and we'll mark this as 7.
14     (Exhibit 7 was marked for identification
15 and is attached to the transcript.)
16   Q   This is another Office Action from the
17 United States Patent and Trademark Office in
18 connection with application 10/700,329, and the
19 mailing date of this is January 8, 2009.
20     And I'll scroll down.
21     This is another file in which there was
22 a Notice of Abandonment issued on that date -- or
23 mailed on that date, January 8, 2009.
24     Am I correct that this would have been
25 another Notice of Abandonment you would have

---

Page 33

```
 1  located when you went through the files after you
 2  received them?
 3      A   Yes.
 4      Q   And am I --
 5      A   More of the same.
 6      Q   And am I correct that given that this
 7  particular Notice of Abandonment was mailed on
 8  January 8, 2009, that you would have received the
 9  files at some date after that in order for you to
10  have noticed that this had been abandoned?
11      A   Yeah, I think it must be, yeah.
12          MR. HASLAM:  Can we have Tab 23.  We'll
13  mark this as Exhibit 8.
14          (Exhibit 8 was marked for identification
15  and is attached to the transcript.)
16      Q   This is a Petition for Revival of an
17  Application for Patent Abandoned Unintentionally
18  Under 37 CFR1-1.37(b).  And this was filed on
19  November 3rd, 2003.
20          And again, the petition, as noted on
21  this form, required a statement that the entire
22  delay was unintentional.
23          And I'll just ask you, was the basis on
24  which you made the statement that the entire delay
25  was unintentional was related to the bankruptcy or
```

Page 34

```
 1  bankruptcy-type issues?
 2      A   The information I received from -- yeah,
 3  I seem to remember all -- I'm starting to remember
 4  now that a lot -- it was a frustration of this
 5  prosecution of these patents that all the
 6  communications were conveyed through the attorney
 7  at Bullivant.
 8      Q   And why was that a source of
 9  frustration?
10      A   I -- I seem to remember I wanted -- I
11  would have liked access to the inventors for a
12  number of reasons.
13      Q   Why would you have wanted access to the
14  inventors?
15          MR. WANG:  Objection.  Calls for
16  attorney/client privilege.
17          MR. HASLAM:  I'm asking why, not for any
18  communications.
19      Q   Why -- I'm asking right now for what you
20  would have asked them.  I'm asking why you would
21  have wanted access to the inventors.
22      A   Well, to understand the technology
23  better, understand the course of the prosecution,
24  all those -- all of the reasons you would want
25  that prosecution.
```

Page 35

```
 1      Q   So would one of those things you also
 2  would have wanted to ask the inventors what they
 3  knew about the circumstances as to why the
 4  applications had gone abandoned?
 5      A   Of course.
 6          MR. WANG:  Objection.
 7      Q   Was there a reason that you were not
 8  able to talk to the inventors?
 9      A   I cannot think of any good reason.  I
10  think at the time I was frustrated that it might
11  have been resource driven.
12      Q   And "resource driven" meaning the client
13  didn't want to spend the money?
14      A   Yeah.
15      Q   And I think I've asked you this, and I
16  apologize if I have, you've told me that the
17  information you had, which you based the statement
18  that the entire delay was unintentional, may have
19  come from one of your colleagues at the Bullivant
20  law firm.
21          Do you recall on any of the -- with
22  respect to any of the applications that went
23  abandoned, that you talked to anyone at the
24  client, Aequitas Capital Management or
25  Aequitas Equipment Finance?
```

Page 36

```
 1          MR. WANG:  Objection to the extent it
 2  calls for privilege.
 3          MR. HASLAM:  At this point I'm just
 4  asking whether he did have such conversations.
 5      A   I don't think -- I don't think I had
 6  those conversations.
 7      Q   Was that resource constraint, too?
 8          THE WITNESS:  That was my dog.
 9      Q   Was the reason you didn't have
10  conversations with the client a matter of
11  resources?
12      A   Well, I think that there was a breakdown
13  in communication.  My understanding, there was
14  also some breakdown in communication.
15      Q   When you say "breakdown in
16  communication," what do you mean?
17      A   The relationships were maybe not good.
18      Q   And do you mean between the law firm and
19  the Aequitas entities?
20      A   Whoever -- whoever acquired the patents
21  and the original -- originators of the patents.
22      Q   And how would that have impacted your
23  ability to talk to somebody at Aequitas?
24          MR. WANG:  Objection.  Calls for
25  speculation.
```

