# EXHIBIT H

```
                                                    1
 1         UNITED STATES DISTRICT COURT
 2         CENTRAL DISTRICT OF CALIFORNIA
 3  ---------------------------------x
 4  XR COMMUNICATIONS, LLC, dba VIVATO :
 5  TECHNOLOGIES,                      :
 6            Plaintiff,               :
 7       v                             : Case No.:
 8                                     : 8:17-CV-00596-DOC
 9  D-LINK SYSTEMS, INC., et al.,      :
10            Defendants.              :
11  ---------------------------------x
12
13       Videotaped Deposition of DANIEL BURKE
14               Conducted Virtually
15              Tuesday, July 26, 2022
16                  11:05 a.m. EDT
17
18
19
20
21
22
23  Job No.: 457682
24  Pages: 1 - 116
25  Reported by: Dianna C. Kilgalen
```

```
                                                    2
 1       Videotaped Deposition of DANIEL BURKE,
 2  conducted virtually with all parties attending
 3  remotely.
 4
 5
 6          Pursuant to Notice, before Dianna C.
 7  Kilgalen, Notary Public in and for the State of
 8  Maryland.
```

```
                                                    3
 1              A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF, XR COMMUNICATIONS,
 3  LLC, DBA VIVATO TECHNOLOGIES:
 4       PHILIP X. WANG, ESQUIRE
 5       RUSS AUGUST & KABAT
 6       12424 Wilshire Boulevard
 7       Los Angeles, California 90025
 8       310.826.7474
 9  ON BEHALF OF THE DEFENDANT, ARUBA NETWORKS,
10  LLC:
11       ROBERT HASLAM, ESQUIRE
12       KEE YOUNG LEE, ESQUIRE
13       LAURA BRODKIN, ESQUIRE
14       COVINGTON & BURLING LLP
15       850 Tenth Street, Northwest
16       OneCity Center
17       Washington, DC 20001
18       202.662.6000
19  ON BEHALF OF THE DEFENDANTS, BELKIN
20  INTERNATIONAL, INC. and NETGEAR, INC.:
21       SAJID SALEEM, ESQUIRE
22       DUANE MORRIS LLP
23       1075 Peachtree Street, NE, Suite 2000
24       Atlanta, Georgia 30309
25       404.253.6900
```

```
                                                    4
 1         A P P E A R A N C E S  C O N T I N U E D
 2  ON BEHALF OF THE DEPONENT:
 3       AARON BARHAM, ESQUIRE
 4       FURMAN, KORNFELD & BRENNAN
 5       Wall Street Plaza
 6       88 Pine Street
 7       32nd Floor
 8       New York, New York 10005
 9       212.867.4100
10
11  Also present:
12       Malcolm Cooke,
13       Planet Depos AV Technician
14       Drew Halton, Videographer
```

Page 5

```
            CONTENTS
EXAMINATION OF DANIEL BURKE              PAGE
By MR. HASLAM:              7, 108
By MR. WANG:                91

            EXHIBITS
BURKE DEPOSITION EXHIBIT                 PAGE
1    Aruba_0032751-794           48
2    Aruba_0032799 and 800       55
3    Aruba_0032496-498           57
4    Aruba_0032805-866           57
5    Aruba_0032871-874           71
```

Page 6

THE VIDEOGRAPHER: Here begins disk number one in the video deposition of Daniel Burke in the matter of XR Communications, LLC dba Vivato Technologies versus D-Link Systems, Inc., et al., in the U. S. District Court, Central District of California, Civil Action Number 8:17-CV-00596-DOC.

Today's date is July 26, 2022. The time on the video monitor is 11:05 a.m. eastern. The videographer is Drew Halton for Planet Depos. All participants are attending remotely.

Would counsel please voice identify themselves and state whom they represent?

MR. HASLAM: Bob Haslam from Covington & Burling representing Aruba Networks, and with me is Kee Young Lee.

MR. WANG: Philip Wang from the law firm of Russ, August & Kabat representing the plaintiff XR Communications dba Vivato Technologies.

MR. SALEEM: Sajid Saleem from Duane Morris representing Defendant Belkin International, Inc. and Netgear.

THE VIDEOGRAPHER: The court reporter is Dianna Kilgalen representing Planet Depos. Would

Page 7

the reporter please swear in the witness?

MR. BARHAM: I will just introduce myself. Aaron Barham with Furman, Kornfield & Brennan. I'm representing Mr. Burke today.

PROCEEDINGS

DANIEL BURKE, having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT ARUBA NETWORKS, INC.

BY MR. HASLAM:

Q. Good morning Mr. Burke. You are appearing here today for this deposition pursuant to subpoena. Is that correct?

A. Yes.

Q. You are represented by counsel today? Is that correct?

A. Yes.

Q. Prior -- let me ask you this: At one point in time, you were represented by counsel for the Plaintiff XR Communications in connection with this deposition, correct?

A. Yes.

Q. How did that representation come about?

A. I contacted them and I asked them if they would be representing me or if they would

Page 8

represent me and they agreed.

Q. Does XR's counsel currently represent you in connection with this deposition?

A. No.

Q. When did that change occur?

A. **I think maybe within an hour before Mr. Wang sent an e-mail to counsel informing them that they no longer represented me. It might have been less, but I think an hour is safe.**

Q. Was the decision to change counsel yours or XR's counsel?

A. **Can you break that down? I don't -- I don't understand the way it's worded.**

Q. Okay. You -- at one point in time in connection with this deposition, you were represented by counsel for XR Communications, Russ Kabat, right?

A. **That's correct.**

Q. You are no longer represented by them in connection with this deposition, correct?

A. Yes.

Q. And I understand that it was your decision to change counsel, correct?

A. Yes.

Q. Okay. Have you been deposed before?

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052263
XR-EDTX1-00052261

9

1  A. Yes.
2  Q. So I will dispense with any lengthy
3  discussion. I will say that I will be asking you
4  questions today. As the -- you were told at the
5  beginning, if you will let me finish my
6  questions, I will let you finish your answers.
7     There is no judge here today. So if
8  your counsel or someone makes an objection, you
9  can answer the question subject to the objection,
10 unless you have been instructed not to answer by
11 your counsel, in which case I will assume you are
12 going to follow your counsel's instruction.
13    If you don't understand a question,
14 please let me know, and if you could tell me what
15 it is you don't understand, I will try to
16 rephrase my question so you do understand it.
17    Can you do those things for me?
18 A. I won't have you reread what you -- your
19 litany there, but I have been deposed before.
20 Q. All right. Let me ask this: Was there
21 anything I stated in my preparatory comments
22 there that caused you any trouble or you thought
23 wasn't something you could agree to?
24 A. I don't think so, know.
25 Q. Okay. Do you currently represent XR

10

1  Communications today in any capacity?
2  A. No.
3  Q. Okay. When were you -- if you recall,
4  when were you first retained to act on behalf of
5  XR Communications?
6  A. I don't remember.
7  Q. Who contacted you to discuss
8  representation of XR Communications?
9  A. I don't recall. I don't recall their
10 names. Let's put it that way.
11 Q. Was the -- you said you don't recall
12 their names. Was it more than one person who
13 contacted you in connection with your
14 representation of XR Communications?
15 A. I have a weak recollection. If I'm
16 getting the client correct, I recall two men
17 contacting me regarding acquiring some patent
18 properties, and they wanted to know if I could
19 help them, and I said I could.
20 Q. And prior to that conversation with
21 those two gentlemen, had you ever done any work
22 for them in any capacity?
23 A. No. And let's -- you know, the
24 recollection on the conversation with those two
25 and that's a little weak. But that's -- but no.

11

1  The answer is I didn't know these guys and I had
2  never met them as far as I know.
3  Q. If I throw some names out, let me know
4  if these refresh your recollection. Was
5  Mr. Hansen, Kai Hansen, one of the people who
6  contacted you?
7  A. The name is vaguely, vaguely familiar,
8  but I couldn't say he was one of them.
9  Q. Do you recall talking to Mr. Hansen at
10 any time during your representation of XR
11 Communications?
12 A. I couldn't say. I couldn't say. I
13 don't remember any names really. I mean, it
14 could have been him. But I mean, to me, that
15 name's familiar, but it almost could be like
16 somebody that appeared in a movie, you know.
17 That is kind of the degree of recollection.
18 Q. Okay. How about Adrian Chraplyvy?
19 A. The name doesn't ring a bell. I mean,
20 Adrian rings a bell. The last name doesn't ring
21 a bell at all.
22 Q. How about Adrian Zajac?
23 A. That name rings a bell.
24 Q. Had you done any work for Mr. Zajac
25 before?

