IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES,<br><br>      Plaintiff,<br>v.<br>AT&T Services inc.; AT&T Mobility LLC; and AT&T Corp.,<br><br>   Defendants,<br>NOKIA OF AMERICA CORPORATION and ERICSSON INC.,<br>Intervenors, | Case No. 2:23-cv-00202-JRG-RSP<br>(Lead Case)<br>JURY TRIAL DEMANDED |

**PLAINTIFF XR COMMUNICATION, LLC'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**

# TABLE OF CONTENTS

I. There are No Genuine Disputes That Schwedler and Burke Acted With Specific Intent to Deceive the USPTO ................................................................................................. 1

    A. There is No Genuine Issue That Schwedler and Burke Did Not Falsely Represent That the Delay was Unintentional ..................................................................................... 1

        1. Defendants' Cases on Intentional Abandonment Are Inapposite ........................... 2

        2. PTO Regulations for Intentional Abandonment Also Require a Deliberate Decision to Abandon or to Permit the Application to Become Abandoned ................... 3

        3. Defendants Cannot Prove that the Application Was Intentionally Abandoned by Clear and Convincing Evidence .......................................................................... 4

    B. There is No Genuine Dispute that Schwedler and Burke Performed An Inquiry Reasonable Under the Circumstances ................................................................................. 5

    C. Compelling authority shows that an alleged violation of the duty of "reasonable inquiry" is insufficient to show inequitable conduct ............................................................ 7

II. Conclusion ................................................................................................................. 10

## TABLE OF AUTHORITIES

**Cases**

*3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*,
  228 F. Supp. 3d 1331 (N.D. Ga. 2017) .................................................................................. 8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................................................... 1, 2

*Asghari-Kamrani v. USAA*,
  252 F. Supp. 3d 562 (E.D. Va. 2017) .................................................................................... 9

*Fed. Trade Commn. v. AbbVie Inc.*,
  329 F. Supp. 3d 98, 124 (E.D. Pa. 2018) ............................................................................... 2

*Freshub, Inc., et al. v. Amazon.com, Inc.*, et al,
  6:21-CV-00511-ADA, Dkt. 274 (W.D. Tex. Aug. 2, 2021) ......................................... 4, 5, 8, 9

*In Lumenyte Int'l Corp. v. Cable Lite Corp*,
  92 F.3d 1206, 1996 WL 383927 (Fed. Cir. 1996) ............................................................ 2, 3, 7

*In re Application of Cheol Kim*,
  09/254,058, 2009 WL 1212054 (P.T.O. Apr. 1, 2009) ....................................................... 2, 3

*In re Rembrandt Technologies LP Patent Litigation*,
  899 F. 3d 1254 (Fed. Cir. 2018) ............................................................................................ 7

*Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  731 F.3d 1239 (Fed. Cir. 2013) ............................................................................................. 7

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) ..................................................................................... 6, 8, 9

**Other Authorities**

MPEP § 711.03(c)(3)(II)(C) ...................................................................................................... 4

**Rules**

FED. R. CIV. P. 56(c)(1)(A) ................................................................................................... 1, 2

XR is entitled to summary judgment of no inequitable conduct for multiple, dispositive reasons. Defendants'[1] ignore the "single most reasonable inference" standard under *Therasense* that requires proving a knowing and deliberate misrepresentation to the USPTO; instead, Defendants generally argue that such inferences are "permitted". *See* Opp.[2] at 6. There simply insufficient evidence—much less than the required clear and convincing evidence—that patent prosecutors Schwedler or Burke made materially false statements in the revival petitions with an intent to deceive. Defendants at most allege that Schwedler and Burke acted negligently (because they "should have" done more investigation). But *Therasense* held that negligence—or even gross negligence—is insufficient. Defendants' theory fails as matter of law.

I.  **THERE ARE NO GENUINE DISPUTES THAT SCHWEDLER AND BURKE ACTED WITH SPECIFIC INTENT TO DECEIVE THE USPTO**

To create a genuine dispute of material fact, Defendants needed to cite to specific evidence in the record that would be such that a "a reasonable jury could return a verdict" for Defendants. FED. R. CIV. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). Defendants fail to do so.

