# Exhibit R

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| HEADWATER RESEARCH LLC, § <br> § <br> *Plaintiff*, § <br> § <br> v. § <br> § <br> VERIZON COMMUNICATIONS INC., § <br> CELLCO PARTNERSHIP d/b/a VERIZON § <br> WIRELESS, and VERIZON CORPORATE § <br> SERVICES GROUP, INC., § <br> § <br> *Defendants*. § | Case No. 2:23-cv-00352-JRG-RSP |

## MEMORANDUM ORDER

Before the Court is the Daubert Motion and Motion to Strike the Opinions of Jim Bergman, filed by Defendants Verizon Communications Inc., Cellco Partnership d/b/a Verizon Wireless, and Verizon Corporate Services Group, Inc.. **Dkt. No. 187**. For the reasons discussed below, the Motion is **DENIED**.

### I.    BACKGROUND

On July 28, 2023 Plaintiff Headwater Research LLC filed suit against Defendants, asserting that they infringe four of its patents: U.S. Patent Nos. 8,589,541; 8,924,543; 9,198,042; and 9,215,613. Dkt. No.1 at 1. On January 29, 2025, the Parties agreed to dismiss the '543 Patent. Dkt. No. 144.

On June 5, 2025, the Court addressed Defendants' Motion for Summary Judgment of Non-Infringement for the '042 Patent (Dkt. No. 181) and found that the Motion should be granted (Dkt. No. 303 (Report and Recommendation)).

### II.    APPLICABLE LAW

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine

a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under

2

Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

### III.   ANALYSIS

Defendants raise a number of issues with the report of Plaintiff's damages expert, Mr. Bergman, with respect to (1) whether his analysis depends on unreliable inputs; (2) whether he uses an improper royalty base; (3) whether his model accounts for non-infringing alternatives; and (4) whether his bargaining split has basis.

The Court will take up each issue in turn.

#### A.  Inputs to Mr. Bergman's Analysis

In the Motion, Defendants argue that "Mr. Bergman's sole calculation underpinning his $199 million damages figure hinges entirely on the validity of two inputs: Dr. Wesel's testing and Dr. Bazelon's spectrum valuation." Dkt. No. 187 at 3.

Because the Court has already resolved that Dr. Wesel and Dr. Bazelon's opinions on these points are sufficiently reliable, there is no issue with Mr. Bergman relying on them as he did. Dkt. No. 323; Dkt. No. 321. Accordingly, the Motion to Strike on this basis is **DENIED**.

#### B.  Whether Mr. Bergman Used an Improper Royalty Base

In the Motion, Defendants argue that "Mr. Bergman's royalty base—Dr. Bazelon's valuation of the spectrum purportedly saved by the accused features—is improper for two reasons:

3

(1) Verizon's spectrum holdings have no nexus to any alleged infringement of the patents, and (2) Dr. Bazelon's valuation, as used by Mr. Bergman, violates the entire market value rule." Dkt. No. 187 at 4.

Both of Defendants' arguments here have already been advanced in Defendants' Motion to Strike Dr. Bazelon. *See id.* at 4-8; *compare* Dkt. No. 186 at 4-7.

The Court has already resolved these issues in the Order on Defendants' Motion to Strike Dr. Bazelon (Dkt. No. 186), and determined that the EMVR is not invoked because Dr. Bazelon uses an avoided-costs based model, which is permitted (Dkt. No. 321 at 5-6). There is nothing in Defendants' instant Motion that changes that result.

Accordingly, the Motion to Strike on this basis is **DENIED**.[1]

### C. Whether Mr. Bergman's Model Accounts for Non-Infringing Alternatives[2]

In the Motion, Defendants argue that "[t]he Court should strike Mr. Bergman's model because he does not measure the cost difference between infringing the asserted patents and non-infringing alternatives, as is required in a cost-savings damages model." Dkt. No. 187 at 8 (citing *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022)).

Defendants further argue that "Mr. Bergman cannot dispute that Verizon has excess spectrum capacity that exceeds the 3.5% in alleged additional network traffic that Verizon would encounter but for the patented technology. This means that one potential acceptable alternative to the use of the asserted patents is to turn off the accused features and accept the corresponding increase in data traffic. Mr. Bergman's model presumes (incorrectly) that Verizon lacks capacity to handle additional network traffic." Dkt. No. 187 at 9. From this, Defendants conclude that

---

[1] Defendants' other concerns regarding the use of the large dollar-value figures are addressed in the Court's Supplemental Order on the Motions *in limine*. Dkt. No. 318.
[2] ("NIAs").

4

"Verizon has, as one possible non-infringing and lower-cost alternative, the option to simply turn off the accused features and accept the increase in data traffic" and that "[a]t the very least, Mr. Bergman's damages calculation *must* consider the fact that Verizon could choose to turn off the accused features after reaching a verdict in this litigation. *Id.* at 10-11 (emphasis in original).