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052646
XR-EDTX1-00052637

---

**Page 37**

1  A   I just remember being told to do -- to
2  run the communications through the attorney at
3  Bullivant.
4  Q   And that either came from the client or
5  from your colleague at Bullivant?
6  A   Sorry, could you repeat that?
7  Q   Yeah. I was just asking you that the --
8  sort of the instruction to run things through your
9  colleague at Bullivant for information flow, was
10 that something that your colleague requested, or
11 was that something you understood the client
12 wanted?
13 A   All I know is what the colleague
14 requested.
15 Q   Okay. Thank you.
16     MR. HASLAM: Can we have Tab 23.
17     AV TECHNICIAN: I think this is Tab 23.
18 Do you mean 23.1?
19     MR. HASLAM: Oh, it is 23. 23.1,
20 please, thank you.
21     (Exhibit 9 was marked for identification
22 and is attached to the transcript.)
23 Q   This is a message from the Patent Office
24 mailed November 3rd, 2009, in connection with that
25 same application we just looked at. And this

**Page 38**

1  decision noted here indicates that the request to
2  revive was dismissed.
3     Do you recall that there was one
4  instance which, because you had not attached an --
5  a Power of Attorney, that the application to
6  revive was denied, or dismissed?
7  A   I don't recall that.
8     MR. HASLAM: Can we have Tab 25. We'll
9  want this as Exhibit 10.
10    (Exhibit 10 was marked for
11 identification and is attached to the transcript.)
12 Q   This is a filing with the Patent Office
13 that is time stamped as having been received by
14 the Patent Office on April 29, 2010. It's a Power
15 of Attorney and this gives Power of Attorney to
16 Daniel Burke.
17    I know I asked you about Mr. Burke
18 before, but does this refresh your recollection
19 that sometime in 2010 the files relating to
20 Vivato Networks were transferred for handling to a
21 Mr. Burke?
22 A   Yeah, I -- I'm not sure when I left
23 Bullivant, so I'm not sure whether that would have
24 been before or after I was out the door.
25 Q   Okay. There was a time at which you

**Page 39**

1  left Bullivant, you're just not sure when?
2  A   Yeah.
3  Q   Am I -- and do you recall having any
4  conversations with Mr. Burke after the files were
5  transferred to Mr. Burke concerning the
6  circumstances surrounding why any of the
7  applications that had been abandoned in the
8  Vivato Networks' portfolio had been abandoned?
9  A   I don't recall.
10     MR. WANG: Objection. Privilege.
11 Q   You don't recall doing that?
12 A   I don't recall talking to Dr. --
13 Mr. Burke, no.
14 Q   Do you recall having had any
15 conversations with a Mr. Ambrose concerning the
16 Vivato Networks' portfolio?
17 A   I don't recall that.
18 Q   I'll ask you this one final time.
19     Between the time you received the files
20 relating to the Vivato Networks' patent
21 applications and patents and the time that the
22 files were transferred for handling to Mr. Burke,
23 did you ever have any discussions with
24 Thomas Sidley at Aequitas Capital or
25 Aequitas Equipment Finance concerning the