12

1  A. No.
2  Q. What were you asked to do --
3  A. Not that I recall, but I don't think so.
4  Q. When you were retained, what was it you
5  were asked to do?
6  A. I was asked to help -- they wanted to
7  acquire -- as I recall, they wanted to acquire
8  some patent properties. I'm using that term --
9  it's not really a term of art.
10    But I don't remember whether it was
11 patents or applications, but it was -- had do
12 with patent properties. Let me use that term
13 today. They just -- they wanted to acquire them.
14 That was -- that was the initial -- that was the
15 initial thing, and -- that was it.
16 Q. After you were retained, were you
17 provided any documentation relating to any patent
18 properties, whether they were patents or patent
19 applications?
20 A. If I remember it correctly, and this
21 recollection, you know, I will just say it one
22 more time and then I will stop saying it, the
23 recollection is very weak.
24    What I recall is that I was given a
25 draft of a document that was supposed to effect

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052264
XR-EDTX1-00052261

## 13

1  this transaction. And if I remember right, when
2  I loaded that document, it had nothing to do with
3  what they wanted to do. I mean, by analogy, it
4  was almost as if somebody came to me to buy a
5  house and then the first draft they gave me was a
6  car lease.
7       It was like this just -- this has no
8  connection with what you are telling me you want
9  to do. That's what I recall.
10  Q.  And what transpired after that
11 recognition by you?
12  A.  I worked on it.
13  Q.  Do you recall the name of the entity or
14 person from whom XR Communications intended to
15 acquire the patent properties?
16  A.  No.
17  Q.  Does the name Aequitas Equipment Finance
18 sound familiar?
19  A.  It does.
20  Q.  To the best of your recollection, is
21 that the entity from whom XR Communications was
22 going to acquire the patent portfolio?
23  A.  I really don't know.
24  Q.  Did you ever talk to a Mr. Tom Sidley
25 during your -- during the time that you

## 14

1  represented XR Communications?
2  A.  I don't know.
3  Q.  If I told you that Mr. Sidley was
4  somebody affiliated with Aequitas Equipment
5  Finance, LLC, would that help refresh your
6  recollection?
7  A.  No. When I say I don't know, it means,
8  you know, I don't remember. So I just -- no, it
9  doesn't.
10  Q.  Okay. In connection with your work with
11 XR Communications, do you recall ever contacting
12 or discussing anything about the patent
13 properties with anyone affiliated with an
14 Aequitas Capital Management or Aequitas Equipment
15 Finance?
16  A.  I just don't remember.
17  Q.  And by you don't remember, are you
18 saying you don't remember that occurring or you
19 don't remember one way or the other?
20  A.  I don't understand the distinction you
21 are trying to make in your question.
22  Q.  Well, if I ask you if you have been to
23 Moscow and you say you don't recall, it could
24 mean you don't recall ever going to Moscow, or it
25 could be I traveled to Russia. I don't remember

## 15

1  whether I went to Moscow or not. It's that
2  distinction I'm asking for.
3       With that clarification --
4  A.  Hold on. Let me just try to understand
5  your clarification.
6  Q.  Let me withdraw it and say it this way.
7  I'm asking -- what I'm trying to ask you is are
8  you telling me you don't think you ever had any
9  conversations with anyone affiliated with
10 Aequitas, or you don't -- you don't remember but
11 you may have or may not have?
12      MR. BARHAM:  I object to the form of the
13 question to the extent that it conflicts with the
14 prior testimony, but you can respond.
15  A.  Are you asking -- you are asking a
16 compound question. I could have answered the
17 first half of it easily. I'm not saying I
18 didn't. I'm definitely not saying I didn't.
19      I'm saying I don't remember. So I very
20 well may have. And just sitting here, you know,
21 many years later, I just don't remember. But
22 that -- I can't say I did. I can't say I did or
23 I didn't.
24 BY MR. HASLAM:
25  Q.  Okay. Thank you for the clarification.

## 16

1  And I take it because you don't know whether you
2  did or didn't, if you did, can you tell me what
3  you believe might have been the subject matter
4  that you discussed with anyone from Aequitas?
5       MR. BARHAM:  Object to form. You can
6  answer.
7  A.  Can I have that question back, please?
8  Q.  Yes. Given that you are not sure one
9  way or the other whether you may have had
10 conversations with someone from Aequitas, I'm now
11 just asking you if you did, do you recall what,
12 if anything, you discussed with anyone affiliated
13 with Aequitas?
14      MR. WANG:  Objection to form. Calls for
15 speculation.
16  A.  I don't remember having any
17 conversations with anybody there, it's -- with
18 anybody. You know, I don't remember working with
19 Aequitas or representing Aequitas. So I just
20 don't remember.
21      You know, I could speculate, but I
22 don't -- I don't think that's going to really do
23 anybody any good here.
24 BY MR. HASLAM:
25  Q.  I don't want you to speculate. If you

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052265
XR-EDTX1-00052261

---

17

1 have, however, a vague recollection, I would
2 appreciate having that, but if it's just
3 guesswork, then I don't want it. It doesn't do
4 anyone any good.
5   A.  Mr. Haslam, I'm sorry. I just don't
6 have any recollection.
7   Q.  Okay. At some point in connection with
8 your representation of XR Communications, did you
9 receive any files relating to any patents or
10 patent applications?
11   A.  I don't know. I don't recall.
12   Q.  Other than reviewing this draft of a
13 document that you were told related to the
14 transaction by which XR Communications intended
15 to acquire some patent portfolios, do you recall
16 reviewing any other documents in connection with
17 your representation of XR Communications?
18   A.  Like I said, I worked on the -- there
19 was an agreement to acquire those patent
20 properties. So I don't think it's a stretch too
21 far to think, you know, there were multiple
22 drafts.
23         You know, when I do a document, there's
24 always drafts. You know, I do drafts. I go over
25 it, you know. I'm constantly revising it. So I

18

1 believe, you know, it's a weak recollection, but
2 I think I worked on that but I don't remember
3 reviewing anything else.
4   Q.  Okay. At some point in time in
5 connection with your work for XR Communications,
6 you received files relating to the prosecution of
7 patent applications, correct?
8   A.  I don't recall receiving anything.
9   Q.  You reviewed the prosecution files for
10 certain applications that XR Communications was
11 acquiring, correct?
12       MR. BARHAM:  Objection. You can answer.
13   A.  I don't recall reviewing anything like
14 that, the patent prosecution files.
15   Q.  Do you recall in connection with your
16 work for XR Communications that you learned at
17 some point in time that certain patent
18 applications had gone abandoned?
19       MR. BARHAM:  Objection to form. You can
20 answer.
21   A.  I didn't hear a question.
22   Q.  Do you recall that at some point in time
23 during your representation of XR Communications
24 you became aware that at least one patent
25 application, among those acquired by XR

19

1 Communications, had gone abandoned?
2   A.  No. I don't remember.
3   Q.  You have absolutely no recollection of
4 having worked on reviving a patent application
5 that had gone abandoned? Did you hear my
6 question?
7   A.  Again, could the court reporter read it
8 back? I don't think it was a question.
9   Q.  I will ask it again then. I will ask it
10 again. Isn't it true that during your work for
11 XR Communications, you became aware that a patent
12 application acquired by XR Communications had
13 gone abandoned?
14       MR. BARHAM:  Object to form. You can
15 answer.
16   A.  I'm not trying to give you a hard time,
17 but let's not go with is it not true. All right?
18 There are too many negatives in there. I think
19 it's confusing. It's often interpreted not
20 literally, but we are trying to have a very clear
21 record.
22   Q.  All right. I will ask another question.
23 You worked on a patent application owned by XR
24 Communications in which the application had gone
25 abandoned, correct?