**A. There is No Genuine Issue That Schwedler and Burke Did Not Falsely Represent That the Delay was Unintentional**

As an initial matter, and independently supporting summary judgment of no inequitable conduct, there is insufficient evidence that the '329 application was intentionally abandoned. Thus, there is insufficient evidence that Schwedler and Burke's certifications regarding unintentional abandonment were "false." Intentional abandonment requires a deliberate decision by the applicant to abandon an application or permit an application to become abandoned. And in every case that

---

[1] "Defendants" refers collectively to all Defendants (*i.e.*, Defendants AT&T Corp., AT&T Mobility LLC, and AT&T Services, Inc., Verizon Communications, Inc. and Cellco Partnership d/b/a Verizon Wireless, T-Mobile USA, Inc.) and Intervenor Ericsson Inc.

[2] "Mot." or "Motion" refers to Vivato's Motion for Partial Summary Judgment (Dkt. 172). "Opp." or "Opposition" refers to Defendants/Intervenors' Opposition to Vivato's Motion (Dkt. 182).

has found intentional abandonment, there has been direct, compelling evidence of such a deliberate decision. There is no such evidence here; only Defendants' speculation, which is insufficient to survive summary judgment. FED. R. CIV. P. 56(c)(1)(A); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

1. Defendants' Cases on Intentional Abandonment Are Inapposite

None of Defendants' cited cases support their assertion that when a prosecutor withdraws because of payment issues, any subsequent abandonment is considered intentional. Opp., 7-12. Rather, those cases (and every case XR is aware of that found intentional abandonment) involved direct, compelling evidence that the applicant made a deliberate decision to permit abandonment.

In *In Lumenyte Int'l Corp. v. Cable Lite Corp*, there were five buckets of documents and evidence that showed the applicant knew of the response deadline and deliberately permitted the application to go abandoned given a perceived lack of value. 92 F.3d 1206, 1996 WL 383927, at *2 (Fed. Cir. 1996) (unpublished). A contemporaneous letter stated that the applicant informed the prosecutor to stop working because "[he has] ***decided not to spend any additional money prosecuting the above referenced patent application and that it was [his] desire to not respond to the outstanding office action***[.]" *Id.* at *3 (brackets in original)[3]. Similarly, in *In re Application of Cheol Kim*, there was extensive documentary evidence of a deliberate course of action to permit abandonment of the specific application at issue. 09/254,058, 2009 WL 1212054, at *3 (P.T.O. Apr. 1, 2009). The applicant was ***expressly instructed*** by the prosecutor that the application would go abandoned and allowed it to do so. *Id.* The applicant also ***filed a sworn declaration*** expressly stating, ***"I gave up the proceeding of the application***," which the PTO relied on as showing a deliberate decision to abandon the application. *Id.* (emphasis added).[4]

---

[3] All emphasis is added unless otherwise noted.

[4] Defendants also cite to *Fed. Trade Commn. v. AbbVie Inc.*, 329 F. Supp. 3d 98, 124, 126 (E.D. Pa. 2018), *reversed in part on other grounds*, 976 F.3d 327 (3d Cir. 2020) for the incorrect proposition that "the law