Finally, Defendant argue that "Mr. Bergman also does not demonstrate that Verizon forewent buying additional spectrum that it would otherwise have purchased absent use of the asserted patents. Nor does Mr. Bergman demonstrate how, specifically, Verizon benefits from allegedly available spectrum. The spectrum saved by the alleged infringement of the asserted patents is beneficial to Verizon only if Verizon's network could not support an expansion in spectrum usage without deleterious effects on the network infrastructure or on customer experience." *Id.* at 11. Defendants conclude, asserting that "[t]o measure saved costs, a Plaintiff must consider the actions a Defendant would take absent the accused infringing action." *Id.* (citing *Grain Processing Corp. v. American Maize–Prods. Co.,* 185 F.3d 1341, 1350 (Fed. Cir. 1999)).

In response to Defendants' first point, Plaintiff argues that Mr. Bergman does, in fact, address Verizon's identified NIAs in his report, but that he ultimately concludes that they were all unavailable or unacceptable as a part of his reliance on (as is relevant here) Dr. Wesel, who concluded the same. Dkt. No. 212 at 6 (citing Bergman Report at ¶¶ 127-131).

In response to Defendants' second and third points, Plaintiff argues that "Verizon's suggestion that it did not benefit from the asserted patents because it allegedly maintained 'excess capacity' during the relevant period fails both legally and logically. Even assuming that some parts of Verizon's network were not fully utilized at all times does not make such capacity an alternative to the patented functionality, nor does it negate the economic value of conserving capacity." Dkt. No. 212 at 9.

5

Plaintiff asserts that this "misstates how wireless carriers plan and operate their networks" and that, as discussed by Dr. Bazelon in his opinions on network capacity (on which Mr. Bergman relies), "wireless carriers plan their networks with excess capacity precisely because demand for data traffic is growing rapidly and unpredictably." *Id.* (citing Bazelon Report at ¶¶ 21-30). For example, Plaintiff points out that data traffic increased more than 20 times from 2016 to 2024. *Id.* (citing Bazelon Report at ¶ 32). Thus, "Verizon's suggestion that unused capacity has no economic value is not only wrong as a matter of economic principle, but also inconsistent with Verizon's own network planning and capital investment practices." *Id.* at 10 (citing Bazelon Second Supplemental Report at ¶ 10 ("Verizon VP of Network planning stated 'We're always going to entertain spectrum. As a wireless business, spectrum is a significant part of what we do from a deployment standpoint. So we're going to entertain spectrum as it may become available.'")).

Plaintiff further argues that, as to Defendants' assertion that excess capacity is a non-infringing alternative, "it is not," explaining that:

> Verizon is proposing that it would simply forgo the benefits provided by its infringement of the patents in suit, not a non-infringing way to achieve those benefits. Moreover, Verizon has not established that this is an "alternative" available to it, as it does not show that it could remove or disable the infringing features even if it wanted to, as those features are built into operating systems Verizon does not control, in devices Verizon does not build. It is Verizon's obligation to identify and prove the existence of non-infringing alternatives, and it has not met that burden here.

*Id.* at 11.

As Plaintiff correctly points out, Mr. Bergman does address NIAs in his report, chiefly by relying on Dr. Wesel. Bergman Report at ¶¶ 127-131. To the extent that Defendants complain that Mr. Bergman does not perform an independent analysis of the NIAs, this is not required. Experts are permitted to rely on the opinions of others where necessary. As Mr. Bergman is a damages

6

expert, and not a technical expert, like Dr. Wesel, it is permissible for him to rely on Dr. Wesel's opinions that none of the NIAs proposed by Defendants were available or acceptable.[3]

As to Defendants' other arguments, Plaintiff is again correct that, here, Verizon's excess capacity is not a non-infringing alternative because the claimed benefit of the accused instrumentalities is network capacity *savings*, allowing Verizon to forgo having to acquire additional spectrum by being able to make greater use of what it currently has; the accused benefit of the asserted claims is not that this *adds more spectrum* to what Verizon already has. Although a fine point of distinction, it is a critical one under the facts and circumstances of this case. Consequently, while Defendants' points may be relevant to the hypothetical negotiation, Verizon's current excess capacity is not an NIA.

Accordingly, the Motion to Strike on these bases is **DENIED**.

### D. Whether Mr. Bergman's Bargaining Split has Basis

In the Motion, Defendants argue that Mr. Bergman's 25/75 bargaining split between Headwater and Verizon is not supported by the facts of the case. Dkt. No. 187 at 13. Specifically, they assert that "Mr. Bergman provides no specific justification for his proposed 25/75 split" but "[i]nstead," merely "points obliquely to Verizon's operating margin and states without explanation or justification that the parties would 'consider these percentages' in determining a reasonable royalty." *Id.* at 13-14 (citing Bergman Report at ¶ 264[4]). Defendants contend that this is insufficient because "operating margins are an aggregated measure that reflect a wide variety of factors." *See id.* at 14. In short, Defendants assert that "Mr. Bergman does not point to a single piece of evidence

---

[3] To say nothing of Mr. Bergman's own analysis on this point. *See* Bergman Report at ¶ 129.
[4] The paragraph states: "As reflected in Schedule 4.1, Verizon's operating margin (excluding one-time expenses like goodwill impairment) have ranged between 21% and 24% from fiscal year 2018 and third quarter 2024. This means that, to earn its revenue, Verizon has expended costs of between 76% and 79% of revenue. The parties to the hypothetical negotiation would consider these percentages as one of the factors in determining the final reasonable royalty." Bergman Report at ¶ 264 (internal citation omitted).