**Page 40**

1  circumstances surrounding why patent applications
2  in the Vivato Networks Holdings' portfolio had
3  gone abandoned?
4  A   I don't recall ever directly talking to
5  him.
6  Q   Given that -- I think you testified that
7  the attempts to revive the abandoned applications
8  in the Vivato Networks' portfolio that you were
9  handling was the first time you recall dealing
10 with revival of abandoned applications, other than
11 discussions with your colleague at Bullivant, did
12 you do any research or talk to anybody else about
13 reviving abandoned applications?
14     MR. WANG: Objection. Calls for
15 privilege.
16 Q   You can answer.
17 A   Yeah, I assume I would have done some
18 outside research at least.
19 Q   Do you recall -- apologies if I asked
20 this.
21     Was the colleague that you were
22 discussing the issues related to the
23 Vivato Networks Holdings' portfolio, was he a
24 corporate attorney?
25 A   Yes, I believe so.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052647
XR-EDTX1-00052637

**Page 41**

1  MR. HASLAM: That's all I have. Thank
2  you very much for your time. I think other
3  counsel may have some questions.
4  MR. WANG: Thank you, Mr. Schwedler.
5  We've been going for more than an hour. If it's
6  okay with you, could we take a five- or 10-minute
7  break and then continue?
8  THE WITNESS: Yeah, sure.
9  MR. WANG: Okay. If it's fine with
10 everyone, I think five minutes or whatever you
11 prefer, Mr. Schwedler.
12 THE WITNESS: Five minutes would be
13 fine.
14 MR. WANG: Let's go off the record.
15 THE VIDEOGRAPHER: Off record, 5:12.
16 (A recess was taken.)
17 THE VIDEOGRAPHER: On record, 5:19.
18 EXAMINATION BY COUNSEL FOR PLAINTIFF
19 BY MR. WANG:
20 Q  Welcome back, Mr. Schwedler.
21    How many years have you been a patent
22 prosecutor?
23 A  Have I been a patent prosecutor?
24 Q  Yes.
25 A  I think I registered in 1995.

**Page 42**

1  Q  And for how many years did you practice
2  as a patent prosecutor?
3  A  Until about 2015.
4  Q  So for about 20 years, correct?
5  A  20 years, sure.
6  Q  Right.
7     And in 1995 was when you were -- you
8  were admitted to the Patent Bar and you got a PTO
9  registration number?
10 A  Yeah, got to register.
11 Q  And in those 20 years, have you ever
12 been subject to any disciplinary proceedings
13 before the PTO?
14 A  I don't think so. There is -- I stopped
15 practicing, and there was a client who had filed a
16 complaint, but I don't think there was
17 proceedings.
18 Q  Okay. So you're aware that patent
19 attorneys have a duty of candor with the Patent
20 and Trademark Office, correct?
21 A  Yes.
22 Q  And at all times in your career did you
23 take those obligations seriously in your
24 communications with the Patent and Trademark
25 Office?

**Page 43**

1  A  Certainly.
2  Q  You're aware that I represent the
3  current Patent Owner, XR, of the patents that
4  arose from some of the applications that we've
5  talked about?
6  A  Yes, I know that.
7  Q  And you're aware that Mr. Haslam
8  represents Aruba, who is an accused infringer of
9  some of these patents, correct?
10 A  Yes.
11 Q  And are you aware that Aruba in this
12 litigation has made the allegation that you,
13 Mr. Schwedler, committed inequitable conduct
14 before the Patent and Trademark Office?
15 A  No.
16 Q  In your -- today we looked at several
17 Petitions for Revival that were submitted to the
18 Patent and Trademark Office. Do you recall that?
19 A  Yes.
20 Q  And in those documents you signed your
21 name, you included your Patent and Trademark
22 number, and you made certain representations to
23 the Patent and Trademark Office. Do you recall
24 that?
25 A  Yes.