20

1   A.  I don't recall. I recall working on
2 some applications for XR, but I don't recall any
3 details.
4   Q.  I take it from your answer so far that
5 you have not looked at any files that you or your
6 firm may have concerning your work with XR
7 Communications. Is that correct?
8   A.  Somebody from your firm, I believe it
9 was Mr. Sharma, when he contacted me and we spoke
10 a few times, sent me an e-mail with an attachment
11 and I sort of paged through it. I didn't read
12 it. I think that had to do with reviving an
13 application.
14   Q.  Did that refresh your recollection at
15 all, that e-mail and attachment from Mr. Sharma?
16   A.  No.
17       MR. HASLAM:  Can I have I think it's
18 what's Tab 4 in the documents that I have
19 uploaded to the court reporter? And can you give
20 the witness control of this document?
21       AV TECH COOKE:  If you click on the
22 screen, Mr. Burke, you should have control of the
23 document.
24       THE WITNESS:  It's not my computer. So
25 I'm going slow here. I will let my counsel --

### 21

```
 1   that will change the page, but how do I -- okay.
 2   Just give us a second.  We are just getting it.
 3          MR. HASLAM:  Take your time.
 4          THE WITNESS:  Thanks.  How do I page
 5   down?
 6          MR. HASLAM:  If you scroll.
 7          THE WITNESS:  Just scroll?  Okay.
 8          MR. HASLAM:  Or you can click on it and
 9   take it up.  There you go.
10          THE WITNESS:  Okay.  Okay.  What was
11   your question to me?
12          MR. HASLAM:  I just wanted you to take a
13   look at this.  I now have some questions for you.
14   BY MR. HASLAM:
15      Q.  Have you ever seen this document before?
16      A.  No.
17          MR. HASLAM:  Okay.
18      A.  I don't believe so.
19      Q.  Okay.  You will notice on the first page
20   here that this is a document that was filed in
21   connection with an application serial number
22   10/700,329.  That is the application that most,
23   if not all of my questions today will relate to.
24          You will notice that this is a
25   revocation of a Power of Attorney with a new
```

### 22

```
 1   Power of Attorney and change of correspondence
 2   filed appointing a Mr. Brooks as counsel for the
 3   patent owner at this point in time.
 4          Have you ever talked to Mr. Brooks,
 5   Edward J. Brooks, III?
 6      A.  I don't know.
 7      Q.  Do you recall ever talking to Mr. Brooks
 8   in connection with any of your work for XR
 9   Communications?
10          MR. BARHAM:  Objection.  You can answer.
11      A.  I don't remember.
12      Q.  What did you talk to Mr. Brooks about if
13   you talk -- if you ever had a conversation with
14   him?
15          MR. BARHAM:  Objection.  You can answer.
16   I will say if you have a recollection, you can
17   say to the best of your ability.  But as I stated
18   before, don't guess because that is not helpful
19   for anyone.
20   BY MR. HASLAM:
21      Q.  Do you have an answer?
22      A.  I'm -- I'm just trying -- I'm just
23   trying to understand the question in light of my
24   -- in light of our last question and answer.  You
25   know, I think my previous response was I don't
```

### 23

```
 1   remember ever speaking to him.
 2          MR. HASLAM:  Okay.
 3      A.  Not that you would ever try to trick me,
 4   but --
 5      Q.  When you say you don't know one way or
 6   the other, I'm just going to push you or probe
 7   you.
 8      A.  I understand.
 9          MR. HASLAM:  To make sure I find out
10   that later on, you are not going to pop up and
11   say oh, I do remember a conversation with so and
12   so.  Now I am going to push you.  I'm going to
13   push you a little bit when you say that.  I just
14   want you to understand that.  I'm not trying to
15   trick you.  That is why I'm doing it?
16      A.  Okay.  This document does not refresh my
17   recollection as to any conversations with a
18   Mr. Brooks.
19      Q.  Okay.  If you will scroll down a little
20   bit to the page -- I think it's this page here at
21   the bottom?
22      A.  I'm sorry.  Which one?  I started
23   scrolling.
24      Q.  The one you are on, the one that is on
25   the screen now.  If you will scroll down, there
```

### 24

```
 1   is a signature and a name of the person preparing
 2   this right there.  Signature of applicant or
 3   assignee of record.  There is a signature and
 4   under that the name of Gary Haycox, H-A-Y-C-O-X.
 5          Do you recall ever having any
 6   conversations with a Gary Haycox in connection
 7   with your work for XR Communications?
 8      A.  I can't read the document well, but in
 9   light -- for your question, I do not recall
10   having a conversation with a Gary Haycox.
11      Q.  Do you recall having any conversations
12   with anyone who works for or represented an
13   entity by the name of Vivato Networks?
14      A.  Forgive me, but isn't -- isn't that what
15   XR's going by now?
16      Q.  It is.  Did you ever have any
17   conversations with anyone who worked for or was
18   affiliated with Catcher, a company by the name of
19   Catcher Holdings?
20      A.  No.
21      Q.  Did you ever have any conversations or
22   communications with anyone who worked for or was
23   affiliated with a company by the name of Catcher?
24      A.  I need to correct my last response,
25   because I don't -- you were doing do I recall.  I
```

### 25

1  don't know whether I had these conversations. I
2  just don't remember. So I don't remember having
3  conversations, whether I had conversations with
4  anybody that you referred to in the last two
5  questions.
6      MR. HASLAM: Okay.
7   A.  I'm not going to say I didn't, but I
8  sure as heck don't remember that I did not.
9   Q.  Likewise, you don't remember that you
10 did?
11  A.  That's correct.
12  Q.  I won't ask this question again. If I
13 were to ask you assuming you did have
14 conversations, can you tell me what they were,
15 your answer would be since I don't recall having
16 the conversations one way or the other, I don't
17 know what, if anything, was discussed?
18  A.  That's correct.
19  Q.  Thank you. Did you ever have any
20 conversations with anyone who worked for or
21 represented a company named Vivato Networks
22 Holdings, Incorporated?
23  A.  I don't know. I just don't remember. I
24 mean, I don't know. I can't distinguish
25 between -- I mean, I know you have used the name

### 26

1  Vivato, and maybe there are various iterations of
2  it.
3      I have no basis for distinguishing one
4  from the other. I sure don't have that straight
5  if there are -- I believe there's more than one,
6  but --
7   Q.  What is it that leads you to believe
8  there is more than one?
9   A.  Didn't you just ask me about them before
10 without holdings and then you asked with the
11 holdings?
12     MR. HASLAM: Yes.
13  A.  That's the basis.
14  Q.  Well, during the time that you
15 represented XR Communications, did you become
16 aware that there were entities going by the name
17 of -- with Vivato in the name prior to XR --
18     AV TECH COOKE: I'm sorry. Counsel, we
19 are not on the video record. I think the
20 videographer got dropped from the call. If you
21 want to go off the record.
22     MR. HASLAM: Let's go off the record.
23     AV TECH COOKE: I guess he can't lead us
24 off. It's like 11:36.
25     (Thereupon, there was a recess taken at

### 27

1  11:36 a.m.)
2      (Thereupon, the proceedings were resumed
3  at 11:39 a.m.)
4      THE VIDEOGRAPHER: On record 11:39.
5  BY MR. HASLAM:
6   Q.  I think when we broke, I think I was
7  asking you at the time we broke other than XR
8  Communications doing business as by Vivato, were
9  you aware that the name Vivato had been used by
10 other companies prior to the acquisition of the
11 patent properties by XR Communications?
12  A.  I don't remember.
13     MR. HASLAM: Can I have pulled up I
14 think what's Tab 10, Brooks Exhibit 7? And
15 again, can we give control of the document to the
16 witness?
17     AV TECH COOKE: You should have control
18 if you click your screen.
19     MR. WANG: I'm sorry to interrupt. I
20 haven't gotten a copy of the exhibits. If they
21 could be provided like in previous depositions,
22 that would be helpful.
23     AV TECH COOKE: Sure. I can provide a
24 OneDrive link with marked exhibits in just one
25 moment.

### 28

1  I just can't control my computer while
2  it's being remote controlled. Of course, take
3  your time, Mr. Burke, but I will do so after the
4  witness is done with this document.
5   A.  I have taken a quick look at it. If you
6  want me to do more, I will be happy to.
7  BY MR. HASLAM:
8   Q.  No. I will ask you -- I will ask you
9  some questions, and if in response to my
10 questions, you want to go back and review the
11 document, feel free to do so.
12     Do you recognize this as a form document
13 from the Patent and Trademark Office?
14  A.  No.
15  Q.  Do you recognize the format of the
16 document without -- without regard to the
17 contents of what's in the document?
18  A.  It looks to me like there are two
19 identical documents, and then there is something
20 stamped received by the Patent Office, which
21 makes no sense to me because on the first page
22 that I have on the screen now, it looks like it's
23 something that comes from the Patent Office.
24     So I can't -- I haven't gotten my head
25 around why there would be a received stamp from

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052268
XR-EDTX1-00052261

### 29

1  the patent office. So it's not -- it doesn't to
2  me, Mr. Haslam, it doesn't look like it's one
3  document. And that's -- I scrolled through it
4  initially a couple of times quickly, but I don't
5  know that you want me to spend the time to try to
6  figure out whether there are any differences or
7  why there are two of the same thing, if they are
8  the same thing.
9      MR. HASLAM: No.
10  A.  It's just a little --
11  Q.  Let me ask this: On the page -- on the
12  first page of Brooks 11, sorry -- of Schwedler
13  Exhibit 7, do you recognize that as a form used
14  by the Patent and Trademark Office to communicate
15  with an inventor or an inventor's counsel?
16  A.  Could I have this -- could I have
17  control of the document again?
18      MR. HASLAM: Yes.
19      AV TECH COOKE: You should just if you
20  click.
21      MR. HASLAM: I'm asking right now just
22  about the first page.
23  A.  Okay. Other than -- other than the
24  production stamp on the bottom, it looks like --
25  the first page looks like a PTO cover sheet.