2

In sharp contrast to these cases, there are no contemporaneous instructions or letters of either Haycox or Sidley's "decision not to spend any additional money prosecuting" or "not to respond to the outstanding office action" like in *In Lumenyte*, nor any express instruction by either prosecutor to Haycox or Sidley that "the application would go abandoned" or express declaration "giving up the proceeding of the application" as in *Cheol Kim*. Defendants cite to **nothing** in Sidley's transcript to support their speculation, and only cite to portions in Haycox's testimony regarding Brooks's outstanding bills and that he may withdraw. But there is no evidence here that Haycox or Sidley: (a) knew of the office action rejection in the '329 application that issued; (b) knew the application would go abandoned if it was not responded to; and (c) then made a deliberate decision to permit the application to go abandoned. There is not even any evidence that Haycox or Sidley knew of the status of the '329 application or realized it could go abandoned. To the contrary, Haycox's testimony was unequivocal: he **never** intended to abandon any applications and was never aware that any applications went abandoned. Ex. 27 at 64:6-12, 81:18-82:4; *see also* Mot., 12-13 (citing other evidence for unintentional abandonment). Further, in early 2008, Vivato Networks Holdings was the applicant/assignee of the application, and Catcher Holdings held the exclusive right to prosecute the application. Opp. 8-9. Thus, it is unclear whether Sidley/Aequitas's "intent" is even relevant or could constitute intentional abandonment. Nor is there any evidence of Aequitas's intent to abandon. When Aequitas later sold the portfolio to XR, it represented in the purchase agreement that the application was revived "in accordance with the applicable rules and procedures of the USPTO." SUF 17. No case has found intentional abandonment under these circumstances.

    2.  <u>PTO Regulations for Intentional Abandonment Also Require a Deliberate Decision to Abandon or to Permit the Application to Become Abandoned</u>

---

generally *presumes* that people intend the natural consequences of their actions" (Mot., 11); but *Fed. Trade Comm.* does ***not*** so hold. Rather, the cited portions recite the general rule that state of mind ***can be*** inferred from other evidence in the record, which XR does not dispute.

Under PTO regulations, abandonment is intentional only if the applicant "deliberately permits" an application to become abandoned, *i.e.*, the abandonment was a "deliberately chosen course of action". MPEP § 711.03(c)(3)(II)(C). Contrary to Defendants' implication, the MPEP never states that abandonment is intentional for a failure to pay prosecution expenses. *See* Opp., 9. Rather, where a delay results from "a deliberately chosen course of action," such an intentional delay does not become "unintentional" because the applicant, for example, sought to defer patent prosecution expense (of which there is no evidence here). MPEP § 711.03(c)(3)(II)(C) (giving five examples of rationales that are insufficient to change intentional delay into unintentional delay). But in all instances, and as the MPEP states, there must be "a previous deliberate decision" to abandon the application in the first place. Here, there is no evidence of any such deliberate decision.

### 3. Defendants Cannot Prove that the Application Was Intentionally Abandoned by Clear and Convincing Evidence

The *Freshub* case cited in XR's brief is instructive because Defendants agree that "there was no 'granular and concrete account of how' the failure to respond to the office action that resulted in abandonment occurred in *Freshub*." Resp. at 22, n. 5; Ex. 39, *Freshub, Inc., et al. v. Amazon.com, Inc.*, et al, 6:21-CV-00511-ADA, Dkt. 274 (W.D. Tex. Aug. 2, 2021), *aff'd* 93 F.4th 1244, 1252 (Fed. Cir. 2024). But there is even less evidence here, and *Freshub* confirms that Defendants cannot prove intentional abandonment by clear and convincing evidence.

In *Freshub*, the '291 application was abandoned for more than five years, and there was evidence that the office action rejection and notice of abandonment were forwarded to the applicant five years before revival. Ex. 39, 4–5. The applicant executed an agreement in the first year of the five-year period that listed the '291 application as abandoned. *Id.* Nevertheless, the court found none of the evidence "amount[ed] to clear and convincing evidence that [the applicant] Ikan made a deliberate decision to abandon the '291 application." *Id.* at 10. "Given the lack of evidence and [defendant] Amazon's high burden of proof," the court found, Amazon failed to show that the '291

4

application was intentionally abandoned. *Id.* Thus, "Amazon has not shown by clear and convincing evidence that Ikan made a representation to the PTO in revived the '291 application." *Id.*

The same outcome applies here, except that the period of delay was far shorter than five-years (and perhaps only a couple months, given Defendants' focus on the first quarter of 2008). Further, unlike in *Freshub*, the circumstances here involved a complex history, with many prior owners/assignees of the application, as well as a bankruptcy and foreclosure proceedings that coincided with office action rejections that resulted in the abandonments at issue. Defendants cannot prove that Haycox or Sidley made a deliberate decision to abandon the '329 application by clear and convincing evidence.