7

demonstrating that this bargaining split is realistic in the context of Verizon's other negotiations . . . ." *Id.* However, Defendants go on to acknowledge that "Mr. Bergman also states that he has reviewed hundreds of agreements" and that his experience guided his determination of the bargaining split. *Id.* Regardless, they argue that Mr. Bergman still does not "provide any evidence, nor does he demonstrate how he arrived at the 25/75 split, as opposed to a 30/70 split or an 20/80 split" and that, consequently, "[t]his is little more than the 25% 'rule of thumb' that the Federal Circuit rejected in *Uniloc*." *Id.* (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)).

In response, Plaintiff argues that "[c]ontrary to Verizon's claim in its motion, Mr. Bergman explains in detail why, based on the specific facts of this case, the parties to the hypothetical negotiation would look to Verizon's operating margin as a measure of how to split the cost-savings benefit here." Dkt. No. 212 at 12 (citing Bergman Report at ¶¶ 262-267). Specifically, Plaintiff argues that "Mr. Bergman notes that 'from Verizon's perspective, if the patented technology creates cost savings on network capacity—a core feature of Verizon's business model—the share of those savings could be split to reflect Verizon's overall cost distribution and structure.'" *Id.* (citing Bergman Report at ¶ 262; Dkt. No. 212-2 at 167:18-168:21 (explaining that costs as reflected in the margin are relevant because "what this company provides is infrastructure. What this company is spending its money on is infrastructure.... In this case it makes sense to me that Verizon would say, 'This is a core part of our business, this is what we spend all of our time and effort working on, we should get some benefit for our cost structure.'")).

The Federal Circuit has made clear that a starting point of a 25 percent royalty, with no evidence showing a relation to the facts of the case, is "arbitrary, unreliable, and irrelevant." *Uniloc*, 632 F.3d 1292, 1318. In short, invoking a 'rule-of-thumb' is not sufficient.

8

Here, however, Mr. Bergman does point to evidence in his report that is related to the facts of the instant case. Contrary to Defendants' assertions, Mr. Bergman justifies his 25/75 split by first stating that:

> . . . the determination of a reasonable royalty should also consider Verizon's commercialization efforts. That is, telecommunications companies invest heavily in network infrastructure like cellular towers, network equipment, etc. While Dr. Bazelon's analysis captures the incremental savings of network costs, these investments are long-term in nature and require significant ongoing expenses and maintenance. Telecommunications companies also have additional expenses necessary to generate revenue including their cost of service and sales and marketing expenses. As a result, one conservative way to consider Verizon's contribution would be to weigh the cost savings to network capacity against these operating costs. Said another way, from Verizon's perspective, if the patented technology creates cost savings on network capacity—a core feature of Verizon's business model—the share of those savings could be split to reflect Verizon's overall cost distribution and structure.

Bergman Report at ¶ 262. He then goes on to explain that, for the periods "from fiscal year 2018 and third quarter 2024," Verizon's operating costs "ranged between 21% and 24%." *Id.* at ¶ 264 (internal citations omitted).

As to his justification for why the parties would take this operating-cost based approach, Mr. Bergman points to the Master Services Agreement between Sprint and ItsOn, which created "a threshold payment ($0.15 representing 100% of the realized roaming savings) and a capped payment ($0.25 representing something less than a 50% sharing of the realized roaming savings to ItsOn). *Id.* at ¶¶ 266-267 (internal citations omitted). Mr. Bergman reasons that "[b]ecause the parties likely choose the amounts based on the anticipated savings, it is reasonable to conclude that the likely expectation of the parties was a roughly 50/50 split of the roaming benefits" and that in the instant case, "the parties to hypothetical negotiation [sic] would be performing a similar exercise to determine how to split the network capacity savings associated with the patents-in-suit. As a result, the payment based on roaming savings in the ItsOn and Sprint agreement would be

9

informative to the parties." *Id.* at ¶ 267. This, in turn, leads to his conclusion that "a bargaining split of 25% to Headwater and 75% to Verizon is reasonable . . . ." *Id.* at ¶ 268.

The Court finds that, in light of the above, Mr. Bergman's apportionment is sufficiently tied to the facts of the case.[5] Defendants' arguments against Mr. Bergman's methodology go towards its weight, not its admissibility.

Accordingly, the Motion to Strike is **DENIED**.

**SIGNED this 23rd day of June, 2025.**

                ROY S. PAYNE
                UNITED STATES MAGISTRATE JUDGE

---

[5] Defendants' other arguments are similarly unpersuasive.