**Page 44**

1  Q  Including about the prior abandonment of
2  certain applications being unintentional, correct?
3  A  Yes.
4  Q  When you submitted those documents, did
5  you have -- strike that.
6     When you submitted those documents, were
7  they based on your best information at the time?
8  A  Yes, certainly.
9  Q  And were they based on a reasonable
10 investigation into what you needed to know to make
11 those representations?
12 A  Yes, certainly.
13 Q  Did you ever intend to deceive the
14 Patent and Trademark Office in making those
15 submissions?
16 A  No, never.
17 Q  Did you ever have -- did you ever have
18 or receive any information contrary to the
19 representations that you made?
20 A  No.
21 Q  Did you ever receive any information
22 that the patent applications that we've been
23 talking about were deliberately abandoned? In
24 other words, that they were abandoned on purpose?
25 A  No, no, that was contrary to my

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052648
XR-EDTX1-00052637

### 45

1  understanding.
2  Q  Your understanding was that the patents
3  were -- if certain ones were abandoned, it was
4  unintentional?
5  A  Absolutely, yes.
6  Q  Through all relevant periods that were
7  subject to the certifications that you made?
8  A  Yes, yes, certainly.
9     MR. HASLAM: Objection. Leading. Move
10 to strike for the purposes of interposing the
11 objection.
12 Q  And so, for example, Mr. Schwedler,
13 you --
14    MR. WANG: Excuse me, Mr. Haslam.
15 Q  For example, Mr. Schwedler, you never
16 received any information that applications were
17 intentionally abandoned because the Office Actions
18 could not be overcome?
19 A  No, no.
20 Q  And you never received any information
21 that certain applications were abandoned because
22 it was decided they were not patentable, ever?
23 A  No, never received that information.
24 Q  You never received any information that
25 certain applications were abandoned because they

### 46

1  were -- they lacked sufficient commercial value to
2  justify continued prosecution?
3  A  No.
4  Q  Never?
5  A  Never.
6     (Court Reporter clarification.)
7  Q  Mr. Schwedler, earlier today Mr. Haslam
8  or you talked about possibly talking to the
9  inventors of the applications. Do you recall
10 that?
11 A  I didn't understand that question, could
12 you repeat it?
13 Q  Do you recall earlier testimony about
14 possibly speaking to the inventors of the
15 applications at issue?
16 A  I remember talking about that, yes.
17 Q  Is it fair to say that if you needed
18 information, direct information from the inventors
19 in order to make your certifications, you would
20 have gotten that information before making the
21 certifications?
22 A  Yes.
23    MR. HASLAM: Objection. Calls for
24 speculation.
25 Q  So whatever additional information that

### 47

1  might have been -- that might have come from the
2  inventors were not necessary for you to make those
3  submissions to the Patent Office?
4     MR. HASLAM: Objection. Leading.
5  A  I believe that anything relevant would
6  have been communicated through the managing
7  partner of the case -- of the files. In Portland.
8  Q  You had mentioned that your internal
9  contact within your firm was a corporate attorney.
10 Do you remember that?
11 A  Yes.
12 Q  And you would not be relying on that
13 attorney to make any legal conclusions about your
14 obligations as a patent prosecuting attorney,
15 correct?
16 A  No, I would have looked for him -- no.
17 Q  You would have gotten factual
18 information from that attorney and then made your
19 own conclusions, correct?
20 A  Yes. Yes.
21 Q  Have you ever been found to have
22 committed inequitable conduct throughout your
23 20-year career as a patent prosecutor?
24 A  No.
25 Q  Finally, Mr. Schwedler, I wanted to ask,

### 48

1  when did you stop doing this work, or stop
2  prosecuting?
3  A  Around 2015, '16. My Parkinson's became
4  -- my Parkinson's disease progressed that I
5  couldn't practice anymore.
6  Q  Okay. I'm sorry to hear that. And
7  you're still dealing with that disease now?
8  A  Yes.
9     MR. WANG: With that, I have nothing
10 further. Thank you, Mr. Schwedler.
11    MR. HASLAM: I have just a few
12 follow-up.
13    FURTHER EXAMINATION BY COUNSEL FOR ARUBA
14 BY MR. HASLAM:
15 Q  You were asked some questions about your
16 investigation before filing the Petitions to
17 Revive. I just want to go over that.
18    So one of things you did is you talked
19 to the corporate attorney in the Portland office
20 who was the corporate attorney for Aequitas,
21 correct?
22 A  Yes.
23 Q  You did not talk to the prior counsel
24 who had been prosecuting the patents at the time
25 they went abandoned, correct?