### 30

1  Q.  Okay. And the mail date typically
2  indicates the date that the Patent Office mailed
3  this form, correct?
4  A.  I believe so, yes.
5  Q.  And the date is January 8th, 2009 on
6  this Schwedler Exhibit 7?
7  A.  On this first page, yes.
8  Q.  And up in the upper left-hand part of
9  the document under application number, that
10  typically indicates the particular application
11  that this communication relates to?
12  A.  Yes.
13  Q.  And this one is 10/700,329, correct?
14  A.  That's what it says.
15  Q.  Okay. If you look at the second page,
16  the second page again is a form used by the
17  Patent and Trademark Office, correct?
18  A.  Yes. It -- yes. Again, without the
19  production number, but yes.
20  Q.  And this particular -- this particular
21  page of Schwedler Exhibit 7, page 2, is entitled
22  Notice of Abandonment, correct?
23  A.  That's what it says, yes.
24  Q.  And it's again for Application
25  10/700,329, correct?

### 31

1  A.  Correct.
2  Q.  And it's indicating that the failure to
3  file a timely reply to the office letter mailed
4  on 17 March, 2008, is checked as the reason why
5  this application is now abandoned, correct?
6  A.  That's -- that's what's checked, yes.
7  Q.  Okay. Do you recall reviewing this
8  document in connection with your work for XR
9  Communications?
10  A.  No. I do not recall.
11  Q.  Have you ever dealt with an abandoned
12  application before, either one that went
13  abandoned while you were working on it, or was
14  abandoned prior to the time that you were asked
15  to work on it?
16  A.  Yes.
17  Q.  Other than in connection with XR
18  Communications, have you had experience working
19  on abandoned patent applications?
20  A.  Yes.
21  Q.  How many?
22  A.  I don't know.
23  Q.  When was the first one?
24  A.  I don't know. I have been -- I mean --
25  I was an examiner in '81, and I became an agent

### 32

1  in about '83, '84. So I have been working on
2  patent prosecution since 1984. A long time.
3  Q.  That is a long time. Have you worked on
4  abandoned patent applications while you were a
5  practitioner and not an examiner?
6  A.  Yes.
7  Q.  Do you recall approximately how many?
8  A.  No. But unfortunately, with people
9  being human, stuff happens, and, you know,
10  sometimes you have to revive applications. They
11  have made it a lot easier relatively recently.
12  But that's about all I can -- I mean, I can't --
13  the question is how many, right?
14      MR. HASLAM: Yes.
15  A.  No. I really couldn't even venture a
16  guess.
17  Q.  You said in that answer that they have
18  made it a lot easier. During the time period
19  2009/2010, do you recall what the requirements
20  were for reviving an abandoned patent
21  application?
22  A.  I don't.
23  Q.  Did you have a practice or policy as to
24  how you proceeded with attempting to revive an
25  abandoned patent application in the time period

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052269
XR-EDTX1-00052261

---

Page 33

```
 1  2009/2010?
 2    A.  By the same practice I do apply with
 3  everything.
 4    Q.  And what is that?
 5    A.  Follow the rules.  If you don't know the
 6  rules, look up the rules and then follow the
 7  rules.
 8    Q.  As you sit here today, do you recall
 9  what the rules are for reviving a patent, an
10  abandoned patent application?
11        MR. BARHAM:  Objection.  You can
12  respond.
13    A.  Are you talking about now or back then?
14  BY MR. HASLAM:
15    Q.  Back then in the 2009/2010 time period.
16    A.  I don't remember what the rules were
17  back then.
18    Q.  Do you recall what the rules are today?
19    A.  I believe so.  I would still double
20  check them, but I believe so.
21    Q.  What are the rules today as you
22  understand them?  I understand you haven't
23  checked them and you don't have them in front of
24  you.  So I'm just asking for your best
25  recollection.
```

Page 34

```
 1    A.  Well, my recollection is that if
 2  something goes abandoned unintentionally, you
 3  pay, you know, you have to -- you say that and
 4  they whack you with a big fee and then you are
 5  back, you know, you are back up and running.
 6    Q.  And all you have to do is say it was
 7  unintentional?
 8        MR. WANG:  Objection to form.
 9  Mischaracterizes testimony.  Calls for legal
10  opinion.
11        MR. BARHAM:  Same.
12    A.  I would check the rules.
13  BY MR. HASLAM:
14    Q.  Well, as you understand today, at least
15  you said you would have to say it's unintentional
16  and you pay a whopping fee and you are back up an
17  running, correct?
18    A.  I believe so.  I mean, of course, it
19  would have to be unintentional.
20    Q.  How do you determine that?
21    A.  Well, unfortunately, sometimes I'm the
22  one who made the mistake.
23    Q.  How about in situations where you are
24  not the one that made the mistake, what do you
25  do?
```

Page 35

```
 1    A.  I don't recall any instances like that.
 2    Q.  In connection with Application
 3  10/700,329, what did do you to determine that the
 4  patent application that went abandoned because of
 5  a failure to timely file a proper reply to the
 6  office letter mailed on 17 March, 2008 was
 7  unintentional?
 8    A.  I don't remember.
 9        MR. HASLAM:  Can we have Brooks Exhibit
10  7 which I think is at Tab 10?
11        AV TECH COOKE:  Stand by.
12        MR. HASLAM:  Again, if we can give the
13  witness control of this document.
14        AV TECH COOKE:  Sure.  Just click your
15  screen.
16        THE WITNESS:  I'm looking at it.
17  BY MR. HASLAM:
18    Q.  Have you ever seen Brooks 7 before?
19    A.  I don't know.
20    Q.  I showed you a document earlier
21  indicating that Mr. Brooks, Edward J. Brooks, III
22  had a Power of Attorney in connection with
23  Application 10/700,329.
24        Do you recognize Brooks 7 as a request
25  filed in that same application by Mr. Brooks
```

Page 36

```
 1  asking to withdraw as attorney?
 2    A.  I would have to go back and look at them
 3  to double check.  But this appears to be he's
 4  filing a paper to get removed, you know, request
 5  withdrawal as attorney for this application.
 6    Q.  All right.  Mr. Brooks has been deposed
 7  in this case before.  And I will represent that
 8  he testified that he did not recall having any
 9  conversations with you.
10        Given that and having reviewed this
11  document, do you recall ever asking Mr. Brooks
12  why he withdrew?
13        MR. BARHAM:  Objection to form.  You can
14  answer.
15        MR. WANG:  Objection to form.  Compound,
16  confusing.
17    A.  I don't -- I don't know if -- I don't
18  know whether I had conversations with Mr. Brooks.
19  I don't remember whether I had conversations with
20  him or a conversation or multiple conversations.
21  I just don't remember.
22  BY MR. HASLAM:
23    Q.  Do you have a recollection that you
24  called Mr. Brooks at any time during your
25  representation of XR Communications and asked him
```