### B. There is No Genuine Dispute that Schwedler and Burke Performed An Inquiry Reasonable Under the Circumstances

Schwedler and Burke each provided credible, unrebutted testimony that they performed a reasonable investigation before submitting the revival petitions. Mot., 14-17; SUF 14-16. Each testified in detail about the reasonable investigation they performed or would have performed. *Id*. Defendants ask the Court to disregard this testimony but provide no basis for doing so. None of Defendants' criticisms have merit.

First, Defendants incorrectly assume that the application was intentionally abandoned and try to use that as affirmative evidence that a reasonable inquiry was not conducted. Opp., 12-13 (asserting that "if Schwedler and/or Burke **had** performed the required inquiry, they could not have truthfully represented that the entire period of delay was unintentional") (emphasis in original). This fails. Whether an attorney made a reasonable inquiry is a separate question/requirement from whether the statement, based on perfect information, is true.

Further, the application was unintentionally abandoned, as discussed above, so there were no "directly contrary" facts to be uncovered. Tellingly, every relevant witness—including Brooks and Haycox—testified to their understanding that any abandonment was unintentional. Mot., 7-8,

5

12-13. Defendants themselves fail to identify any "directly contrary facts" (other than speculating it is in the mind of Haycox and Sidley that they fail to provide support for). Likewise, consulting the MPEP or relevant cases would only further support a conclusion the application was unintentionally abandoned. Defendants misinterpret those cases, which involve direct, compelling evidence of a deliberate decision to abandon, as discussed above.

Second, Defendants have no basis to assert that Schwedler and Burke conducted no investigation into the circumstances of abandonment. Thus, Defendants resort to a qualifier and repeatedly assert that Schwedler and Brooks conducted "no verifiable investigation." *See* Opp., 7, 16, 19, 22, 23. This is meritless. No court has disregarded an actor's sworn testimony regarding his or own actions simply because of a lack of "verification" (whatever that means). Defendants' argument is also pernicious because it would appear to reverse the burden to prove inequitable conduct by clear and convincing evidence.

*Therasense* makes clear that "[b]ecause the party alleging inequitable conduct bears the burden of proof, the patentee need not offer any good faith explanation unless the accused infringer first proves a threshold level of intent to deceive by clear and convincing evidence." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011) (en banc). Here, Defendants fell short of their threshold burden to show deceptive intent. Unlike cases finding inequitable conduct, there is no evidence that Schwedler and Burke made knowing and deliberate misrepresentations to the PTO. And though they were not required to, they provided a good faith explanation through credible and detailed testimony. There is no basis to disregard their sworn testimony while accepting Defendants' attorney arguments and unfounded characterizations.

Third, Defendants' arguments that Schwedler and Burke might have done more (Opp., 14–18) fail to show they clearly and convincingly violated "the duty of reasonable inquiry." There is no *per se* requirement to interview witnesses with firsthand or direct knowledge—nor did the PTO

6

say that. But even without such a requirement, the undisputed evidence is that multiple attorneys at the Bullivant firm, including Schwedler, reviewed relevant records and had discussions with each other and Sidley regarding the revival of the '329 application around 2009 while Schwedler was working on the revival petition, and further had conversations with the potential buyer, *i.e.*, XR. Mot., 19, 22-23. Defendants completely ignore this. But in any event, all Schwedler and Burke had to do was reasonably inquire into the facts and circumstances of the delay, which they did. At a minimum, and in addition to other inquiries, Schwedler obtained the facts he needed from his Bullivant colleague who brought in the client and was the managing partner of the case. SUF 14-16; Mot. 7-8, 12-13. And Burke advised XR in acquiring the portfolio, including substantively drafting the patent purchase agreement in which Aequitas represented that the application was revived "in accordance with the applicable rules and procedures of the USPTO." D-SUF 17. Burke also had full access to XR's personnel, having worked with on both patent acquisition and prosecution. The undisputed facts fully support a finding of reasonableness here.