### Page 49

1  A  I do not remember doing that, no.
2  Q  You did not talk to anyone at Aequitas
3  about information they may have known about why
4  the patents went abandoned?
5  A  Only indirectly, through the corporate
6  attorney.
7  Q  Only through the corporate attorney.
8     You said you may have done some
9  research. You did not find a case, did you, that
10 said that non-payment leading to abandonment made
11 the abandonment unintentional; isn't that correct?
12    MR. WANG: Objection.
13 A  I don't recall.
14    MR. WANG: Privilege.
15 Q  I'm sorry, did I hear an answer?
16 A  I don't recall.
17 Q  After the files were turned over to
18 Mr. Burke, do you recall having any conversation
19 with anybody at XR Communications about anything,
20 any information that you may have had as to why
21 the patent applications in the Vivato Networks'
22 portfolio had gone abandoned?
23 A  I don't recall that. And again, I'm not
24 sure about the timing about when I left Bullivant.
25 Q  Why did you stop the practice of law?

### Page 50

1  A  Parkinson's disease.
2  Q  Were there any other reasons?
3  A  No. That was a good enough one.
4  Q  Okay.
5     MR. HASLAM: I have no further
6  questions.
7     MR. WANG: I just have a couple.
8  FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
9  BY MR. WANG:
10 Q  Mr. Schwedler, are you being compensated
11 for your testimony here today?
12 A  There was -- there was conversation
13 about, but I don't think I signed agreements to
14 it.
15 Q  And did -- did Aruba's counsel at
16 Covington Burling first reach out to you about
17 your testimony today?
18 A  Yeah, they're the ones who first reached
19 out to me.
20 Q  And when was that?
21 A  Oh, gosh, it was a while ago. Maybe a
22 month ago. I've got emails, I could ...
23 Q  Okay. And who did you have
24 conversations with at Covington & Burling?
25 A  Those are only -- I'd have to look at

### Page 51

1  the email; I don't remember his name.
2  Q  Was it Mr. Sharma?
3  A  Yes, I think that's right.
4  Q  About how many conversations have you
5  had with Mr. Sharma?
6  A  At least a couple.
7  Q  Did Mr. Sharma ever reveal to you that
8  his firm and his client were alleging that you
9  committed inequitable conduct in patent --
10 A  Absolute -- absolutely not. No hint or
11 suggestion.
12 Q  Assuming that they are making
13 allegation, do you find that his communications
14 with you were misleading?
15 A  Yeah, bordering on dishonorable.
16 Q  How many phone calls have you had with
17 Mr. Sharma?
18 A  I think at least two. He left a couple
19 of messages -- I wouldn't consider them
20 conversations -- about this.
21 Q  And about how many email exchanges have
22 you had with him or his firm?
23 A  Several. Several.
24 Q  More than three?
25 A  Yes, yes.

### Page 52

1  Q  And I assume that during one of the
2  first communications with Mr. Sharma, he or his
3  firm offered to compensate you for your testimony?
4  A  Yes.
5  Q  And that was something that he brought
6  up in the first instance, correct?
7  A  Absolutely.
8     MR. WANG: With that, I have nothing
9  further.
10    MR. HASLAM: Just one or two follow-up.
11 FURTHER EXAMINATION BY COUNSEL FOR ARUBA
12 BY MR. HASLAM:
13 Q  Many of the emails you exchanged with
14 Mr. Sharma were trying to set up or arrange a time
15 you might be able to talk; is that correct?
16 A  That's correct.
17 Q  The emails themselves were not
18 substantive communications, correct?
19 A  Not the emails, no.
20 Q  You had what, one or two conversations
21 with Mr. Sharma?
22 A  Yeah.
23 Q  And he asked you questions similar to
24 the ones I asked you today, correct?
25 A  No.

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052650
XR-EDTX1-00052637