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052270
XR-EDTX1-00052261

```
                                          37
 1  why he withdrew as counsel in connection with
 2  Application 10/700,329?
 3       MR. BARHAM: Objection.
 4       MR. WANG: Objection. Objection to
 5  form.
 6   A.  I don't --
 7       MR. WANG: Asked and answered.
 8   A.  I don't recall whether I had any
 9  conversations with Mr. Brooks. So as far as the
10  specific detailed conversation that you referred
11  to in your question, I mean, I may have but I
12  don't remember.
13       MR. HASLAM: Okay. Can I have Brooks
14  11, please? Can you give the witness control of
15  this document?
16       AV TECH COOKE: Yes. You should still
17  have control.
18       THE WITNESS: I have taken a look at it.
19       MR. HASLAM: Okay. I will note for the
20  record that Brooks 11 relates to application
21  serial number 10/700,342. I will just point out
22  that is a different serial number than the one on
23  the previous documents I have shown you.
24       THE WITNESS: I thought it was.
25   Q.  Do you recall ever seeing Brooks Exhibit
```

```
                                          38
 1  11?
 2   A.  No.
 3   Q.  If you will look at the second page,
 4  this is an interview summary and can -- you are
 5  familiar with interview summaries in connection
 6  with prosecuting patents at the United States
 7  Patent and Trademark Office?
 8   A.  Yep. Yes, I am.
 9   Q.  And what is the purpose of interview
10  summaries?
11   A.  The Patent Office would like a record
12  for the public of what transpired. I --
13       MR. HASLAM: I'm sorry. I didn't mean
14  to cut you off.
15   A.  No. I think that's -- you asked me the
16  purpose of them.
17       MR. HASLAM: Okay.
18   A.  I think that's the purpose.
19   Q.  Okay. Now, you will notice the
20  interview summary on this document relates to
21  some conversations that the patent examiner had
22  with a Christopher R. Ambrose on the one hand and
23  Mr. Edward J. Brooks on the other. Do you
24  recognize that -- see that?
25   A.  I don't recognize it, sir.
```

```
                                          39
 1   Q.  Do you see that?
 2   A.  I see -- I see the portion of the
 3  document you are referring to.
 4   Q.  Do you know Mr. Ambrose?
 5   A.  The name sounds a little familiar.
 6   Q.  In what regard is it familiar?
 7   A.  I don't know. I think there is an
 8  Ambrose, New Jersey, but I don't know.
 9   Q.  Let me sharpen it up. Are you familiar
10  with Christopher R. Ambrose?
11   A.  That doesn't sound -- no. I don't think
12  so.
13   Q.  Have you ever had any conversations with
14  Christopher R. Ambrose in connection with your
15  work for XR Communications?
16   A.  I don't recall. I don't remember.
17   Q.  I apologize if I asked you this. Do you
18  recognize -- had you ever seen this document
19  before I showed it to you today?
20   A.  Not that I recall.
21   Q.  Okay. In connection with your work for
22  XR Communications, did you work on the
23  prosecution of patents on behalf of XR
24  Communications?
25   A.  You are not a patent attorney. You
```

```
                                          40
 1  prosecute patent applications, not patents. So I
 2  did do some prosecution work on patent
 3  applications.
 4   Q.  For XR Communications?
 5   A.  I believe so, yes.
 6   Q.  Did you at some point in time in your
 7  work on patent prosecution for XR Communications
 8  receive files relating to those prosecutions?
 9   A.  I don't remember.
10   Q.  If you -- back in the 2009/2010 time
11  period, if you were asked to take over
12  prosecution of patent applications which were
13  pending in the Patent Office, was it your
14  practice to obtain the files relating to the
15  prosecution from the time the original
16  application was filed up until the time that you
17  were asked to continue prosecution?
18   A.  Yes. You would want to see -- as part
19  of the practice, you definitely want to see what
20  had transpired, but I don't know if I actually
21  received them. I don't know if anything was
22  available on line.
23       I just -- you would have to -- if you
24  are going to work on something, you have to -- if
25  you are going to go somewhere, you have to know
```

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052271
XR-EDTX1-00052261

**Page 41**

1 where you are, right, where you are starting.
2 So, of course, you would have to have what you
3 are working on to work on.
4      You know, now, and I don't know what the
5 practice was then, but now, everything is
6 available on line. I don't know if that was the
7 practice, you know, if everything was available
8 on line then. I just don't recall.
9    Q.   If -- if you worked on the prosecution
10 of Application 10/700,342, which is the
11 application to which Brooks Exhibit 11 relates,
12 do you recall that you would have gotten the
13 prosecution files relating to that application
14 before proceeding to do work on it?
15      MR. WANG: Objection.
16      MR. BARHAM: Objection. I guess let
17 them put their objections on the record.
18      MR. WANG: Thank you. Objection to form
19 and assumes facts.
20    A.   I have a lot of problems with the
21 question. You are saying if I did something,
22 then you are trying to jam too much in to that
23 question, I think. I don't recall whether I
24 worked on this application. You said there is a
25 different one from the other one.

**Page 42**

1  BY MR. HASLAM:
2    Q.   Well, let me ask this: If this file,
3 Application 10/700,342, has a Power of Attorney
4 naming you as the attorney for representing XR
5 Communications, was it your practice at that time
6 in 2009/2010 to get the prosecution files before
7 doing any work?
8      MR. BARHAM: Objection to form. You can
9 answer.
10    A.   I would need something. I -- I just
11 assume I would need something. I don't -- would
12 I get everything? I don't know.
13      MR. HASLAM: Could I have Schwedler --
14 Schwedler Exhibit 8, which is Tab 23?
15      AV TECH COOKE: And you should have
16 control.
17      MR. HASLAM: You are free to review this
18 document. It's a lengthy document. I am going
19 to be focusing my questions on the first three
20 pages of the document.
21      THE WITNESS: Would you like me to limit
22 my review to the first three pages?
23      MR. HASLAM: Why don't you, and if
24 anything I ask you makes you want to look at more
25 of it, feel free to look at whatever you want to

**Page 43**

1 do on this document.
2      THE WITNESS: No. No. We are not
3 going -- I just don't -- I don't -- not knowing
4 what is in the rest of the document, I'm not
5 going to know whether something is going to help
6 me or not. So if you want me to limit my review
7 to the first three pages --
8      MR. HASLAM: All right. Limit your
9 review to the first three pages.
10      THE WITNESS: All right. I reviewed
11 the first three pages.
12    Q.   Have you ever seen the first three pages
13 of Exhibit Schwedler 8?
14    A.   Some or all of this may have been
15 included in the transmission I got from
16 Mr. Sharma at your firm recently.
17    Q.   In the 2009/2010 time frame, did you
18 review a copy of Schwedler Exhibit 8?
19    A.   I don't remember.
20    Q.   Do you know a Carl J. Schwedler?
21    A.   The name does not ring a bell other than
22 seeing him on these documents.
23    Q.   Do you ever recall having any
24 conversations with Mr. Schwedler concerning
25 the -- any of the patent properties that you were

**Page 44**

1 working on for XR Communications?
2    A.   I don't remember one way or the other.
3    Q.   And you recognize the first two pages of
4 Exhibit Schwedler 8 as a petition to revive an
5 abandoned patent application?
6    A.   It's part -- it's part -- it's part of a
7 petition.
8    Q.   On the second page, if you go back up to
9 the top --
10    A.   On the second -- top of the second page?
11 Okay.
12    Q.   Yes. Under the paragraph at the top
13 numbered 4, Statement, there is a preprinted on
14 the form the following statement, quote: The
15 entire delay in filing the required reply from
16 the due date for the required reply until the
17 filing of a grantable petition under 37 CFR
18 1.137(b) was unintentional, close quote.
19      Do you see that?
20    A.   I see that sentence.
21    Q.   Did you ever talk to Mr. Schwedler about
22 the basis on which he made that statement?
23    A.   I don't remember whether I spoke to
24 Mr. Schwedler. So I don't remember whether or
25 not I spoke with him about that particular

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052272
XR-EDTX1-00052261

---

45

1  statement.  I just don't remember.
2     Q.   Earlier we saw a document that indicated
3  that this Application 10/700,329 went abandoned
4  for failure to respond to a March 17th, 2008
5  office action.
6        Do you recall asking or talking to
7  Mr. Schwedler what occurred between the time the
8  patent application went abandoned and the time in
9  August 28, 2009 when Mr. Schwedler filed this
10 petition to revive, what transpired?
11    A.   Same answer.  I just don't remember
12 whether I spoke to Mr. Schwedler or not.  So I
13 don't remember the specifics of any conversation
14 I might have had with him.
15    Q.   What was the reason that the application
16 went abandoned and remained abandoned from 2008
17 until August 26 -- 28, 2009?
18    A.   I don't remember.
19    Q.   At some point in time, did you know the
20 answer to that question?
21        MR. BARHAM:  Objection to form.
22    A.   I don't remember.
23        MR. HASLAM:  Could I have Schwedler
24 Exhibit 9?  Could I have Schwedler Exhibit 9,
25 which I think is Tab 23?  There we go.

46

1         AV TECH COOKE:  My apologies.
2         MR. HASLAM:  Can you give control of
3  this document to the witness?
4         AV TECH COOKE:  The witness should have
5  control if he just -- yes.
6         THE WITNESS:  I have reviewed these four
7  pages.
8  BY MR. HASLAM:
9     Q.   Have you ever seen Schwedler Exhibit 9
10 before?
11    A.   It may have been included in the papers
12 I received from Mr. Sharma of your firm recently.
13    Q.   During the time that you represented XR
14 Communications, did you see a copy of Schwedler
15 Exhibit 9?
16    A.   I don't remember.
17    Q.   Having reviewed Schwedler Exhibit 9, you
18 recognize that this is a document sent by the
19 United States Patent and Trademark Office
20 dismissing the petition that we reviewed that was
21 Schwedler Exhibit 8, correct?
22    A.   It doesn't seem complete.  I mean, it
23 does seem like it denied his petition, but it
24 seems like something's missing.
25    Q.   What do you think -- what do you think's