### C. Compelling authority shows that an alleged violation of the duty of "reasonable inquiry" is insufficient to show inequitable conduct.

Cases finding inequitable conduct all involve situations where there was direct, compelling evidence that the prosecutor knew that applications were intentionally abandoned but nevertheless said the opposite to the PTO. Mot., 24, n.5 (citing *In re Rembrandt Technologies LP Patent Litigation*, 899 F. 3d 1254, 1274 (Fed. Cir. 2018)[5]); *Lumenyte*, 1996 WL 383927, at *2 (Fed. Cir. 1996)). Here, Defendants have not shown any evidence here that Schwedler or Burke knew or

---

[5] Indeed, *Rembrandt* reiterated the Federal Circuit's holding in *Network Signatures* that a patentee's representation of unintentional delay under standard PTO procedures "does not provide clear and convincing evidence of withholding of material information with the intent to deceive the Director." 899 F.3d at 1275 (quoting *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1243 (Fed. Cir. 2013)). The *Rembrandt* court distinguished *Network Signatures* on only one basis: the district court in *Rembrandt* had found "that the same people who deceived the PTO were involved in a variety of other misconduct." *Id.* 1275. Here, there is no evidence that Schwedler and Burke were "involved in a variety of other misconduct," further demonstrating the lack of deceptive intent here.

believed that their statements in the revival petitions were false. Mot., 24-26.

Defendants again rely on *3d Med.* as the only case that allegedly supports their inequitable conduct theory. *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331 (N.D. Ga. 2017); Resp. at 15. But in *3d Med.*, the court's ruling was expressly based on its many findings that the prosecutor, Mr. Bailey, had not investigated and had no idea whether his representations to the PTO were true. *Id.* at 1337 ("Nor did he conduct any investigation[.]"… "Mr. Bailey submitted the Petition without any idea of whether his certification was true."), 1339 ("Mr. Bailey admitted during his deposition that, when he submitted the Petition, he did not know whether IMS's non-payment was unintentional."…"He also admitted that he had not investigated that question."). Thus, *3d Med.* might, at most, support an argument for inequitable conduct where the prosecutor conducts no investigation, has no knowledge, and has no idea whether his representations are true. But those are facts are entirely absent here, where Schwedler and Burke repeatedly testified that they conducted an investigation, had knowledge that the abandonments were unintentional, and believed their representations to be true (both at the time and until today).

Further, as XR explained, *3d Med.* is wrongly decided and inconsistent with *Therasense*. Mot., 25-26. Defendants barely mention *Therasense*, perhaps because they cannot reconcile their inequitable conduct theory with *Therasense's* express holding that an omission that "amounts to gross negligence or negligence under a 'should have known' standard does not satisfy" the requirement to prove specific intent to deceive. *Therasense*, 649 F.3d at 1290–91 (Fed. Cir. 2011).

*Freshub* further contradicts Defendants' theory that a prosecutor's inadequate investigation can constitute inequitable conduct. Defendants' attempts to distinguish it are unavailing. In *Freshub*, the '291 application was abandoned for more than five years. Ex. 39, at 6. There, the prosecutor, Mr. Weiss, made a sworn statement that the entire five-year delay in responding to the PTO's last office action rejection was unintentional. *Id.* (FF 19). Mr. Weiss knew he was required

8

to investigate the abandonment before requesting revival of the '291 application. *Id*. (FF 20). "Mr. Weiss could not identify specific actions he took to investigate the abandonment of the '291 application other than looking at his firm's docketing system." *Id*. (FF 21). In granting the petition to revive, the PTO noted that the application "has been abandoned for an extended period of time," and noted it was relying on the prosecutor's duty of candor and good faith in representing that the entire five-year delay was unintentional. *Id.* at 7 (FF 23). The PTO also reminded Mr. Weiss to inquire into the underlying facts and circumstances of abandonment. *Id.* (FF 24). Despite these findings, the court held that defendant Amazon failed to prove intent to deceive as a matter of law. *Id*. at 11–12. This was because, as the court held, "Amazon does not provide any direct evidence that Ikan possessed a specific intent to deceive the PTO in reviving the '291 application." *Id*. at 11. This was true even though Mr. Weiss could not identify any actions he took to investigate the abandonment of the '291 application "other than looking at his firm's docketing system." *Id*. at 11, 6. The court held that even where Mr. Weiss, presumably did no investigation into a five-year period of delay other than looking at his firm's docket, that "at most" indicated negligence. *Id*. Thus, under *Therasense*, intent to deceive was not the "single most reasonable inference" and failed.