47

1  missing?
2     A.   Well, I only read it once.  You know,
3  I'm trying to move things along.  We have a lot
4  of people on the phone here.  It said there is a
5  form attached, a blank form attached, and I
6  didn't see a blank form attached.
7     Q.   You are referring to the last page that
8  says certificate under 37 CFR 3.73(b) and privacy
9  act statement?
10    A.   In the body, no.  I mean, that would be
11 another basis.  But in the body of this, it
12 says -- okay.  So I'm on page 3.  I'm in the
13 first full paragraph, the paragraph that starts
14 in view of the above, and the last sentence in
15 that paragraph says a blank certificate under 37
16 CFR 3.73(b) is enclosed with this petition for
17 the Petitioner's convenience.
18        That is what I noticed when I was
19 reading through it and I just don't see that.  So
20 I'm just saying for the record it's not complete.
21    Q.   Well, the portion you do have, do you
22 recall seeing that during your time working for
23 XR Communications?
24    A.   No.  I don't remember.
25    Q.   Do you recall in your review of the

48

1  files relating to Application 10/700,329 becoming
2  aware that Mr. Schwedler had filed a petition to
3  revive that abandoned application where the
4  petition was denied or dismissed?
5     A.   I don't remember it from back then.  I
6  mean, like I said, Mr. Sharma from your firm sent
7  me an attachment.  And I mean, I didn't read it,
8  but I scanned, I paged through it, and it looked
9  like there were a couple petitions, a couple
10 denials, then another petition and then it was
11 granted.
12        But I don't remember or have any
13 recollection of doing -- working on this back in
14 that time frame you are talking about.
15        MR. HASLAM:  All right.  Can I have the
16 document -- it's Tab 24.  Can we mark this as
17 Burke Exhibit 1?
18        (Whereupon, Burke Deposition Exhibit 1
19 was marked for identification and attached to the
20 transcript.)
21 BY MR. HASLAM:
22    Q.   Burke Exhibit 1 purports to be a renewed
23 petition under 37 CFR 1.137(b) in connection with
24 Application 10/700,329.  Do you recall seeing a
25 renewed petition that purported to renew what we

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052273
XR-EDTX1-00052261

49

1   saw as Schwedler Exhibit 9?
2       A.  I believe -- I believe there was
3   something like that in the documents that
4   Mr. Sharma sent me.
5       Q.  Okay.  Back in the time that you were
6   working for XR Communications, do you recall
7   seeing the renewed petition which is Burke
8   Exhibit 1?
9       A.  I haven't reviewed Burke Exhibit 1.  Do
10  you want me to take a look at it?
11      Q.  Well, let's me ask you just look at the
12  first two pages first and see if that refreshes
13  your recollection.
14          THE WITNESS:  Okay.  I looked at the
15  first two pages, only the first two pages.
16      Q.  Do you recall seeing the renewed
17  petition that constitutes the first two pages of
18  Burke Exhibit 1?
19      A.  It might have been included in the
20  papers I got recently from Mr. Sharma from your
21  firm.
22      Q.  Do you recall seeing the first two
23  pages, the renewed petition in Burke 1, during
24  the time you represented XR Communications?
25      A.  No.

50

1       Q.  If you will look at the third page of
2   Burke Exhibit 1, is it your understanding that in
3   connection with a petition to revive an abandoned
4   application, one of the requirements is that any
5   response to an office action that was pending at
6   the time it went abandoned was to be included in
7   a petition to revive?
8       A.  You didn't give me enough time to review
9   the third page.  But yeah, when you are filing a
10  petition to revive, you have to file the
11  response, a response, which would have been due
12  at the time or just prior to the application
13  going abandoned.  That's a general rule.
14      Q.  And on the third page of Burke Exhibit
15  1, and that's Bates stamped Aruba 0032753 is a
16  document titled Amendment, the first sentence of
17  which says, quote:  In response to the office
18  action of March 17th, 2008, please consider the
19  following amendments and remarks, close quote.
20          And I don't know if you recall, but the
21  office action that was pending at the time the
22  Application 10/700,329 went abandoned was an
23  office action dated March 17th, 2008.  But the
24  pages between 32753 and 32788 purport to be the
25  amendment that is included in Burke Exhibit 1.

51

1           And if you could look at the page
2   stamped Aruba_0032792, that page is a form for
3   designating a Power of Attorney, correct?
4       A.  I will look at it.  The page that's
5   designated Aruba 0032792 appears to be a Power of
6   Attorney.
7       Q.  All right.  And at the bottom of that
8   form under the heading Signature of Applicant or
9   Assignee of Record is a signature, the typed name
10  Thomas A. Sidley, and it indicates that
11  Mr. Sidley is a member Aequitas Equipment
12  Finance, LLC.
13          I asked you before does this refresh
14  your recollection as to whether you ever had any
15  conversations with Mr. Thomas A. Sidley
16  concerning Application 10/700,329?
17      A.  You asked me that before, but this
18  document does not refresh my recollection as to
19  whether I ever had a conversation with
20  Mr. Sidley.
21      Q.  If you look at the next two pages, 793
22  and 794?
23      A.  I assume these are in order, the Bates
24  stamps are in order?
25          MR. HASLAM:  Yes.  It should be.

52

1       A.  Okay.  Just checking.  All right.  I
2   looked at the pages ending 793 and 794.
3       Q.  Okay.  Do you recognize this form?
4       A.  No.
5       Q.  Do you have any understanding as to
6   whether when filing a petition to revive an
7   abandoned application a statement of all prior
8   owners or assignees is required?
9       A.  No.  I don't recall it.  It might have
10  said something about that in the last document
11  you had me looking at.
12      Q.  Okay.  Now, earlier I had asked you some
13  questions about whether you talked with people at
14  Vivato, and you said:  Well, isn't XR
15  Communications Vivato?
16          I want to use this document, and if you
17  can turn to page 3794, I want to ask you some
18  questions related to that topic.
19      A.  That is the last page?
20      Q.  Yes.  You will see on the paragraph
21  numbered 4, it says:  From Vivato Networks, Inc.,
22  formerly Vivato Networks, LLC to Aequitas Capital
23  Management, Inc.
24          Did you ever talk to anybody in
25  connection with Application 10/700,329, talk to

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052274
XR-EDTX1-00052261

### 53

1 anyone at Vivato Networks, Inc., formerly known
2 as Vivato Networks, LLC, the entity referred to
3 in the paragraph numbered 4 on page 32794?
4     MR. BARHAM: Objection to the extent it
5 has been asked and answered, but you can respond.
6   A.  I just don't remember.
7   Q.  On the page -- on the line numbered 5,
8 it says: From Aequitas Capital Management, Inc.
9 to Aequitas Equipment Finance, LLC. Do you
10 recall in connection with your work on
11 Application 10/700,329 talking to anybody at
12 Aequitas Capital Management, Inc.?
13   A.  I don't remember one way or the other.
14   Q.  Did you ever talk to anyone at Aequitas
15 Capital Management, Inc. relating to the reasons
16 why the Patent Application 10/700,329 went
17 abandoned?
18   A.  I don't remember whether I spoke to
19 anybody at Aequitas Capital Management, Inc.
20   Q.  Did you ever have any conversations with
21 anyone at Aequitas Capital Management, Inc. as to
22 what, if anything, they were doing between the
23 time the patents went abandoned during their
24 ownership of the patents?
25   A.  I don't remember whether I spoke to

### 54

1 anybody at that company.
2   Q.  On line 5 is a reference to Aequitas
3 Equipment Finance, LLC. Do you recall having any
4 conversations with anyone at Aequitas Equipment
5 Finance, LLC in connection with any work on
6 attempting to revive Patent Application
7 10/700,329?
8   A.  I don't remember whether I had
9 conversations with anybody at that LLC.
10   Q.  On line 6, there is a reference to a
11 company Vivato Networks Holdings, LLC. Do you
12 recall talking to anybody at Vivato Networks
13 Holdings, LLC concerning the abandonment or
14 revival of Patent Application 10/700,329?
15   A.  No. I don't remember whether I spoke --
16 I don't have a recollection as to whether I spoke
17 with anybody at any of these companies or LLCs.
18     MR. HASLAM: Okay. Okay. Could I have
19 the next exhibit Tab 26.
20     MR. BARHAM: Could we take a break
21 before we move to another document?
22     MR. HASLAM: Yes.
23     MR. WANG: Mr. Haslam, we have been
24 going for a long time, and I think Burke
25 mentioned it's lunchtime over there.