The facts here are similar, except the period of abandonment was much shorter than five years, and Schwedler and Burke did far more investigation than merely "looking at the [] firm docket." Further, far more evidence here indicates that the application was unintentionally abandoned, and Schwedler and Burke both testified to knowing or investigating that evidence (including circumstances relating to Catcher's collapse and Aequitas's foreclosure proceedings). Indeed, even a cursory comparison to the facts of *Freshub* demonstrates that there is no basis to infer deceptive intent in this case.

*Asghari-Kamrani v. USAA* is also instructive, both on the facts and because it analyzes and distinguishes *3d Med.* as a matter of law. 252 F. Supp. 3d 562, 583–84 (E.D. Va. 2017). Defendants

9

mischaracterize the case and their discussion of it is unreliable. In *Asghari*, the applicants made false representations concerning a priority claim and their only investigation was "reviewing the relevant files." *Id.* at 583. They testified that they "did not feel that there was any need to contact or question their past attorneys regarding whether this type of priority claim was the result of an unintentional delay." *Id.* The court found that this explanation sufficient and plausible and thus, could not find inequitable conduct. The court distinguished *3d Med.* on the basis that the applicants testified that "they did conduct an investigation to determine if there was a reason as to whether the delay was intentional or unintentional, and therefore whether their certification of unintentional delay was true." *Id*. at 584. Therefore, the dispositive fact was that the applicants did conduct "some" investigation and that alone undermined any intent to deceive. Notably, the court did not purport to assess the applicants' investigation under the amorphous "reasonable inquiry" standard. Rather, even if the applicants' investigation allegedly fell short, it was sufficient for purposes of assessing inequitable conduct. *Asghari-Kamrani* also assessed and rejected a separate claim of inequitable conduct. *Id.* at 584–86. In doing so, the court held that "where [the prosecutor] Mr. Kim had conducted an investigation or relied on the investigation of his law partner and had at least *some* idea that the certification he was making was true, intent to deceive [was] not the single most reasonable inference[]." *Id.* at 586 (emphasis in original). Thus, the court held that it is entirely reasonable to rely on the investigation of a colleague, as long as a prosecutor has "some idea" that the certification being made is true. These holdings further undermine Defendants' allegations regarding inequitable conduct here.

## II.    CONCLUSION

For the foregoing reasons, and under the facts and the law, there is no basis to find that intent to deceive is "the single most reasonable inference" here. XR's Motion for Partial Summary Judgment of No Inequitable Conduct should be granted.

Dated: June 25, 2025

Respectfully submitted,

*/s/ Reza Mirzaie*
Marc Fenster
CA State Bar No. 181067
Reza Mirzaie
CA State Bar No. 246953
Adam Hoffman
CA State Bar No. 218740
Neil A. Rubin
CA State Bar No. 250761
James Pickens
CA State Bar No. 307474
Christian W. Conkle
CA State Bar No. 306374
Philip Wang
CA State Bar No. 262239
Minna Jay
CA State Bar No. 305941
Paul Kroeger
CA State Bar No. 229074
**RUSS AUGUST & KABAT**
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474
rak_vivato@raklaw.com

Andrea L. Fair
TX State Bar No. 24078488
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: 903-757-6400
andrea@millerfairhenry.com

*Attorneys for Plaintiff,*
*XR Communications, LLC,*
*dba Vivato Technologies*

11

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Texas using the ECF System, and served defendants with a copy via electronic mail.

/s/ Reza Mirzaie
Reza Mirzaie