### 55

1     MR. HASLAM: Well, I will let Mr. Burke
2 decide when he wants to go to lunch, but I have
3 got a request for a recess and that is fine with
4 me.
5     Mr. Burke, what is your preference on
6 lunch?
7     THE WITNESS: Why don't we take a short
8 break, and then can we just defer that question?
9 Can we make it like a 10-minute break?
10     MR. HASLAM: Yes. That is fine.
11     THE WITNESS: Okay.
12     MR. HASLAM: Ten minutes. We can go off
13 the record.
14     THE VIDEOGRAPHER: Yes, sir. Off record
15 12:40.
16     (Whereupon, Burke Deposition Exhibit 2
17 was marked for identification and attached to the
18 transcript.)
19     (Thereupon, there was a recess taken at
20 12:40 p.m.)
21     (Thereupon, the proceedings were resumed
22 at 12:53 p.m.)
23     THE VIDEOGRAPHER: On record 12:53.
24 BY MR. HASLAM:
25   Q.  I think when we broke, I just had marked

### 56

1 as Burke Exhibit 2 a two-page document Bates
2 stamped Aruba 0032699 through 800. This is a
3 decision on a petition under 37 CFR 1.137(b). It
4 relates to the petition -- renewed petition filed
5 on November 18th, 2009 and it indicates that that
6 petition is dismissed.
7     Do you recall ever seeing Burke Exhibit
8 2 before?
9   A.  I'm just -- I'm just scanning it real
10 quickly. It was probably included in the
11 documents that Mr. Sharma from your office sent
12 to me recently.
13   Q.  Did looking at those documents that
14 Mr. Sharma may have sent you recently refresh
15 your recollection about reviewing this document
16 during the time you represented XR
17 Communications?
18   A.  It did not refresh my recollection.
19   Q.  You will see that this is -- relates to
20 the renewed application filed November 18th,
21 2009, which was Burke Exhibit 1. Do you have a
22 recollection that in reviewing Application
23 10/700,329 that Mr. Schwedler had made two
24 attempts to get that petition revived?
25   A.  I don't have any recollection from back

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052275
XR-EDTX1-00052261

### 65

1  A.  I don't remember any specific
2  conversations.  In addition to the first two
3  gentlemen I spoke with regarding acquiring a
4  patent, the patent properties, I believe I spoke
5  to other people at the client who were more
6  technical oriented.
7       But I really cannot say whether I spoke
8  to any of them in connection with this particular
9  amendment.  I just don't remember.
10  Q.  Okay.  Did you talk to Mr. Schwedler
11  about this amendment?
12  A.  I don't remember.
13  Q.  Okay.  I'm going to ask you now a series
14  of questions about the pages in Burke Exhibit 4
15  that are Bates stamped Aruba 0032861 through 864.
16  So if you want to take a moment to review those,
17  and then I will ask you some questions.
18       THE WITNESS:  861 to 864?
19       MR. HASLAM:  Yes.
20       THE WITNESS:  What page am I stopping
21  on?  864?
22       MR. HASLAM:  864.
23       THE WITNESS:  Okay.  I looked at it.
24  Q.  While you are on page 864, is that your
25  signature?

### 66

1  A.  I believe so.
2  Q.  And the date that is written in 11 --
3  November 8, 2010, that's your handwriting?
4  A.  I believe so, yes.
5  Q.  And are the pages that we just -- that
6  you just reviewed, Aruba 0032861 through 864,
7  that's a renewed petition that you prepared?
8  A.  I believe so.  I mean, that's what it
9  looks like.  I don't remember it, but it sure
10  looks like I did it.
11  Q.  All right.  And in the first sentence,
12  you state that this is -- this document is being
13  filed in response to a decision on petition
14  mailed May 6, 2010 regarding the above-identified
15  patent application, which is Application
16  10/700,329.
17       And the decision on petition mailed May
18  6th, 2010 dismissed that petition, correct?  We
19  saw that earlier?
20  A.  I believe so.
21  Q.  Okay.  What were you doing in connection
22  with Application 10/700,329 between May 6th,
23  2010, and November 2010 when you actually filed
24  the renewed petition for revival and associated
25  documents?

### 67

1  A.  I really don't remember.  I mean, I
2  could speculate I was working on it.  Obviously,
3  I worked on it.  But I can't say what I was doing
4  when, what and when.
5  Q.  Well, to the extent that you were
6  working on the renewed petition, what kind of
7  things do you recall doing?
8  A.  I don't -- I don't recall any of this.
9  Q.  Okay.  You will see on page 32862 --
10  A.  Hold on.  That's the second?
11  Q.  The second page of what I asked you to
12  look at.
13  A.  Go ahead.  Go ahead.
14  Q.  Okay.  In the paragraph that begins this
15  application --
16  A.  I'm with you.
17  Q.  -- was assigned to XR Communications,
18  LLC on December 23rd, 2009 while the renewed
19  petition was still pending -- withdraw that.
20       On page 32863, in the paragraph that
21  begins, quote:  Turning now to the present
22  renewed petition.  Do you see that paragraph?
23  A.  I have it up on the screen.
24  Q.  Okay.  In the last sentence, you state,
25  quote:  Accordingly, the statement of

### 68

1  unintentional delay in the renewed petition is
2  proper in that it is now signed by the attorney
3  of record for the current assignee of record
4  period, close quote.
5       That is a statement regarding
6  unintentional delay made by you or by
7  Mr. Schwedler are you referring to in that
8  sentence?
9  A.  I don't recall what I was referring to
10  back then.  It looks like I was addressing one of
11  the deficiencies that the petition's examiner had
12  pointed out.  I believe he was pointing out that
13  Mr. Schwedler, you know, hadn't documented that
14  he was the correct person to sign the petition,
15  and I believe I'm saying here that I have
16  documented that I am the proper person to sign
17  this petition.
18       But I don't have a recollection of back
19  then, Mr. Haslam.  I really don't.
20  Q.  We saw on page 32806 in the statement
21  that you signed and prepared, the statement,
22  quote:  The entire delay in filing the required
23  reply from the due date for the required reply
24  until the filing of a grantable petition under 37
25  CFR 1.137(b) was unintentional, close quote, that

**69**

1 is a statement made on your behalf and by you,
2 correct?
3   A.  What page are you talking about?
4       MR. HASLAM:  32806.
5   A.  Is there a way to scroll up quicker than
6 just scrolling?  Hold on.  Hold on.  Okay.  I'm
7 on 32806.  Please ask the question or give me the
8 question again.
9   Q.  If you go up to the paragraph numbered
10 4, that's the statement regarding the entire
11 delay was unintentional, that is a statement
12 being made by you to the Patent Office, correct?
13   A.  Yes.
14   Q.  And that is a statement that encompasses
15 the entire time from 2008 when the application
16 went abandoned until the time that you made the
17 statement in November 2010, correct?
18   A.  I believe so, yes.
19   Q.  What did you do to determine, prior to
20 the time that you began working on this
21 Application 10/700,329, from the time the patent
22 application went abandoned until the time you
23 began working on it, what did you do to determine
24 that that entire time period was unintentional?
25   A.  I don't remember what I did back then.

**70**

1   Q.  Did you do anything?
2   A.  Yes.
3   Q.  What was it?
4   A.  I determined that it was unintentional.
5   Q.  What was the reason that it went
6 abandoned in the first place?
7   A.  You have shown me a document that said
8 somebody didn't file a response.
9   Q.  Why was that response not filed?
10      MR. WANG:  Objection to form.
11 Argumentative.
12   Q.  From June --
13      THE REPORTER:  I didn't get an answer.
14   A.  I said -- I believe I said I don't
15 remember.  That's my answer.
16   Q.  And you recognize that your statement is
17 intended to encompass the entire time from the
18 time the patent went abandoned until the time you
19 made this statement, correct?
20   A.  I believe so, yes.
21   Q.  Okay.  After the patent went abandoned,
22 what, if anything, was anybody doing attempting
23 to revive the patent application?
24   A.  Well, apparently one attorney filed two
25 petitions, and another attorney, being me, filed

**71**

1 another petition.  And mine -- I believe mine was
2 granted or we wouldn't all be sitting here today.
3   Q.  What investigation did you do to
4 determine that the entire time period from the
5 time the patent application went abandoned until
6 the time you filed your petition, what
7 investigation did you do to determine that that
8 entire time period was unintentional?
9   A.  I don't remember.
10   Q.  From May 10th until November 8th, what
11 were you doing in connection with the petition to
12 revive?
13      MR. BARHAM:  Objection.  Asked and
14 answered.  You can respond.
15   A.  You have asked me that already, but I
16 really don't remember.
17      MR. HASLAM:  Let me have marked Tab 28
18 as the next exhibit in order.
19      AV TECH COOKE:  Stand by.
20      (Whereupon, Burke Deposition Exhibit 5
21 was marked for identification and attached to the
22 transcript.)
23      MR. HASLAM:  Can you review -- we will
24 mark this as Burke Exhibit 5.
25   A.  We are hearing an alarm.  I don't know

**72**

1 if it's in this office or one of your offices.
2      MR. HASLAM:  That's in my office.  We
3 are near the end.  I'm going to ignore it.
4      THE WITNESS:  It's so clear, it sounds
5 like it could be coming from here.  If we see
6 smoke behind you, I will let you know.
7      MR. HASLAM:  That is it, and then it
8 will be too late.
9      THE WITNESS:  Amazing how clear it is.
10 BY MR. HASLAM:
11   Q.  Do you recall seeing Burke Exhibit 5
12 before?
13   A.  I think it was included or at least some
14 of it, not all of it, I think some of it was
15 included in the documents that Mr. Sharma
16 recently sent me.  I'm not sure but I think it
17 was.
18   Q.  This document accepts the petition that
19 we just saw, Burke Exhibit 4, correct?
20   A.  It does a few things.  It grants the
21 petition and then it granted the Power of
22 Attorney, you know, accepted that.
23   Q.  In the -- on the first page, there's a
24 statement in I guess the fourth paragraph, quote:
25 It is not apparent whether the person signing the

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052279
XR-EDTX1-00052261

## Page 77

1 Argumentative.
2    A.  I don't recall.  You are asking me what
3 I thought back in 2000 -- whenever this was, in
4 2010?
5        MR. HASLAM:  Yes.
6    A.  I don't know that I even -- I don't know
7 that I formed an opinion on it at the time.  I
8 mean, direct knowledge to me is like you witness
9 something or, you know, you could witness
10 something firsthand.
11   Q.  Well, let's focus on that.  Did you have
12 direct knowledge of the circumstances of the
13 delay between -- of this application between June
14 of 2008 and the time that you filed your renewed
15 petition on November 8th, 2010?
16   A.  I would be speculating.  I definitely
17 didn't have it for the entire time period.
18   Q.  For what time period did you have direct
19 knowledge?
20   A.  When I was involved.
21   Q.  And to the best of your recollection,
22 now having gone through several documents, what
23 time period do you think you were involved?
24   A.  I don't recall.  Probably it looks like
25 April of 2010.

## Page 78

1    Q.  Okay.  So you had direct knowledge --
2    A.  At least, you know, at least.
3    Q.  So from April 10th, at least, through
4 November 8th, 2010, you had direct knowledge of
5 the facts and circumstances of the delay at
6 issue, correct?
7    A.  I don't remember what I knew back then.
8 Looking at these documents, it looked like the
9 delay was unintentional from the -- you know,
10 from the entire time period.
11   Q.  And on what do you base that?
12       MR. BARHAM:  Objection to the extent it
13 has been asked and answered, but you can respond.
14   A.  On my practice, my -- my statement, the
15 other fellow's statements.
16   Q.  You relied on Mr. Schwedler's
17 statements?
18   A.  I have no idea what I relied on back
19 then.  I just said from looking at these
20 documents, it looks like the entire time period.
21   Q.  What was the reason that Mr. Brooks
22 withdrew from representing the client, his
23 client?
24   A.  I have no idea.
25       MR.WANG:  Objection to form.

## Page 79

1    A.  I don't remember now.  I don't know if
2 ever knew.  But sitting here today, I have no
3 idea.
4    Q.  Do you have any understanding as to
5 whether a client who does not pay or fails to pay
6 his counsel causing an abandonment is a reason
7 that meets the unintentional delay requirements
8 for reviving a petition?
9        MR. BARHAM:  Objection to form.
10   A.  Are you asking me -- are you asking me
11 sitting here right now regarding my understanding
12 of the law?
13   Q.  I'm really asking you at the time you
14 filed the petition, renewed petition in 2010, did
15 you have an understanding on that subject?
16   A.  I have no recollection of my
17 understandings or what I did or what reasonable
18 inquiry I did at the time.
19   Q.  Did you do any legal research as to what
20 constituted unintentional delay with respect to
21 the reason for the original abandonment?
22   A.  Can you just -- somebody repeat that
23 either have it read back or repeat it.
24   Q.  I can repeat it.  Did you do any legal
25 research at the time you prepared your renewed

## Page 80

1 petition for revival in November of 2010 as to
2 what constituted the legal bases for an
3 unintentional delay causing abandonment?
4    A.  I don't have a specific recollection but
5 I probably did, because that would be my
6 practice.  This isn't something like we deal
7 with every day.  Right?  So I probably looked
8 into it.
9    Q.  Did you document in any way any inquiry
10 or diligence or investigation that you did about
11 the circumstances surrounding the reason for the
12 original abandonment and any efforts made to
13 revive the patent between June of 2008 and the
14 time that you filed your renewed petition on
15 November 8th, 2010?
16       MR. WANG:  Objection to form.
17 Confusing, compound.
18   A.  I don't remember.
19   Q.  Do you still have any files from the
20 time that you represented XR Communication in
21 connection with this application?
22   A.  I don't know.
23   Q.  What was the reason for the delay
24 between May 6th, 2010 when Mr. Schwedler's second
25 petition for revival was denied and November 8th,

RESTRICTED - ATTORNEYS' EYES ONLY

XR-EDTX1-00052281
XR-EDTX1-00052261

**Page 89**

```
 1       And I have asked you before, but having
 2   looked at that, did you make an inquiry as to the
 3   entire period of time from March 17 -- from
 4   March -- from the day after the due date of the
 5   March 17th office action 2008 until the time you
 6   filed your petition for revival?
 7       A.  According to my practice and the way
 8   I've always practiced, I did, but I just don't
 9   remember what I did.  I don't -- wouldn't file
10   something like this willy-nilly.  I would do what
11   I was supposed to do.
12       It's -- you know, I have been involved
13   in disputes, you know, since before I got out of
14   law school.  And it's obvious that when patents
15   are in litigation, that things like this are
16   combed over with a fine tooth comb.
17       It's no surprise that you got to do
18   things right up front, correctly up front so that
19   when somebody goes over it with a fine tooth
20   comb, there are no issues.
21       Q.  And given that people go over it with a
22   fine tooth comb, you would have documented the
23   analysis you did to support the statement that
24   you made that entire time of delay was
25   unintentional, correct?
```

**Page 90**

```
 1       A.  No.
 2       MR. WANG:  Objection to form.
 3       A.  I don't know what I did.  And not
 4   necessarily, no.
 5       Q.  You did not talk to anybody about the
 6   reason why the application went abandoned in the
 7   first place, correct?
 8       MR. WANG:  Objection to form.
 9   Mischaracterizes testimony.  Asked and answered.
10       A.  That's not correct, Mr. Haslam.
11       Q.  Who did you talk to?
12       A.  I told you I don't remember, but you
13   can't say -- you can't -- I don't remember who I
14   spoke to or what I did, but I can't sit here and
15   testify that I didn't speak to anybody.
16       I mean, it didn't go abandoned on my
17   watch so to speak.
18       Q.  But your statement covers that time
19   period when it wasn't on your watch, correct?
20       A.  Yes, sir.
21       MR. HASLAM:  I have no further
22   questions.
23       MR. WANG:  I have some questions.  But
24   before I continue, Mr. Burke do you need a break
25   or would you like a short break?
```

**Page 91**

```
 1       THE WITNESS:  No.
 2       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
 3   BY MR. WANG:
 4       Q.  Mr. Burke, now is 2022, correct?
 5       A.  2022.
 6       Q.  And the events that Mr. Haslam asked
 7   about today occurred in 2000 --
 8       THE WITNESS:  Time out.  Can somebody
 9   mute?  Somebody is moving papers around.  It's
10   just making it difficult to hear.  Can you start
11   that question again?
12       MR. WANG:  Sure.  Sure.
13   BY MR. WANG:
14       Q.  The events that we have been talking
15   about in this deposition occurred roughly in the
16   2009/2010 time frame?
17       A.  Roughly and earlier, yes.
18       Q.  So that's at least 13 years ago,
19   correct?
20       A.  Ballpark, yes.
21       Q.  And you did not have a specific --
22   specific recollections of particular
23   conversations or actions from that time period 13
24   years ago, correct?
25       A.  That's correct.
```

**Page 92**

```
 1       Q.  And -- and you wouldn't want to
 2   speculate to testify about any specific actions
 3   or communications if you didn't have a
 4   recollection about them, correct?
 5       A.  I think I told Mr. Haslam everything I
 6   remember.
 7       Q.  Okay.  I want to clarify something.  And
 8   I apologize if you already stated this.  But many
 9   times in today's deposition, you would respond to
10   Mr. Haslam's questions with I don't recall or I
11   don't remember.
12       Do you recall that?
13       A.  Yeah.  That was my response to a lot of
14   Mr. Haslam's questions.
15       Q.  Right.  Just to be absolutely clear,
16   when you gave that response, you were not
17   testifying that something did or did not occur,
18   correct?
19       A.  That's correct.
20       Q.  It was just that you didn't have a
21   specific recollection of that event or whether or
22   not it occurred sitting here today?
23       A.  I think a lot of it, I didn't have any
24   general recollection.  So yeah, I didn't have a
25   specific recollection or even a general
```